UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

_____

)
HILL HOLLIDAY CONNORS                    )
COSMOPULOS, INC. d/b/a ERWIN-             )
PENLAND,                                 )
      Plaintiff,                         )
                                         )
vs.                                      )
                                         )     Case Number: 6:08-CV-3980-GRA
JEFFREY GREENFIELD and                   )
1st APPROACH, LLC,                       )
      Defendants, and                    )
      Third-Party Plaintiffs,            )
                                         )
vs.                                      )
                                         )
CELLCO PARTNERSHIP d/b/a                  )
VERIZON WIRELESS, and                    )
JOSEPH A. ERWIN,                         )
      Third-Party Defendants.            )
_____ )

**DEFENDANTS' AND THIRD PARTY PLAINTIFFS'**
**IDENTIFICATION OF EXPERT WITNESSES**

      Defendants and Third-Party Plaintiffs, Jeffrey Greenfield and 1st Approach, LLC,

hereby identifies the following experts who are expected to testify at the trial of this

matter:

      1.   Oliver G. Wood, Jr.
          P. O. Box 24677
          Columbia, SC  29224
          (803) 736-1300

      2.   Larry Namer
          16542 Ventura Blvd; Suite 203
          Encino, CA  91436
          (818) 387-6553

3. Susan Fournier
   Boston University School of Management
   595 Commonwealth Avenue
   Boston, MA  02215
   (617) 353-2773

Defendants and Third-Party Plaintiffs, Jeffrey Greenfield and 1st Approach, LLC, hereby certifies that a written report prepared and signed by each of the above experts, including all information required by Fed.R.Civ.P. 26(a)(2)(B), has been disclosed to all parties and a copy of same is attached hereto for ease of reference for all parties and the court.

Respectfully submitted,

_____
Paul J. Doolittle, Esq.
Jekel-Doolittle, LLC
Paul@J-DLaw.com
SC Bar #066490
PO Box 2579
Mt. Pleasant, SC 29465
(843) 654-7700 telephone
(888) 567-1129 facsimile
*Attorneys for Defendant, Third-Party Plaintiff Jeffrey Greenfield and 1st Approach, LLC*

This 29th day of September, 2009.

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

_____

HILL HOLLIDAY CONNORS                          )

COSMOPULOS, INC. d/b/a ERWIN-PENLAND,          )

      Plaintiff,                               )

vs.                                            )

                                               )     CASE NUMBER: 6:08-CV-3980-GRA

JEFFREY GREENFIELD and                         )

1st APPROACH, LLC,                             )

      Defendants, and                          )

      Third-Party Plaintiffs,                  )

vs.                                            )

                                               )

CELLCO PARTNERSHIP d/b/a                        )

VERIZON WIRELESS, and                          )

JOSEPH A. ERWIN,                               )

      Third-Party Defendants.                  )

_____ )

**Expert Witness Report of Susan M. Fournier**

## I.    Background and Qualifications

I, Dr. Susan M. Fournier, declare as follows:

I am an Associate Professor of Marketing and Dean's Research Fellow at Boston University's Graduate School of Management. Before joining Boston University in 2005 I served as Associate Professor of Marketing at Harvard Business School (1994-2003) and the Tuck School of Business at Dartmouth (2003-2005). A copy of my curriculum vitae, which includes a complete list of my publications, is attached as Exhibit A.

I hold a Ph.D. in Marketing from the University of Florida, a Master's of Science in Marketing from The Pennsylvania State University, and a Bachelor's of Science in Business Administration, with a concentration in Marketing, from the University of Massachusetts at Amherst.

My field of expertise is branding, with research in the areas of brand management and brand strategy. More specifically, my research has explored the creation of shareholder value through branding, risk/return profiles for different brand architecture strategies, cultural branding strategies, branded entertainment, co-creation paradigms for brand management, the effectiveness of consumer-generated advertising, brand strength metrics, the management of person-brands, relationship brand marketing, customer relationship management, personality effects on commercial relationships, consumer-firm contracting processes, and the lived experience of various consumer-brand relationships.

I have received a number of awards including five best article awards for work published in Journal of Consumer Research, Harvard Business Review, *Journal of Marketing*, and *Journal of the Academy of Marketing Science*. I have also authored many best-selling Harvard Business School cases on branding and brand related issues, including, to the best of my knowledge, the first published case on branded entertainment ("Launching the BMW Z3 Roadster").

My research has also been cited by numerous academics and practitioners, garnering accolades from the ISI Web of Science Top Cited Papers in *Journal of Consumer* Research and from the Social Science Research Network (SSRN) for a top-ten "most downloaded" marketing article from 1997-2009.

At Boston University, Harvard Business School, and the Tuck School of Business I have taught MBA, undergraduate, and executive courses on Branding and Brand Management, covering such topics as building brand equity, leveraging brand equity, and sustaining brand equity over time. In 13 of the 15 sessions I conduct in my MBA and undergraduate brand classes, I use branding cases and research articles that I wrote myself.

In addition to teaching courses, I have supervised many MBA and undergraduate student teams in their work on "live" company and industry projects dealing with branding related issues.

At Boston University I serve on the Doctoral Program Development Committee and have taught several doctoral courses, including one on Marketing Management (with attention to branded entertainment and the cultural branding paradigm) and another on Consumer Behavior, which considers socio-cultural influences on consumer behavior such as communities, relationships, and consumer culture as a whole.

Prior to joining Boston University, while I was a faculty member at Harvard Business School and the Tuck School of Business at Dartmouth, I taught MBA courses on Brand Management, and many executive education programs, including a program I designed and led for managers specifically devoted to branding—Managing Brand Meaning—in which I used many of the original cases and research I developed.

Prior to my career as a marketing academic, I served as a Vice President and Director at Young & Rubicam Advertising. I have also held positions in marketing research at Yankelovich Clancy Shulman and in marketing and advertising at the Polaroid Corporation.

I consult with a range of companies and organizations to inform my research, teaching, and case development. Among these assignments, I served on the Board of Advisors for Harley-Davidson's Harley Owner's Group for ten years and the COO's Council on Innovation for Irving Oil for five years.

I am a long-standing member of the Editorial Boards for *Journal of Consumer Research, Journal of Relationship Marketing, Journal of Business-to-Business Marketing,* and *Marketing Theory*. As a frequent reviewer of articles submitted to journals in marketing and consumer behavior, I am asked to evaluate the research of scholars wishing to publish their articles in leading scholarly journals. Most times these articles are related to branding and branding related issues.

I have been engaged by the law offices of Jekel-Doolittle LLC in connection with its representation of Jeffrey Greenfield and 1st Approach LLC ("Greenfield").  I am being compensated at my rate of $500 per hour for the present engagement.

I have been asked by counsel for Jeffrey Greenfield/1st Approach LLC to consider whether Greenfield has any rights to future payments or future creative rights relating the Erwin-Penland ("EP")/ Verizon Wireless ("VZW") How Sweet the Sound ("HSTS") program based on: (1) a comparison of the information and ideas that Greenfield contributed to VZW versus the current EP/VZW HSTS program; (2) a consideration of trends in and the state-of-the-art of branded entertainment in marketing, and Greenfield's role in the industry; and (3) the nature of the work relationship between EP and Greenfield.

In the context of preparing this report, I have reviewed certain documents made available to me by the offices of Jekel-Doolittle LLC.

## II.    Summary of Opinions

Having examined the information provided to date on this matter, and based on thirty years of experience as a Brand Strategy researcher, a faculty member responsible for bringing the latest developments in Branding into the classroom, a leading business case writer in the area of branded entertainment, and a former advertising executive, I have reached the following three major conclusions.

1. Greenfield leveraged unique skill sets, capabilities, perspectives and thought-leadership on branded entertainment to help create state-of-the-art branding strategy which Greenfield and EP pitched to Captain D's and VZW.

- o Greenfield is a thought-leader with an innovative perspective on leveraging branded content for the creation and capture of value for the brand.
- o Greenfield's skills and credentials in the area of branded entertainment are acknowledged by the industry.
- o The HSTS branded entertainment program that EP and Greenfield shared with VZW, while reflective of Greenfield's views on branded content, was not characteristic of the brand strategy work that advertising agencies were doing at that time.

2. There existed a collaborative, co-creative partnership between Greenfield and EP concerning the integrated marketing program and the creative idea on which it was based.

- o This relationship was clarified in numerous documents, correspondences, and actions that specified a collaborative partnership sharing in the development and ownership of the campaign asset and idea.
- o Collaborative relationships are fraught with issues that have a direct bearing on the issues debated in this case.

3. The (information and) ideas that Greenfield contributed with EP to VZW regarding an integrated marketing program based on a celebration of gospel music and spirituality in the form of national competition for the title of *Best Church Choir in America* are not substantively different than the work EP and VZW are currently doing under the rubric of "How Sweet the Sound" ("HSTS").

The bases for these opinions are discussed individually below, drawing from my expertise and understanding of the timeline of events and information I have reviewed in this case.

IV. **Basis of Opinion (1):** Greenfield leveraged unique skill sets, capabilities, perspectives and thought-leadership on branded entertainment to help create state-of-the-art brand strategy for VZW.

- Greenfield is a thought-leader with an innovative perspective on leveraging branded content for the creation and capture of value for the brand.
- Greenfield's skills and credentials in the area of branded entertainment are acknowledged by the industry.
- The HSTS branded entertainment program that EP and Greenfield shared with VZW, while reflective of Greenfield's views on branded content, was not characteristic of the brand strategy work that advertising agencies were doing at that time.

**Greenfield's Perspective on Branded Entertainment**

Based on my understanding of the state-of-the-art in branded entertainment practice circa 2005 when the HSTS program ideas were developed, and evidences of Greenfield's perspective on branded entertainment, I would qualify Greenfield as a thought leader with a leading edge perspective on leveraging branded content for creating and capturing value for the brand and the firm. In order to understand Greenfield's unique philosophy on branded entertainment, I offer a historical perspective on branded entertainment and its evolution over time.

Branded entertainment is a provocative marketing philosophy at the intersection of advertising and entertainment whereby brands are built by leveraging culturally-resonant branded entertainment content.[1] It has been defined as "embedding one's brand as part of any entertainment property (e.g., sporting event, TV show, theme park , short film, movie or videogame) in an effort to impress and connect with your consumer in a unique and compelling way."[2] Branded entertainment situates brand building at the intersection of marketer-led advertising and culturally-resonant entertainment, a positioning that led Coca-Cola executive Steve Heyer to provocatively label the practice metaphorically as *Madison* (advertising) *and Vine* (entertainment industry).[3] Most refer to branded entertainment as the "New Age of Marketing" in light of the different philosophy on the creation of brand equity that the practice reflects. Branded entertainment provides a *cultural* perspective on branding: one that values the resonance, authenticity, and social capital of cultural ideas and products (e.g., movies, TV shows, cultural events, celebrations) over firm-driven advertising messages that simply sell the brand.  The goal of branded entertainment is to create long-form content: the antithesis of advertising, the perception of one being an authentic cultural entertainment product and the other simply a commercial for the brand.[4]

While the practice of branded entertainment has been around since the 1950s, several aspects of the contemporary consumer environment have caused the philosophy to grab hold.[5]  Starting in the 1990s, traditional print and television advertising was becoming a less effective means of reaching consumers in media that were increasingly fragmented across hundreds of outlets and channels.  With the transformational power of new technology, consumers were also time shifting, first with VCRs, and then with Digital Video Recorders, such as TiVo, which allowed people to skip through traditional commercial messages for the first time. New methods of delivering information, such as Internet streaming, smart phones, and digital music devices, made it increasingly difficult for advertisers to locate their audiences, let alone break through with messages that people cared to receive.  Consumers were increasingly savvy (and skeptical) about the goals of marketers and their various campaigns.

Branded entertainment promised to address these conundrums.  The subject area is complex, encompassing several areas of marketing and referenced by a variety of terms (e.g. product placement, advertiser-funded programming, adver-tainment, branded content). To provide some context, and as a means to understand what comprised branded entertainment during the period of 2005-2006 when Greenfield and EP were collaborating on the First and Second Pitches, I will briefly trace some of the forms and uses of branded entertainment. Though I reference these evolutions as "phases", it is important to note that each phase continues today.

---

[1] Donaton, Scott (2004), *Madison & Vine: Why the Entertainment and Advertising Industries Must Converge to Survive*, NY: McGraw Hill Crain Communications
[2] O'Guinn, Thomas, Chris Allen, and Richard Semenik (2006), *Advertising and Integrated Brand Promotion*, Ohio: Thomson South Western, p. 625
[3] Heyer, Steve (2003), "Steve Heyer's Manifesto for a New Age of Marketing: Madison & Vine Explained," *Advertising Age*, February 6.
[4] Jaffe, Joseph (2005), "Life After the 30-Second Spot," NJ: John Wiley & Sons
[5] Jaffe, Joseph (2006),  *Life After the 30 Second Spot*, NJ: John Wiley & Sons

***Phase1: Branded Entertainment as Product Placement***. In the first phase of branded entertainment, the practice was synonymous with *product placement*: the "sponsorship practice of placing any branded product into the content and execution of any entertainment product."[6] Motion pictures and television have been the primary entertainment properties into which advertisers have sought to place their products, though novels, sporting events, and videogames provide other platforms.

Product placement has been used as a marketing strategy since the early days of the motion picture and television industries. The 1950s saw the practice in its strong form, with a number of television programs were sponsored by one specific advertiser, e.g., Eddie Fischer's Coke Hour and Procter & Gambel's "soaps." Still, it was the placement of the candy Reese's Pieces in Steven Spielberg's 1982 movie blockbuster *ET: The Extra Terrestrial* which many in the industry believe brought the term "product placement" term into common use. Product placement remains a popular marketing strategy today.

A "typical" product placement involves the advertiser having little or no input into the content of the show or entertainment entity; managers "shop" their products through specialized agencies trying to land relevant placements for their brands. The goal of product placement, as explained by thought-leader Mark Burnett, the creator of *The Apprentice* and the *Survivor* series, is "to create a magic moment wherein the use of the brand dovetails perfectly with the film's storyline in a way that makes consumers forever associate the brand with that film property of star." As familiar examples, consider Ray Bans and Tom Cruise (from the movie, *Risky Business*), BMW and James Bond in the hit film *Goldeneye,* and the Pontiac giveaway on *Oprah*. The key decision in making product placement decisions concerned the "fit" between the meanings of the entertainment property and those of the brand.

***Phase 2: Brand-as-Content.*** Although the process of product placement provided marketers with the authenticity and resonance they craved, it came at a high cost. In order to embed their advertising messages into culturally-resonant properties like movies and TV shows, marketers had to give up control over their brands. In the second phase of branded entertainment, managers sought more input into the placement of their products into the plot or storyline. Advertisers wanted more input into the context in which their product would be placed and the amount of exposure that would be granted, or, even better, a say in how that content would be woven around their brand. Thus, we enter the *Brand as Content* era, wherein firms sought more "seamless integration" of the brand inside a show/film's storyline.

The evolution of the James Bond-BMW association in the film *Tomorrow Never Dies* provides an example of this strategy. Whereas the BMW Roadster received a throw-away :26 scene in the first tie-in with *Goldeneye*, the second film showcased BMW's motorcycle and 7-series automobile, granting over seven minutes of airtime to the plot-relevant demonstration of the performance attributes of the brand.

---

[6] O'Guinn, Thomas, Chris Allen, and Richard Semenik (2006), Advertising & Integrated Brand Promotion, Ohio: Thomson South-Western, p. 627

One well-known example of the brand-as-content era was a 1993 episode for the sitcom *Seinfeld* in which Junior Mints candy became a major element of the storyline. The plot was woven around a story about a Junior Mint being "lost" inside a friend undergoing surgery. The exchange between two of the show's main characters demonstrates the authenticity granted by brand advocacy that advertising can never match.

> *Kramer*: Who's gonna turn down a Junior Mint? It's chocolate, it's peppermint-- it's delicious!
> *Jerry*: That's true.
> *Kramer*: It's very refreshing!

As this strategy advanced, the brand's integration into the plotline and story increased.  By 2005, for example, the hit reality show *The Apprentice* starring Donald Trump, weaved entire episodes around a major advertiser's product, for example, with teams competing to develop marketing campaigns or new products for Dominos Pizza, Mattel, Ciao Bella Ice Cream, and Crest. A 2003 episode of the HBO series *Sex and the City* provides another evolutionary example.  Here, Absolut Vodka played a crucial role in the plot line between stars Kim Cattrall (Samantha) and Jason Lewis (Smith) when Samantha gets Smith a gig as the "Absolut Hunk."

Brand-as-content shifted in the early 2000's as marketers again sought to increase the control they had over the messages being sent about their brands.  Whereas the above examples can be qualified as *program-driven branded content* (that is, where advertisers work with producers to insert their brands into existing TV properties, scripts, and films in a meaningful way), a recent trend toward what can be called *advertiser-created branded content* has taken hold.  In this evolution, advertisers create and own branded content outright.  The most noted example of this strategy is BMWFilms *The Hire*, a Bond-like series of webisodes starring Clive Owen and his BMW 7-series that was created by BMW's advertising agency, Fallon, and produced by some of Hollywood's best producers and directors (e.g., Frankenheimer, Ang Lee).  An animated TV series for AXE Body Spray on the FOX network called *City Hunters* provides a more contemporary example.  Companies like Stella Artois have taken this strategy to an extreme level by creating a separate entertainment division with skill sets relevant to the task.

So, what is Greenfield's position within this complex and ever-changing landscape of branded entertainment?  As a researcher in this area, I identify two of Greenfield's core perspectives which push the practice of branded entertainment in innovative ways.

### *Tenet 1:* **Branded entertainment can be successful even if the branded content never airs on TV**

The most recent innovation in branded entertainment is what I will call *grass-roots branded content,* the creation and capture of brand-relevant content at the local, community grassroots level.  This philosophy is innovative because it essentially inverts the communications model that dominates prior phases of branded entertainment, wherein branded content is *pushed down from* writers and industry mavens in the form of shows and movies.  The renewed philosophy shifts this process fundamentally to one where content is created *from the bottom-up*.  This bottom-up philosophy is fundamental to Greenfield's views on branded entertainment.

Grassroots content is powerful; it has a strong local-level effect that helps build equity in the brand. Research supports that brand associations are stronger if they can be created at the grassroots, community level.[7]  Meanings created by and shared among a "community of friends" are more authentic, more trustworthy, more salient, more resonant, and hence stronger than rather than those generated through paid-for advertising for a brand.  This bottom up approach, where brand associations are generated and shared at the person-to-person level, the reference group level (my choir), the community level (other choirs in my town), and the sub-culture level (African American ethnic groups) builds stronger brands.

The key to making the inverted model work, according to Greenfield and others, is giving people something at the grassroots level that they can and want to talk about.  That something, of course, involves a "Big Idea" that is relevant to the culture and the brand.  As David Apicella, senior creative partner at Ogilvy & Mather NY notes: "None of these 'new' forms of advertising will work unless the communication begins with a Big Idea that is exciting and at its heart speaks to the essence of the brand."[8]

But, according to Greenfield and his collaborators at Buzzmarketing, success also hinges on purposively generating and proliferating buzz and excitement from that content such that the raw energy generated at the grassroots level can help build the brand.  Brand Energy is one of five brand equity pillars in Y&R's acclaimed AssetValuator model; Brand Energy drives shareholder value for a firm.[9]  In the extreme form of this argument, which Greenfield advocates, it truly does not matter if the content generated at the grassroots level never makes it to TV.  What matters is the conversation and energy (the 'buzz') that is created at the local community level and then leveraged across multiple media and delivery platforms in order to build the brand.  More specifically, Greenfield, with training and experience at the intersection of marketing and technology, stresses the Internet's role in buzz proliferation.  In 2005, the Internet was likely a tactical afterthought rather than a strategic equity driver for the brand.  Greenfield's philosophy about "grassroots content wrapped in buzz" is evidenced in his estimates for total impressions for the HSTS program: a full 90% of impressions are generated from the Internet; TV plays a minimal role.

According to Greenfield, the mere *possibility* of appearing on television makes people excited and gives them something to talk about. We live in a media-centric culture in which almost everyone wants to be on television. Americans' quest for their "ten minutes of fame" drove the popularity of many reality shows in the past decade (e.g., Fear Factor).  Greenfield argues that the presence of cameras at an event makes it exciting: it matters little if there is film in the camera at all.  This is an innovative view in the

---

[7] Fournier, Susan, Michael Solomon, and Basil Englis (2009), "When Brands Resonate," in Schmitt, B.H. and D.L. Rogers (eds.) *Handbook on Brand and Experience Management*, Cheltenham, UK and Northampton, MA, USA: Edward Elgar, 35-57;  Fournier, Susan (2009), "Lessons Learned about Consumers' Relationships with their Brands," in J. Priester, D. MacInnis, and C.W. Park (eds.), *Handbook of Brand Relationships*, N.Y. Society for Consumer Psychology and M.E. Sharp, 5-23.

[8] Cited in Jaffe, Joseph (2005), "Life After the 30-Second Spot," NJ: John Wiley & Sons, p. 197

[9] Mizik, Natalie and Robert Jacobson (2008), "The Financial Value Impact of Perceptual Brand Attributes," *Journal of Marketing Research*, XLV (February), 15-32; Fudge (2005) Brand Energy," paper presented at the conference, *Connecting with Customers in a Complex World*, NY: Marketing Science Institute; Ed Lebar (2006), "Brand Energy: Quantifying the Value of Brand Momentum," white paper at Y&R Brands.

branded entertainment arena, where most adopt the Entertainment Industry model wherein the TV show (and the advertising revenue it can generate) stands as the ultimate goal.

Still, while Greenfield encourages managers to release their fixation on TV content in leveraging the power of branded entertainment, he stresses the importance of filming grassroots content when executing branded entertainment strategies for the brand. Filming at the local level captures the branded content, which allows for future revenue-generating opportunities for photo, text, and video (e.g., DVDs, CDs, footage for documentaries, content for online downloads, etc.). Since you have to film the grassroots activity, Greenfield reasons, why not package that content into an episode or pilot, and shop that content around to entertainment executives? Greenfield advocates that this unique strategy controls financial risks managers in the entertainment industry face, thus making the branded content more attractive. On the brand side, filming allows the creation of a revenue-producing asset: an asset which the advertiser can then own. Greenfield also highlights tax incentives on film production which offer cost-savings that increase the value of the asset as well.

Greenfield's philosophy that the TV show is ancillary to the branded entertainment process is pioneering. As Greenfield discussed in numerous emails and conversations with EP on the HSTS project, TV is the mechanism that enables and fuels the goal of branded entertainment programs: Internet-enabled, brand-driven buzz. As a case in point consider *Hottest Mom in America*, a reality television series concept co-owned by Medicis Pharmaceutical and Greenfield/Buzznation that auditions women for the title of "Hottest Mom" using the American Idol model. *Hottest Mom* never aired on TV, but this is insignificant. The grassroots event generated a considerable level of interest and brand excitement, which drove Medicis' share price up 500%. This branded entertainment program was widely-covered in the business press in 2007, most notably appearing on the cover of the *Wall Street Journal* as an example of the new philosophy in branded entertainment at the time.

**Tenet 2: We can build brand equity through branded entertainment by applying the business models and strategies of the entertainment industry *to the brand*.**

Greenfield's second innovation is enabled by experiences in Hollywood wherein he developed a keen understanding of the processes and systems that drive revenue and profit for entertainment properties. This sensitivity drives Greenfield's aforementioned tactic of shopping Pilot Programs developed from grassroots content as a persuasive means for entertainment executives to control program costs. But the philosophy is broader, with wider implications: Greenfield takes the business models for creating and capturing value in the entertainment industry and applies these to the brand. Greenfield's philosophy is original in that he translates *entertainment* business strategies into strategies for the *brand*. My interpretation of this perspective is that it has pushed the Brand-as-Content phase into a new era in branded entertainment.

Central to his philosophy is a conception of branded content as a *capitalized asset with a back-end revenue stream,* the ownership and management of which requires innovative deal structuring, a fee structure based on % ownership of the entity, and consideration of tax incentives that can reduce the cost of the asset base (e.g., tax incentives for production). Pertinent to this, in a 3/28/06 email, EP and

Greenfield discuss the co-creation of an LLC to coordinate the shared asset created with the HSTS program.  This conception was innovative as branded entertainment properties were conceived not as revenue-producing assets, but as an outlay of marketing spending.

Thinking about a branded content program as an asset is a radical way of thinking about a brand "promotion," and many clients, agencies, and partners are simply unable or unwilling to embrace it. Erwin in fact seems to have had his own epiphany of understanding in June 2006 in a conference call with Greenfield nine months after discussions on HSTS began:

> "The thing I like now …I had been questioning the whole 'going through the Internet' thing. I did not think it was the right way to go for this demographic.  But what is exciting is this is kind of groundbreaking. Like Al said everyone is going backwards from old content, TV, into these websites and stuff.  But this here is organic, from grassroots to a portal or website and then building up to a TV show where you have got these cross media. Pretty fresh. That part is really exciting. And I think the publicity around the local competitions is excellent. Which we can deliver. PR becomes even more important. The thing I like …This is breakthough. Content up. Cross media. Exciting. " (conference call audio tape 6/9/2006 meeting)

In 2005, Mark Burnett, industry thought leader and creator of *Survivor*, talked about how branded entertainment would progress only if its practitioners truly understood the entertainment industry and acted from these perspectives. According to him, branded entertainment was "the talk of the marketing and entertainment businesses" but marketers "had yet to learn the basics of the entertainment business or how the business of entertainment worked."[10]  The paradigm was breaking new ground, but the executions were lagging.  Branded entertainment opportunities were being pursued by people with "no education and no information." The industry needed people who understood the shift of brands from information to entertainment if the promise of branded entertainment was to be fulfilled.

The HSTS program, and Greenfield's *Hottest Mom in America* program, developed in 2005, are examples of this new paradigm.  From my understanding and familiarity with the field, the program structure evidenced in these two programs is innovative among branded entertainment programs produced circa 2005, and still is today.  If Greenfield's model and perspective were commonplace, as claimed by EP, campaigns adopting them would not win awards and garner front page news (as *Hottest Mom* did in the *Wall Street Journal)*.  I am not aware of other branded entertainment programs from this period that leveraged Greenfield's approach. And, I am not aware of many branded entertainment programs that had the same marketplace effectiveness as *Hottest Mom in America* or HSTS, which respectively garnered 30% increases in market share in a stagnant market, and a $500 million increase in market capitalization.

In summary, I note that contemporary reference books on branded entertainment still focus on the conceptual models and philosophies from Phases 1 and 2, most predominantly product placement in existing film properties, such as movies and TV shows.   In the closing section of one 2007 text, for example, the authors cite BMWfilms "The Hire" as a prime innovative example of the potential of

---

[10] The Next Big Idea conference, 2005

integrated branded entertainment campaigns.[11]   This campaign was developed in 1995 and fits in the traditional branded content model. While marketers may claim that creating and leveraging resonant and relevant branded content through integrated grassroots marketing campaigns is a familiar concept, the simple truth is that very few seem to have been able to execute these basics, let alone incorporate innovative entertainment business strategies into their approach.

**Greenfield's Reputation and Credentials**

In light of the above innovations, Greenfield was in 2005, and remains today, a recognized thought-leader in the area of Branded Entertainment and the development of integrative marketing campaigns to leverage his philosophy.  From my understanding, it was recognition and appreciation of these credentials that led Erwin to recruit Greenfield for the Captain D's new business pitch in October 2005. Among the credentials attesting to Greenfield's thought leadership are the following social signals of his stature in the field:

- Participant in closed-door discussion, "Media Think Tank Series," hosted by Association for Television Arts & Sciences (Los Angeles, June 2003). One of four agency heads asked to participate.
- Speaker, "So You Want Your Brand To Be in Pictures," American Apparel and Footwear Association (New York, June 2005)
- Panelist, "Deals and Dollars: Branding in Entertainment," Panel Discussion at National Association of Television Program Executives' 3rd Annual TV Producers' Boot Camp (Los Angeles, July 2005)
- "Next Big Idea – Branded Entertainment" Panel Discussion on 'Making The Deal' (New York, October 2005). One of two invited speakers.
- Speaker, "Creative Branding Opportunities," Global Entertainment & Media Summit (Connecticut, October 2005)
- Speaker, "Branded Entertainment," Intermarket Agency Network Conference (Los Angeles, October 2005)
- Panelist, "Making the Deal," Branded Entertainment Conference, The Next Big Idea (NYC, October 2005)
- Guest, "Paid to Place," The Brian Lehrer Show, (New York, January 27, 2006)
- Speaker, "Buzz Marketing:  How to Become the Next Big Thing in Hollywood,"  National Association of Television Program Executives Conference (Las Vegas, January 2006)
- Panel Moderator, "New Frontiers: Product Placement & Branded Entertainment," (Banff, June 2006)
- Speaker at the National Association of Television Program Executives' TV Producers Boot Camp: " Buzz Marketing:  How to Become the Next Big Thing in Hollywood (Los Angeles, July 2006)
- Invited Keynote, Televisa Conference Brand New World, "Product Placement and Branded Entertainment" (Mexico City, August 2006)

---

[11] Lehu, Jean-Marc (2007), "Branded Entertainment: Product Placement and Brand Strategy in the Entertainment Business," London: Kogan Page

- Co-author, *White Paper on Branded Entertainment*
- Panelist, "When the Brand Becomes the Content" (Boston University, April 2008)
- Speaker, The Social Communications Summit (New York: February 10, 2009)
- Speaker, "Branded Entertainment: The New Paradigm," MK854 MBA Branding, Boston University
- Editor, Product Placement News, where he is responsible for detailing industry trends (2002 - present).
- Editor of Branded Entertainment Monthly , a joint effort he launched with VNU Media (Hollywood Reporter & Billboard) after that organization reached out to him directly to fulfill that role (2005-present).
- Greenfield has been quoted in numerous articles in Brandweek, Backstage, C21 Media, The New York Times, The Washington Post, Emmy Magazine, The Wall Street Journal, Entertainment Tonight, The Hollywood Reporter, Christian Science Monitor, and Investor's Business Daily, and has participated in numerous news interviews for ABC, CBS, CNBC, BBC, and CNET.

**State-of-the-Art at Traditional Advertising Agencies circa 2005**

The skill-sets and perspectives that Greenfield evidenced in the EP/VZW program were not commonplace in the work that traditional advertising agencies were doing circa 2005.  Specifically, advertising agencies were criticized for their silo-centric prioritization of advertising over other media and marketing vehicles, and their failures to create and leverage truly integrative campaign ideas. These limitations would stand as formidable barriers to the creation of a campaign such as HSTS.

The current EP/VZW campaign demonstrates a level of sophistication and excellence in *program integration* that is rarely attained in marketing, let alone by advertising agencies who have historically specialized in one communication function: the creation and placement of ads.  In my expert opinion, and based on the accolades that the program received in professional gate-keeping venues such as the Association for National Advertisers, where the EP/VZW work was presented, the HSTS campaign stands as an example of integrated marketing communications at its best.  The Big Idea provided the basis on which all program elements and mix vehicles were integrated.  The concept integrated seamlessly with the needs and lifestyles of the identified target audience to provide a meaningful value proposition.  The metaphor of the Big Idea (sound) is perfectly integrated with the product.  The concept was fully enabled:  content was translated into music, video, photography and text.  It activated and integrates a diverse and broad range of communications channels, all utilized to their fullest potential and delivering against their strategic roles. Carefully-timed integration across program elements and media also provided synergies not available in traditional advertising campaigns.  At another level of integration, the product was fully woven into the program.  The target was offered a valid reason for using the VZW products in context; they could text, share videos, and post images to the Internet.  Could anyone have created an integrated campaign such as this?  At the New Art and Science of Branding Conference hosted in San Francisco Sept 16-17 2009, both David Aaker and Kevin Keller (the Grandfather and Father

of branding, respectively) observed that, embarrassingly, the integration challenge is still something that companies cannot seem to pull off.

Much has been written about the failure of advertising agencies to offer integrated marketing solutions such as this because of their *decentralized organizational structures* and vested interests in the advertising revenue stream.  Because of media-based compensation structures, agencies are more likely "vendors than partners" (p. 157) in integrated marketing communications.  As Professor Don Schultz puts it, "while agencies talk about integration and orchestration, when they sit down to play the first line is "so what should the advertising say?" (Schultz, p. 15).  But integrated campaigns involve entry points that are rarely driven by advertising that leads and dominates, as was the case with the event-based HSTS idea.

Management reactions to the HSTS program at VZW reflect this perception of advertising agencies as tied too strongly to tired advertising ideas.  According to Stratton, CMO at VZW, "Advertisers don't get any new ideas. This is just the kind of out of the box thinking that we need.  Let's flesh out the grassroots stuff, the local, the online and other marketing issues here."

The advertising industry went through a wave of acquisitions that started in the 1990s to confront this very issue.  Today most agencies today are "integrated" with a range of communications specialists under the corporate umbrella.  But it's largely "a flag of convenience" according to Schultz since the functional specialties are "separate and not equal by any means."[12]

To solve this problem Schultz stresses retraining to deliver on the integrated marketing communications challenge (e.g., "a completely new breed of account executives trained in all the disciplines," (p. 15), with a move from functional specialists (e.g., advertising, PR) to communications generalists and strategists, and a centralized management structure unifying specializations across the complex conglomerate firm.  No longer trapped in functional boxes and trained to "do advertising," account executives need to shift to solving business problems with everything marketing has at its hand.  These acknowledged barriers reduce the probability that an advertising agency such as EP could have unified and coordinated all communications tools to send target audiences a consistent, relevant, and persuasive message that served its client's goals. In my opinion, this why Greenfield was brought in: to collaborate against this goal.

As support for this contention, note that EP was at the time of the Second Pitch the agency of record for VZW for print and magazine ads.  EP was operating expressly as an Advertising Agency with a focus on creating advertising and buying media for placement of print ads: it was not an integrated marketing solutions partner providing VZW with local, grassroots integrated marketing campaigns.  At the time of the Second Pitch, EP had no Branded Entertainment specialization, nor any special corporate structures or positions enabling the "New School" of Branding which focused on branded content and buzz.  While these capabilities were available in the broader Hill Holiday parent organization, particularly through the

---

[12] Schultz, Tannenbaum, and Lauterborn (1994), *Integrated Marketing Communications*, Chicago:NTC Business Books

Chief Marketing Officer and thought leader that it hired in January 2006 (Baba Shetty), the documents I have received suggest that these skills were not consulted nor leveraged by EP for VZW at that time.

In recognition of its skills and associated limitations, EP approached Greenfield as a potential team member after hearing his talk on branded content at the IAN conference in LA in October 2005. Greenfield was given the leadership role in developing the First Pitch, a demonstrated acknowledgement of his thought-leadership in the subject area and branding philosophy represented in the First Pitch.  Greenfield was also granted a leadership role in developing the VZW Second Pitch "skeleton," again demonstrating acknowledgement of his thought-leadership and comparative expertise. He was asked by EP to join the presentation to VZW in the Second Pitch because "he would provide evidence of how well they had thought this through…"

In summary, the HSTS campaign is noteworthy in many ways, none of which are the historical strengths of ad agencies.  Further, the campaign that Greenfield contributed to EP and VZW was not characteristic of the work that EP was doing for VZW at that time.

III.     **Basis of Opinion (2):** Greenfield and EP worked together as a collaborative, cross functional team concerning the integrated marketing program and the creative idea on which it was based.

In order to understand the depth of this collaborative, cross functional team partnership, I will first review the initiation and evolution of the relationship between Greenfield and EP. Second, I will examine how the Greenfield-EP team-based relationship continued after the Captain D's First Pitch through to the Second Pitch made to VZW, and for some time after the Second Pitch was completed. Third, I will briefly highlight what has been learned from research concerning how collaborative, cross functional teams work and discuss how this applies to the Greenfield-EP relationship. Finally, I will discuss some of the negative aspects and biases related to collaborative relationships and how this applies to the Greenfield-EP team.

**Initiation and Evolution of the Greenfield–EP Team Relationship**

First, to understand the extent of the collaborative, team partnership that formed between Greenfield and EP, it is crucial to review the background of the relationship that the parties established in their interactions in October-November 2005. This relationship was established in the context of a new business pitch (First Pitch) for Captain D's, and evolved and deepened as the parties continued to team for the Second Pitch to VZW.  This background and context is important because it:

(a) establishes the collaborative, team environment that characterized the Greenfield-EP working relationship, and

(b) provides the context in which this integrated cross-functional team generated fundamental program elements which were later pitched to and adopted by VZW in their HSTS campaign.

Greenfield met Erwin ("Erwin"), chief executive of EP, at an 10/21/05 Intermarket Agencies Network sponsored conference in LA, where Greenfield was presenting a talk on branded entertainment.

Greenfield had been recommended as "an excellent speaker" capable of addressing the timely topic of Branded Entertainment.

Erwin approached Greenfield at the conference, a meeting Greenfield referenced three days later in a follow-up email to Erwin as follows: "I'm glad I got you all worked up about incorporating branded entertainment into your upcoming pitch." Erwin responded that Greenfield's "area of expertise might give us a competitive advantage (not to mention a new marketing tool)" for a November 15 new business pitch ("The First Pitch") that EP was preparing for Captain D's, a seafood restaurant chain in the South and Sunbelt with a large African-American audience. From my understanding of the documents made available to me, Greenfield was specifically sought out by EP to bring his unique skills and capabilities to the First Pitch for Captain D's.

The team relationship kicked off the next day, on 10/25/05 with a conference call discussing Captain D's and their marketing issues; a second conference call on 11/01/05 involved brainstorming among Greenfield and EP in search of a compelling program idea. It appears that the creative idea for a grassroots gospel church choir competition (listed as the "Big Idea" in Section 3) was generated in this meeting.[13] Greenfield called this concept *Amazing Grace* in reference to the title and first line of the iconic gospel song that captured the spirit of the program. EP changed the selling idea from *Amazing Grace* to *How Sweet the Sound* ("HSTS"), which is the second line in the *Amazing Grace* song. On 2/15/06, Greenfield filed a joint copyright with the Writer's Guild of America to register *HSTS*, putting the copyright in the name of co-collaborators Erwin from EP and Greenfield.

As I understand from the correspondence, Greenfield and EP divided tasks for the First Pitch so as to leverage individual skill sets: Greenfield would develop the *Amazing Grace* program idea for the Captain D's presentation and EP would shoot a film trailer to bring the concept alive. On November 3rd and 4th 2005, Greenfield produced and shared with EP three work products relating to the strategy (listed as the "Strategic Pillars" in Section 3) and core program elements that would comprise the *Amazing Grace* marketing campaign.

The first work product Greenfield contributed provided "a breakdown of the Internet component of the proposal." This 14-page document detailed Greenfield's marketing philosophy of creating and spreading buzz by leveraging resonant branded content created for a specific target market. Message boards, search engine marketing, blogs, fan websites, and online contests were listed as elements of the campaign.

The second work product Greenfield contributed was an 11-page "product placement piece" which considered consumer contests, celebrity seeding at events, TV product placements, and a radio product placement campaign.

---

[13] I inferred this from court documents made available to me. I have not been provided any notes or recordings from the conference call on 11/1/05 that would allow me to make unequivocal attribution to Greenfield or EP for the generation of this idea.

The third work product Greenfield contributed was a 5-page installment presented as *Amazing Grace*, "an American-Idol style church choir competition branded reality show." This proposal provided a general structure for the Captain D's choir competition, including:

(1) Local Participation Phase (film crews to sent to local Captain D's restaurants, local press coverage to drive restaurant traffic, interviews among choir contestants, spokesperson contest, "Best of the Best" contests to identify 25 choirs from each region);

(2) Regional Competitions (hosted at large venues in Atlanta, Jackson, Birmingham, and Charleston; panel of celebrity judges); and

(3) National Competition (four finalists competing for the title of the Best Church Choir in America). According to the proposal, the Regional and Final competitions would be filmed and edited at a later date such that Captain D's could pursue possible television and film opportunities; a 12-episode series produced at a cost to the client of $3 million was also proposed.  However, the TV Show was not presented as the "reason-for-being" of the program.  Greenfield's document stressed what he called "the real secret behind the success of shows like *American Idol*: the buzz-generating power of the local experiences that never make it to a show."

On 11/4/05, at the request of EP, Greenfield submitted an 18-page PowerPoint slide deck that integrated his three previous work products into a draft presentation.  This slide deck started with Greenfield's Internet-based buzz philosophy on branded entertainment, and then provided program details on the Choir Competition Big Idea.  In addition to the program elements discussed above for the Local, Regional, and National competitions, additional executional ideas and amplifications were also incorporated in this slide deck: i.e., use of local judges, submission of tapes by choirs to register for the competition, creation of a Pilot program that could be pitched to networks, tax law changes and their impact on the program budget.

Given his role as originator of the above foundational documents, I believe that Greenfield could be considered the lead developer of the *Amazing Grace* Choir Competition idea.

My characterization of Greenfield's leadership role is further buttressed by emails from EP to Greenfield (of which I've noted two below):

"As soon as you can get us your complete outline we can put all your information in our template with our roles and costs added….The way you organized the pharma presentation is a good starting point as we decide the very best way to make this presentation a hit (email from Erwin to Greenfield and others on 3/20/06).

"Thanks for the skeleton. When can we expect the guts of the presentation with specifics on show costs, options, timetables, etc. (email from Erwin to Greenfield on 3/27/06)

The HSTS program was one of several ideas that EP presented to Captain D's in their 11/15/05 new business pitch for the account.  While EP made it into the final round of potential agencies for the Captain D's account, it was not awarded the business.  Erwin, in an 11/18/05 phone call to share this

news with Greenfield, noted that the Captain D's client "loved the HSTS idea" and felt it was "the biggest idea he had ever heard."

**Evolution of the Greenfield – EP team relationship from First Pitch to Second Pitch**

The collaborative teaming relationship established in the context of the First Pitch continued through to the Second Pitch and beyond, until communications cease from EP to Greenfield in late June 2006. This collaborative team relationship is detailed across numerous emails, phone calls, conference calls, actions, and iterated work products that were exchanged between the parties during this time period, including:

- "Glad that you believe that HSTS has real potential. We have invested significant time and research with our partners…" (email from Allen Bosworth to Harrobin at VZW dated 2/13/06)
- "Please do keep working on the deck.  This will be a 'team presentation' in which Allen and I will want to (and need to) lead because they know us. We will need you to help prove to them how completely we have thought this through and that basically all they have to do is say yes to one of the options that we present to them." (email from Erwin to Greenfield on 3/17/06)
- "The entity to manage the entire effort: we discussed that forming an LLC likely to be called HSTS LLC would manage the effort for the duration of the process. 50% of the LLC would be owned by VZW and 50% would be owned by the creators of the program, specifically 1st approach and EP (meeting summary notes from Shannon Wilbanks dated 3/28/06)
- The HSTS integrated branded content idea was co-pitched to VZW on 4/26/06.
- Shared ownership was reflected in the proposed sharing of profits generated from the program, as detailed in the Second Pitch: "Create a contract whereby Verizon Wireless receives 40% of net revenues generated from the property after production expenses have been paid.  Includes main program and all derivatives such as DVD, syndication, CD, Year 2 and beyond program rights, web site advertising, downloads, etc."
- Ideas for the HSTS campaign presented in the Second Pitch for VZW were identified as "Copyright by Erwin-Penland/1st Approach April 26, 2006" in the deck.
- "As we discussed, I want to make sure you are still as engaged and interested.  Greenfield: "Absolutely." Erwin: "Then let's drive quickly and get options back to the client. Say we talked with Jeff Greenfield and here's something for him."  (Erwin, in conference call audio dated 6/9/06)
- "We should work collaboratively now that the objectives are twisting and turning. How can we make..here's what I do not want to be part of: got it, pitched it, got a pat on the back.  We have a chance to do something GREAT. Let's not push on dollars, but on doing something cool. Let's make it freaking great. So we look proud to be part of it." (Erwin in conference call audio dated 6/9/06)
- "I have revised the deck please review so I can resend" (email from Allen Bosworth to Greenfield and others dated 6/19/06, after documentary ideas and $3m effort explored)

- "Gotta leave. My purpose was to get engaged with you to make sure we are all in the same boat despite the fact that this is changing and the budget will not be something that we went with originally." (Erwin in conference call 6/9/06)

**Cross-Functional Teams and Their Application to the Greenfield-EP Team Relationship**

Teams (and the cross-functional or cross-disciplinary teams that are often used in business) can be thought of and defined in a few ways. For current these purposes, I include two definitions:

> 1. A team is "an interdependent collection of individuals who work together towards a common goal and who share responsibility for specific outcomes of their organizations."[14]

> 2. "A team is a small number of people with complementary skills who are committed to a common purpose, set of performance goals, and approach for which they hold themselves mutually accountable."[15]

Cross-functional teams are engaged with the expectation that the contributions of individual members can be leveraged to enhance performance levels overall: i.e., a team is greater than the sum of all the individual "bests" of its members. Cross-functional teams are appropriate for conducting complex tasks comprising a number of interdependent subtasks for which specializations matter. Given the evolution of the Greenfield – EP association, this relationship can certainly be characterized as a cross-functional team in which parties with various specializations and from different disciplines (e.g., branded entertainment, advertising, media, brand naming, creative) collaborated together to produce a common work product, the HSTS program and pitch.

From the documents provided to me in this case, the Greenfield – EP relationship functioned as an integrated, cross-functional team for the new business pitch to Captain D's. This team continued to collaborate, using the Captain D's campaign to form the basis for the Second Pitch on 4/26/06 by Greenfield and EP to VZW, an EP client for which the HSTS idea was thought to be relevant by the EP account team.

**Issues with Cross-Functional Teams and Their Application to the Greenfield-EP Team Relationship**

While cross functional team collaborations have advantages, they are fraught with issues and problems as well. These "issues" with team collaborations serve as the subject of much academic research.

One issue which has been identified in the team literature is particularly relevant in the current dispute between Greenfield and EP. This issue concerns ownership of collaborative work products. Typically, team members need to feel vested in the team and its ideas to allow the team to maximize its performance.  This is the very goal of the many team-building exercises that companies undertake. However, an unfortunate side effect of collaboration is that individual team members often feel they

---

[14] Sundstrom, E., DeMeuse, K. P., & Futrell, D. (1990). Work teams: Applications and effectiveness. *American Psychologist*, 45, 120-133.
[15] Katzbach, Jon and Douglas K. Smith (1993), "The Discipline of Teams," *Harvard Business Review*

have contributed more than others in creating the work product.  This *egocentric bias* occurs when people claim more responsibility for themselves for the results of a joint action than an outside observer would credit them.[16]

Another side effect of collaborative team engagements is the potential that the origination details of shared work products can become blurred.  This "blurring" can result in the misattribution of effort and affect how people identify and process the authorship of ideas.  This is called the "eureka error."[17] Note, for example, the recent June 2009 presentation of the HSTS Memphis campaign given by VZW at a conference of the Association of National Advertisers.  VZW claimed that they and EP were the HSTS concept originators.  The executive described the process: "In Q1 2007, we sat down with the agency and wondered, 'What can we do with the AA market?' We asked, what resonates with AAs. Community. Spirituality. Churches!  A ton of churches. Massive churches! So, what if we put together a choir competition. How would we get this started?" This story fails to acknowledge that a full presentation deck exploring this concept had been co-developed by EP and Greenfield in November of 2005.

Based on all of the data and information which has been made available to me, I believe EP has been and is operating under this egocentric bias, and not rightly providing *any* credit for the creation of the First Pitch and Second Pitch to Greenfield.  This is entirely inappropriate in light of the documented work flow.

IV.    **Basis of Opinion (3):** The information and ideas that Greenfield contributed with Erwin-Penland ("EP") to Verizon (VZW) regarding an integrated marketing program based on a celebration of gospel music and spirituality in the form of national competition for the title of *Best Church Choir in America* are not substantively different than the work EP and VZW are currently doing under the rubric of "How Sweet the Sound" ("HSTS").

In Exhibit 1, I analyze and compare the marketing programs comprising the Second Pitch and the current EP/VZW HSTS program.[18]  The programs are compared in terms of generally-accepted dimensions and components of integrated marketing communications programs,[19] specifically:

- Brand Strategy: including statement of the business problem, objectives, and target audience

---

[16] Ross, M. & Sicoly, F. (1979), "Egocentric biases in availability and attribution," *Journal of Personality and Social Psychology* 37, 322-336.

[17] Preston, Jesse and Wegner (), "The Eureka Error: Inadvertent Plagiarism by Misattributions of Effort," *Journal of Personal and Social Psychology*, 92 (4), 575-584

[18] I use two sources to make my comparisons: (1) the "Pilot Program" for the HSTS campaign, *HSTS Memphis*, which ran in October 2007 and (2) the current VZW HSTS program as described on the company website (howsweetthesound.com).  The regional execution in Memphis was framed as a successful Pilot for the HSTS concept and thus is emblematic of the HSTS program overall: "the success of this market drove the expansion of the program into 11 markets including a grand finale."  HSTS Memphis has also been publically discussed by VZW (two presentations in June and September of 2009 at Association of National Advertiser conferences), and thus offers for analysis a client-created summary of the current campaign.

[19] See, for example, Schultz, Tannenbaum, and Lauterborn (1994), *Integrated Marketing Communications*, Chicago:NTC Business Books; Esther Thorson and Jeri Moore (1996), "Integrated Communication." Belch, George and Michael Belch (2006), *Advertising and Promotion: An Integrated Marketing Communications,* NY: McGraw Hill

- The Integrated Marketing Communications Concept, as captured in the "Big Idea" and The "Selling Idea"
- Program Strategy and Strategic Pillars of the Program: the overall strategic concept for the program, including specification of the core strategic platforms that bring the concept alive
- Integrated Marketing Mix: Media vehicles through which the program is delivered, and the philosophy that guides the balance across these various marketing tools
- Executional Elements: Details regarding how the core concept will be executed in-market, discussed here in terms of the structure of the Choir Competition "Big Idea"

Based on a comparison of the elements and sub-elements summarized in Exhibit 1, I conclude that the program collaboratively developed by Greenfield and EP for the Second Pitch is not substantively different from the current EP/VZW HSTS program.  Similarities exist across all of the dimensions of the integrated marketing communications program, with minor executional differences.  Given that a firm needs to make a multitude of decisions and selections in formulating an Integrated Marketing Communications program, these similarities are notable.  In addition, examining the number of bases on which these two programs are similar, and the depth of similarity, it would be difficult to conclude that these two programs were developed independently.  My role as a marketing and branding expert leads me to assess the current EP/VZW HSTS program as being a derivative of the core creative ideas collaboratively proposed and developed by Greenfield and EP for their First and Second Pitches.

In gauging program similarities it is important to consider *which* elements are being considered since some are more critical than others in qualifying the marketing idea.  According to Professor Don Schultz, a thought leader in the area of integrated marketing communications, the most important element of an integrative marketing campaign is the creative concept, often referred to as the *Big Idea*[20]. The Big Idea is the platform around which all elements of the program will be integrated; it provides the glue that allows the integration of media vehicles and marketing tools to take place.  The Big Idea is not just an important element: it is also recognized as one of the most difficult work products to generate.  Creative ideas are the currency for competitive advantage in advertising and marketing services; agency contracts are won and lost on the power and originality of agencies' creative ideas.  Saracino, Internet Marketing VP at VZW, who had just given a speech at Madison & Vine chastising advertisers for not coming up with any new ideas expressed strong support of the HSTS idea: "This is just the kind of out of the box thinking we need" (Meeting Notes 2/13/06). The Big Idea in this case—an American-Idol style local grassroots competition for the title of *Best Choir in America*—is *identical* across the First Pitch, Second Pitch, and current EP/VZW campaign.  Without this creative concept there would be no acclaimed, Effie-award-winning HSTS marketing campaign.

The Big Ideas for the Second Pitch and the current EP/VZW campaigns are also similar when considered in terms of the target audience's likely understanding of the campaign ideas.  Branding experts[21] would

[20] Schultz, Donald (2003), *IMC The Next Generation: Five Steps For Delivering Value and Measuring Financial Returns,* NY: McGraw Hill
[21] Keller, Kevin (2008), *Strategic Brand Management*, NJ: Prentice Hall; Aaker, David (2006), *Building Strong Brands*, NY: The Free Press.

argue that the objective of any marketing program is to create strong, positive, and unique associations that become attached to the brand in the target consumers' minds. The question then becomes: What are the actual associations that could become reinforced at the local level?  While consumer research on the program was not available to me, it seems logical that the First and Second Pitches and the current EP/VZW campaign would generate the same dominant mental associations among target consumers: Church Choirs, Choir competitions, spiritual music, *Amazing Grace* (the song), and, more generally, music or singing.  Thus, in terms of associative network theory and consumers' information processing, the Second Pitch and current campaign are the same.

This is not to say that there exist *no* differences between the Second Pitch and the current EP/VZW programs.  Some executional differences between the Second Pitch and the current EP/VZW Memphis program do exist.  However, these executional differences are minor and inconsequential (e.g., Number of regions 6 versus 11, Judge voting for Grand Prize winners versus People's Choice via Text2Vote) in that they do not substantively change the essence of the program concept.  Further, such executional variations are to be expected as many programs undergo frequent refinement as they approach launch.

The second noted difference between the First and Second Pitches and the current EP/VZW program is the fact that that the current campaign did not go forward with translating the branded content from the local competitions into a "TV Show."  This difference is irrelevant for several reasons:

1. The TV show component of the "fully-integrated local marketing vehicle *and tv concept* conceived as a reality program that taps into the soul of America with a celebration of music and spirituality…(p. 8)  is secondary to the core idea, which hinges not on a television arrangement, but rather on the creation of local grassroots branded content capable of generating buzz.  As was stated in many emails and phone conversations, and repeatedly acknowledged by EP executives, the benefits of the VZW branded content program derive not from the competitions appearing on television but rather from the impressions, conversations, energy and excitement that is generated from the the grassroots local community events themselves.  Evidence of this philosophy is contained in the fact that TV impressions comprise less than 10% of the impressions that Greenfield estimates for his reality program campaign in the Second Pitch.  This point is expanded in the review of Greenfield's philosophies, in Point (1) above.

2. In numerous communications in presentation decks and emails, the ancillary nature of the Television Show component was made very clear. Some examples follow:
   - "This can be a successful opportunity even if it never appears on television." (4/26/06 presentation deck)
   - "Also Television Team – AVAILABLE (if you need it somewhere down the line)." (4/26/2006 deck)
   - "Show purpose is delivered in filming not airing.  We do not need the show."
   - Greenfield: Key is we are going to use the TV show as a marketing tool to increase # of AAs who are using their product line, and we will see that increase before the show ever airs.  The TV show is merely a part of this marketing campaign.  Show is almost anticlimactic, by

the time it airs. What we want to do is utilize this to build sales over time. (Conference call notes 2/13/2006)

- "Boost to the brand comes from the local marketing standpoint, not the show. Need to think through further how to make this a local marketing thing even if they are not going through all the way. We local PR, etc." (2/15/06 conference call notes)

- "Get back to them…including the different options that VZW can consider" (Erwin to Greenfield email 3/27/2006)

- Key points: 1. this opportunity represents a fully integrated vehicle for VZW, including advertising, product placement, PR and much more 2. It is not just a show it is the filming of the show. The pastor packets, the special VZW church calling plan and other vehicles like this that make this program extraordinary. (from meeting summary Wilbanks 3/27/2006 meeting)

- Erwin: "Q.2 what if the program does not sell to the major networks what's Plan B?" Greenfield: "Plan B is the majority of the exposure from this campaign is NOT from TV but from everything else. The TV is a plus, a great plus. If they want to buy a TV show we can give them the number for BET ad sales but that's all it will be … ADS!" Erwin: "Q.3 what if the program doesn't sell anyplace, what's Plan C?" Greenfield: "Plan C is a pure internet play." (Greenfield email reply to Erwin re. questions to prep for the presentation 4/25/2006)

- "Important to remember that this is much more than just sponsoring a TV show. In fact this can be a successful opportunity even if it never appears on television. At the heart of it HSTS is a grassroots celebration of spiritual music in the communities and worshipping places of America." (from the 4/26/2006 deck)

- "Attached…a spreadsheet of various ways to approach the HSTS effort." (email from Bosworth to VZW, CC Greenfield and others, 5/16/2006)

- "This is so much more than a TV play or a grassroots play or a MOD play. It's an emotional touchpoint in an important community." (Bosworth to Harrobin 2/13/06)

- Erwin:"The thing I like now …I had been questioning the whole going through the internet thing. I did not think it was the right way to go for this demographic. But what is exciting is this is kind of groundbreaking. Like Al said everyone is going backwards from old content, TV, into these websites and stuff. But this here is organic, from grassroots to a portal or website and then building up to a TV show where you have got these cross media. Pretty fresh.. that part is really exciting. And I think the publicity around the local competitions is excellent. Which we can deliver. Pr becomes even more important. The thing I like …This is breakthough. Content up. Cross media. Exciting. " (conference call audio tape 6/9/2006 meeting)

3. Basing assumptions of similarity on the TV Show requirement is also flawed when the realities of producing the HSTS concept are considered. Filming at the grassroots events was an integral and intrinsic part of the project and the business model that it implied. Cameras had to be on site to film local and national competitions such that content could be created and available for text, video, and photo implications. Camera crews were also instrumental in attracting crowds

to the event "in the hope that they might appear on television;"cameras thus add tremendous energy and excitement to the event.  Greenfield is on record as saying that it does not even matter if there is film in the camera: the cameraman pointing his camera will suffice.  Cameras (and the costs associated with them) *had to be there*  … with or without a later translation to TV.  In Greenfield's espoused philosophy on branded entertainment, production of the TV show is ancillary to the process of executing the HSTS grassroots campaign.

4.  Finally, the current HSTS campaign *DID* yield film products—(1) a  documentary of Gospel Choirs that aired on Black Entertainment Television and (2) a DVD of music made available as a holiday promotion in VZW stores. Both of these platforms thus render the programs conceptually the same.  The documentary and TV Show are also both *television concepts*, since a potential venue for their exposure lies in, but is not restricted to, networks and syndication.  Note also that the Second Pitch describes the concept as a "fully-integrated local marketing vehicle *and tv concept* conceived as a reality program that taps into the soul of America with a celebration of music and spirituality… (p. 8)." This program specification allows for an interpretation of the branded content in documentary form.  Further, in a June 2006 conference call, EP and Greenfield agreed to go forward with the possibility of a documentary versus TV series idea, thus making the entire documentary versus TV argument irrelevant.  A TV Show, a reality series, a documentary, a set of webisodes: these executions are similar in the material they would leverage in their creation.  These distinctions become inconsequential to the HSTS campaign.

5.  In summary, EP argues that since VZW's final campaign comprised a gospel competition but no TV show component that the concept is different from that presented in the Second Pitch.  This is a flawed conclusion stemming from a failure to understand the nature and purpose of the proposed branded content campaign.  Greenfield co-developed a "fully integrated local marketing vehicle and TV concept."  The Concept presents an opportunity for a TV show, but the production and airing of such a show is not a requirement for program success.

**Prior Testimony**

I have not served as an expert witness in the past four years.

**Compensation**

I am being compensated for my time in this case at the rate of $500/hour, with a rate for depositions and court appearances of $8,000 day. My compensation is in no way related to my views on any of the issues in this matter nor is it contingent on the outcome of this case.

**Materials Considered**

In addition to reviewing the complaint and the counterclaim in this case, I have considered certain documents provided to me for this case:

> VERIZON ANA PRESENTATIONS
> MULTIPLE VOICE FILES PROVIDED BY 1ST APPROACH
> EP1 – 549
> EP565 – 953
> EP1052 – 3261
> GREENFIELD/1STAPPROACH 1 – 1275

To the extent that new documents and information become available in this case, it may be necessary to supplement and refine my opinion. Hence, the analysis and opinion expressed in this document are subject to revision and supplementation based on a review of additional documents or other developments. I may refer to my original and supplemented documents during the trial for this case.

Susan M. Fournier

Associate Professor of Marketing

Dean's Research Fellow

Boston University

Dated September 29, 2009

Exhibit 1

Comparison of Integrated Marketing Communications Programs:  VZW "Second Pitch" (April 26 2006) and Current EP/EZW Program

| | Pitch to VZW Oct 26 2006 ("Second Pitch") | EP/VZW HSTS Campaign |
|---|---|---|
| **Brand Strategy** | | |
| Problem | Brand underperforming in African-American (AA) Market | "Brand underperforming within traditionally-hard-to-reach African-American (AA) Market;" "VZW having difficulty penetrating AA audience"; "Creative not breaking through to AA market" |
| Objectives | 1. Increase AA Awareness<br>2. Increase AA Penetration<br>2. Strengthen Brand Relevance<br>3. Build VZW Goodwill in AA community | 1.  "Capture the heart of a community (AA market) that has been traditionally-hard to reach" (brand relevance)<br>2.  "Establish a more competitive posture in Memphis where VZW share of market was roughly half its national market share;" "increase purchase consideration and grow market share"(Increase AA Awareness and Penetration)<br>3." Deepen community relationships" (Build VZW community goodwill) |
| Target Audience | African Americans in high-density but underserved markets, particularly in the South | African-American audience(generally); AAs in Memphis , "one of the highest density AA markets in the Southeast" (Pilot program) |
| **The IMC Concept** | | |
| The "Big Idea" | An American-Idol style local grassroots competition for the title of *Best Choir in America*…that celebrates music and spirituality | "A nationwide search for the best church choir in America;" "A Gospel celebration in search of the best church choirs in America;" "A multi-phase competition (or contest) to search for the Best Church Choirs in America (the community)"; "a celebration of church music, all church music, sung the way only a church choir can sing it." |
| The "Selling Idea" (Title of Creative Concept) | "How Sweet the Sound," taken from second line of the song, *Amazing Grace*[22] | "How Sweet the Sound" taken from second line of the song, *Amazing Grace* and copyrighted and registered to EP and VZW |

---

[22] Program Element conceived by EP creative team

Exhibit 1 (Cont'd)

| | Pitch to VZW Oct 26 2006 ("Second Pitch") | EP/VZW HSTS Campaign |
|---|---|---|
| **Overall Strategy** | Leverage branded content created via "the grassroots celebration of spiritual music in the communities and worshipping places of America" through "a fully-integrated local marketing vehicle and TV concept" | Leverage "the celebration of church music" through a "fully-integrated marketing program" "that brings the idea to life" |
| **Strategic Pillars of the Program** | | |
| Branded entertainment content | Filmed Local, Regional, and National competitions for *America's Best Church Choir* with text, video and photo implications | Filmed Local, Regional, and National competitions for *America's Best Church Choir* with text, video and photo implications |
| Possible Platforms/outlets for the branded content | *Television:* 13-episode TV series to be pitched to networks or placed with purchased airtime<br><br>*Online*: Online episodic downloads, Choir Clips, Finalist videos; VCAST downloads via verizonwireless.com website and HSTS show website<br><br>*Device-related*: Ringtone, MOD, RingBack tone, VOD opportunities<br><br>*Media*: DVD/CDs | *Television:* 1-hour documentary aired on Black Entertainment Television<br><br>Online: Dedicated HSTS website provides content for viewing including episodic downloads, choir clips and :30 overviews, wallpaper, VCAST videos and music<br><br>*Device-related:* Ringtones, Ringback tones<br><br>*Media*: DVD of HSTS Memphis Seasonal Promotion<br><br>*Merchandise:* Tshirts, bags, coffee cups, hats |
| Buzz creation and proliferation | Local excitement/buzz created at community level and proliferated through TV, print, PR, Internet to drive entries, event attendance, and conversation: partnerships with local radio and TV to co-promote registration, voting, and event; Booth interviews with choirs not chosen; In-line interviews with spectators; Pastor Packet generates community conversations; Cameras capture Backstage chatter; Online downloadable choir clips generate conversation on and offline; Message board with posts generate buzz about campaign; Discussion board comments/links feed to SEM | "Create Buzz: promoted competition and drove entries and event attendance through radio, print, and out of home" ; Clear channel and Memphis Commercial Appeal media sponsors; PR-supported efforts; *Grace* magazine, *Sister-to-Sister* integration |
| Touchpoints for Product/Brand interaction | Traffic to VZW stores for registration and voting; Product placement with demonstration: Text message demos via voting; Demos of video message postings to blogs | "Link to VZW locations for registrations, information and awareness"; on-site event product demonstrations; free phones; text message demos via voting |
| Community Outreach | Goodwill through contributions to Church funds | Goodwill through contributions to Church funds; phone donations to Hopeline (domestic violence agency |

Exhibit 1 (Cont'd)

| | Pitch to VZW Oct 26 2006 ("Second Pitch") | EP/VZW HSTS Campaign |
|---|---|---|
| **Executional Details of Big Idea** | | |
| Design Model | American Idol-style competition for *Best Church Choir in America* progressing from local to regional to national finals | Multi-phase competition for *Best Choir in the Community* with winners in each chosen regional location |
| Judges | National and local Celebrity Judges (e.g., local weatherman) | Celebrity Judges with an understanding of church music |
| Entry Round Specifics (Video Audition Round) | Pastor Packet $^{TM}$ provides talking points, event flyers, forms<br>Register at VZW stores, agents, online<br>Choirs submit 7-minute audition video to enter<br>20 choirs in each of 6 regions selected by expert judges | Pastor Packets sent to Choir Directors<br>Register via website, mail, or at VZW stores<br>Choirs submit 3-minute audition tape to enter<br>16 choirs selected by expert judge panel<br>Choirs divided into 3 categories by congregation size<br>Song choices from VZW list |
| Selecting the Finalists | **Local competitions**:<br>20 Choirs in each of 6 regions compete (120 choirs total)<br>6 locations (high AA, low VZW share): NY, LA, Chicago, Philly, Birmingham, Houston<br>Performances at VZW-sponsored venues if available<br>Judges narrow from 20→12 for each location<br>People vote to narrow from 12→6 for Regional Finals<br>Audience votes accepted via online, text message, or in store<br><br>**Regional Finals**:<br>6 Choirs per location<br>Persons in attendance get VZW phone for text-in voting<br>People's Choice: Leading text vote goes to Finals<br>Regional winners get "Fan Site" | **Regional Round**:<br>11 locations: LA, Chicago, Philly, Houston, Memphis, St. Louis, Washington DC, Detroit, Atlanta, Oakland<br><br>Performances at VZW-sponsored venues if available<br><br>Judges select Large and Small/Medium Category Winners as well as the National Finalist for each Region<br><br>Attendees elect *People's Choice Award  Winner* using Text2Screen voting<br><br>Regional Finalist advances to Grand Finale Round |
| Selecting Best Choir (Grand Finale Round) | Top 6 Choirs compete Live in Atlanta at VZW-sponsored venue<br>Audience Text-2-Vote for "People's Choice" winner<br>"Anticipated winners" superimposed Text-to-screen | Top 11 compete in Live event in community venue<br>Judges select Grand Prize Winner and Runner up<br>Audience *National People's Choice Winner* via Text2Screen votes |
| Prizes | Choirs get donation and entry into $10k sweepstakes;<br>donations and entries increase with qualifying rounds; Top 6 get "something church needs" within given dollar amount;<br>Winner grand prize (church bus, scholarship) and feature CD | Regional Finalists receive $3K for the church<br>Regional/Category Winners receive $10K for the church<br>*People's Choice* Winners receive $5K for the church<br>Grand Prize winner gets $25K; Runner-up gets $15K<br>All get free phones |

**Exhibit 1 (Cont'd)**

| | Pitch to VZW Oct 26 2006 ("Second Pitch") | EP/VZW HSTS Campaign |
|---|---|---|
| **Integrated Marketing Mix** | | "360 degree branding" |
| Media Vehicles (and their impressions, where available) | Local community events (100,000) | Local Community events |
| | Internet interaction sparked by local events: websites for show, brand and fans; discussion boards; blogs; SEM; links to partner websites; Mobile Marketing; VCAST downloads (850 million) | Internet: dedicated HSTS website; blog; Links to/from partner websites; Mobile Marketing; VCAST downloads |
| | Media Partnerships: TV, Radio , Print(100,000 million) | Media partnerships: TV, Radio, print |
| | Public Relations  (50 million) | Public Relations: broadcast and community print coverage (58 million) |
| | Television PR (120 million) | Television (via PR) |
| | Promotional offers and retail promotions (free phones) | Promotional offers and retail promotions (free phones and bonus minutes) |
| | | Out of home and print advertising |
| | Direct Mail: Pastor Kits | Direct Mail: Pastor Kits |
| | DVD, CD | DVD HSTS Memphis Promotional Giveaway |
| Gross Impressions | Estimated total impressions: 1.1 billion | |
| Mixing Philosophy | All program elements integrated around the event; Emphasis on Grassroots Events and Buzz Generated from this; TV Show Ancillary Bonus not required for program success (note: Television less than 10% of generated impressions) | All program elements integrated around the event; 360 degree branding; Emphasis on Grassroots Events and Buzz Generated from this |

**Exhibit 1 (Cont'd)**

| | | |
|---|---|---|
| **Business Model and Proprietary Program Assets** | The Property identified in The Big Idea functions as a shared asset of *relevant and ownable branded content* with text, video, and photo implications supporting a diversified revenue stream | Not discussed |
| Revenue Stream | Online episodic  downloads<br>Advertising on show web site<br>DVD/CD sales<br>Admission revenue at events<br>Text message revenue<br>Picture revenue<br>Ringtones, Ring back tones, VOD, MOD<br>Network licensing and syndication rights<br>Charitable donations<br>Tax benefits for production costs | Online episodic downloads<br>Advertising on show website<br>Merchandise sales<br>Admission revenue at events<br>Text message revenue<br>Picture revenue<br>Ringtones, Ringbacks, VOD, MOD<br>Music lyrics and sheet music<br>Charitable donations |
| **Program Costs** | $12.6m | $500,000-1 million per market/ $12m total cost |

CONFIDENTIAL

LIBA/2026308.2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION


HILL HOLLIDAY CONNORS
COSMOPULOS, INC., d/b/a ERWIN-
PENLAND,

Plaintiff,

v.

JEFFREY GREENFIELD and
1st APPROACH, LLC,

Defendants, and Third-Party
Plaintiffs,

v.

CELLCO PARTNERSHIP d/b/a VERIZON
WIRELESS, and JOSEPH A. ERWIN,

Third-Party Defendants.


CIVIL ACTION NO. 6:08-3980-GRA
**Hon. G. Ross Anderson Jr.**


**EXPERT WITNESS REPORT OF Larry Jay Namer**

CONFIDENTIAL

LIBA/2026308.2

## I. BACKGROUND AND QUALIFICATIONS

My name is Larry Jay Namer and I have been engaged by the law firm of Jeckel-Doolittle LLC in connection with its representation of Jeffrey Greenfield.
I have been asked to provide my professional opinion
on the extent to which Jeffrey Greenfield and 1st Approach, LLC (together,
"Greenfield") may have certain rights and financial interests in the work Erwin-Penland

is performing on the "How Sweet the Sound" project for Verizon Wireless"). Specifically, I have been asked to provide my expert opinion on the extent to which certain parties such as Verizon Wireless, Cello Partnership, Hill Holliday Connors, Cosmopulos, and Erwin Penland, have benefited monetarily from the implementation of "How Sweet The Sound" and all of its components.

## II. QUALIFICATIONS AND BACKGROUND

I am a 38-year veteran of the media and entertainment industry having started my career right after college in 1971. After graduating Brooklyn College with a degree in economics I started my working career at Sterling Manhattan Cable. Shortly after I joined the company it was acquired by Time Inc and the name was changed to Manhattan Cable TV. Over a ten-year period I gradually advanced and finally held the position of Director of Corporate Development. In that position I was responsible for finding new business opportunities outside the typical cable business of retransmitting channels, and then evaluating the potential costs, revenues and returns. In1981 I was recruited by Cable America and Atlanta based Multiple Systems Operator (MSO) and was hired as Vice president and general manager of Valley Cable TV in Los Angeles. Valley cable was the first 61-channel two-way cable system built in the United States. As VP and GM I was responsible for all aspects of the building and marketing of the cable system, which was one of the largest in The US at the time. During this time I was directly involved in evaluating, selecting and managing all advertising agencies, promotions companies, and public relations firms. I left the company in 1984 to pursue more entrepreneurial ventures and with a partner, Alan Mruvka, formed Movietime Channel Inc. This was a new cable network idea for which we wrote the plan and financial forecasts and then raised the funding and implemented the plan. Shortly after launching the network in 1987 we changed the name to E! Entertainment Television. I ran the company as President and CEO and was responsible for every aspect of company operations including marketing publicity and promotions. During that time I was directly involved in the selection and ongoing management of several advertising agencies, promotional agencies and public relations firms. After E! I formed and ran several other new companies and have always been the final decision maker in selecting advertising and promotional companies to work for us. Currently I am Founder and CEO of Metan Development Inc, a company I formed to exploit opportunities in China mainly in the form of creating branded entertainment. In this venture we have been working with companies such as Ford, Coke, Harley, L'Oreal and many others to create brand integration and brand marketing campaigns for them in China. I had been doing this work and meeting with the brands and their agencies myself up until September 16th 2009 when I hired a woman from Australia to join the company and take over this function.  While at E! and in every company I was involved with since then I have been working with brands on marketing and brand integration concepts and on assigning value to those campaigns. Within the last ten years I have been published in a book entitled Inside Interactive TV…. The Story of Microsoft Interactive TV by David Feinlieb. In this book I wrote one chapter on the connection between Hollywood content and interactive TV technology.

## III. SUMMARY OF OPINIONS

Having examined the information provided to date and having considered the matter,

based upon my 38-year experience and knowledge of the media and advertising industry, I have come to the following opinions: Several parties involved in this case have benefited greatly from the development, implementation and execution of the How Sweet the Sound marketing program and accompanying promotions and media events. In particular extraordinary benefits have been received by Verizon Wireless, and Erwin Penland and the corporate entities involved with him. The benefits for these parties are both direct and indirect in that the goodwill and industry recognition that has ensued while difficult to measure in absolute terms in none the less very significant. In the case of Verizon Wireless the document I examined point out that in at least one of the 13 target markets for the show the penetration grew from 10% to 13 percent, which is a 30% growth that appears to be attributable to the implementation of the How Sweet The Sound marketing program. I feel it is reasonable to assume at this point, that the subscriber increases in the other markets reached somewhat levels. From the documents I examined it appears that the target markets represent somewhere between 10-15 % of the entire Verizon subscriber base. If the market value of Verizon is about 50 billion USD then $5.0 billion to $7.5 billion USD of that value is attributable to those markets. If 30% of the value attributable to those markets came as a result of the How Sweet the Sound campaigns then I believe the overall value of Verizon Wireless was increased by $1.5 billion to $2.25 billion USD. In the case of Penland and his companies they received much more than the initial agency fees paid by Verizon. The campaign itself was considered incredibly successful and was even recognized by the advertising industry's highest honor, an Effie award. Having been involved in many advertising and marketing agencies over my 38 years in the business I am very aware that having executed successful and recognized campaigns is an key consideration in the selection of an agency. What's more smaller agencies that receive such high level industry recognition as an Effie Award, frequently become acquisition or takeover targets of the much largest agencies that dominate the global advertising scene. Among those large agency groups is Interpublic which is the parent of Hill Holliday Connors and Cosmopulos.  These companies have historically paid a premium for creative agencies and, marketing firms that could prove a foothold within certain geographic areas such as the south (of the US). It is a certainty that Penland increased its value not only to the parent company but also to the many regional advertisers that have come to use Penland after hearing of their great success with Verizon. While no specific data was provided to measure that value I can say how my company would go about determining a relative value. If they increased any company's value by $1.5 - $2.5 billion they should be able to command fees equal to 7 percent of that value from new clients. So I would say that Penland's value increase by being able to pitch new clients based on their Verizon success is somewhere between 105.0 and 175 million dollars in annually. Over the past two years that value would be $210-350 million and growing. In my opinion the "marketing" value of any Effie is about 3 years. That 3 year timeframe is based on my belief that the team that actually worked on the campaign stays relatively intact for that number of years but any longer timeframe would probably mean that new folks at the agency had replaced that team. This would be a key driver in determining which agency to chose. In this case the market increases appear to be achieve in a very difficult market segment, African Americans. That achievement and the agency behind that result would certainly get the attention of many major US corporations that struggle to win the hearts, minds and dollars, of that market

segment. I truly believe that this well recognized achievement by Penland has resulted in consideration for client projects well beyond what would normally be achieved by smaller local agencies. In other words this campaign put them on the radar of most big consumer good companies who want to increase their penetration of this market. Without this recognition it is doubtful that major brands would even consider a local agency or one outside the big media cities such as NY, Boston, Chicago etc. If I were asked to determine a premium by which the benefit could be measured because the effort was toward such a difficult and desirable market segment then I would say 20 %. That would put the benefit to at least at another $40-70 million. In reviewing the press release regarding a market study of marketing executives I found the following key statements that make me feel comfortable in my opinion about the value of the Effie and the movement toward successful creative agencies.

*Effie Awards and Millward Brown Survey Reveals Priorities Among Executive Level Marketers from Client and Agency-Sides*
**New York, NY** *(April 27, 2009)* – A survey of 110 executive level marketers from both clients and agencies at Final Round Effie Awards judging in New York revealed themes of innovation, creativity and a strong commitment to accountability. The Effie Awards honor the most significant achievement in marketing communications: ideas that work.
Despite reports of budgetary cutbacks, the majority of agencies (77%) described their companies as in "innovation mode" while client-side marketers told a different story. A little over a third from the client-side agreed their companies were operating in "innovation mode" while the rest were split between "re-organizing/reduction" and "survival" modes. Only a very small percentage reported their business as "status quo."
Despite the challenges arising from the financial downturn, 63% of respondents claimed that the economy has not compromised their creativity. "The economy has not stifled creativity, it has propelled marketers to become more innovative and accountable," said Mary Lee Keane, President of Effie Worldwide. "Marketers want business results and will spend where they can measure effectiveness."
Accountability was a key theme among judges who spoke of an intense "focus on measurement," the importance of "demonstrating the financial impact of marketing campaigns" and "personal ownership of delivering results" when answering a question on what accountability means to them.
"The challenge for marketers right now is creating brand relevance among consumers who are uncertain about the future," said Mary Ann Packo, CEO of Millward Brown North America. "At the same time, they must deliver measurable results proving the value of every marketing dollar spent."

Additionally the press release goes on to say "Marketers also indicated the agency characteristics that have grown in importance in the past year:
• Non-traditional media capabilities • Creativity   • An understanding of the client's category and business"
*above from the Effie website

If one to Google search for "How Sweet The Sound" as it is reasonable to

assume many Chief Marketing Officers of major consumer goods did after learning of the campaigns great success, one would find the recent press release from Promo magazine(http://promomagazine.com/pro_awards/verizon-how-sweet-the-sound whereby they report that the positive impression of Verizon Wireless was increased by 20% based solely on the 100 million PR impressions that resulted from the campaign.

I understand that more documents and other information may be forthcoming and I reserve the right to change or modify my opinions based on examining other documents not introduced as of September 25th 2009.

.

## IV. BASIS OF OPINIONS

I have reviewed certain pleadings in this case, without limitation to documents titled or numbered.  I believe that I have reviewed all the pleadings and documents filed and served by all parties in this litigation as of September 25th 2009. I may alter or change my opinions based on the introduction of any new documents provided after September 25th 2009.

The following documents have been reviewed:

EP1 – EP549
Verizon ANA presentation
Verizon annual report
EP1052-EP3261
EP565-EP953
Greenfield/1[st] Approach 1
Greenfield/1[st] Approach 2
Greenfield/1[st] Approach 4
Greenfield/1[st] Approach 648
Greenfield/1[st] Approach 880
Greenfield/1[st] Approach 887
Greenfield/1[st] Approach 882
Greenfield/1[st] Approach 798-863
Greenfield/1[st] Approach 650-797
Greenfield/1[st] Approach 1126-1163
Greenfield/1[st] Approach 922-1123
Greenfield/1[st] Approach 1125
Greenfield/1[st] Approach 919-920
Greenfield/1[st] Approach 1180-1184
Greenfield/1[st] Approach 916-918
Greenfield/1[st] Approach 1241-1274
Greenfield/1[st] Approach 1238-1240
Greenfield/1[st] Approach 1275
Various voice mail messages

## V. PRIOR TESTIMONY

I have not testified as an expert at trial or by deposition.

## VI. COMPENSATION

In this matter I am being compensated for my time at a rate of $350/hour.  My compensation is in no way related to any specifics of what I may testify to, my views on any of the issues in this matter, or contingent in any way on the outcome of this or any other case.

## VII. MATERIALS CONSIDERED

Was supplied numerous documents and I considered the following items:
EP1 – EP549
Verizon ANA presentation
Verizon annual report
EP1052-EP3261
EP565-EP953
Greenfield/1st Approach 1
Greenfield/1st Approach 2
Greenfield/1st Approach 4
Greenfield/1st Approach 648
Greenfield/1st Approach 880
Greenfield/1st Approach 887
Greenfield/1st Approach 882
Greenfield/1st Approach 798-863
Greenfield/1st Approach 650-797
Greenfield/1st Approach 1126-1163
Greenfield/1st Approach 922-1123
Greenfield/1st Approach 1125
Greenfield/1st Approach 919-920
Greenfield/1st Approach 1180-1184
Greenfield/1st Approach 916-918
Greenfield/1st Approach 1241-1274
Greenfield/1st Approach 1238-1240
Greenfield/1st Approach 1275
Various voice mail messages

I have reviewed certain pleadings in this case, without limitation to documents titled or numbered. I believe that I have reviewed all the pleadings and documents filed and served by all parties in this litigation as of September 25th 2009. I may alter or change my opinions based on the introduction of any new documents provided after September 25th 2009.

## VIII. EXHIBITS

I have analyzed numerous documents in reaching this opinion. To the that extent new documents and information become available, it may become necessary to refine and supplement my opinion. Therefore, the analysis and opinion expressed herein is subject to revision or supplementation based on my review of additional documents or other developments. At trial, I may refer to all or a portion of the above-mentioned documents, as well as additional documents produced during this litigation, and demonstrative exhibits prepared for trial.

Larry Namer

Dated: September 29, 2009

# PRELIMINARY EVALUATION

## OF THE

## ECONOMIC LOSS TO

## MR. JEFFREY GREENFIELD AND 1ST APPROACH, LLC

Prepared

for

Mr. P. Jeffrey North
Attorney at Law

Prepared

by

Dr. Oliver G. Wood, Jr.

September 29, 2009

I have been requested to evaluate the economic loss sustained by Mr. Jeffrey Greenfield and 1st Approach, LLC, as a result of alleged actions by Hill Holliday Connors Cosmopolus, Inc. d/b/a Erwin-Penland.

From the documents I have reviewed to date, including the pleadings, exhibits, and a limited number of documents produced by Erwin-Penland to date, it is my professional opinion that Defendants and Third-Party Plaintiffs Jeffrey Greenfield and 1st Approach LLC have suffered a substantial economic loss proximately caused by the wrongful acts and omissions of Erwin-Penland, Joseph A. Erwin and Verizon Wireless including, but not limited to, the following three categories of economic loss:

1.  The lost profits owed to them as the creator or co-creator and owner of How Sweet the Sound, including but not limited to a share of all revenue and / or other benefits received by, or credited to, Erwin-Penland from or by Verizon in anyway related to the How Sweet the Sound campaign, and including but not limited to a share of all revenue and / or other benefits received by Verizon in anyway related to How Sweet the Sound;

2.  The lost profits owed to them in providing a full range of production services to the How Sweet the Sound campaign.

3.  The lost profits which they would have earned from new business generated from the positive publicity about them for creating and producing How Sweet the Sound, an Effie Award-winning national campaign.

The above-shown lost profit calculations depend in large part upon documents in the possession of Erwin-Penland and Verizon Wireless which have not yet been produced to Jeffrey Greenfield and 1st Approach LLC (or were produced to them just yesterday, September 28th), e.g. contracts between Erwin-Penland and Verizon Wireless (and other vendors), market analysis, revenue reports, wireless subscriber values, cost allocations, profit sharing formula, production costs and fees etc. Upon receipt and review of the relevant documents, the undersigned will promptly supplement this report.

My C.V. and list of cases in which I have testified is attached hereto. My compensation in this case is on an hourly basis at $325 per hour.

_Clinn F. Wood Jr._

9/29/09

# CURRICULUM VITAE

Oliver G. Wood, Jr.
Consulting Economist
P.O. Box 24677
Columbia, SC  29224
PH:(803)736-1300   FX:(803)736-1301
EMAIL:  ogwecon@aol.com

## EDUCATION:

- BS in B.A.                Univ. of SC    1958 (Cum laude)
- MA in Economics          Univ. of SC    1963
- Ph.D. Economics          Univ. of FL    1965

## PROFESSIONAL EXPERIENCE:

- Teaching:

| | | |
|---|---|---|
| Asst Prof. | Univ. of SC | 1965-1968 |
| Assoc. Prof. | Univ. of SC | 1968-1973 |
| Prof. of Banking & Finance | Univ. of SC | 1973-1994 |
| Distinguished Prof. Emeritus | | 1994-Present |
| Economist-in-Residence, Charleston School of Law | | 2007-Present |

- Consulting Economist:
  Personal injury, wrongful death, employment termination, family law,
  business loss, and punitive damages cases                1969-Present

## BUSINESS EXPERIENCE:

- Organizer & Founding Director, Republic National Bank, Columbia, SC, 1975-1987
- Assisted in organization of 11 banks and 2 savings and loan associations; consultant to numerous financial institutions
- Former member of the Columbia Advisory Board, Lexington State Bank and BB&T Financial Corp
- Organizer and Vice Chairman, BankMeridian, N.A.  (Columbia /Hilton Head)
- Former Member, Columbia Advisory Board, First South Bancorp., Inc.
- Former Director, Edisto Farm Credit, ACA
- Former Member of Retirement Plan Committee, AgFirst Bank, Columbia

## MILITARY:

- Active Duty, U.S. Navy (Supply Corps), 1959-1961
- U.S. Naval Reserve, 1961-1987; retired as Captain

## PUBLICATIONS:

- Books and Monographs:
  1. The SC Savings and Loan Industry.  Bureau of Business and Economic Research. University of SC (1967).
  2. The BASF Controversy.  (with others) Bureau of Business and Economic Research. University of SC (1971).
  3. SC State Finances.  (with others)  Bureau of Business and Economic Research. University of SC (1973).
  4. Commercial Banking.  New York:  Van Nostrand Co., Inc. (1978)
  5. Analysis of Bank Financial Statements. (co-authored) New York: Van Nostrand Co., Inc. (1979).
  6. Introduction to Money and Banking.  New York: Van Nostrand Co., Inc. (1980).
  7. How to Borrow Money. (co-authored), New York: Van Nostrand Reinhold (1981).

## MEMBERSHIPS:

- Beta Gamma Sigma (business honor society – past president of USC Chapter)
- Omicron Delta Epsilon (economics honor society)
- ODK  (national leadership honor society)
- USC NROTC Alumni Association (founder, president (2 terms), treasurer)

# List of Dr. Wood's testimonies in deposition and/or trial since 2000

| Court | Location | Case name | Dr. Wood deposed | Dr. Wood testified |
|-------|----------|-----------|------------------|--------------------|
| USDC | Birmingham AL | STEWART/NELSON | 4/20/2009 | |
| USDC | Anderson, SC | HILL/NEAL | | 1/23/2007 |
| USDC | Anderson, SC | COMPTON/SPIER | 11/4/2002 | |
| USDC | Anderson, SC | JENKINS/PERKINS | 11/10/2003 | |
| USDC | Anderson, SC | STEPHENS/KRAUSE | 7/26/2006 | |
| USDC | Atlanta, GA | NADEAU/ALLEN | 11/5/2003 | |
| USDC | Augusta, GA | STEINKOHL/KAUFMANN | 8/24/2005 | |
| USDC | Beaufort, SC | HINELY/JOHNSON | 5/11/2005 | 6/7/2006 |
| USDC | Beaufort, SC | WATSON/JOHNSON | 5/11/2005 | 6/7/2006 |
| USDC | Birmingham AL | SPRINKLES/NELSON | 4/20/2009 | |
| USDC | Charleston Co., SC | LILLY/NOVAK | 7/11/2008 | 11/24/2008 |
| USDC | Charleston Div SC | RUSSELL/SLOAN | 9/14/2007 | |
| USDC | Charleston Div, SC | SANTEE COOOPER/BELL | | 11/19/2008 |
| USDC | Charleston Div.SC | CANNADY/RHOAD | 9/29/2008 | |
| USDC | Charleston SC | NATALE/FURR | 1/16/2008 | |
| USDC | Charleston, SC | FERRAN/WYNDHAM | 8/23/2005 | |
| USDC | Charleston, SC | CRALLE/HOWE | 12/14/2004 | |

| Court | Location | Case name | Dr. Wood deposed | Dr. Wood testified |
|-------|----------|-----------|------------------|--------------------|
| USDC | Charleston, SC | DANTZLER/SLOAN | 6/24/2002 | |
| USDC | Charleston, SC | STALEY/WERN | 4/29/2003 | |
| USDC | Charleston, SC | STANITSKI/GOWDOWN | 9/15/2003 | |
| USDC | Charleston, SC | BLANDING/BARR | 5/23/2006 | |
| USDC | Charleston, SC | CROMER/WORKS | 12/1/2005 | |
| USDC | Charleston, SC | GLOVER/WORKS | 12/1/2005 | |
| USDC | Charleston, SC | SAMPSON/MARCUM | 6/12/2003 | 1/9/2004 |
| USDC | Charleston, SC | CUNI/WYNDHAM | 8/23/2005 | |
| USDC | Charleston, SC | GLOVER/HOWE | 2/22/2000 | 5/31/2000 |
| USDC | Charleston, SC | MOGUL/HOWE | 4/6/2005 | 4/18/2005 |
| USDC | Charleston, SC | FERRAN/RHOAD | 8/23/2005 | |
| USDC | Charleston, SC | CULICK/EARHART | 9/11/2000 | |
| USDC | Charleston, SC | PHONE CARD/CONNELL | | 3/23/2000 |
| USDC | Charleston, SC | BARR/EARHART | 9/11/2000 | |
| USDC | Charleston, SC | KENNEY/GRIMBALL | 12/18/2007 | |
| USDC | Charleston, SC | AUT/TANENBAUM | 12/28/2004 | |
| USDC | Charleston, SC | CORNETT/HOWE | 8/14/2000 | 8/28/2000 |
| USDC | Charleston, SC | CLEMENTS/GIBSON | 7/12/2006 | |
| USDC | Charleston, SC | HAYWARD/KLOK | 5/17/2005 | 10/3/2005 |

| Court | Location | Case name | Dr. Wood deposed | Dr. Wood testified |
|-------|----------|-----------|------------------|--------------------|
| USDC | Charleston, SC | COKER/SAVAGE | | 8/2/2000 |
| USDC | Charleston, SC | HOWLE/SAVAGE | | 7/18/2001 |
| USDC | Charleston, SC | DENNIS/RAHN | 5/10/1999 | 11/6/2000 |
| USDC | Charleston, SC | PARTLOW/HOWE | | 12/14/2001 |
| USDC | Charleston, SC | LITTLE/WAGNER | 1/27/2000 | |
| USDC | Charleston, SC | DUNNING/TISDALE | 2/19/2003 | 10/8/2003 |
| USDC | Charleston, SC | VETERAN'S LIFE/GRIMBALL | | 7/17/2002 |
| USDC | Charleston, SC | TEUTON/RATCHFORD | 1/9/2001 | 5/30/2001 |
| USDC | Charleston, SC | TRAVELERS/KEFALOS | 2/18/2002 | |
| USDC | Charleston, SC | BAUSCH&LOMB/WARD | 8/13/2008 | |
| USDC | Charleston, SC | BROWN/GIBSON | 7/27/2006 | |
| USDC | Charleston, SC | FORD MOTOR COMPANY/BELL | | 10/3/2005 |
| USDC | Charlotte, NC | BLOUNT/RUTTER | | 12/10/2002 |
| USDC | Charlotte, NC | LILLY/RUTTER | 6/14/2004 | |
| USDC | Columbia SC | STUCKSLAGER/ELLIOTT | | 5/15/2007 |
| USDC | Columbia, SC | SANDERS/BELLINGER | 11/18/2003 | 7/27/2004 |
| USDC | Columbia, SC | LANGSTON/WILLIAMS | | 5/5/2003 |
| USDC | Columbia, SC | BRANCH/ALEXANDER | 11/29/2001 | |
| USDC | Columbia, SC | HUNTER/HARPOOTLIAN | 2/20/2002 | |

| Court | Location | Case name | Dr. Wood deposed | Dr. Wood testified |
|-------|----------|-----------|------------------|--------------------|
| USDC | Columbia, SC | IRIEL/JOHNSON | 2/7/2001 | |
| USDC | Columbia, SC | MCDANIEL/SHIPLEY | 8/1/2002 | |
| USDC | Columbia, SC | WILKINS/SAMUEL | 3/31/2008 | |
| USDC | Columbia, SC | TRIMNAL/SUGGS | 1/30/2004 | |
| USDC | Columbia, SC | ROGERS/ROME | 1/15/2001 | |
| USDC | Columbia, SC | HUGGINS/ROME | 9/19/2000 | |
| USDC | Columbia, SC | NATIONAL LIFE INSURANCE/HARP | 11/17/2005 | |
| USDC | Columbia, SC | NETWORK COMPUTING-charpi/MO | 5/21/2002 | |
| USDC | Columbus, GA | CULPEPPER/POPILOCK | 2/1/2005 | |
| USDC | Dade Co, FL | BOLANDPEREZ/SPIER | 3/11/2008 | |
| USDC | Eastern Dist., NC | GOLDMAN/TANENBAUM | 5/10/2000 | |
| USDC | Eastern District, NC | GANT/CLAWSON | 2/16/2004 | |
| USDC | Eastern Div, NC | COLOMB/CICHOWSKI | 5/28/2009 | |
| USDC | Florence Div SC | RAM CORPS/GOLDSTEIN | 4/30/2008 | |
| USDC | Florence, SC | DIAZ/ODOM | 6/26/2000 | |
| USDC | Florence, SC | OWENS/MCDOUGALL | 12/11/2000 | |
| USDC | Florence, SC | STRICKLAND/BELL | 10/19/2004 | 3/17/2005 |
| USDC | Florence, SC | LOVE/BELL | | 2/24/2000 |
| USDC | Florence, SC | KINNEYMAN/HOPKINS | | 10/10/2002 |

| Court | Location | Case name | Dr. Wood deposed | Dr. Wood testified |
|-------|----------|-----------|------------------|--------------------|
| USDC | Florence, SC | HAMILTON/STEVENS | 2/18/2002 | |
| USDC | Florence, SC | TUNSTALL/SLOAN | 5/24/2006 | |
| USDC | Florence, SC | GAINEY/SUGGS | 6/26/2000 | |
| USDC | Florence, SC | CHENG/MUSE | 2/13/2007 | |
| USDC | Florence, SC | BETHEA/MYERS | 10/16/2006 | |
| USDC | Florence, SC | WILLIS/BROWN | 3/27/2008 | |
| USDC | Florence, SC | CARPENTER/TANENBAUM | 4/1/2002 | |
| USDC | Florence, SC | LANGSTON/MCSWAIN | 8/17/2000 | |
| USDC | Florence, SC | BOURNE/FURR | 2/6/2001 | |
| USDC | Florence, SC | WICKER/HATFIELD | | 2/12/2002 |
| USDC | Greenville Div, SC | FNBS/ST.CLAIR | 8/15/2008 | |
| USDC | Greenville SC | TARGET/RANSOM | | 10/22/2008 |
| USDC | Greenville, SC | MARQUIS MARBLE/MCKINNEY | | 6/14/2005 |
| USDC | Greenville, SC | MARTINEZ/COVINGTON | 10/12/2006 | |
| USDC | Greenville, SC | WOODRUFF/MYERS | | 8/16/2000 |
| USDC | Greenville, SC | SON LIGHT TRUCKING/SETTANA | 2/23/2006 | |
| USDC | Greenville, SC | WEYGANT/KASSEL | 10/12/2006 | |
| USDC | Greenville, SC | BRIDGEWATER CANDLE/CREECH | | 3/12/2004 |
| USDC | Greenville, SC | WELLS/KAHN | 3/1/2000 | 3/7/2000 |

| Court | Location | Case name | Dr. Wood deposed | Dr. Wood testified |
|-------|----------|-----------|------------------|--------------------|
| USDC | Greenville, SC | GALLAGHER V. VAN LOTT/CATOE | 6/1/2006 | |
| USDC | Greenwood SC | LAVENDER/HUFF | 12/12/2007 | |
| USDC | Greenwood, SC | UKADIKE/SMITHDEAL | 10/2/2000 | 5/7/2001 |
| USDC | Nashville, TN | CATALANO/OMER | 12/21/2000 | |
| USDC | Nashville, TN | MARTENS/FOWLER | 3/2/2000 | |
| USDC | Orangeburg, SC | HATFIELD/COOK | 2/26/2004 | |
| USDC | Rock Hill, SC | GLASPER/STEWART | | 4/27/2006 |
| USDC | Rock Hill, SC | LANGLEY/KELLY | 7/31/2002 | |
| USDC | Rock Hill, SC | HAMILTON/STIEGLITZ | 6/8/2000 | |
| USDC | South Carolina | MESC/HARTY | 8/11/2004 | |
| USDC | Souther Dist. GA | WILLIAMS/TISDALE | 11/13/2008 | 7/21/2009 |
| USDC | Southern Dist, GA | HERRINGTONLEE/PARDUE | | 7/15/2009 |
| USDC | Southern Dist., GA | MATTHEWS/BROWN | | 7/11/2000 |
| USDC | Spartanburg, SC | KUBES/TRACHTMAN | | 4/3/2000 |
| USDC | Valdosta, GA | LINDSEY/DEAN | 8/6/2002 | |
| Super | Cobb Co., GA | HUDDLESTON/STRAIN | 1/12/2005 | |
| Super | Mecklenburg Co., SC | MILLER/DEVORE | 4/26/2005 | |
| Super | Middlesex C., NJ | HUGHES/THOMPSON | 5/6/2005 | |
| State | Aiken CO, SC | THOMAS/WASHINGTON | 8/3/2009 | |

| Court | Location | Case name | Dr. Wood deposed | Dr. Wood testified |
|-------|----------|-----------|------------------|--------------------|
| State | Aiken Co, SC | ALEXANDER/WASHINGTON | 6/30/2009 | |
| State | Aiken CO, SC | AUGUSTA FIBERGLASS/RICHARD | | 7/30/2008 |
| State | Aiken Co., SC | BRYANT/DIGGS | 5/26/2000 | 6/1/2000 |
| State | Aiken Co., SC | BROWNING/SLOAN | 1/13/2009 | |
| State | Aiken Co., SC | GRAY/JOHNSON | 1/12/2001 | |
| State | Aiken Co., SC | DYCHES/BELLINGER | 5/10/2005 | |
| State | Aiken Co., SC | DAVENPORT/SIMMONS | 8/24/2006 | |
| State | Aiken Co., SC | PEEK/EARLY | 3/14/2000 | |
| State | Aiken Co., SC | COLE/HENSHAW | | 3/1/2000 |
| State | Aiken Co., SC | LAWSON/SHIPLEY | | 6/13/2006 |
| State | Allendale Co., SC | GOODY'S FAMILY CLOTHING/TINS | 3/8/2005 | |
| State | Allendale Co., SC | DYAL/TINSLEY | 3/8/2005 | |
| State | Allendale Co., SC | ELMORE/TINSLEY | | 6/6/2006 |
| State | Allendale Co., SC | BOWE/SAUNDERS | 11/22/2004 | 9/21/2006 |
| State | Allendale Co., SC | SANDERS/GERGEL | 10/3/2005 | 1/10/2006 |
| State | Allendale Co., SC | DILLARD/TAYLOR | 6/5/2002 | |
| State | Allendale County | DARIEN/HENDERSON | 3/6/2007 | |
| State | Anderson Co., SC | WEBB/PRUITT | 7/29/2002 | 9/17/2002 |
| State | Augusta Co., GA | GARCIA/NIMMONS | 5/1/2006 | |

| Court | Location | Case name | Dr. Wood deposed | Dr. Wood testified |
|-------|----------|-----------|------------------|--------------------|
| State | Bamberg Co., SC | HARTLEY/CROSBY | 10/14/1999 | 5/4/2000 |
| State | Barnwell Co., SC | STRADLEY/BEVON | 7/15/2002 | |
| State | Barnwell Co., SC | HOEFS/KASSEL | | 2/9/2000 |
| State | Barnwell Co., SC | MCCLURE/SUGGS | | 7/11/2000 |
| State | Barnwell Co., SC | FRICKLING/SMITH | | 2/28/2001 |
| State | Beaufort Co, SC | DIXON/COPE | | 8/5/2009 |
| State | Beaufort Co., SC | MUNIER/SVALINA | 5/13/2004 | |
| State | Beaufort Co., SC | KLOSTERMAN/HOLLOWAY | | 1/24/2007 |
| State | Beaufort CO., SC | DYNCORP PLAINT.IFFS/MCDOUGA | | 2/14/2007 |
| State | Beaufort Co., SC | NATIONSBANC/MCDOUGALL | | 3/29/2000 |
| State | Beaufort Co., SC | FULLMORE/NEWMAN | | 10/24/2007 |
| State | Beaufort Co., SC | BEARDEN/BOWEN | 6/30/2004 | |
| State | Beaufort Co., SC | MCDONOUGH/MCKAY | 11/2/1999 | 2/1/2000 |
| State | Beaufort Co., SC | SMILEY/YARBROUGH | 3/11/2003 | |
| State | Beaufort Co., SC | NIVENS/AKINS | 5/16/2001 | 5/31/2001 |
| State | Beaufort Co., SC | DAWSON/MCDOUGALL | 1/8/2002 | |
| State | Beaufort Co., SC | MARTASIN/KUHN | 3/19/2001 | 3/28/2002 |
| State | Beaufort Co., SC | ALFORD/ALFORD | 2/26/2002 | |
| State | Beaufort County | BARLOW/CROSBY | 10/18/2007 | |

| Court | Location | Case name | Dr. Wood deposed | Dr. Wood testified |
|-------|----------|-----------|------------------|--------------------|
| State | Berkeley Co., SC | WARD/GIBBS | | 4/24/2001 |
| State | Berkeley Co., SC | PLATT/SAVAGE | 9/20/2005 | |
| State | Berkeley Co., SC | MURRAY/BELL | 7/20/2000 | |
| State | Berkeley Co., SC | CSXT/SAVAGE | 9/20/2005 | |
| State | Berkeley Co., SC | SUMPTER/WHITE | 2/22/2002 | |
| State | Berkeley Co., SC | SKINNER/MEYERS | 1/10/2002 | |
| State | Berkeley Co., SC | DRIGGERS/SLOAN | 3/31/2004 | |
| State | Berkeley Co., SC | WHEELER/BECK | 11/8/2001 | |
| State | Berkeley Co., SC | WOOD/YARBOROUGH | 1/24/2005 | |
| State | Berkeley Co., SC | CHAMBERS/BECK | 6/14/2001 | |
| State | Berkeley Co., SC | CARLTON/SLOAN | 4/9/2001 | |
| State | Berkeley Co., SC | JOHNSON/UTSEY | 5/31/2006 | |
| State | Berkeley Co., SC | BERNARD/HOWE | 11/7/2000 | |
| State | Berkeley Co., SC | CHARLESTON STEEL/JOYE | 5/3/2004 | |
| State | Boston Ma | WATTS/BADDER | 2/20/2009 | |
| State | Cabarrus Co., NC | COYOTE/ROUSSEAUX | 7/14/2008 | |
| State | Charleston Co, SC | ADAMS/SAUNDERS | 1/6/2003 | |
| State | Charleston CO, SC | BRIGGUM/GIBSON | 11/25/2008 | |
| State | Charleston CO, SC | BROWARD/YARBOROUGH | 2/27/2008 | |

| Court | Location | Case name | Dr. Wood deposed | Dr. Wood testified |
|-------|----------|-----------|------------------|--------------------|
| State | Charleston CO, SC | LONG/LEWIS | 4/24/2009 | |
| State | Charleston Co., SC | LEWIS/KLOK | 10/14/2004 | |
| State | Charleston Co., SC | COCKLE/FURR | 2/26/2002 | |
| State | Charleston Co., SC | CHARLESTON TREASURES/DEAN | 9/21/2000 | |
| State | Charleston Co., SC | COWSERT/SENN | 11/14/2005 | |
| State | Charleston Co., SC | WALL/SAVAGE | 8/8/2000 | |
| State | Charleston Co., SC | MCKNIGHT/BERLINSKY | | 8/16/2005 |
| State | Charleston Co., SC | AUGUSTIN/BECK | 3/11/2002 | |
| State | Charleston Co., SC | REGISTER/JACOBSON | 9/25/2000 | |
| State | Charleston CO., SC | ALAN/JOYE | 11/6/2008 | |
| State | Charleston Co., SC | ROGERS/BELL | | 6/25/2001 |
| State | Charleston Co., SC | SWAFORD/SLOAN | | 3/28/2000 |
| State | Charleston Co., SC | NATIONWIDE/KEFALOS | | 12/10/2001 |
| State | Charleston Co., SC | ARDIS/KAHN | | 12/5/2001 |
| State | Charleston Co., SC | MILLIGAN/TANENBAUM | 7/24/2000 | |
| State | Charleston Co., SC | WASHINGTON/JACOBSON | 1/29/2004 | |
| State | Charleston Co., SC | RESPRESS/BUTAITIS | | 3/2/2001 |
| State | Charleston CO., SC | HOLT/SUGGS | 2/2/2009 | |
| State | Charleston Co., SC | JENKINS/SCHWARTZ | 12/30/2003 | |

| Court | Location | Case name | Dr. Wood deposed | Dr. Wood testified |
|-------|----------|-----------|------------------|--------------------|
| State | Charleston Co., SC | ECKERD/KLOK | 10/14/2004 | |
| State | Charleston Co., SC | BENNETT/HUDSON | 2/12/2008 | 11/26/2008 |
| State | Charleston CO., SC | HOLST/KEARSE | | 8/27/2008 |
| State | Charleston Co., SC | SEABROOK/TEVIS | | 12/10/2003 |
| State | Charleston Co., SC | MYRICK/BLAND | 12/21/2002 | |
| State | Charleston Co., SC | ROTHMAN/BUTAITIS | 5/23/2001 | |
| State | Charleston Co., SC | SIMON/SAUNDERS | 1/6/2003 | |
| State | Charleston Co., SC | BATES/RUSH | 11/7/2005 | |
| State | Charleston Co., SC | HOARD/GIBBS | 7/19/2005 | |
| State | Charleston Co., SC | MOSER/KAHN | 5/7/2001 | 1/15/2002 |
| State | Charleston Co., SC | EVANS/WILLS | 3/7/2001 | 3/27/2001 |
| State | Charleston Co., SC | THORNLEY/LAWTON | 2/19/2001 | |
| State | Charleston Co., SC | COOK/RICHTER | | 12/8/2004 |
| State | Charleston CO.,SC | SCREGIONAL HSG/CLEVELAND | 9/18/2008 | |
| State | Charleston Sc | ALBRITTON/YARBOROUGH | 5/16/2009 | |
| State | Charleston, SC | BURBAGE/GOWDER | | 5/17/2006 |
| State | Charlotte, NC | PITTS/BOWEN | | 12/11/2003 |
| State | Chatham Co., GA | PRYOR/TATE | 9/9/2003 | |
| State | Cherokee Co., SC | DICKSON/ROBERTS | | 5/1/2001 |

| Court | Location | Case name | Dr. Wood deposed | Dr. Wood testified |
|-------|----------|-----------|------------------|--------------------|
| State | Chester Co., SC | COLE/HENSHAW | | 7/16/2002 |
| State | Chester County, SC | FORD/JOYE | 11/28/2006 | |
| State | Chesterfield Co., SC | PEPSI/DIBBLE | 7/18/2002 | |
| State | Clarendon Co., SC | BELKEN/JORDAN | 7/23/2004 | 8/3/2004 |
| State | Clarendon Co., SC | MCFADDIN/HOWE | 7/12/2004 | |
| State | Clarendon Co., SC | WALKER/KAHN | 12/27/1999 | 1/12/2000 |
| State | Cobb Co., GA | AGUIRRE/STRAIN | 4/10/2007 | |
| State | Cobb Co., GA | DYSART/STRAIN | 10/11/2006 | |
| State | Colleton Co, SC | JERIDEAU/MATTHEWS | 10/27/2008 | |
| State | Colleton Co., SC | HARTZOG/CROSBY | 9/23/2004 | 1/25/2006 |
| State | Colleton Co., SC | HENDERSON/YARBOROUGH. | 6/27/2005 | |
| State | Colleton Co., SC | LEJOIE/SABB | 1/9/2006 | |
| State | Colleton Co., SC | HENDERSON/YARBOROUGH | 6/27/2005 | |
| State | Colleton CO., SC | FRANKS/MURDAUGH | 7/26/2007 | 8/8/2007 |
| State | Colleton Co., SC | GUFFEY/UTSEY | 9/24/2001 | 11/15/2001 |
| State | Colleton Co., SC | DRIVER/HOWE | 7/13/2005 | |
| State | Colleton Co., SC | MCRAE/PARKER | 10/26/2004 | |
| State | Colleton Co., SC | FAIRCHILD/UTSEY | 5/10/2006 | 10/26/2006 |
| State | Colleton Co., SC | HAILEY/YARBOROUGH | 6/27/2005 | |

| Court | Location | Case name | Dr. Wood deposed | Dr. Wood testified |
|-------|----------|-----------|-----------------|-------------------|
| State | Colleton Co., SC | PADGETT/LONGTIN | 1/3/2008 | |
| State | Colleton Co., SC | HOOKS/YOUNG | 1/17/2002 | |
| State | Coosa Co., AL | JAMES/MORRIS | 9/18/2002 | |
| State | Cullman CO, AL | MALLARD/MORRIS | 12/17/2008 | |
| State | Dade Co., GA | JOHNS/BELL | 4/3/2000 | 10/13/2000 |
| State | Darlington Co, SC | HUCKABEE/JENNINGS | | 12/16/2008 |
| State | Darlington CO, SC | CAMERON/WILLOUGHBY | 6/12/2009 | 7/15/2009 |
| State | Darlington Co., SC | MATTHEWS/BAKER | | 3/21/2000 |
| State | Darlington Co., SC | BOSEMAN/GRAHAM | | 11/7/2001 |
| State | Darlington Co., SC | GODBOLDWASHINGTON | 1/24/2008 | |
| State | Darlington Co., SC | BYRD/GANJEHSANI | 5/10/2002 | |
| State | Darlington Co., SC | COLLINS/MCLEOD | 5/16/2005 | |
| State | Davidson Co., NC | FINE/DEAN | 2/19/2008 | |
| State | Davidson Co., TN | FELTS/OMER | 9/13/2000 | |
| State | DeKalb Co., GA | BURDETT/SUGGS | 8/5/2008 | |
| State | Dillon Co., SC | JACKSON/MCMILLAN | 1/11/2005 | |
| State | Dillon Co., SC | PRICE/AMMONS | | 2/4/2008 |
| State | Dkalb Co, GA | BUNKLEY/SUTHERS | | 12/17/2007 |
| State | Dorchester CO, SC | SCOFIELD/PALMER | 6/24/2009 | |

| Court | Location | Case name | Dr. Wood deposed | Dr. Wood testified |
|-------|----------|-----------|------------------|--------------------|
| State | Dorchester Co., SC | DAVIS/NEWMAN | 9/28/2005 | |
| State | Dorchester Co., SC | PERANI/KEITH | 3/17/2003 | 4/8/2003 |
| State | Edgecombe Co., NC | BATTLE/JEKEL | 3/31/2003 | |
| State | Edgefield Co SC | BARTLEY/KELLY | 3/14/2008 | 9/25/2008 |
| State | Elizabethtown, NC | OXENDINE/JOYE | 10/17/2006 | |
| State | Etowah Co, AL | DAVIS/KNOWLES | 4/24/2006 | |
| State | Etowah Co, AL | DUCKETT/ROSEN | 8/18/2009 | |
| State | Etowah Co., AL | SIMON/KNOWLES | 4/24/2006 | |
| State | Fairfield Co., SC | MOORE/PERKINS | 6/22/2009 | |
| State | Fairfield Co., SC | BALDWIN/RAMEY | | 2/27/2003 |
| State | Fairfield Co., SC | BLUE/SLOAN | | 2/9/2005 |
| State | Fairfield Co., SC | STOKES/HASELDEN | 1/8/2002 | |
| State | Fairfield Co., SC | ZAREN/SLOAN | | 2/9/2005 |
| State | Fairfield Co., SC | GLADDEN/FEDOR | 4/17/2000 | |
| State | Fairfield Co., SC | MEREDITH/CROSBY | 4/7/2004 | |
| State | Florence CO, SC | SMITH/RANSOM | | 8/13/2009 |
| State | Florence Co., SC | COLLINS/WUKELA | | 5/18/2006 |
| State | Florence Co., SC | ELLIS/KAHN | | 6/4/2003 |
| State | Florence Co., SC | HINKLE/HATFIELD | 12/17/1998 | 1/17/2001 |

| Court | Location | Case name | Dr. Wood deposed | Dr. Wood testified |
|-------|----------|-----------|------------------|--------------------|
| State | Florence Co., SC | ROBINSON/TEMPLE | 4/30/2001 | |
| State | Florence Co., SC | DAVIS/SAUNDERS | | 4/5/2006 |
| State | Florence Co., SC | BRIGMAN/WUKELA | | 11/29/2005 |
| State | Florence Co., SC | GASKINS/WUKELA | 7/20/2006 | |
| State | Florence Co., SC | OSBORNE/GRAHAM | 7/16/2003 | |
| State | Florence Co., SC | CARRIGG/WRIGHT | | 5/10/2007 |
| State | Florence Co., SC | WILBANKS/HATFIELD | | 5/25/2000 |
| State | Florence Co., SC | BLUE CROSS BLUE SHIELD/BROW | | 2/16/2000 |
| State | Florence Co., SC | LANE/MOSS | 2/6/2007 | 2/13/2007 |
| State | Florence Co., SC | OLIN/HATFIELD | | 3/11/2004 |
| State | Florence Co., SC | REDBONE/DIEGEL | | 3/21/2003 |
| State | Florence Co., SC | JAMES/BELL | 10/2/2002 | |
| State | Florence Co., SC | COLUMBIA FARMS/HATFIELD | | 1/23/2002 |
| State | Florence County, SC. | WATSON/WILLCOX | 2/26/2007 | |
| State | Florence County,SC | HUNTER/GRAHAM | | 1/9/2007 |
| State | Florence SC | DRAWDY/HATFIELD | | 1/9/2008 |
| State | Florence, SC | MITCHELL/PHELAN | 4/26/2006 | |
| State | Forsyth Co., NC | RICHARDSON/RUTTER | | 10/12/2004 |
| State | Fredericksburg, VA | REEP/MESTER | 11/26/2001 | |

| Court | Location | Case name | Dr. Wood deposed | Dr. Wood testified |
|-------|----------|-----------|------------------|--------------------|
| State | Fulton CO, GA | BULLARD/HAYES | 3/31/2009 | 5/5/2009 |
| State | Fulton Co., GA | LEWIS/STRAIN | 7/19/2004 | |
| State | Georgetown Co., SC | SACHS/MYERS | 3/28/2000 | |
| State | Georgetown Co., SC | WALDEN/SUGGS | 10/1/2001 | |
| State | Greenville Co. SC | AMEER/OVERBAY | | 9/1/2004 |
| State | Greenville Co., SC | TURNER/LUTZEL | 5/1/2000 | |
| State | Greenville Co., SC | SHEPHERD/LUTZEL | 5/1/2000 | |
| State | Greenville Co., SC | WALKER/LUTZEL | 5/1/2000 | |
| State | Greenville Co., SC | WALLACE/LUTZEL | 5/1/2000 | |
| State | Greenville Co., SC | WATKINS/LUTZEL | 5/1/2000 | |
| State | Greenville Co., SC | JORDAN/LUTZEL | 5/1/2000 | |
| State | Greenville Co., SC | HAYNIE/LUTZEL | 5/1/2000 | |
| State | Greenville Co., SC | STARKMAN/LUTZEL | 5/1/2000 | |
| State | Greenville Co., SC | LANDERS/BEVON | 10/17/2006 | |
| State | Greenville Co., SC | ZIEGENFUS/CHANCE | 10/21/2002 | |
| State | Greenville Co., SC | WATSON/BELL | 10/6/2004 | 7/28/2006 |
| State | Greenville Co., SC | HEFNER/ANTHONY | 11/9/2000 | |
| State | Greenville Co., SC | MCCOY/SUGGS | 8/14/2003 | 1/28/2004 |
| State | Greenville CO., SC | MULLWEE/GLICK | 7/18/2006 | |

| Court | Location | Case name | Dr. Wood deposed | Dr. Wood testified |
|-------|----------|-----------|------------------|--------------------|
| State | Greenville Co., SC | GUARANTY INSURANCE/RAMEY | 1/12/2006 | |
| State | Greenville Co., SC | HUMPHRIES/LUTZEL | 5/1/2000 | |
| State | Greenville Co., SC | MCKOWN/LUTZEL | 5/1/2000 | |
| State | Greenville Co., SC | LANIER/LUTZEL | 5/1/2000 | |
| State | Greenville Co., SC | HAMILTON/LUTZEL | 5/1/2000 | |
| State | Greenville Co., SC | PADGETT/LUTZEL | 5/1/2000 | |
| State | Greenville Co., SC | COLLINS/MOORHEAD | | 4/30/2002 |
| State | Greenville Co., SC | MCCALL/WRIGHT | 2/20/2001 | |
| State | Greenville Co., SC | MCCALL/LUTZEL | 5/1/2000 | |
| State | Greenville Co., SC | MARTIN/LUTZEL | 5/1/2000 | |
| State | Greenville Co., SC | DOWDLE/LUTZEL | 5/1/2000 | |
| State | Greenville Co., SC | MERCK/LUTZEL | 5/1/2000 | |
| State | Greenville Co., SC | BURRISS/LUTZEL | 5/1/2000 | |
| State | Greenville Co., SC | BUTLER/LUTZEL | 5/1/2000 | |
| State | Greenville Co., SC | ANTHONY/LUTZEL | 5/1/2000 | |
| State | Greenville Co., SC | DORRITY/DAVIS | 6/28/2001 | 7/10/2001 |
| State | Greenville Co., SC | SOUTHERN/LUTZEL | 5/1/2000 | |
| State | Greenville Co., SC | LITTLETON/LUTZEL | 5/1/2000 | |
| State | Greenville Co., SC | HERRIN/LUTZEL | 5/1/2000 | |

| Court | Location | Case name | Dr. Wood deposed | Dr. Wood testified |
|-------|----------|-----------|------------------|--------------------|
| State | Greenville Co., SC | NELMS/LUTZEL | 5/1/2000 | |
| State | Greenville Co., SC | HANKS/LUTZEL | 5/1/2000 | |
| State | Greenville Co., SC | CHILDERS/LUTZEL | 5/1/2000 | |
| State | Greenville Co., SC | EADES/LUTZEL | 5/1/2000 | |
| State | Greenville Co., SC | MULLINAX/LUTZEL | 5/1/2000 | |
| State | Greenville Co., SC | HICKS/LUTZEL | 5/1/2000 | |
| State | Greenville Co., SC | DEATON/LUTZEL | 5/1/2000 | |
| State | Greenville Co., SC | ADCOX/LUTZEL | 5/1/2000 | |
| State | Greenville Co., SC | ELLISON/LUTZEL | 5/1/2000 | |
| State | Greenville Co., SC | DURHAM/LUTZEL | 5/1/2000 | |
| State | Greenville Co., SC | COBB/LUTZEL | 5/1/2000 | |
| State | Greenville, SC | PEREZ/MCANGUS | 5/22/2009 | |
| State | Greenville, SC | GRIFFIN/FELDER | 9/17/2003 | |
| State | Greenwood CO, SC | SHEALY/MYERS | 12/14/2006 | |
| State | Greenwood Co., SC | CLEAVELAND/JOHNSON | 11/18/2002 | 3/20/2003 |
| State | Greenwood Co., SC | OUZTS/SUGGS | | 3/23/2004 |
| State | Greenwood Co., SC | ASHLEY/SMITHDEAL | 6/18/2004 | |
| State | Greenwood, SC | WHALEY/RUTTER | 12/18/2002 | 5/2/2007 |
| State | Gwinnett CO, GA | SAKI YU/SLEPPY | 1/12/2007 | |

| Court | Location | Case name | Dr. Wood deposed | Dr. Wood testified |
|-------|----------|-----------|------------------|--------------------|
| State | Hamilton Co., TN | BURGESS/MICHEL | | 10/5/2005 |
| State | Hampton Co. Sc | THOMAS/MCCOOL | 5/20/2008 | |
| State | Hampton Co., SC | WADDELL/JOHNSON | 6/9/2000 | |
| State | Hampton Co., SC | COLVIN/JACOBSON | 12/12/2005 | 8/6/2008 |
| State | Hampton Co., SC | PRINCE/RUTTER | 10/31/2005 | |
| State | Hampton Co., SC | FLEMING/RUTTER | 4/25/2005 | |
| State | Hampton Co., SC | STEVENS/MCCOOL | 3/29/2004 | |
| State | Hampton CO., SC | CALHOUN/RIVERS | | 1/16/2009 |
| State | Hampton Co., SC | PINCKNEY/RUTTER | 10/20/2004 | |
| State | Hampton Co., SC | SMITH/RUTTER | 9/15/2004 | |
| State | Hampton Co., SC | BRANHAM/CROSBY | 6/16/2004 | 6/21/2006 |
| State | Hampton Co., SC | DAVIS/GOODING | 10/28/2004 | |
| State | Hampton Co., SC | BAUMGARDNER/DETRICK | 8/18/2001 | |
| State | Hampton Co., SC | HEDDEN/RUTTER | 3/18/2004 | |
| State | Hampton Co., SC | SHEALY/ROME | | 8/5/2004 |
| State | Hampton Co., SC | LACOMB/WEIDNER | 2/7/2007 | |
| State | Hampton Co., SC | BLACK/DETRICK | 2/3/2004 | |
| State | Hampton Co., SC | POSTELL/RUTTER | 10/20/2004 | |
| State | Hampton Co., SC | CRAVEN/PARKER | 8/15/2005 | |

| Court | Location | Case name | Dr. Wood deposed | Dr. Wood testified |
|-------|----------|-----------|------------------|--------------------|
| State | Hampton Co., SC | MEHLMAN/ERVIN | 1/5/2000 | 1/13/2000 |
| State | Hampton Co., SC | BROOKS/KNIGHT | 8/17/2000 | |
| State | Hampton Co., SC | JACKSON/SAUNDERS | 11/11/2002 | |
| State | Hampton Co., SC | FLYNN/WILLIAMS | 7/6/2006 | |
| State | Hampton Co., SC | LILLY/ERVIN | 1/5/2000 | 1/13/2000 |
| State | Hampton Co., SC | DONNELL/BURROUGHS | 1/17/2007 | |
| State | Hampton Co., SC | WILLARD/RUTTER | 7/22/2004 | |
| State | Harnett Co., NC | TILLEY/WEST | 5/21/2001 | |
| State | Henry Co., VA | TUNNELL/HASKINS | 2/12/2003 | 6/10/2005 |
| State | Hillsborough Co., FL | HOWE/RUTTER | 11/3/1999 | 3/15/2000 |
| State | Horry Co, SC | FOWLER/RANKIN | | 12/8/2008 |
| State | Horry Co., SC | MIDSOUTH/LAZENBY | 5/22/2003 | 7/1/2003 |
| State | Horry Co., SC | CORDONE/JACOBSON | 9/18/2007 | |
| State | Horry Co., SC | PEAVY/WARTHEN | 4/10/2006 | |
| State | Horry Co., SC | DOWE/MCCLELLAN | 10/30/2000 | |
| State | Horry Co., SC | MATHIS/PERKINS | | 6/20/2007 |
| State | Horry Co., SC | BELL/HATFIELD | | 4/20/2005 |
| State | Horry Co., SC | KENNEDY/KASSEL | 3/8/1999 | 8/30/2000 |
| State | Horry Co., SC | DUVALL/KASSEL | 1/17/2002 | |

| Court | Location | Case name | Dr. Wood deposed | Dr. Wood testified |
|-------|----------|-----------|------------------|--------------------|
| State | Horry Co., SC | SANTEE COOPER/WILLOUGHBY | 7/10/2003 | |
| State | Horry Co., SC | WILKES/ERWIN | 6/6/2005 | |
| State | Horry Co., SC | NORMAN/FURR | 9/14/2004 | |
| State | Horry Co., SC | KNUTH/WRIGHT | | 9/15/2005 |
| State | Horry Co., SC | BRALLEY/HAIGHT | | 6/26/2001 |
| State | Horry Co., SC | LESANE/LOCKLAIR | 8/30/2006 | |
| State | Horry Co., SC | GABRIEL/HANNA | 5/21/2003 | |
| State | Horry Co., SC | LEDGER/FELDER | | 3/26/2002 |
| State | Horry Co., SC | COX/SARTIP | | 12/12/2000 |
| State | Horry County | SMITH/WHETSTONE | 7/11/2007 | |
| State | Indian River Co, FL | DUNCAN/PETERSEN | 9/2/2003 | |
| State | Jasper Co., SC | SCHAER/HENDERSON | | 5/2/2001 |
| State | Jasper Co., SC | MIMS/NEWMAN | 4/3/2001 | |
| State | Jasper Co., SC | MORINE/MCDOUGALL | 1/11/2005 | |
| State | Jefferson CO., AL | POWERS/BADHAM | 9/14/2009 | |
| State | Jefferson Co., AL | POWERS/BADHAM | 9/14/2009 | |
| State | Jefferson, MS | FOSTER/YARBOROUGH | 10/30/2008 | |
| State | Kershaw CO, SC | HARMAN/LAND | 3/12/2008 | |
| State | Kershaw Co, SC | ARLEDGE/GERGEL | 7/21/2006 | |

| Court | Location | Case name | Dr. Wood deposed | Dr. Wood testified |
|-------|----------|-----------|------------------|-------------------|
| State | Kershaw Co., SC | CATOE/KOON | 9/3/2002 | |
| State | Kershaw Co., SC | PENLAND/DETWILER | 1/29/2003 | |
| State | Kershaw Co., SC | HELLER/RODGERS | 3/2/2000 | |
| State | Kershaw Co., SC | MCLEOD/SUGGS | 10/31/2001 | |
| State | Lancaster Co., SC | HANCOCK/STEWART | 5/18/2009 | |
| State | Lancaster Co., SC | CAUTHEN/JOHNSON | | 1/19/2000 |
| State | Lancaster Co., SC | OUTEN/MATTHEWS | 11/22/2004 | |
| State | Laruens Co., SC | BOWERS/RAMEY | 11/22/2005 | |
| State | Lauren Co., SC | FORDMOTORCOMPANY/BREHME | | 3/22/2007 |
| State | Laurens Co., SC | BURROUGHS/GAMBRELL | 7/1/2002 | |
| State | Lexington Co., SC | VOGT/BARTON | 11/6/2002 | 9/19/2001 |
| State | Lexington Co., SC | VELETTO/WHETSTONE | | 9/21/2001 |
| State | Lexington Co., SC | WHEELER/SUGGS | 5/20/2003 | |
| State | Lexington Co., SC | WILLIAMS/MULLIS | 3/8/2001 | 3/27/2001 |
| State | Lexington Co., SC | SATCHER/FOSTER | 7/22/2002 | |
| State | Lexington CO., SC | DAVIS/GOLDBERG | 3/30/2009 | |
| State | Lexington Co., SC | MCKNIGHT/SHIPLEY | | 1/19/2005 |
| State | Lexington Co., SC | CHEEK/SUGGS | | 8/22/2000 |
| State | Lexington Co., SC | SHERER/STEWART | 5/27/2003 | |

| Court | Location | Case name | Dr. Wood deposed | Dr. Wood testified |
|-------|----------|-----------|------------------|---------------------|
| State | Malboro CO., SC | SHEPPARD & SON /SMITH | 7/28/2009 | |
| State | Marion Co., SC | GREEN/HATFIELD | | 1/10/2007 |
| State | McCormick Co., SC | THACKER/YOUNG | 10/11/2005 | 5/30/2006 |
| State | Mecklenberg Co., NC | STATON/WEINSTOCK | 10/6/2005 | |
| State | Mecklenburg Co, NC | WATSON/SUGGS | 9/14/2009 | |
| State | Mecklenburg CO, NC | SCOTT/DEVORE | 9/23/2008 | |
| State | Mecklenburg Co, NC | PEELE/GWYNNE | | 2/19/2009 |
| State | Mecklenburg Co., NC | KING/BLOUNT | 3/30/2006 | |
| State | Mecklenburg Co., NC | MCGEE/BLOUNT | 3/3/2003 | |
| State | Mecklenburg Co., NC | TAYLOR/BLOUNT | 12/2/2002 | |
| State | Mecklenburg Co., NC | BAKER/BLOUNT | 4/28/2005 | |
| State | Mecklenburg Co., NC | TAYLOR/BLOUNT | 12/2/2002 | |
| State | Mecklenburg Co., NC | KING/BLOUNT | 3/30/2006 | |
| State | Middlesex Co, MA | TAYLOR/HART | 8/21/2008 | |
| State | Mobile Co., AL | MIDDLETON/GIBSON | 7/27/2005 | |
| State | Nash Co., NC | HUDGINS/JEKEL | 3/31/2003 | |
| State | Newberry Co., SC | SALTERS/POPWELL | 11/7/2000 | |
| State | Newberry Co., SC | FRANKLIN/KOON | 7/2/2001 | |
| State | Newberry Co., SC | LEWIS/POPE | 5/23/2001 | |

| Court | Location | Case name | Dr. Wood deposed | Dr. Wood testified |
|-------|----------|-----------|------------------|--------------------|
| State | Newberry Co., SC | STATE AUTO/POPE | | 8/14/2002 |
| State | Newberry Co., SC | GILLIAM/POPE | 5/4/2005 | |
| State | Oconee Co., SC | SPURLOCK/OWENS | 6/5/2000 | 6/28/2000 |
| State | Orange Co., NC | HEBERT/SPEARS | | 8/31/2000 |
| State | Orangeburg CO. SC | RUTLAND/COPE | | 1/29/2008 |
| State | Orangeburg Co., SC | JONES/ANDERS | 10/30/2002 | |
| State | Orangeburg Co., SC | MYSELS/NICHOLS | | 6/8/2004 |
| State | Orangeburg Co., SC | WHITAKER/ANDERS | 8/1/2000 | |
| State | Orangeburg Co., SC | WILLIAMS/DETRICK | 6/26/2003 | 10/22/2003 |
| State | Orangeburg Co., SC | STILLINGER/TIERNEY | 6/3/2002 | |
| State | Orangeburg Co., SC | PLAYER/WILLIAMS | 9/22/2005 | |
| State | Orangeburg Co., SC | BRUNSON/HOWE | 2/16/2006 | |
| State | Orangeburg Co., SC | DAIMLERCHRYSLER/WILLIAMS | 9/22/2005 | |
| State | Orangeburg Co., SC | BONETTO/HARPOOTLIAN | 10/31/2002 | 10/21/2003 |
| State | Orangeburg CO., SC | BAACK/CROSBY | 2/16/2007 | |
| State | Orangeburg Co., SC | NELSON/KNIGHT (CROSBY) | 2/9/2006 | |
| State | Orangeburg Co., SC | HOLMES/KELLY | 10/25/2004 | |
| State | Orangeburg Co., SC | WILSON/MCWHIRTER | 9/26/2005 | |
| State | Orangeburg, SC | MYLES/HOLMES | 4/1/2008 | |

| Court | Location | Case name | Dr. Wood deposed | Dr. Wood testified |
|-------|----------|-----------|------------------|--------------------|
| State | Organgeburg Co., S | WIMBERLY/CARTER | | 8/31/2004 |
| State | Palm Beach Co., FL | MASON/SPIEGELMAN | 4/12/2004 | |
| State | Putnam Co., WV | VANCE/BELL | | 9/17/2004 |
| State | Richland Co, SC | GENTILE/SWARAT | 4/27/2009 | 5/18/2009 |
| State | Richland Co, SC | BURCH/ELLIOTT | | 1/28/2008 |
| State | Richland Co., SC | THOMAS/BELL | | 9/19/2001 |
| State | Richland Co., SC | HALTIWANGER/BROWN | 10/30/2000 | |
| State | Richland Co., SC | HANSEN/JOHNSON | 12/2/2002 | 5/17/2004 |
| State | Richland Co., SC | POWELL/KASSEL | 7/12/2005 | |
| State | Richland Co., SC | BYRON/SUGGS | 3/18/2002 | |
| State | Richland Co., SC | RAND/ELLIS | 11/3/2005 | 3/8/2006 |
| State | Richland Co., SC | MCNAIR/HOOD | 5/6/2002 | |
| State | Richland Co., SC | HILLERICH & BRADSBY/FEW | 8/21/2006 | |
| State | Richland CO., SC | AIG/OWEN | | 9/10/2008 |
| State | Richland Co., SC | BROWN/FELDER | | 12/11/2002 |
| State | Richland Co., SC | HERITAGE PROPANE/SUGGS | 4/21/2003 | 10/13/2004 |
| State | Richland Co., SC | WARD/RATCHFORD | 8/9/2006 | |
| State | Richland Co., SC | YORK INTERNATIONAL/HARPOOT | 7/9/2003 | |
| State | Richland CO., SC | DARBY/CASH | | 10/20/2008 |

| Court | Location | Case name | Dr. Wood deposed | Dr. Wood testified |
|-------|----------|-----------|------------------|--------------------|
| State | Richland Co., SC | INGRAM/SUGGS | | 3/8/2000 |
| State | Richland Co., SC | SHELLEY/SHELTON | | 5/20/2003 |
| State | Richland Co., SC | KITTRELL/HAMMER | 9/22/2003 | |
| State | Richland Co., SC | HALLMAN/HAWKINS | | 4/24/2000 |
| State | Richland Co., SC | ASELTON/ANDERS | | 11/12/2004 |
| State | Richland Co., SC | CONNOR/HAMMER | | 10/30/2002 |
| State | Richland Co., SC | KEETER/HARPOOTLIAN | | 6/15/2009 |
| State | Richland Co., SC | VEST/SUGGS | | 9/3/2009 |
| State | Richland Co., SC | MORGAN/HARPOOTLIAN | 10/20/2005 | |
| State | Richland Co., SC | CORNISH/SUGGS | 7/16/2001 | |
| State | Richland Co., SC | POWERS/WRIGHT | 11/6/2006 | |
| State | Richland Co., SC | STRINGER/ELLIOTT | | 6/20/2000 |
| State | Richland Co., SC | EDWARDS/FREEMAN | 1/4/2000 | |
| State | Richland Co., SC | WALKER/LEWIS | 3/7/2006 | |
| State | Richland Co., SC | ETHEREDGE/MCLEOD | 9/19/2007 | |
| State | Richland Co., SC | PERRY/HENSHAW | 2/21/2001 | |
| State | Richland Co., SC | KIRKLAND/MYERS | 1/10/2008 | 6/23/2008 |
| State | Richland Co., SC | PARKER/BOOTH | | 11/17/2003 |
| State | Richland Co., SC | JAMES/HALL | 6/3/2003 | |

| Court | Location | Case name | Dr. Wood deposed | Dr. Wood testified |
|-------|----------|-----------|------------------|--------------------|
| State | Richland Co., SC | FORREST/HARPOOTLIAN | 8/23/2006 | |
| State | Richland Co., SC | SHEALEY/FEDOR | 3/1/2002 | 7/24/2002 |
| State | Richland Co., SC | ERVAY/BELLINGER | 5/25/2007 | 11/15/2007 |
| State | Richland Co., SC | BRANHAM/MCGOWAN | | 3/6/2002 |
| State | Richland Co., SC | SALTERS/HARDEE | | 6/14/2005 |
| State | Richland Co., SC | WILLIAMSON/BAGNELL | 6/7/2004 | |
| State | Richland Co., SC | NEW ORLEANS/FEDOR | 3/16/2000 | |
| State | Richland Co.SC | JEC/PROTOPAPAS | 8/27/2007 | |
| State | Richmond Co., GA | CARPENTER/NIMMONS | 8/3/2005 | |
| State | Richmond Co., GA | BEARD/MIDDLETON | 2/9/2005 | |
| State | Richmond Co., GA | WESTBROOK/MALCHOW | 11/19/2001 | |
| State | Richmond CO., GA | GAY/JACKSON | 5/19/2009 | |
| State | Saluda Co., SC | JONES/ANDERS | 10/3/2001 | |
| State | San Diego Ca | THOMPSON/FREEMAN | 12/6/2007 | |
| State | Shelby Co., TN | DAIMLERCHRYSLER/MORRIS | 2/22/2005 | 2/23/2005 |
| State | Spartanburg Co., SC | MCABEE/DELANEY | | 2/26/2003 |
| State | Spartanburg Co., SC | RUSCH/POLIAKOFF | 7/10/2000 | |
| State | Spartanburg CO., SC | INGRAM/JEFFCOAT | 3/25/2009 | |
| State | Spartanburg Co., SC | AGEE/DERRICK | 9/7/2005 | |

| Court | Location | Case name | Dr. Wood deposed | Dr. Wood testified |
|-------|----------|-----------|------------------|--------------------|
| State | Spartanburg Co., SC | MITCHELL/THOUVENOT | 2/11/2004 | |
| State | Sumter Co, SC | BURKE/LAND | | 5/22/2007 |
| State | Sumter Co., SC | MCCLAIN/WILLIAMS | 8/1/2001 | |
| State | Sumter Co., SC | LEWIS/COPE | 4/17/2007 | |
| State | Sumter Co., SC | BROWN/HOLLER | 2/27/2001 | |
| State | Sumter Co., SC | FORD MOTOR CO./BELL | 7/7/1999 | 3/21/2000 |
| State | Sumter Co., SC | FLEMING/MILES | 6/10/2002 | 10/15/2002 |
| State | Sumter Co., SC | JACKSON/JONES | 9/14/2000 | |
| State | Sumter Co., SC | GLASSCOCK/WEINBERG | 11/16/2000 | 11/21/2000 |
| State | Sumter Co., SC | VIELE/ANDERS | 9/27/2004 | 4/12/2005 |
| State | Sumter Co., SC | MOURADJIAN/MILES | | 5/19/2008 |
| State | Sumter Co., SC | SERUYA/BOORDA | 7/14/2003 | |
| State | Tallapoosa Co., AL | JONES/INGRAM | 8/5/1999 | 2/2/2000 |
| State | Tallapoosa Co., AL | WALLS/INGRAM | 1/28/2002 | |
| State | Tallapoosa Co., AL | JONES/INGRAM | 8/5/1999 | 2/2/2000 |
| State | Tallapoosa Co., AL | HARDY/HORNSBY | 12/9/2002 | |
| State | Union Co., NC | ESPINOZA/ROBERTS | | 10/9/2007 |
| State | Watauga CO., NC | COBB/BROWN | 5/21/2008 | 8/26/2008 |
| State | Williamsburg Co., SC | BROWN/SABB | | 4/23/2003 |

| Court | Location | Case name | Dr. Wood deposed | Dr. Wood testified |
|-------|----------|-----------|------------------|--------------------|
| State | Williamsburg Co., SC | POWELL/JENKINSON | 12/30/2004 | 10/6/2008 |
| State | Williamsburg Co., SC | POWELL/MCFADDEN | | 12/20/2005 |
| State | Williamsburg Co., SC | PRESSLEY/INABINET | 7/8/2003 | 8/5/2003 |
| State | Williamsburg Co., SC | RICHARDSON/JEKEL | 2/2/2006 | |
| State | Williamsburg Co., SC | WILSON/SABB | 7/30/2002 | 8/13/2002 |
| State | Williamsburg Co., SC | DRAYTON/HENDERSON | 11/13/2003 | |
| State | Worth Co., GA | MILTON/LOWRY | 5/23/2005 | |
| State | York Co. SC | ORLOWSKI/PERKINS | 3/31/2009 | 5/23/2009 |
| State | York Co., SC | SCHILLO/WRIGHT | 3/3/2005 | |
| State | York Co., SC | ANDERSON GRIGGS/BOSTON | 3/8/2006 | |
| State | York Co., SC | MOORE/BENSON | | 9/4/2002 |
| State | York Co., SC | CLARK/STEWART | 8/18/2004 | |
| State | York Co., SC | EDDY/GARRETT | | 4/25/2002 |
| State | York Co., SC | HEYL TRUCK LINES | | 4/28/2006 |
| State | York Co., SC | ALLEN/MCKINNEY | 4/27/2000 | |
| State | York Co., SC | RATTEREE/SUGGS | 10/26/2000 | |
| State | York Co., SC | HYMAN/FURR | 5/2/2005 | |
| State | York Co., SC | BLACK/KASSELL | 8/29/2006 | |
| State | York Co., SC | HAWKS/ORR | 5/26/2005 | |

| Court | Location | Case name | Dr. Wood deposed | Dr. Wood testified |
|---|---|---|---|---|
| State | York Co., SC | GRAHAM/STEWART | 8/1/2007 | |
| State | York Co., SC | SUTHERLAND/HOOD | 11/19/2002 | |
| State | York Co., SC | SPRINGS INDUSTRIES/STUCKEY | 11/12/2003 | |
| State | York Co., SC | HEFFNER/ROBERTS | 2/22/2000 | |
| State | York Co., SC | MCFADDEN/MCGOWAN | 8/30/2001 | 10/17/2002 |
| State | York Co., SC | AUTO-OWNERS/DOVE | | 1/31/2000 |
| State | York Co., SC | HELMS/KASSEL | 10/30/2000 | |
| Not file | Not filed | PARSON/HOOVER | 12/2/2008 | |
| Not File | Not filed | COX/DEANTONIO | 3/3/2009 | |
| Not file | not filed yet | BOYLE/WHETSTONE | 2/25/2009 | |
| Not file | Not Filed yet | WENZELL/DASTA | 10/1/2008 | |
| NASD | Columbia SC | KAPLAN/WILSON | | 7/17/2007 |
| Mediatio | Aiken, SC | BOSWELL/YOUNG | | 7/8/2004 |
| Mediatio | Beaufort Co., SC | HAMLIN/SVALINA | 12/31/2003 | 6/4/2004 |
| Mediatio | Charleston, SC | ARD'S TRUCKING/JOYE | | 8/10/2005 |
| Mediatio | Charlotte, NC | GULLEDGE/WEINBERG | | 5/4/2004 |
| Mediatio | McCormick Co., SC | HAWES/YOUNG | | 11/11/2004 |
| Mediatio | Richland Co., SC | DAVISF/ROGERS | | 10/8/2004 |
| Mediatio | Spartanburg Co., SC | MILLS/MCCUTCHEN | | 10/28/2004 |

| Court | Location | Case name | Dr. Wood deposed | Dr. Wood testified |
|-------|----------|-----------|------------------|--------------------|
| Mediatio | Spartanburg, SC | ELLIOTT/ANTHONY | 7/5/2006 | 7/21/2004 |
| mediate | mediation | ARDIS/WELCH | 7/27/2009 | |
| Hearing | Beaufort, SC | GRAY/HARVEY | 5/19/2009 | 6/11/2009 |
| Arbit. | Charlotte, NC | SCHELS/WILLOUGHBY | | 5/7/2002 |
| Arbit. | Columbia, SC | ANGLIN/BUTCHER | 10/4/2001 | |
| Arbit. | Florence, SC | HERRINGTON/DEBERRY | | 5/14/2002 |
| Arbit | Arbitration | GENERAL HOLDINGS/WILSON | | 2/4/2009 |
| Arbit | Myrtle Beach, SC | AULT/LAND | 4/21/2005 | |
| | | EVORY/KEFALOS | | 8/28/2009 |