UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| HILL HOLLIDAY CONNORS COSMOPULOS, INC., d/b/a ERWIN-PENLAND,<br><br>       Plaintiff,<br><br>   v.<br><br>JEFFREY GREENFIELD and 1st APPROACH, LLC,<br><br>       Defendants, and Third-Party Plaintiffs,<br><br>   v.<br><br>CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS, and JOSEPH A. ERWIN,<br><br>       Third-Party Defendants. | CIVIL ACTION NO. 6:08-3980-GRA<br><br>**Hon. G. Ross Anderson Jr.** |

**PLAINTIFF ERWIN-PENLAND AND THIRD-PARTY DEFENDANT
JOSEPH A. ERWIN'S MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................ i

LIST OF SUPPORTING EXHIBITS .............................................. iv

INTRODUCTION ...........................................................................1

STATEMENT OF UNDISPUTED FACTS ......................................4

ARGUMENT ...................................................................................14

I.    Summary Judgment Is Appropriate Based Upon Admitted Facts. ........... 14

II.   Erwin-Penland Is Entitled to Summary Judgment on Greenfield's Trade Secret Counterclaim [Count IX]..................................................... 15

A.    The Information Shared by Greenfield Was Not a "Trade Secret".......................................................................................... 16

B.    Greenfield Waived Any Trade Secret Claim. .............................. 19

III.  Erwin-Penland Is Entitled to Summary Judgment on Greenfield's Breach of Contract Counterclaims [Counts II, III, IV & VI] Because No Contract Existed.................................................................... 22

A.    No Contract Existed Between Greenfield And Erwin-Penland........................................................................................... 23

B.    No Implied Contract Existed Between Greenfield and Erwin-Penland.................................................................................. 24

C.    Greenfield's Conversion and Breach of Contract By Fraudulent Act Claims [Counts VI and III] Also Fail Because Greenfield Has No Rights in HSTS............................... 26

D.    Greenfield's Promissory Estoppel Claim [Count IV] Fails Because Erwin-Penland Did Not Promise Greenfield Anything. ..................................................................................... 26

IV.   Erwin-Penland Is Entitled To Summary Judgment on All of Greenfield's Counterclaims Sounding In Fraud [Counts I, V, VII & VIII]. ........................................................................................ 27

V.    Erwin-Penland Is Entitled To Summary Judgment on Greenfield's Counterclaim for Cancellation of Trademark [Count XIV]. .................... 31

VI.    Erwin-Penland and Mr. Erwin Are Entitled to Summary Judgment on Counterclaims Alleging Breaches of Fiduciary Duty [Counts X & XI]. ....................................................................................... 32

    A.    No Fiduciary Relationship Existed Between Greenfield and Erwin-Penland. ............................................................................ 32

    B.    The Counterclaim Against Mr. Erwin for Aiding and Abetting Also Fails. ...................................................................... 33

VII.   Greenfield's Counterclaims for Equitable Relief [Counts XII & XIII] Should Be Dismissed. ...................................................... 34

VIII.  Erwin-Penland Is Entitled to Summary Judgment on its Claim for Declaratory Judgment. ............................................................... 35

CONCLUSION ..................................................................................... 35

# TABLE OF AUTHORITIES

Page(s)

**CASES**

A.V. v. iParadigms, LLC,
    562 F.3d 630 (4th Cir. 2009) .................................................................22

Advance Stores Co. v. Refinishing Specialties,
    948 F. Supp. 643 (W.D. Ky. 1996).........................................................32

AMA Mgmt. Corp. v. Strasburger,
    420 S.E.2d 868 (S.C. Ct. App. 1992)......................................................31

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986)...............................................................................15

Aveda Corp. v. Evita Mktg., Inc.,
    706 F. Supp. 1419 (D. Minn. 1989).........................................................31

Beale v. Hardy,
    769 F.2d 213 (4th Cir. 1985) ..................................................................15

Bond v. Blum,
    317 F.3d 385 (4th Cir. 2003) ..................................................................22

Brown v. Green Tree Financial Servicing Corp.,
    2008 WL 2157120 (D.S.C. May 19, 2008 )............................................33

Brown v. Pearson,
    483 S.E.2d 477 (S.C. Ct. App. 1997)......................................................33

Burke v. Jacoby,
    981 F.2d 1372 (2d. Cir. 1992).................................................................15

Cain v. United Insur. Co.,
    102 S.E.2d 360 (S.C. 1958) ....................................................................26

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986)...............................................................................15

Edens v. Laurel Hill, Inc.,
    247 S.E.2d 434 (S.C. 1978) ....................................................................23

Fender & Latham, Inc. v. First Union Nat'l Bank of S.C.,
    446 S.E.2d 448 (S.C. Ct. App. 1994)......................................................23

Future Group II v. Nationsbank,
    478 S.E.2d 45 (S.C. 1996) ...................................................................34

Gignilliat v. Gignilliat, Savitz & Bettis, L.L.P.,
    684 S.E.2d 756 (S.C. 2009) ...........................................................26, 34

Goodman v. Goldberg & Simpson, P.S.C.,
    2009 WL 3321024 (Ky. App. Ct. Oct. 16, 2009) ...................................34

Insurance Co. of N. Am. v. U.S.,
    159 F.2d 699 (4th Cir. 1947) ...............................................................25

Intellimedia Sports Inc. v. Intellimedia Corp.,
    1997 WL 398344 (T.T.A.B. May 20, 1997) ..........................................32

LandBank Fund VII, LLC v. Dickerson,
    632 S.E.2d 882 (S.C. Ct. App. 2006)...............................................23, 24

Lollis v. Lollis,
    354 S.E.2d 559 (S.C. 1987) ..................................................................33

McCoy v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,
    2004 WL 3329996 (D.S.C. Jan. 21, 2004)........................................23, 24

Mincey v. World Sav. Bank,
    614 F.Supp.2d 610 (D.S.C. 2008)..........................................................28

Murray v. NBC, Inc.,
    671 F.Supp. 236 (S.D.N.Y. 1987)..........................................................16

O'Shields v. Southern Fountain Mobile Homes, Inc.,
    204 S.E.2d 50 (S.C. 1974) .....................................................................28

Orient Express Trading Co. v. Federated Dep't Stores, Inc.,
    842 F.2d 650 (2d Cir. 1988)...................................................................31

Pitts v. Jackson Nat'l Life Ins. Co.,
    574 S.E.2d 502 (S.C. Ct. App. 2002)......................................................31

Regions Bank v. Schmauch,
    582 S.E.2d 432 (S.C. Ct. App. 2003)................................................30, 32

Ryan v. Eli Lilly & Co.,
    514 F. Supp. 1004 (D.S.C. 1981)...........................................................15

Stanley Smith & Sons v. Limestone College,
    322 S.E.2d 474 (S.C. Ct. App. 1984)................................................24, 25

Tom Hughes Marine Inc. v. Am. Honda Motor Co.,
    219 F.3d 321 (4th Cir. 2000) .........................................................29, 30

Tralins v. Kaiser Aluminum & Chemical Corp.,
    160 F. Supp. 511 (D. Md. 1958) ...........................................................22

Trident Constr. Co. v. Austin Co.,
    272 F. Supp. 2d 566 (D.S.C. 2003)........................................................28

Turner v. Milliman,
    671 S.E.2d 636 (S.C. Ct. App. 2009).....................................................29

W.E. Gilbert & Assocs. v. S.C. Nat. Bank,
    330 S.E.2d 307 (S.C. Ct. App. 1985).....................................................23

Williams-Garret v. Murphy,
    106 F. Supp.2d 834 (D.S.C. 2000)....................................................32, 33

Woods v. State,
    431 S.E.2d 260 (S.C. Ct. App. 1993).....................................................27

## STATUTES

1992 S.C. Acts 437 ........................................................................ passim

15 U.S.C. § 1051(a) ...........................................................................32

17 U.S.C. § 102(b) ............................................................................22

S.C. Code Ann. § 39-8-10 et seq. ........................................................ passim

## OTHER AUTHORITIES

Fed. R. Civ. P. 9(b) ...........................................................................28

Fed. R. Civ. P. 56 .......................................................................... passim

<u>**LIST OF SUPPORTING EXHIBITS**</u>

Exhibit 1, Affidavit of Allen Bosworth **(SUBJECT TO MOTION TO SEAL)**

Exhibit 2, Excerpts from the deposition of Allen Bosworth. **(SUBJECT TO MOTION TO SEAL)**

Exhibit 3, Excerpts from the deposition of Jeffrey Greenfield.

Exhibit 4, Judgment in United States v. Jeffrey B. Greenfield, No. 1:00cr10014, bates-labeled DC0001-DC0005.

Exhibit 5, Judgment in Blue Cross and Blue Shield of Mass. v. Mass. Rehabilitation Ass., Inc. et al., 1:97-CV-11929-MBB.

Exhibit 6, Excerpts from the deposition of Cheryl Davey.

Exhibit 7, Jeffrey Greenfield and Cheryl Davey's 2007 federal tax returns, bates-labeled Greenfield Taxes-000057-68. **(SUBJECT TO MOTION TO SEAL)**

Exhibit 7a, Jeffrey Greenfield and Cheryl Davey's 2008 federal tax returns, bates-labeled Greenfield-Davey 2008 Tax Returns000001-11. **(SUBJECT TO MOTION TO SEAL)**

Exhibit 8, Document titled "Top 100 Branded Entertainment Opportunities," bates-labeled EP000337-361.

Exhibit 9, Excerpts from the deposition of Joseph Erwin. **(SUBJECT TO MOTION TO SEAL)**

Exhibit 10, Excerpts from the deposition of Shannon Wilbanks. **(SUBJECT TO MOTION TO SEAL)**

Exhibit 11, Excerpts from the deposition of Andy Mendelsohn. **(SUBJECT TO MOTION TO SEAL)**

Exhibit 12, Excerpts from the deposition of William Reynolds. **(SUBJECT TO MOTION TO SEAL)**

Exhibit 13, Document titled "'Amazing Grace' Captain D's Branded Reality Show," bates-labeled Greenfield/1[st] Approach000652-671.

Exhibit 13a, Document titled "Product Placement/Hollywood Integration Proposal," bates-labeled Greenfield/1[st] Approach000741-751.

Exhibit 13b, Document titled "Internet Buzz Campaign," bates-labeled Greenfield/1[st]Approach000752-772.

iv

Exhibit 13c, Document titled "Branded Entertainment Financing," bates-labeled EP000396-418.

Exhibit 14, Captain D's presentation deck.

Exhibit 15, Defendants' Responses to Erwin-Penland's First Set of Interrogatories, dated April 18, 2009.

Exhibit 16, Expert Report of Peter Sealey.  **(SUBJECT TO MOTION TO SEAL)**

Exhibit 17, Expert Report of Michael G. Agate.  **(SUBJECT TO MOTION TO SEAL)**

Exhibit 18, Document titled "Verizon Wireless Branded Entertainment Opportunity," dated December 29, 2005, bates-labeled EP000837-850.  **(SUBJECT TO MOTION TO SEAL)**

Exhibit 19, Document containing Greenfield's "Activities," ranging from November 2, 2005 to June 9, 2006, bates-labeled Greenfield/1stApproach000870-871.

Exhibit 20, Defendant's Deposition Exhibit 27.

Exhibit 21, Emails exchanged between Messers. Erwin, Bosworth, Greenfield and Ms. Wilbanks, bates-labeled Greenfield/1st Approach000242-246.

Exhibit 22, Emails (with attachment) exchanged between Messers. Greenfield, Bosworth, Reynolds, Erwin, and Mendelsohn and Ms. Wilbanks, bates-labeled EP000460-464.

Exhibit 23, Docket Entry No. 21, Ex. A, Verizon Wireless Presentation.

Exhibit 24, Emails exchanged between Messers. Greenfield and Bosworth, bates-labeled Greenfield/1stApproach0000129-130.

Exhibit 25, Excerpts from the deposition of Suzy Deering.  **(SUBJECT TO MOTION TO SEAL)**

Exhibit 26, Letter dated August 22, 2008 from Miles Feldman, Esq, to Erwin-Penland et al.

Exhibit 27, Expert Report of Neal Burns.  **(SUBJECT TO MOTION TO SEAL)**

Exhibit 28, Wikipedia page for Clash of the Choirs, http://en.wikipedia.org/wiki/Clash_of_the_choirs (last visited February 26, 2010).

Exhibit 29, Brian Stelter, *'American Idol' Creator Plans Web Show*, N.Y. Times, Dec. 18, 2009.

Exhibit 30, Emails exchanged between Messers. Greenfield, Bosworth, Erwin and Hughes and Ms. Wilbanks.

Exhibit 31, Emails exchanged between Messers. Erwin and Bosworth, bates-labeled EP050532. **(SUBJECT TO MOTION TO SEAL)**

Exhibit 32, Excerpts from the deposition of Mark Hughes.

Exhibit 33, Unpublished cases cited in Erwin-Penland and Mr. Erwin's Memorandum of Law in Support of Their Summary Judgment.

Hill Holliday Connors Cosmopulos, Inc., d/b/a/ Erwin-Penland ("Erwin-Penland"), and Joseph A. Erwin (collectively, the "Moving Parties") respectfully move for summary judgment dismissing all counterclaims against them brought by defendants and counterclaim-plaintiffs 1st Approach, LLC and Jeffrey Greenfield (collectively, "Greenfield" or "Defendants") and for summary judgment on Erwin-Penland's declaratory judgment claim, finding that Defendants have no rights in the How Sweet the Sound concert events.

## <u>INTRODUCTION</u>

After nearly ten months of discovery, the undisputed facts are exactly as set forth in Erwin-Penland's declaratory judgment action. Nothing revealed in the depositions and over 500,000 pages of discovery provides a legal or factual basis for Greenfield to continue to pursue his counterclaims for breach of contract, fraud, unjust enrichment, or misappropriation of trade secrets. Defendants are entitled to no rights, credit, or damages for any work being undertaken by Erwin-Penland or its longstanding client, Verizon Wireless. Based upon the clear admissions of Greenfield, the undisputed documentary evidence, and black letter South Carolina law, summary judgment in Erwin-Penland's favor on all of Defendants' claims is warranted.

The subject matter of this dispute is a nationwide marketing program, dubbed How Sweet the Sound, that is sponsored by third-party defendant Verizon Wireless. How Sweet the Sound is a series of gospel choir events held in various cities around the country. Erwin-Penland and several other marketing agencies have assisted Verizon Wireless in developing, planning, and undertaking these concerts since 2007. Greenfield and his wife's company, 1st Approach LLC, claim that How Sweet the Sound was Greenfield's "idea," and thus they are entitled to damages,

1

ownership, and profits based upon their purported ownership of that idea.[1]  Respectfully, Greenfield is simply wrong.  The law is especially clear that an idea cannot be owned.

The genesis of these claims is Greenfield's *de minimis* involvement in speculative pitches to two clients in 2005 and 2006 (only one of which he attended), both of which involved creating a reality-based episodic television series involving church choirs, which, it is undisputed, was never created.  That Greenfield was invited to help with the pitches is testimony to his misrepresentation, not his *bona fides*.  Greenfield misrepresented himself as a person with television production experience and "Hollywood" connections.  As a result, Erwin Penland invited his participation in the two pitches it put together in 2005 and 2006.  His contributions to these limited pitches were wholly related to the idea of filming and producing a reality *television* series.  In truth, Greenfield is a convicted felon, former magician and chiropractor with virtually no marketing background, and – by his own admission – absolutely no television production experience, facts not revealed to Erwin-Penland until this litigation.  It is further undisputed that both pitches were ultimately *rejected*, and neither the clients nor Erwin-Penland has created a reality television series.

More than a year after the second pitch, and starting in 2007 with a single concert, Verizon Wireless has sponsored a series of local gospel concert events dubbed How Sweet the Sound.  Erwin-Penland has assisted with the production of these concerts.  Greenfield admits that he has made no contribution to these local concerts: he has done no work; produced none of the creative materials; and performed none of the logistics necessary to produce these complex

---

[1]  The parties disagree over who first came up with this "idea," but that dispute is immaterial to the legal claims at issue.  Even assuming *arguendo*, and solely for purposes of this Motion, that Greenfield is the co-creator of the "idea" of a reality based television series involving church choir competitions, summary judgment is still appropriate.  Even novel ideas (which the ideas in question certainly were not) are not property unless legally protected, and here there is no such protection.

events.  Yet in 2008, Greenfield demanded an accounting and damages from Erwin-Penland for work he never performed.  This suit soon followed.

Legally and factually, Greenfield's claims fail.  First, Greenfield admits that his purported trade secrets are merely the combination of well-known marketing techniques and strategies, without any detail or substance.  Greenfield argues unconvincingly that the combined use of the internet, grassroots marketing, and creating marketing "buzz" are somehow his original and protectable ideas.  Neither trade secret nor copyright law protects vague, generalized, and unoriginal "concepts" from use by others, nor can the combination of such create a trade secret.  It is further undisputed that Greenfield did nothing to *protect* these purported trade secrets from disclosure.  Greenfield testified that *all* of his alleged trades secrets were contained in the Verizon Wireless presentation which was freely disclosed to Verizon Wireless and other third parties present at the pitch.

Second, in order to bring claims for breach of contract, it is axiomatic that a *contract* must exist.  Here, it is undisputed that no written or verbal agreement existed with Defendants at any time: not for ownership, scope of work, price, or execution.  The entire interaction between Defendants and the Moving Parties related to speculative pitches for future possible work (the production of a reality based *television* series) that were either rejected or never realized.  Such speculative interactions cannot give rise to a legally binding agreement or valid claim for damages.

Finally, the undisputed facts show no misrepresentation, unjust enrichment, or fraudulent act occurred.  The information in question was freely shared by Defendants with both Erwin-Penland and other third-parties.  Defendants were not induced into contributing to these pitches based on false pretenses.  Rather, Greenfield hoped – as did Erwin-Penland – that his

3

contributions to the pitches would lead to future work from these clients.  Mere expectations cannot amount to fraud.  Further, Erwin-Penland has been paid by Verizon Wireless *solely for the work that it has actually performed*.  At no point has Erwin-Penland been paid for any "idea" or concept, nor did it receive any share of Verizon Wireless profits, the very damages that Greenfield now seeks despite having contributed no time or effort to these concerts.

In sum, by bringing these claims, Greenfield seeks to profit from the work of others.  As a matter of law, Defendants' legal "hold-up" suit should end now, with summary judgment granted on both the Plaintiffs' claim and on Defendants' counterclaims.  Baseless conjecture, misdirection, and exaggerated claims cannot survive Rule 56, and Greenfield has nothing else to offer.

## STATEMENT OF UNDISPUTED FACTS

### A.    The Parties

Erwin-Penland is a full-service Greenville-based marketing agency.  (Affidavit of Allen Bosworth ("Bos. Aff."), attached hereto as Exhibit ("Ex.") 1, ¶¶ 2, 4)  Founded 22 years ago, Erwin-Penland has grown from a two person shop to a 240 person regional and national advertising agency.  (Id.)  Erwin-Penland's clients include Verizon Wireless, Michelin, Denny's, United Way, the Greenville Humane Society, and Hands on Greenville.  (Id.)  In 2004, Erwin-Penland became part of Hill Holliday Connors Cosmopolus, LLC, a national advertising agency that is owned by IPG, one of the preeminent advertising groups in the country.  (Ex. 2, Deposition of Allen Bosworth ("Bos. Dep.") 10:20-25)  Erwin-Penland provides the full spectrum of advertising and marketing services to its clients, including all forms of media advertising, branded entertainment, social marketing, event marketing, interactive, and public

relations services.  (Bos. Aff. ¶ 4)  Third-party defendant Joseph Erwin was one of the original founders of Erwin-Penland, and today serves as its President.  (Id. ¶ 5)

Defendant Greenfield is a former magician and chiropractor who has lived in California, Massachusetts (where he was incarcerated), Maine, and currently New Hampshire.  (Ex. 3, Deposition of Jeffrey Greenfield ("Gf. Dep.") 45:11-12, 46:9-11, 58:22-23, 88:5-11)  He has never had any formal business course training.  (Gf. Dep. 87:14-15, 89:20-21)  He graduated from chiropractic school in 1988, and owned a chiropractic business in Massachusetts in the 1990s.  (See Gf. Dep. 43:15-19, 88:11)  Around 1997, this business was shut down for fraud, as discussed below.  (See Gf. Dep. 93:5-94:10)  Sometime after he was released from incarceration, Greenfield began representing himself as a "marketing" expert.

Based upon a massive fraud involving his chiropractic practice and its fraudulent insurance billings, Greenfield pled guilty to conspiracy to commit mail fraud in United States v. Jeffrey B. Greenfield, No. 1:00-CR-10014, in federal district court in Massachusetts.  (Ex. 4)  Greenfield was sentenced to imprisonment for a period of a year and a day, and was ordered to pay $343,854.06 in restitution to defrauded insurance companies.  (Id.)  He served that sentence from 2000-2001.  (Id.; Gf. Dep. 45:8-14)  On August 2, 2000, a civil default judgment was entered against Greenfield in Blue Cross and Blue Shield of Mass. v. Mass. Rehabilitation Ass., Inc. et al., 1:97-CV-11929-MBB, in federal district court in Massachusetts.  (Ex. 5)  Greenfield was ordered to pay Blue Cross $418,024.44 in restitution, plus interest at a rate of 6.375%.[2]  (Id.)  This judgment remains unpaid.  (Gf. Dep. 48:21-23)

Defendant 1st Approach LLC is a single member LLC with an office in Portsmouth, New Hampshire.  (Gf. Dep. 10:14-24, 57:13-23)  Greenfield's wife, Cheryl Davey, is the sole

---

[2]    With statutory interest, Greenfield now owes Blue Cross approximately $650,000.

member.  (Gf. Dep. 10:14-24)  At her deposition, however, Ms. Davey testified that she was not

aware of her ownership of 1st Approach.[3]  (Ex. 6, Deposition of Cheryl Davey ("Davey Dep.")

102:5-8)  Greenfield is the only employee of 1st Approach, yet is listed as its "Executive Vice

President."[4]  (Gf. Dep. 9:7-8, 10:14-24; Ex. 13b)

**B.**     **The Captain D's Pitch**

In October 2005, Mr. Erwin met Greenfield at a conference in Los Angeles where

Greenfield spoke about "branded entertainment."  (Gf. Dep. 98:19-99:9)  Greenfield handed out

a presentation containing his ideas regarding "buzz marketing" to all participants at that

conference.  (See Gf. Dep. 102:2-13; Ex. 8)

Also in October 2005, Erwin-Penland was asked to present to a potential new client,

Captain D's, a restaurant chain.  (Gf. Dep. 109:9-11, 127:1-4; Ex. 9, Deposition of Joseph Erwin

("Erwin Dep.") 42:19-20, 115:11-15)  Erwin-Penland presented its capabilities and ideas to

Captain D's and was selected as a finalist for the account.  (Bos. Aff. ¶ 15)

████████████████████████████████████████████████████

████████████████████████████████████████████████████

(Erwin. Dep 144:18-145:11; Ex. 10, Deposition of Shannon Wilbanks ("Wilbanks Dep.") 41:20-

---

3    Ms. Davey owns upwards of ten other single member entities – including a company set up
     to own her car – all set up at Greenfield's direction.  (See Gf. Dep. 24:19-24, 25:24-26:6)
     Ms. Davey knows nothing about any of these companies.  (See, e.g., Davey Dep. 108:17-
     114:2)

4    ████████████████████████████████████████████████

42:16; Ex. 11, Deposition of Andy Mendelsohn ("Mendelsohn Dep.") 11:14-15:17) 

(Erwin. Dep 144:18-145:1; Wilbanks Dep. 41:20-42:16; Mendelsohn Dep. 11:14-15:17)

(Bos. Dep. 70:7-18; Ex. 12, Deposition of William

Reynolds ("Reynolds Dep.") 32:6-11; Mendelsohn Dep. 87:14-19)

Mr. Erwin contacted Greenfield to see if he would be interested in assisting Erwin-

Penland with putting together the Captain D's pitch.  (Gf. Dep. 108:24-109:11)  To that end,

Greenfield participated in a brief brainstorming conference call with Mr. Erwin and several

Erwin-Penland employees.  (Gf. Dep. 109:17-110:24)  During that brief conference call, the idea

for a choir competition was discussed, and Greenfield testified that he suggested turning the

competition into a reality television series based upon the successful "American Idol" television

program.[5]  (Gf. Dep. 113:15-114:5)  Greenfield later sent Erwin-Penland several emails and

documents, all of which were related to ideas on how to develop the gospel competition concept

into an "American Idol" style, branded reality television series.[6]  (See, e.g., Gf. Dep. 116:14-

119:2; Exs. 13, 13a, 13b, 13c; Counterclaim ¶ 16)

---

[5]    Greenfield claims he came up with the entire idea for a church choir competition, as well as
the idea for turning it into a reality television series.  (Gf. Dep. 87:9-12, 111:16-114:3)
                                                                                    (Erwin. Dep 144:18-145:11; Wilbanks
Dep. 41:20-42:16; Mendelsohn Dep. 11:14-15:17)  For summary judgment purposes only,
however, Erwin-Penland will assume *arguendo* that the entire concept was Greenfield's idea.
As discussed below, it is irrelevant who "came up" with the idea because it is impossible for
anyone to "own" an idea.  (Infra Section III)

[6]    American Idol is a popular reality-based, televised series involving singing competitions and
utilizing celebrity judges.

No written contract or other agreement existed between Greenfield and Erwin-Penland. (Gf. Dep. 206:17-24; Erwin Dep. 110:8-13, 111:18-112:1)  Likewise, neither Erwin-Penland nor Greenfield entered into an agreement with Captain D's.  (Gf. Dep. 206:22-24; Bos. Aff. ¶ 20)  Further, Greenfield testified that he had "no nondisclosure agreement of any kind with Erwin-Penland."  (Gf. Dep. 119:3-6; Erwin Dep. 111:18-112:1)

During these interactions, Greenfield told Erwin-Penland that he had experience in producing television shows and "Hollywood" connections.  (Bos. Aff. ¶ 20; see also Ex. 13a)  In reality, Greenfield has absolutely no television production experience whatsoever, which he admitted during discovery.[7]  (Ex. 15 (interrogatory response admitting that Greenfield has "no direct, hands-on television production experience"); Gf. Dep. 188:5-10)

The pitch to Captain D's was a purely speculative pitch given in the hope of obtaining future business.  (Erwin Dep. 111:18-112:1; Ex. 16, Expert Report of Peter Sealey ("Sealey Report") at 7-8; Ex. 17, Expert Report of Michael G.  Agate ("Agate Report") at 6-7)  Erwin-Penland made the pitch to Captain D's in November 2005.  (Bos. Aff. ¶ 17)  Greenfield did not attend this pitch, nor did he contribute slides to the presentation.  (Gf. Dep. 127:18-21, 127:25-128:5)  None of the various marketing and branded entertainment materials sent by Greenfield to Erwin-Penland were utilized at the Captain D's pitch.  (Ex. 14; Gf. Dep. 127:18-21) ███████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

[7]    Greenfield also testified, contrary to his original representations to Erwin-Penland, that his alleged television production partner, Jamie Gold, in truth did not have the proper skills or judgment necessary to produce a television series and was not who Greenfield thought he was.  (See Gf. Dep. 260:15-261:21)

████████.[8]  (See Ex. 14; Bos. Aff. ¶ 17)  Ultimately, Erwin-Penland did not succeed in

winning the account.  (Gf. Dep. 128:6-8; Bos. Aff. ¶ 20)

**C.     The Verizon Wireless Pitch**

Erwin-Penland has been an agency of record for Verizon Wireless and its predecessors

for twenty years, and has long-performed regional advertising work for Verizon Wireless.

(Erwin Dep. 23:7-10, 28:2-29:3; Bos. Aff. ¶¶ 11-12)



(Bos. Dep. 16:17-25)

(Bos. Dep. 17:1-6, 183:5-18)

(Bos. Aff. ¶ 21; Ex. 18)

(Bos. Aff. ¶ 21)  Verizon Wireless agreed to schedule a formal

presentation for Erwin-Penland to present the How Sweet the Sound concept to Verizon Wireless

and at least one other of its agencies of record.  (Gf. Dep. 134:5-18; Bos. Aff. ¶ 21)

Erwin-Penland invited Greenfield to participate in this second pitch.  (Gf. Dep. 135:3-10)

Like Captain D's, all parties understood that this was a speculative pitch to Verizon Wireless that

was contingent on Verizon Wireless agreeing to the proposal and retaining Erwin-Penland and/or

Greenfield to do the actual work of producing a reality television series.  (See Gf. Dep. 203:12-

17; Erwin Dep. 362:23-363:7)  Greenfield could only *hope* that Verizon Wireless wanted to

sponsor a reality television series, and that he would then be chosen by Verizon Wireless to

produce it.  (See Gf. Dep. 203:12-17)

---

[8]  ████████████████████████████

Erwin-Penland drafted, revised, and managed a Powerpoint presentation or "deck" for the April 26, 2006 Verizon Wireless pitch that described the How Sweet the Sound concept (the "Verizon Wireless Presentation").  (Ex. 23, "Verizon Wireless Presentation"; Bos. Aff. ¶ 22) Greenfield's contributions were limited.  He participated in several conference calls with Erwin-Penland employees regarding the proposed reality television series.  (Gf. Dep. 132:1-15, 133:2-135:20, 155:16-156:13; Ex. 19)  He also registered the scriptwriting credits for an HSTS reality television series in his name and Mr. Erwin's with the television script Writers Guild of America West.  (Gf. Dep. 66:23-67:1; Ex. 20 (describing the television script being registered as an "American-Idol style competition for church choirs"))  Erwin-Penland and Greenfield also exchanged emails in which Greenfield proposed potential "options" for the parties to "own" the television production company that would develop the television series should one be produced by the client.  (Ex. 21)  At no time did Erwin-Penland and Greenfield agree to any of these proposals, nor were they ever shared with Verizon Wireless.[9]  (Gf. Dep. 206:19-21, 207:4-10)

Ultimately, Greenfield contributed 3 slides to the 30-plus slide Verizon Wireless Presentation. (Gf. Dep. 184:17-20; Exs. 22 (attaching Greenfield's slides), 23 at 28-29, 31) These three slides, in total, depicted:  1) Greenfield's purported television production capabilities and connections (which, it was later revealed, were fraudulent); 2) additional unnamed

---

[9]    In March 2006, Greenfield emailed Mr. Erwin proposing multiple possible "options" for ownership of a TV production company should Verizon Wireless go forward with the idea of a reality television series.  (Ex. 21)  One of the options presented in Greenfield's email to Erwin Penland was 50% ownership interest in a television production company.  (Id.) Erwin-Penland did not accept this proposal, or any of the particular options presented, nor were any presented at any time to Verizon Wireless.  (Gf. Dep. 206:19-21, 207:4-10) ("[Q.] There was never any e-mail agreeing to the terms that you proposed, correct? [A.] You mean, where they formally came back and said: We agree with those terms? [Q.] Yes [A.] No they never came back and said that.")  Such television production company was never formed, and the parties never entered into any agreement to create a television production company. (Id.)

"Hollywood" connections that Greenfield represented were interested (of which no record was found during discovery); and 3) a proposed budget for filming and producing the reality-based television series.  (Verizon Presentation at 28-29, 31)  These slides identified the proposed television "production" company as Buzznation, a non-party in which Greenfield claims to be a principal. (Id.; see also Ex. 22)  Erwin-Penland drafted all other aspects of the proposal.[10]  (See Ex. 22; Gf. Dep. 187:24-188:4)

On April 26, 2006, Erwin-Penland presented the idea for a How Sweet the Sound reality television series to Verizon Wireless.  (Bos. Aff. ¶ 24)  Present were several Verizon Wireless employees along with representatives of other advertising agencies.  (Gf. Dep. 166:12-168:2)  Greenfield attended this pitch; he paid his own way and never sought compensation for travel or other expenses.  (Gf. Dep. 163:25-164:15; Erwin Dep. 362:23-363:7)  Greenfield fully understood that this was a speculative pitch for possible future business and that there was no guarantee that any work for him or Erwin-Penland would result from it.  (Erwin Dep. 362:23-363:7; Gf. Dep. 203:12-20)  The Verizon Wireless Presentation was not marked confidential.  (See Verizon Wireless Presentation) ██████████████████████████████████ ██████████████████[11]  (Erwin Dep. 374:11-14; Bos. Dep. 39:8-40:5; Ex. 25, Deposition of Suzy Deering, 37:19-38:19)

**D.     The Current HSTS Project**

In 2007, nearly a year after Greenfield's last substantive conversation with Erwin-Penland, Erwin-Penland assisted Verizon Wireless in the planning and marketing for a single

---

[10]   Greenfield acknowledged in a concurrent email and during his deposition that he was to be responsible for the television "production" aspects of the pitch, with Erwin-Penland to be responsible for "all other marketing."  (Ex. 24; Gf. Dep. 144:24-146:1)

[11]   How Sweet the Sound was never broadcast as a reality-based television series.  An after the fact documentary was shown on the Black Entertainment Television (BET) network, and the 2009 concert finale was also televised.  Both were produced by third-parties.  (Bos. Aff. ¶ 33)

live concert involving church choirs.  (Bos. Dep. 109:22-111:4)  This concert was held in Memphis, Tennessee in October 2007 and called "How Sweet the Sound."  (Reynolds Dep. 22:16-22; Bos. Dep. 155:12-17)  Greenfield was not involved in the planning or execution of this concert in any way.  (Gf. Dep. 265:13-267:11)

In 2008 and continuing into 2009, Verizon Wireless sponsored a series of How Sweet the Sound choir concert events in various cities around the country.  (Bos. Aff. ¶ 25)  Erwin-Penland, along with other longstanding Verizon Wireless agencies, has assisted Verizon Wireless in planning, producing, and marketing these concerts.  (Id.)  The ongoing project involves dozens of employees of both Erwin-Penland and Verizon Wireless in the detailed planning and implementation of the HSTS concerts, as well as multiple third-party vendors.  (Id.)  In addition to *not* being a reality television series, the HSTS project has numerous creative aspects that were developed after Greenfield's interactions ceased.  (Bos. Dep. 175:8-177:4; Gf. Dep. 81:22-82:21)  Greenfield hasn't expended "any time or effort having the concerts go forward," and has had no involvement in the operations or the planning for these concerts. [12] (Gf. Dep. 265:13-267:11)



(Bos. Aff. ¶ 28)

(Bos. Aff. ¶ 29)

---

[12] After the presentation to Verizon Wireless in April 2006, Greenfield did *no work whatsoever* in implementing the revised idea that was later presented to and approved by Verizon Wireless in 2007.  (See, e.g., Gf. Dep. 265:2-267:11 (admitting that he did "no work related to the Memphis concert," "nothing in 2008 related to "How Sweet the Sound," "nothing in 2009," did not "spen[d] any time or effort in having the concerts go forward," had "no involvement in the day-to-day," did not have "any involvement in the logistics related to the How Sweet the Sound concerts," and "haven't had to do any work related to putting the concerts together.")

E.     __Greenfield's Claims In This Case__

In 2008, Greenfield contacted Mr. Erwin and demanded, *for the first time*, compensation or other consideration from Erwin-Penland based upon his alleged contributions to the Verizon Wireless pitch.  (Gf. Dep. 262:24-265:3; Erwin Dep. 69:23-70:15)  Greenfield recorded this telephone call without Mr. Erwin's knowledge or permission.  (Erwin Dep. 70:5-15, Gf. Dep. 180:5-181:12)  Subsequent to this telephone call, attorneys for Greenfield demanded an accounting and compensation from Erwin-Penland.  (Ex. 26; Counterclaim ¶ 40)  This lawsuit followed.

Greenfield claims that the purported "trade secrets" at issue in this case encompass an "American Idol" style church choir competition.  (Gf. Dep. 82:22-83:5)  Yet Greenfield admitted at his deposition that the following are not trade secrets: the use of gospel choirs (Gf. Dep. 73:9-19), gospel music competitions (id. 83:20-22); a television show using a church choir competition (id. 85:1-3); singing competitions (id. 83:14-16); grassroots marketing (id. 83:17-19); the use of "word of mouth, buzz marketing" (id. 70:21-23); the financing and ownership of intellectual property (id. 70:9-11, 71:13-16); the use of local events or local celebrities in a marketing campaign (id. 69:19-70:1); and the use of television, internet, or wireless in marketing campaigns. (Id. 70:5-8, 12-14, 18-20)

Importantly, Greenfield further testified that his purported "trade secrets" were *all* contained in the Verizon Wireless Presentation document.  (Gf. Dep. 65:16-19)  This document was distributed not only to Verizon Wireless employees, but also to all third parties who attended the pitch.  (Gf. Dep. 166:1-168:2, 183:24-184:9; see Bos. Aff. ¶ 21)  Also, notably, Greenfield attached the presentation deck (containing his purported "trade secrets") to his Counterclaim, which was *publicly filed*.

13

The idea of a church choir competition is not a new or novel concept.  (See Gf. Dep. 73:13-19, 83:20-22; Ex. 27, Expert Witness Report of Dr. Neal M. Burns ("Burns Report") at 5; Sealey Report at 8-9)  Greenfield was himself aware of a church choir television series targeted at the African American community called "Sunday's Best" that was being produced for BET even *before* the pitch to Verizon Wireless, and urged Erwin-Penland to "move fast" to beat other similar ideas to market:

> Q.   And you said, when you found out about the BET show:  We have to move quickly.  Correct?
> A.   That's correct.
> Q.   Because you knew this wasn't any secret, right?
> A.   I knew that church choirs and church choirs on TV, at that point, were starting to come out.  And the reason we needed to move quickly was, if that show took off, there would be a lot of interest and a lot of excitement around the same concept.
> Q.   So a TV show involving a church choir competition isn't a secret, correct?
> A.   That's correct.

(Gf. Dep. 84:3-8, 84:16-85:3)  Further, it is undisputed that other choir competitions have been on television dating back to the 1930s, and as recently as 2007.  (See Burns Report at 5-6; Ex. 28)

Greenfield did not have a nondisclosure agreement or written contract with Erwin-Penland or any other relevant entity at any time.  (Gf. Dep. 77:14-19, 119:3-6, 206:13-24 (testifying that "there was no written agreement that [he] or people from Erwin-Penland formally executed" at any time); Bos. Dep. 191:3-7; Erwin Dep. 111:18-112:1)  There was never any agreement between Erwin-Penland and Greenfield as to any proposed terms regarding ownership of HSTS, scope of work, or financial compensation.  (Gf. Dep. 207: 4-10; Counterclaim ¶ 23)

## ARGUMENT

## I.    Summary Judgment Is Appropriate Based Upon Admitted Facts.

Summary judgment should be granted when "there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c).  Where one party demonstrates that the undisputed facts reveal that

the opposing side will fail to prove even one of the essential elements of their claims, summary judgment is appropriate.  Anderson v. Liberty Lobby, Inc., 477 U.S.  242, 248-49 (1986); Burke v. Jacoby, 981 F.2d 1372, 1379 (2d. Cir. 1992).  The party opposing the motion has the burden of setting forth evidence sufficient to demonstrate that a rational trier of fact could find for them on *each* of the elements of their claim.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  The evidence presented must be competent and admissible.  Fed. R. Civ. P. 56(c) and (e); Ryan v. Eli Lilly & Co., 514 F. Supp. 1004, 1006 (D.S.C. 1981).  To avoid summary judgment, Greenfield cannot simply cobble together evidence that is "merely colorable" or "not significantly probative," nor can he prevail on the "mere existence of *some* alleged factual dispute" or a "mere existence of a scintilla of evidence."  Anderson, 477 U.S. at 247, 249, 252 (emphasis in original).  Greenfield "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."  Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985).

## II.    **Erwin-Penland Is Entitled to Summary Judgment on Greenfield's Trade Secret Counterclaim [Count IX].**

The first dispositive issue in this case is whether Greenfield's limited contributions to the How Sweet the Sound ("HSTS") pitch to Verizon Wireless constitute trade secrets that are entitled to legal protection.  (See Counterclaim ¶ 7)  First, as a fundamental matter, there is no merit to Greenfield's claim that using a combination of celebrities, television, internet, and "buzz marketing" as part of an integrated advertizing campaign are protectable "trade secrets."  Neither the individual elements nor the combination of the same constitute trade secrets under South Carolina law.  Second, Greenfield did not make reasonable efforts to maintain the secrecy of what he now claims to be trade secrets; instead, he shared his claimed ideas *without* protection with numerous prospective clients and competitors.  Thus, he waived any possible trade secret protection.  Third, Erwin-Penland could not have "misappropriated" anything because Erwin-

15

Penland did not receive or use any purported "trade secret" by improper means.  Summary

judgment on Count IX is appropriate.[13]

       **A.**      **The Information Shared by Greenfield Was Not a "Trade Secret".**

Under South Carolina law, a trade secret is defined as "information" that:

(i)      derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by the public or any other person who can obtain economic value from its disclosure or use, and

(ii)     is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

S.C. Code Ann. § 39-8-20(5).  Greenfield's purported "trade secrets" fail to meet either criteria.

Nothing Greenfield seeks to protect can be considered a *secret*.  Greenfield has taken the

remarkable position that the very concept of integrated marketing campaigns that combine (in

some form or another) television, internet, celebrities, buzz marketing, and the like – *advertising*

*strategies that have existed for years and are familiar to even most casual television viewers, not*

*to mention national advertising agencies like Erwin-Penland* – are Greenfield's sole, protectable

"trade secrets."  Greenfield's own description of his "trade secrets" is untenable:

Q.      List for me exactly what the trade secrets are that you claim have been misappropriated.

A.      Okay.  Do you want me to just give a specific list, or do you want me to talk about them?

Q.      I'd like you to list first.

---

[13]   All of Greenfield's claims are based in part or whole on the existence of these purported "trade secrets."  See, e.g., Counts II, III, IV, & VI (seeking compensation for his trade secrets based on various contract-based theories); Counts I, V, VII, & VIII (advancing various claims sounding in fraud related to the purported sharing of these trade secrets); Counts X & XI (alleging breaches of fiduciary duty related to the protection of these trade secrets); Counts XII & XIII (seeking injunctive and equitable relief based on the existence of these trade secrets); Counts XIV (seeking cancellation of the HSTS trademark).  Given that there is no trade secret here, all claims flowing from the trade secret claim also fail.  See Murray v. NBC, Inc., 671 F.Supp. 236, 245 (S.D.N.Y. 1987) (finding that because there was no unique and protectable idea in the proposed campaign for a TV series, summary judgment was also appropriate on all attendant contract, fraud, conversion, and unjust enrichment claims related to that purportedly protectable idea).

    **A.   Okay. It would be the combination of using local events, local celebrities, power of television cameras, ownership of intellectual property, internet, wireless, word of mouth, buzz marketing. And it's really the combination of all of those elements that are the trade secrets.**

…

Q.   Just: What exactly are the trade secrets?

A.   It's the combination of all of the elements that I've discussed, and utilizing them to create, you know, a unique marketing campaign. That's what the trade secrets are. It's the unique combination of them, the way that I look at them, the way that I'm able to put them together.

…

Q.   Okay. All right. Anything else?

A.   In terms of trade secrets?

Q.   Yes.

A.   **I listed internet, mobile. Internet, mobile, financing and ownership of IP. The understanding of how people react to cameras. I kind of talked about that already.**

Q.   Okay. Is that it? You have now listed for me all of the trade secrets that you claim in this case have been misappropriated?

A.   Yeah. That I can recall right now, yes.

(Gf. Dep. 62:12-64:9) (emphasis added). Greenfield further admitted at his deposition that all of his purported "trade secrets" were contained in the Verizon Wireless Presentation deck. (Gf. Dep. 65:16-19) ("[Q.] 'Is it your testimony that the trade secrets were contained in the Verizon pitch that occurred in April of 2006?' [A.] Yes.") And it is undisputed that the three slides that Greenfield actually contributed to the Verizon Wireless Presentation contained only information relating to his alleged television production experience and the budget for a reality television series.[14] (Gf. Dep. 184:17-19; Ex. 22; Verizon Wireless Presentation at 28-29, 31)

    Putting aside the discrepancy in what Greenfield claims as his "trade secrets" and what he actually contributed, all of his claimed "trade secrets" were either generally known to, or capable of being readily ascertainable by, others. (See Agate Report at 7-8; Burns Report at 5-6; Sealey

---

[14]  Greenfield will no doubt argue in his opposition that he also told Erwin-Penland that How Sweet the Sound could be successful even if it was never televised. (See Gf. Dep. 156:14-157:3). This is irrelevant. First, Greenfield's sole proposed responsibility in the pitch to Verizon Wireless was related to television production. And second, Greenfield cannot claim that successful, un-televised marketing concepts are his trade secret.

Report at 8-9)  Indeed, Erwin-Penland has vast prior experience with *all* of these concepts.  (Bos. Aff. ¶¶ 6-10) (noting that Erwin-Penland has used local celebrities, local events, internet, television, and grassroots marketing techniques on a wide variety of its campaigns).

As his testimony demonstrates, Greenfield's alleged "secrets" are simply broad marketing concepts that are neither secret nor particularly cutting edge.  It is undisputed that *none* of the individual elements that he claims comprise his trade secrets are actually *secret*. Greenfield admitted that the following elements of the HSTS concert events are neither original nor his trade secrets:  the use of gospel choirs (Gf. Dep. 73:13-19), gospel music competitions (id. 83:20-22); a television show using a church choir competition (id. 85:1-3); singing competitions (id. 83:14-16); grassroots marketing (id. 83:17-19); the use of "word of mouth, buzz marketing" (id. 70:21-23); the financing and ownership of intellectual property (id. 70:9-11, 71:13-16); the use of local events or local celebrities in a marketing campaign (id. 69:19-70:1); the use of television, internet, or wireless in marketing campaigns. (Id. 70:5-8, 12-14, 18-20). Matters generally known in an industry – in this case, the advertising and marketing industries – *cannot* be protected as trade secrets.  See 1992 S.C. Acts 437, 2 Commissioner's Comment ("If the principal persons who can obtain economic benefit from information are aware of it, there is no trade secret").

Faced with the inability to claim that anything contained in the Verizon Wireless Presentation was novel or secret, Greenfield instead claims that, although all of the elements of the HSTS campaign are themselves not secrets, the *combination* of those elements is somehow a protectable secret.  (Gf. Dep. 62:12-65:5, 71:17-72:3)  Yet such claims are nonsensical in light of his admission that his purported "trade secrets" encompass an "American Idol" type series:

> Q.    Now is your chance.  What parts of the "How Sweet the Sound" are your trade secrets?

> A.    The core of the entire program, the gospel choir competition, going and reaching the African American community, by **having a choir competition that's an "American Idol" style competition, that utilizes local events, local celebrities, and – the program as it exists today.  The core elements of that program are my trade secrets**.

(Gf. Dep. 82:22-83:5) (emphasis added).  Greenfield argues, incredibly, that using the same combination of elements used by "American Idol" – one of the most widely viewed television series *in history* – are his protectable "trade secrets."[15]  Such a claim is specious.

In truth, Greenfield admits that the combination of these concepts into a television series is not a secret:

> Q.    **So a TV show involving a church choir competition isn't a secret, correct?**
> A.    **That's correct.**

(Gf. Dep. 85:1-3) (emphasis added).  Greenfield and Erwin-Penland were both aware of similar programs relating to church choirs developed by third-parties *before* the pitch to Verizon Wireless.  One such gospel competition television series was developed by BET in 2006.  (Id. 84:3-25; see also Ex. 30)  The fact that multiple third-parties have already "combined" all of these "ingredients" is fatal to Greenfield's claim.[16]  Either taken individually or in combination, Greenfield has no legal or factual basis to claim any trade secrets.

### B.  Greenfield Waived Any Trade Secret Claim.

Count IX must also be dismissed because Greenfield failed adequately to protect his purported trade secrets and thus waived any claim to protection.  S.C. Code Ann. § 39-8-20

---

[15]  See Ex. 29 at B6 (noting that American Idol is the "most popular television show in the United States"); Ex. 17 at 7 ("The 'marketing system' that Greenfield claims as his 'Trade Secret' is anything but unique and is one that is used around the country")

[16]  Greenfield himself repackaged and combined all of these elements into a completely different marketing program for another of his clients, a pharmaceutical company.  That project, "America's Hottest Mom," was a competition to find the "Hottest Mom in America," that was run and marketed at the same time Verizon Wireless was undertaking HSTS.  (Gf. Dep. 213:2-13, 257:17-258:6)

plainly states that trade secret protection is limited to information that "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Greenfield cannot meet this burden. Greenfield shared his claimed "trade secrets" with Erwin-Penland and others *voluntarily and without any confidentiality or non-disclosure agreements of any kind*. Greenfield further admits that *all* of his purported trade secrets were contained in the presentation made to Verizon Wireless in April 2006, and that numerous individuals and entities, including multiple competitors, attended this presentation. None of these third parties signed a confidentiality agreement. Finally, Greenfield bases his trade secret claims in large part on the mistaken belief that his ideas and concepts are protected by copyright law.[17]

### 1.    Greenfield Voluntarily Shared His Purported "Trade Secrets" Without Protection.

Greenfield cannot legitimately claim protection when he took no steps to protect his claimed "ideas." Greenfield *voluntarily sent* Erwin-Penland all the information he claims was misappropriated. (Gf. Dep. 118:11-119:2) Yet Greenfield had no non-disclosure agreement (or any other contractual agreement) with Erwin-Penland at any time. (Id. 119:3-6, 206:13-24) Further, Greenfield admits that his purported "trade secrets" were all contained in the pitch made to Verizon Wireless in April 2006. (Gf. Dep. 65:16-19) The Verizon Wireless Presentation was not marked or treated as confidential. (See Verizon Wireless Presentation) Numerous individuals were present at this pitch, more than Greenfield can remember. (Gf. Dep. 166:1-168:2) The purported "trade secrets" were thus shared on several occasions with multiple

---

[17]    The foundation of Greenfield's claims is a mistaken belief that he can "own" certain basic concepts, and Greenfield has proceeded to make expansive trade secret claims based on a fundamentally flawed belief that copyright notices protect the ideas and concepts contained in a written work. (See, e.g., Gf. Dep. 308:22-24, 313:10-12 "[Q.] Is it your understanding that you can copyright a concept? [A.] I think you can copyright a concept") Greenfield's misunderstanding of federal law is palpable.

corporations, including Captain D's and Verizon Wireless and the various third parties who attended the April 2006 presentation, without any measures by Greenfield to protect them. (Gf. Dep. 82:22-83:5, 116:3-119:2, 166:1-168:2)

Disclosing and advertising these ideas to numerous individuals, including competitors, establishes that any purported "trade secret" was not adequately protected and precludes a misappropriation claim. 1992 S.C. Acts 437, 2 Commissioner's Comment ("public disclosure of information through display, trade journal publications, advertising, or other carelessness can preclude protection"). Once the information was disclosed to other agencies and individuals, all alleged trade secret protection was lost. Those individuals could have copied or otherwise implemented the plan that was being pitched. S.C. Code Ann. § 39-8-20. Moreover, this disclosure was not inadvertent; Greenfield specifically intented to share this information freely in the hopes of winning business.

Erwin-Penland likewise could not have "misappropriated" these alleged "trade secrets." Black letter law requires the use of "improper means" to establish misappropriation. S.C. Code Ann. § 39-8-20(2). Greenfield voluntarily shared the subject-matter of his trade-secrets with Erwin-Penland, Verizon Wireless, Captain D's, and numerous third parties. (Supra at 20). As a matter of law, Greenfield cannot establish that the acquisition of these purported "trade secrets" was by "improper means" or "without express or implied consent."

### 2.      A Copyright Notice on the Verizon Wireless Presentation Did Not Protect Secret Concepts or Ideas

Greenfield attempts to salvage his claims by arguing that his "trade secrets" were protected because the Verizon Wireless Presentation was copyrighted to Erwin-Penland and 1st Approach, and this copyright notice allowed him to retain ownership over the idea and concept of HSTS. (See, e.g., Gf. Dep. 308:17-24; 311:17-312:5; 313:10-12) This argument demonstrates

a fundamental misunderstanding of copyright law.  Copyrights protect written or other

expressions; they do not protect concepts and ideas.[18]  "*In no case does copyright protection for*

*an original work of authorship extend to any idea*, procedure, process, system, method of

operation, *concept*, principle, *or discovery, regardless of the form in which it is described*,

explained, illustrated, or embodied in such work"  17 U.S.C. § 102(b) (emphasis added).  To be

clear, copyright notices only protect expressions such as the words contained in a document, and

nothing more.  See id.; A.V. v. iParadigms, LLC, 562 F.3d 630, 636 (4th Cir. 2009) (citing Bond

v. Blum, 317 F.3d 385, 394 (4th Cir. 2003) (holding that the Copyright Act protects only the

author's manner of expression and not facts, ideas, or other knowledge); Tralins v. Kaiser

Aluminum & Chemical Corp., 160 F. Supp. 511, 516 (D. Md. 1958) (holding that Copyright

protection extends only to the arrangement of words, not the ideas, concepts, or facts expressed

or described by the words).  Thus, copyright does not protect Greenfield's purported "secret"

concepts and ideas.[19]

### III.    Erwin-Penland Is Entitled to Summary Judgment on Greenfield's Breach of Contract Counterclaims [Counts II, III, IV & VI] Because No Contract Existed.

Greenfield has brought four contract-related claims based on his purported rights in

HSTS:  breach of contract (Count II); breach of contract accompanied by a fraudulent act (Count

----

[18]  ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

[19]  For the same reasons, Greenfield's demand for injunctive relief based on the ongoing misappropriation or "exploitation" of his alleged trade secrets (Count XIII) must necessarily fail.  And in any case, S.C. Code Ann. § 39-8-50(A) states that "an injunction *shall be terminated* when the trade secret has ceased to exist," and here there can be nothing still secret about a concert series that has been in existence for over two years. (Emphasis added.)

III); promissory estoppel (Count IV); and conversion (Count VI).  These claims fail as a matter of law because is undisputed that there was no agreement between the parties.

**A.  No Contract Existed Between Greenfield And Erwin-Penland.**

For there to be a binding contract, South Carolina requires a meeting of the minds as to all essential and material terms.  See, e.g., Fender & Latham, Inc. v. First Union Nat'l Bank of S.C., 446 S.E.2d 448, 449-50 (S.C. Ct. App. 1994) (granting summary judgment where no contract was formed by parties for lack of acceptance); McCoy v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 2004 WL 3329996, at *2 (D.S.C. Jan. 21, 2004).  In order for the Court to find that a contract exists, the Court must find that all parties manifested an *intention to be bound* by their communications or conduct.  LandBank Fund VII, LLC v. Dickerson, 632 S.E.2d 882, 886-87 (S.C. Ct. App. 2006) (holding proponent must prove meeting of the minds existed as to all essential, material terms of alleged oral contract).  Because a valid contract requires both mutual assent and manifestation of such mutual assent as to all essential and material terms, a contract fails where the parties never completed negotiations as to essential terms.  Edens v. Laurel Hill, Inc., 247 S.E.2d 434, 436 (S.C. 1978) (holding that a contract requires agreement as to price, time and place); W.E. Gilbert & Assocs. v. S.C. Nat. Bank, 330 S.E.2d 307, 309 (S.C. Ct. App. 1985) (noting that two essential terms to the existence of a contract are the scope of work to be performed and the amount of compensation).

The undisputed evidence establishes that no contract ever was formed between Greenfield and Erwin-Penland.  Greenfield admitted in his deposition that he did not have a written contract at any time:

> Q:     … Was there a written contract where Jeff Greenfield signed, and someone from Erwin-Penland signed, and you had a contract with them?
> A:     **No, there was no written agreement that me or people from Erwin-Penland formally executed.**

> Q.    And there was no written contract that you or anyone from Verizon executed?
>
> A.    That's correct, yes.

(Gf. Dep. 206:13-24 (emphasis added))  All Erwin-Penland employees testified to the same effect.  (See, e.g., Bos. Dep. 98:14-15; Erwin Dep. 110:8-13)  Greenfield also admits that he *never received a response or agreement* about any "ownership split proposal[s]" for the TV production company that was *never actually formed*.  (Gf. Dep. 207: 4-10) ("[Q.] There was never any e-mail agreeing to the terms that you proposed, correct? [A.] You mean, where they formally came back and said: We agree with those terms? [Q.] Yes [A.] No they never came back and said that."); Counterclaim ¶ 23 (implicitly admitting same))

Mere expectations or negotiations do not make a contract; contracting parties are bound only by objective manifestations and expressions.  McCoy, 2004 WL 3329996, at *2; LandBank Fund VII, 632 S.E.2d at 886-87.  Nothing about the terms of the work, the specific tasks to be performed, or the price to be paid was ever discussed.  Without affirmative manifestations of assent, which it is undisputed never came, the parties never formed a binding agreement about any material terms.

### B.  No Implied Contract Existed Between Greenfield and Erwin-Penland.

Given the admitted lack of written agreement, Greenfield will no doubt claim that an *implied* agreement was created that gives them a basis for bringing this suit.  But Greenfield cannot point to any overt manifestation of agreement to support this claim.  (See Gf. Dep. 207:4-10)  Likewise, Greenfield cannot rely on the parties' conduct to support the existence of an implied contract.  Instead, Greenfield wants this Court to find that his unilateral proposals – which were admittedly never accepted – somehow form the basis for an implied contract.

One-sided hopes cannot bind another party.  "An implied contract, like an express contract, rests on an *actual agreement* of the parties to be bound to a particular undertaking."

24

Stanley Smith & Sons v. Limestone College, 322 S.E.2d 474, 477 (S.C. Ct. App. 1984) (emphasis added). To succeed on this claim, a rational fact finder would have to conclude that Erwin-Penland's conduct and consultations with Greenfield constituted a promise to pay Greenfield for his work. Such a claim fails because there was no assent to such payment or such work by anyone at anytime.

For an implied-in-fact contract to be valid, the parties' conduct must demonstrate agreement as to all essential terms, including the "price for which the work is to be performed." Stanley Smith, 322 S.E.2d at 477. Greenfield's admission that Erwin-Penland "never came back" and agreed with any of his proposed terms is fatal to any implied contract claim.[20] (Gf. Dep. 207:4-10) Likewise, the mere discussion of multiple ownership structure "options" for a potential future agreement (see Ex. 21) does not support a "contract-by-conduct" theory. If anything, such communications demonstrate a clear *lack* of agreement on any term, and it is undisputed that Erwin-Penland never accepted any proposed ownership structures. (Gf. Dep. 207:4-10)

A contract is not complete where something remains to be done to establish contractual relations as contemplated by both parties. Insurance Co. of N. Am. v. U.S., 159 F.2d 699, 701 (4th Cir. 1947). Here, *none* of the terms ever progressed beyond the proposal stage. The absence of a contract is understandable given that this was a pitch for new business, with both Erwin-Penland and Greenfield hoping the pitch would be accepted:

---

[20]  In addition to Greenfield's own admissions, Mr. Hughes, the President of Greenfield's proposed production partner BuzzNation, admitted that the parties did not reach any contractual agreement to do any work in this case. (Ex. 33, Deposition of Mark Hughes 162:14-19 ("[Greenfield] never got a contract, so there's nothing to participate in"), 349:1-11 ("[Buzznation] never received a contract, so how can we have rights if we never received a contract…."))

> A.  The idea was that, when Verizon said 'Let's go, let's do this,' in whatever form it was, a production agreement would be drawn up at that time. There was no reason to go in with contracts in hand until all of the particulars were worked out.
>
> Q.  And no production agreement was ever exchanged with anyone, correct?
>
> A.  That's correct.

(Gf. Dep. 204:9-18)  By his own admission, a binding agreement was never entered into by any of the parties with complete terms concerning any of the work to be performed.

### C.  Greenfield's Conversion and Breach of Contract By Fraudulent Act Claims [Counts VI and III] Also Fail Because Greenfield Has No Rights in HSTS.

With Greenfield's principal claims of trade secret misappropriation and contract stricken, the rest of his claims fall on their own weight.  Specifically, Greenfield's claim for conversion fails as a matter of law because it does not relate to tangible, personal property.  Conversion is the "unauthorized assumption in the exercise of the right of ownership over goods or personal chattels belonging to another to the exclusion of the owner's rights."  Gignilliat v. Gignilliat, Savitz & Bettis, L.L.P., 684 S.E.2d 756, 763 (S.C. 2009).  An action for conversion lies only for "tangible" property, and South Carolina courts have "held that intangible rights are normally not the proper subject of a conversion claim."  Id.  Here, there are no tangible property rights at issue; just ideas.

In addition, because South Carolina law requires a valid contract as a prerequisite to a claim for breach of contract accompanied by a fraudulent act, Greenfield's third counterclaim also fails as a matter of law.  Cain v. United Insur. Co., 102 S.E.2d 360, 362 (S.C. 1958) (holding that there can be no claim for fraudulent breach of contract absent a valid contract).

### D.  Greenfield's Promissory Estoppel Claim [Count IV] Fails Because Erwin-Penland Did Not Promise Greenfield Anything.

Greenfield also seeks equitable relief in the form of promissory estoppel.  A claim of promissory estoppel is available only where: (1) a promise unambiguous in its terms is present;

(2) the party to whom the promise is made reasonably relies on it; (3) the reliance is expected

and foreseeable by the party who makes the promise; and (4) the party to whom the promise is

made sustains injury in reliance on the promise.  Woods v. State, 431 S.E.2d 260, 263 (S.C. Ct.

App. 1993).  The doctrine of promissory estoppel may not be used to create a legally enforceable

promise when it would not otherwise be binding under ordinary contract principles.  Trident

Constr. Co. v. Austin Co., 272 F. Supp. 2d 566, 577 (D.S.C. 2003).  As discussed above,

Greenfield admits that the parties never definitively agreed to any terms concerning the HSTS

idea that was pitched to Verizon Wireless in April 2006.  (See, e.g., Gf. Dep. 207: 4-10).   And

most certainly, there were no "promise[s] unambiguous in [their] terms."  Trident, 272 F.

Supp.2d at 576-77.  Accordingly, this claim fails as a matter of law.

Moreover, Greenfield cannot prove that he reasonably relied on any purported assurances

from Erwin-Penland to his detriment.  Greenfield, in fact, did not rely on any promise, let alone

reasonably, because he never gave up any work in reliance on HSTS or performed work on the

current HSTS program.  It is undisputed that Greenfield gave up no revenue and turned down no

work for his business in reliance on HSTS.  (Gf. Dep. 268:4-12)  Greenfield did "no work related

to the Memphis concert," and "nothing" in either 2008 or 2009 related to HSTS.  (Id. 265:13-19)

Further, he has not expended "any time or effort having the concerts go forward," had no

involvement in the "day-to-day" operations of the concerts, has not worked on any concert

logistics, has not lined up any churches, booked any venues, and has not traveled for the project

(Id. at 265:13-267:11)  Based on his own admissions, there can be no reliance.

## IV.    Erwin-Penland Is Entitled To Summary Judgment on All of Greenfield's Counterclaims Sounding In Fraud [Counts I, V, VII & VIII].

Greenfield asserts four claims that sound in fraud:  fraud in the inducement of a contract

(Count I); negligent misrepresentation (Count V); fraud and misrepresentation (Count VII); and

constructive fraud (Count VIII).  These claims should be dismissed because Greenfield has failed

to plead his fraud claims with requisite particularity:  he did not specify the essential facts (i.e.,

who, what, when, where, and how) supporting his allegations.  See Fed. R. Civ. P. 9(b).[21]

Furthermore, the undisputed evidence eliminates any claim for fraud.

To prove a cause of action for fraud or fraudulent inducement, Greenfield must establish

through particularized evidence all the of the following elements: (1) a representation, (2) its

falsity, (3) its materiality, (4) knowledge of its falsity or reckless disregard of its truth or falsity,

(5) intent that the representation be acted upon, (6) the [proponent's] ignorance of its falsity, (7)

the [proponent's] reliance on its truth, (8) the [proponent's] right to rely thereon, and (9) the

[proponent's] consequent and proximate injury.  See, e.g., Turner v. Milliman, 671 S.E.2d 636,

642 (S.C. Ct. App. 2009).  Even at the summary judgment stage, Greenfield must prove each of

these elements by the heightened standard of clear and convincing evidence.  O'Shields v.

Southern Fountain Mobile Homes, Inc., 204 S.E.2d 50, 52 (S.C. 1974) ("Failure to prove any

one of the ... elements [of fraud] is fatal to recovery").

Greenfield cannot establish that Erwin-Penland made false representations of material

fact.  The crux of the alleged false statements by Erwin-Penland is that Erwin-Penland

---

[21]  The fraudulent allegations set forth in ¶¶ 43, 80, 88 of the Counterclaims, even as described
by Greenfield at his deposition, lack the requisite specificity and particularity necessary to
state a cause of action for fraud.  The allegations merely identify in the most general terms
the subject matter of the alleged false representation:  "that Defendants would be
compensated if the First Pitch and Second Pitch solicitations were successful, and – in the
case of the Second Pitch – that all of the Defendants' fees would be paid and that ownership
in How Sweet the Sound would be split equally between Erwin-Penland and 1st Approach."
(See, e.g., Counterclaim ¶ 43)  The allegations do not – as they must – specify with any
degree of particularity the essential facts (i.e., dates, times, places, amounts, names, etc.).
Further, Greenfield asserts that Erwin-Penland mislead him "as to the status of the Second
Pitch solicitation to Verizon Wireless" (id. ¶ 80), however, Greenfield fails to particularly
allege what specific misrepresentations were made, where they were made, who made them,
or when they were made.  Absent such fundamental allegations, fraud claims cannot survive.
Mincey v. World Sav. Bank, 614 F.Supp.2d 610, 622-624 (D.S.C. 2008).

purportedly promised Greenfield he would be compensated *if* the Verizon Wireless pitch were successful; that *if* a television series were created, then ownership in a TV production company would possibly be split between the parties in one of a few yet to-be-determined ways; and that *if* a television series went forward, then Greenfield's role would be limited to production of the reality television series.  (See Counterclaim ¶¶ 43, 80; Gf. Dep. 144:14-146:1, 207:4-10)  These statements are all ones of *future intent*, and such statements cannot be fraudulent as a matter of law.  Fraudulent statements "must relate to a present or pre-existing fact, and cannot ordinarily be predicated on unfulfilled promises or statements as to future events."  Tom Hughes Marine Inc. v. Am. Honda Motor Co., 219 F.3d 321, 324-25 (4th Cir. 2000).  At most, Erwin-Penland's purported statements indicate a future intent to negotiate a formal business arrangement with Greenfield, which it is undisputed was never consummated.  (See Gf. Dep. 207: 4-10)

Further, to be actionable, a statement must be false at the time it was made.  Tom Hughes, 219 F.3d at 325.  At the time of the purported statements, Erwin-Penland was interested in exploring a mutually beneficial arrangement.  It was only after Verizon Wireless rejected the reality television series idea that Erwin-Penland and Greenfield's communications ceased.  There is no evidence that any of the alleged misstatements were false when made.

Nor can Greenfield establish that Erwin-Penland intended to mislead him.  Erwin-Penland's intent was to explore a mutually beneficial business relationship with Greenfield in an arms-length manner.  Erwin-Penland's actions and statements do not evince an alternate intent, and there is nothing in the record to support the claim that Erwin-Penland "made promises while contemporaneously harboring an intention to dishonor them."  Tom Hughes, 219 F.3d at 326.  Further, it is irrational to even argue that Erwin-Penland would present Greenfield to Verizon

Wireless as its television production person while planning to defraud and discredit him.[22]  Such actions would be a ridiculous risk to its relationship with Verizon Wireless.  In truth, the simplest explanation is the right one: both Erwin-Penland and Greenfield hoped to win the reality television series business, but neither had any guarantee.

Further, Greenfield cannot legitimately argue that he reasonably relied on any purportedly fraudulent statements.  The record clearly shows that Greenfield knew that any business dealings between him and Erwin-Penland were contingent upon Verizon Wireless's acceptance of the reality television series (supra at 9), and that Greenfield and Erwin-Penland were free to communicate with other parties separately about HSTS.  (See Counterclaim ¶ 34 (stating that Greenfield "would like to take the offer to other clients")).  In such an exploratory arms-length relationship, any reliance by Greenfield on Erwin-Penland or Verizon Wireless's future intent to formalize a business relationship would be unreasonable.  See Regions Bank v. Schmauch, 582 S.E.2d 432, 445 (S.C. Ct. App. 2003).

Greenfield also has no competent evidence that he was damaged.  He testified at his deposition that he has not turned down any work in the past two years based upon any claim he is making in this case (Gf. Dep. 268:4-7), and it is undisputed that he has not done any work related to the concert series for which he remains unpaid.  (Id. 265:13-20)  He has no record of any of the work performed for the April 2006 pitch to Verizon Wireless and did not seek

---

[22]   The irony of Greenfield accusing Erwin Penland and Joe Erwin of fraud is not lost.  A better read of what actually took place is that Greenfield tricked Mr. Erwin and Erwin-Penland into believing that he had television production experience.  Had Erwin-Penland known that Greenfield had absolutely no television experience, and that he was a convicted felon, he would never have been at the pitch in the first place.  (See Ex. 15 (stating in interrogatory response that Greenfield has "no direct, hands-on television production experience")).

compensation for his costs associated with the pitch.[23]  (Id. 148:3-5, 164:3-15)  And there is no measure of his lost profits or any other reliable indication of his claimed damages.

Greenfield's constructive fraud (Count VIII) and negligent misrepresentation (Count V) claims likewise fail.  To establish constructive fraud, Greenfield needs to prove all of the elements of actual fraud except for intent, which, as noted above, he cannot do.  Pitts v. Jackson Nat'l Life Ins. Co., 574 S.E.2d 502, 509-10 (S.C. Ct. App. 2002).  Greenfield cannot prove his negligent misrepresentation claim because, like fraud, it requires a false statement, justifiable reliance, and damages, and the record is devoid of evidence proving any of these elements. AMA Mgmt. Corp. v. Strasburger, 420 S.E.2d 868, 873-74 (S.C. Ct. App. 1992).  In addition, negligent misrepresentation requires a breach of a duty of care; because no legal duty existed between Erwin-Penland and Greenfield, this claim fails.  (Infra Section VI)

## V.    Erwin-Penland Is Entitled To Summary Judgment on Greenfield's Counterclaim for Cancellation of Trademark [Count XIV].

Count XIV, in which Greenfield asks this Court to cancel Erwin-Penland's federal trademark registrations for "How Sweet the Sound," demonstrates a fundamental misunderstanding of trademark law.  (See Counterclaim ¶¶ 125, 127-128)  Greenfield seeks to cancel Erwin-Penland's federal registration for HSTS for fraud because he claims that he is the only one entitled to register that mark.[24]  Contrary to Greenfield's claim (Counterclaim ¶ 125), it is wholly immaterial who coined the term, "How Sweet the Sound," though all Erwin-Penland

---

[23]  ███████████████████████████████████████████████████████████

[24]  It is hornbook law that "the courts and the trademark board both view charges of fraud in the registration of a trademark as a disfavored defense."  Aveda Corp. v. Evita Mktg., Inc., 706 F. Supp. 1419, 1425 (D. Minn. 1989).  Therefore, "[a] party seeking cancellation of a registered trademark on grounds of fraud must demonstrate the alleged fraud by 'clear and convincing evidence.'"  Orient Express Trading Co. v. Federated Dep't Stores, Inc., 842 F.2d 650, 653 (2d Cir. 1988).

witnesses agree it was Erwin-Penland that named the project.  Trademark rights are based on use in commerce, not creativity.  See 15 U.S.C. § 1051(a)(3) (requiring, *inter alia,* that the application statement be verified by the applicant and specify that the mark is in use in commerce).  In seeking to register a mark with the PTO, an applicant is simply required to state under oath that "to the best of the verifier's knowledge and belief" no one has a superior right to use the mark.  15 U.S.C. § 1051(a)(3)(D).  Thus, as long as Erwin-Penland had an honest belief that it had the right to use the HSTS mark, Erwin-Penland could not have committed fraud on the PTO.  See Advance Stores Co. v. Refinishing Specialties, 948 F. Supp. 643, 654 (W.D. Ky. 1996); Intellimedia Sports Inc. v. Intellimedia Corp., 1997 WL 398344, at *4 (T.T.A.B. May 20,1997).

Here, it is undisputed that Greenfield has never used the mark in commerce.  Absent such use, he cannot claim trademark rights and thus cannot claim, as a matter of law, that he has rights superior to Erwin-Penland.

## VI.   Erwin-Penland and Mr. Erwin Are Entitled to Summary Judgment on Counterclaims Alleging Breaches of Fiduciary Duty [Counts X & XI].

Greenfield claims that Erwin-Penland breached fiduciary duties to him that arose from the purported special confidence and trust Greenfield placed in Erwin-Penland.  Contrary to this claim, the interactions between the parties constituted arms-length business transactions that did not create a special relationship.

### A.   No Fiduciary Relationship Existed Between Greenfield and Erwin-Penland.

A fiduciary relationship exists only when one imposes a special confidence in another, so that the latter is "bound to act in good faith and with due regard to the interests of the one reposing confidence."  Regions Bank, 582 S.E.2d at 444.  Normal, arms-length commercial relationships are not fiduciary. "Because the fiduciary duty is one which requires a high degree

32

of care and consideration due the person to whom the duty is owed, only certain relationships carry with them this type of duty." Williams-Garret v. Murphy, 106 F. Supp.2d 834, 840 (D.S.C. 2000). "[A]s a general rule, a fiduciary relationship cannot be established by the unilateral action of one party." Brown v. Pearson, 483 S.E.2d 477, 484 (S.C. Ct. App. 1997).

Here, it is undisputed that Erwin-Penland never agreed to enter into a fiduciary relationship with Greenfield. (See, e.g., Gf. Dep. 130:2-5, 207:4-10) The parties were engaged in an arms-length business relationship concerning the potential production of an episodic reality television series and pitch to Verizon Wireless. There was no contract, nor any legal partnership between Greenfield and Erwin-Penland that could have given rise to the necessary "special" relationship. Brown v. Green Tree Financial Servicing Corp., 2008 WL 2157120, at *11 (D.S.C. May 19, 2008 ) (granting summary judgment where conduct took place prior to the parties entering a mutually binding contract). The record also is devoid of any evidence that Erwin-Penland "was acting on [Greenfield's] behalf in contrast to [its] own interests." Williams-Garrett, 106 F.Supp.2d at 841. There is no evidence that Greenfield placed a special trust in Erwin-Penland.[25] Rather, the two parties worked for their own individual benefit in the hopes of convincing Verizon Wireless to sponsor a reality television series.

### B.  The Counterclaim Against Mr. Erwin for Aiding and Abetting Also Fails.

Defendant's claim against Mr. Erwin for aiding and abetting a breach of fiduciary duty fails as a matter of law because there was no underlying duty or intentional participation in a

---

[25]  To the extent Greenfield claims that a constructive or resulting trust arises due to a breach of fiduciary duty or the improper possession and use of his purported "trade secrets," the claim fails as a matter of law. There were no fiduciary duties between the parties, and none of Greenfield's purported property was misappropriated. See Lollis v. Lollis, 354 S.E.2d 559, 561 (S.C. 1987) (constructive trust only arises where property acquired in improper manner). (Supra Sections II, III, IV)

breach of duty.[26]  Where there is neither a duty nor a breach of duty, there can be no claim for

aiding and abetting.  Goodman v. Goldberg & Simpson, P.S.C., 2009 WL 3321024, at *4-5 (Ky.

App. Ct. Oct. 16, 2009) (affirming summary judgment absent a legal duty).  Further, there is no

evidence that Mr. Erwin knowingly participated in any purported breach, or that he intended to

deceive or harm Greenfield.  The record demonstrates only that Mr. Erwin briefly worked with

Greenfield in connection with the two pitches, and that Mr. Erwin believed Greenfield's

expertise and role in HSTS was related to reality television production.  (See Erwin Dep. 124:6-

9, 197:11-22, 213:6-24)  Absent any intent to willfully breach a purported duty to Greenfield, the

claim against Mr. Erwin fails as a matter of law.

**VII.**     **Greenfield's Counterclaims for Equitable Relief [Counts XII & XIII] Should Be
Dismissed.**

There is no merit to Greenfield's jumbled claim for restitution/unjust

enrichment/quantum meruit (Count XII).  To prevail under theories of unjust enrichment or

quantum meruit,[27] Greenfield "must show the following elements: (1) [a] benefit conferred by

[the counterclaim] plaintiff upon the defendant; (2) realization of that benefit by the

[counterclaim] defendant; and (3) retention of the benefit by the [counterclaim] defendant under

circumstances that make it inequitable for him to retain it without paying its value."  Gignilliat,

684 S.E.2d at 764.  Here, Greenfield cannot escape that (1) his only contributions, to the limited

extent they existed, were in helping Erwin-Penland make the pitch for an idea of an episodic,

American-Idol style, reality television series – *an idea which was rejected* (Erwin Dep. 374:11-

---

[26]  To establish a claim for aiding and abetting a breach of fiduciary duty, Defendants must
prove (1) a breach of fiduciary duty (2) Mr. Erwin's knowingly participation in the breach
and (3) damages.  Future Group II v. Nationsbank, 478 S.E.2d 45, 50 (S.C. 1996) (granting
summary judgment where record was devoid of a knowing breach of fiduciary duty).

[27]  The South Carolina Supreme Court recently stated in affirming summary judgment, "it is
axiomatic that a claim for *quantum meruit* will not lie absent evidence of unjust enrichment."
Gignilliat, 684 S.E.2d at 764 (emphasis added).

14; Bos. Dep. 39:1-7); (2) Greenfield had *no role whatsoever* in the planning and implementation of the HSTS project that was actually approved and enacted (Gf. Dep. 265:13-267:11); (3) ███ ████████████████████████████████████████████████████████ (Bos. Aff. ¶ 28); and (4) ████████████████████████████████████ ████████████████████████████████████ (Bos. Aff. ¶ 28)  Thus, there was no unjust enrichment to Erwin-Penland.  There is nothing inequitable about Erwin-Penland being paid for the *work it did do* and Greenfield not receiving compensation for *work he did not do*.  A contrary result would unjustly enrich Greenfield.

**VIII.   Erwin-Penland Is Entitled to Summary Judgment on its Claim for Declaratory Judgment.**

As demonstrated above, there is no dispute of material fact and Greenfield has no rights in HSTS, nor is he owed anything from Erwin-Penland, Verizon Wireless, or Mr. Erwin. Greenfield's attempt to extort these parties in this hold-up lawsuit should be denied, and summary judgment should enter on Erwin-Penland's declaratory judgment claim.

### CONCLUSION

For the foregoing reasons, Erwin-Penland is entitled to summary judgment on each of Greenfield's counterclaims.  Inasmuch as Greenfield's trade secret and attendant claims must be dismissed as a matter of law, Erwin-Penland is also entitled to summary judgment on its request for declaratory relief that Greenfield has no rights in the HSTS program.

Respectfully submitted,


HILL HOLLIDAY CONNORS
COSMOPULOS, INC. d/b/a ERWIN-
PENLAND, and JOSEPH A. ERWIN

By its attorneys,

_____
Bernie W. Ellis, Federal No. 5650
Rita M. McKinney, Federal No. 4852
MCNAIR LAW FIRM, P.A.
Post Office Box 447
Greenville, SC 29602
Phone:   864-271-4940
Fax:       864-271-4015
Email:    bellis@mcnair.net
              nnckinney@mcnair.net

*Of Counsel*

Brenda R. Sharton
Neil T. Smith
Stacey Baron Ardini
Kunal Pasricha
GOODWIN PROCTER LLP
Exchange Place
53 State Street
Boston, MA 02109
Phone:   617-570-1000
Fax:       617-523-1231
Email:    bsharton@goodwinprocter.com
              nsmith@goodwinprocter.com
              sardini@goodwinprocter.com
              kpasricha@goodwinprocter.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 1, 2010, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to the registered participants as identified on the Notice of Electronic Filing.

_____