IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| HILL HOLLIDAY CONNORS COSMOPULOS, INC. d/b/a ERWIN-PENLAND, | ) ) ) | Case Number: 6:08-CV-3980-GRA |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| JEFFREY GREENFIELD and 1st APPROACH, LLC, | ) ) | |
| | ) | |
| Defendants, and Third-Party Plaintiffs, | ) ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS, and JOSEPH A. ERWIN, | ) ) ) | |
| | ) | |
| Third-Party Defendants. | ) | |

## MEMORANDUM IN SUPPORT OF THIRD-PARTY DEFENDANT VERIZON WIRELESS' MOTION FOR SUMMARY JUDGMENT AND/OR JUDGMENT ON THE PLEADINGS

Third-Party Defendant Cellco Partnership d/b/a Verizon Wireless ("Verizon Wireless"), hereby moves for an order of summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure against Defendants and Third-Party Plaintiffs 1st Approach, LLC ("1st Approach") and Jeffrey Greenfield ("Greenfield," or collectively "Defendants") on Counts IX, X, XII, and XIII of the First Amended Counterclaim and Third-Party Complaint ("Third-Party Complaint"), which are the only counts asserted against Verizon Wireless. In support of its Motion, Verizon Wireless respectfully

1

submits this Memorandum of Law and the exhibits attached hereto, demonstrating an absence of any disputed material fact and that Verizon Wireless is entitled to judgment as a matter of law. Verizon Wireless respectfully requests that this Court grant its Motion and enter an order in favor of Verizon Wireless on Counts IX, X, XII, and XIII of the Third-Party Complaint.

## INTRODUCTION

In December 2005, Plaintiff Erwin-Penland, Verizon Wireless' long-standing advertising agency, proposed that Verizon Wireless consider sponsoring a national gospel-choir competition modeled on the wildly popular "American Idol" reality television series. After considering the idea on and off over the next year, Verizon Wireless decided to sponsor a single gospel-choir concert in 2007 called "How Sweet the Sound" ("HSTS"). That program differed significantly from the one originally proposed in 2005 and considered in 2006 in that, among other things, the 2007 program involved a single live, untelevised concert held in Memphis, Tennessee. Verizon Wireless also sponsored multi-city HSTS programs in 2008 and 2009. While these programs were broader in scope than the 2007 program, they too differed significantly from the program proposed and considered in 2005 and 2006, most notably in the lack of a reality television series of the sort included in the 2005 and 2006 proposals. HSTS is mostly a cost center for Verizon Wireless that yields uncertain and largely immeasurable benefits but the company continues to sponsor the program because it is beloved in some segments of the African American community.

Nearly two years after it sponsored its first HSTS program and while it was deeply involved in the execution of the 2009 HSTS program, Defendants served Verizon

Wireless with a third-party subpoena.[1]  Greenfield later brought Verizon Wireless into this suit, claiming that Verizon Wireless misappropriated his trade secrets by sponsoring the HSTS programs, which, according to Greenfield, embody his ideas. (Third-Party Compl. ¶¶ 29, 39, 97).  Greenfield's claims against Verizon Wireless rest entirely on the fact that Greenfield attended and spoke for less than five minutes at an April 2006 pitch by Erwin-Penland to Verizon Wireless, in which Erwin-Penland and numerous other marketing agencies discussed a possible Verizon Wireless sponsorship of a gospel-choir competition and television series.  These claims are baseless.

Outside the context of this lawsuit, the Verizon Wireless executives who attended the April 2006 pitch, who decided to sponsor HSTS, and who executed the three HSTS programs have no idea who Greenfield or 1st Approach are—no one at Verizon Wireless can even recall that Greenfield was at the pitch.  It is undisputed that Verizon Wireless had never interacted with Greenfield, had no business relationship with him, and had no contract or a discussion of entering into a contract with him.  Furthermore, as Verizon Wireless' trusted agency, Erwin-Penland took the lead in presenting the proposal for a gospel-choir competition at the pitch.  Based on its long-standing business relationship with Erwin-Penland and on Erwin-Penland's contractual warranties that none of the services it renders to Verizon Wireless will result in any misappropriation of trade secrets, Verizon Wireless believed that the proposal presented was not a protected trade secret belonging to someone else.

Greenfield cannot claim any legally protected "trade secrets."  In discovery he could not articulate any unique concepts or ideas that were not already known to

---

[1] Verizon Wireless objected to the third-party subpoena, which was not properly served, and did not produce any documents or witnesses in response to it.

marketing professionals or that Verizon Wireless somehow came upon through illicit means. Indeed, Greenfield could not even identify the specific ideas that allegedly constitute his trade secrets. Instead, Greenfield claims generally that his trade secrets in 2005 and 2006 exist as the current-day version of HSTS, even though he cannot articulate the elements of a program that has evolved substantially over the three years of execution by Verizon Wireless and its agencies. Of course, as noted, the elements of the various HSTS programs that Verizon Wireless actually sponsored are very different from the elements of the proposal presented to Verizon Wireless in 2005 and 2006.

More important, as Greenfield admits, most elements of the proposal, including the notion of a televised "American Idol"-type singing competition, can hardly be considered secret. To the contrary, they were already well known and in use by marketing professionals. Consistent with the fact that the elements of the proposal were neither unknown nor unascertainable through proper means, the proposal was freely and openly presented to the attendees of the April 2006 meeting. (Third-Party Compl. ¶ 29). None of the attendees was asked to sign a non-disclosure agreement at any time before or after the meeting. And nothing in the PowerPoint presentation used in the April 2006 pitch itself indicated that the proposed sponsorship program constituted "trade secrets" belonging to Greenfield or anyone else. Thus, to the extent that Greenfield even had a trade secret in the gospel-choir competition proposal presented at the pitch, he completely failed to protect it and his claims must be dismissed for that reason alone.

After extensive discovery, the undisputed fact is that Greenfield attended the April pitch specifically to boost the television component of the Erwin-Penland pitch. Greenfield claimed to possess the contacts and skills required to produce a television

series at the level of "American Idol."   As it turns out, Jeff Greenfield admitted in discovery that he has no experience in television.  Despite his misrepresentations, the fact remains that Greenfield regarded a live television series as an integral component of the concept he claims as a trade secret, and the lack of such a component in the HSTS programs sponsored by Verizon Wireless defeats Greenfield's contention that those programs embody his alleged trade secret.  They do not, and Greenfield's claims should be dismissed for this reason as well.

### STATEMENT OF UNDISPUTED FACTS

**A.     The Presentation of a Gospel Choir Competition to Verizon Wireless**

In December 2005, Joe Erwin ("Erwin") and Allen Bosworth ("Bosworth") of Erwin-Penland, requested a meeting with Andrew Shafer ("Shafer") and Joe Saracino ("Saracino"), employees of the South Area of Verizon Wireless at the time.  (Shafer Dep. at 26:1–27:5, attached hereto as **Ex. 1**).   At this pitch, Erwin-Penland presented a concept for a gospel choir competition providing a PowerPoint presentation, commonly referred to in the industry as a "deck."   (Third-Party Compl. ¶ 12).[2]  The concept as presented by Erwin-Penland was based on a reality television gospel choir competition modeled after "American Idol."   (Shafer Dep. at 16:9–12).   It is undisputed that Greenfield was not involved in this initial meeting with Verizon Wireless, (id. at 26:11–16; Greenfield Dep. at 134:5–18), the deck presented to Shafer and Saracino (the "December Deck") contains no mention of Greenfield and bears a copyright solely in the name of Erwin-Penland.  **Ex. 3**.   At this presentation, Saracino and Shafer informed

---

[2]  As Greenfield admits, Erwin-Penland first presented the same gospel choir television competition concept to another potential client of Erwin-Penland, Captain D's, as part of a larger attempt to secure its business.  (Greenfield Dep. at 136:20–137:25, attached hereto as **Ex. 2**); (Third-Party Compl. ¶¶ 7, 12, 16).  Verizon Wireless was not involved with and did not participate in the presentation to Captain D's in any manner.

Erwin-Penland that the television portion of the program, as proposed, was beyond the budget and scope of the South Area.   (Shafer Dep. at 16:14–17:12).

During the next several months, Erwin-Penland communicated with Verizon Headquarters about a potential meeting to pitch the gospel choir competition to Verizon Wireless employees with nation-wide responsibilities.  It is undisputed that Greenfield did not participate in the discussions with Verizon Wireless leading up to that pitch and was not even on the meeting invite list.  **Ex. 4.**

The pitch was ultimately held on April 26, 2006 at Verizon Headquarters.  In addition to numerous Verizon Wireless executives, Erwin-Penland, and several other advertising and promotional agencies that had long-standing business relationships with Verizon Wireless attended the pitch.  (Greenfield Dep. at 166:9–168:2).  Greenfield was also present but had no substantive role in the meeting.  (Id. at 165:11–19).  The meeting at headquarters was the first and only contact that Greenfield had with Verizon Wireless.  (Id. at 141:10–142:6).  Greenfield claimed to be an experienced television producer with his own television production team and attended the meeting specifically because he hoped to coordinate the television production component of the proposal being pitched.  (Id. at 144:12–16).  Greenfield later admitted in discovery that he had never before produced a television program. (Id. at 192:1–5).  It is undisputed that Verizon Wireless and all of the other agencies in attendance were never asked by anyone to execute a non-disclosure agreement regarding the information in the slide deck or any other aspect of the presentation.  (Id. at 65:23–67:7, 119:3–6).

**B.      The Presentation Deck**

It is undisputed that the deck presented at the April 26 pitch (the "April Deck") provided no notice that the information was confidential or that it contained any of Defendants' alleged trade secrets.  **Ex. 5.**  The April Deck bears the Erwin-Penland logo on most of the pages and refers to Greenfield and/or 1st Approach three times in the thirty plus page presentation.[3]  The first reference to Defendants describes the proposal as a "marketing and <u>television concept</u> conceived by Erwin-Penland and 1st Approach" and contains a brief description of Defendants.  <u>Id.</u> at 8.  The second reference describes Greenfield, <u>his television production team</u> and another entity called "Buzznation" and touts <u>the group's alleged television experience</u>.  <u>Id.</u> at 28–29; (Greenfield Dep. at 188:5–7); Defs.' Resp. to Erwin Penland's First Set of Interrogs., No. 8, attached hereto as **Ex. 6**.  The third and final reference to Defendants comes on the last page of the April Deck which states that it is jointly copyrighted by: "Erwin-Penland/1st Approach."  **Ex. 5 at 36**.

The term "trade secret" appears nowhere in the April Deck, and Greenfield's alleged trade secrets were not specifically identified.  The April Deck is a high-level document that discusses the gospel choir competition concept in broad and general terms.  Indeed, the April Deck contains references to concepts such as gospel music, singing competitions, celebrity judges, message boards, media partnerships, and television programming, that were and are obvious to those in the marketing and promotional field and that were already in the public domain.  **Ex. 7 at 3–4; Ex. 8 at 8–9**.

**C.     Formation of HSTS**

---

[3] 1st Approach is an advertising agency owned by Greenfield's wife, and Greenfield and his wife are the sole employees of the company.  (Greenfield Dep. at 9:7–18).

After the headquarters pitch in 2006, Verizon Wireless' then Director of Media Sponsorships and Integration, Suzy Deering, evaluated the proposal and summarily rejected the television series format of the proposed program based on the fact that creating television programming was outside of Verizon Wireless' core competency. (Deering Dep. at 13:10–12, 37:19–38:19, attached hereto as **Ex. 9**).[4]  In early 2007, Verizon Wireless decided that the South Area would run a local, single-event concert in Memphis, Tennessee called HSTS.   (Shafer Dep. at 28:10–29:7).   Robyn Duval ("Duval"), who is the Associate Director of National Advertising in the South Area, executed HSTS in Memphis.  (Duval Dep. at 22:17–18, 23:13–24:9, attached hereto as **Ex. 10**).   The one-time live concert did not include the television component initially pitched to Verizon Wireless.  (Id. at 37:8–11).   Various agencies with which Verizon Wireless already had working relationships, including Erwin-Penland, were involved in executing the Memphis version of HSTS.   (Id. at 26:20–27:21).   It is undisputed that Greenfield was not involved in any manner in this 2007 HSTS event.  (Greenfield Dep. at 265:13–15).

After discussing the 2007 HSTS event with its agencies, including Erwin-Penland, Verizon Wireless decided to take the local HSTS program already in place in the South Area and run it nationally in 2008.  (Rossi Dep. at 42:14–43:2, attached hereto as **Ex. 11**); **Ex. 12**.   Lou Rossi, Verizon Wireless' National Director of Media Sponsorships, executed HSTS in eleven cities in 2008 and 2009.  (Rossi Dep. at 14:20; 49:12); **Ex. 13 at 43**.  Again, the national version of HSTS does not include the television

---

[4] While performing this review, Deering was promoted to Director of Brand Management and Integration at Verizon Communications such that her responsibilities were expanded to include Verizon's wireline companies and she was no longer involved in evaluating the choir competition concept.  (Deering Dep. at 24:1–13).

component initially pitched to Verizon Wireless.  (Rossi Dep. at 121:21–122:7).  Various agencies with which Verizon Wireless already had working relationships, including Erwin-Penland, are involved in executing the national version of HSTS.  **Exs. 14; 15**.  It is undisputed that Greenfield was not involved in any manner in the 2008 and 2009 HSTS events.  (Greenfield Dep. at 265:16–20).

Greenfield admitted that Verizon Wireless had no contract or agreement of any kind with Greenfield and Verizon Wireless never agreed to pay Greenfield or use him to produce HSTS.  (Greenfield Dep. at 206:19–21).

## PROCEDURAL POSTURE

In August 2008, Greenfield sent demand letters to Erwin-Penland and threatened litigation.  Notably, Greenfield did not make any demand to Verizon Wireless and did not threaten Verizon Wireless with litigation regarding HSTS at this time.  **Ex. 16**.  Indeed, as noted, when Greenfield was sued by Erwin-Penland, Greenfield counter-claimed against Erwin-Penland only and brought a separate lawsuit against only Erwin-Penland.[5]

Erwin-Penland filed suit against Defendants on September 12, 2008 in the South Carolina Court of Common Pleas, Thirteenth Judicial Circuit, seeking a declaratory judgment holding that Defendants have no ownership interest or right in HSTS.  Defendants removed the case to the District of South Carolina, Greenville Division, on December 10, 2008, (Docket No. 3), and filed an answer and counterclaim against Erwin-Penland alone on December 14, 2008.  On February 6, 2009, Defendants faxed Verizon Wireless a third-party subpoena requesting documents from several Verizon Wireless custodians.  **Ex. 17**.  Verizon Wireless objected to the subpoena and did not produce any

---

[5] This lawsuit, filed in the District Court of South Carolina on December 1, 2008, was dismissed on February 20, 2009 since Erwin-Penland had filed its suit first.  See 1st Approach, LLC v. EBE of Greenville, Inc., No. 6:08-cv-03901-GRA (D.S.C. 2008) (Docket Nos. 1, 27).

documents or deposition witnesses in response to it.  **Ex. 18**.  Two months later, on April 2, 2009, Defendants filed a Third-Party Complaint against Verizon Wireless, stating claims for misappropriation of trade secrets, constructive and/or resulting trusts/breach of fiduciary duty, restitution/unjust enrichment/Quantum Meruit, and injunctive relief. (Docket No. 24).

Discovery in this case is virtually completed.[6]  Defendants have deposed the Verizon Wireless employees who were primarily involved in the different HSTS events. In addition, Defendants have deposed several Erwin-Penland employees involved in the programs.  The parties have exchanged hundreds of thousands of pages of documents. Now, after diligently pursuing discovery, Verizon Wireless moves for summary judgment on all of Third-Party Plaintiff Greenfield's claims against it.  It is undisputed that Greenfield's only interaction with Verizon Wireless occurred at one presentation, where he spoke for less than five minutes, that neither Greenfield nor 1st Approach has a contract with Verizon Wireless, and that Defendants have never participated in HSTS in any manner.

## ARGUMENT

Summary judgment is "favored as a mechanism to secure the just, speedy and inexpensive determination of a case, where its proper use can avoid the cost of a trial." JKC Holding Co., LLC v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001).  A grant of summary judgment is warranted where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as

---

[6]  The only remaining discovery is the deposition of Saracino and potentially a Rule 30(b)(6) deposition of Verizon Wireless pertaining to damages only.  Because of scheduling conflicts, Verizon Wireless and Greenfield agreed to conduct the Saracino deposition after the discovery deadline.  It is scheduled for March 4, 2008 and will occur before briefing on this motion is complete.

to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). Initially, the party seeking summary judgment must demonstrate that no genuine issue of material fact exists, but once the movant makes this threshold demonstration, Rule 56(e) shifts the burden of proof to the nonmoving party to set out specific, material facts showing a genuine issue for trial beyond the allegations averred in its pleadings. Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986).

Where, as here, the nonmoving party bears the burden of proof at trial, the moving party can discharge its obligation merely "by pointing out to the court that there is an absence of evidence to support the nonmoving party's case." Id. at 325. In this case, the nonmoving party's Rule 56(e) shifted burden is "particularly strong." See Hughes v. Bedsole, 48 F.3d 1376, 1381 (4th Cir. 1995) ("The obligation of the nonmoving party is 'particularly strong when the nonmoving party bears the burden of proof.'") (quoting Pachaly v. City of Lynchburg, 897 F.2d 723, 725 (4th Cir. 1990)). Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

I.     **Defendants' Misappropriation of Trade Secret Claim Fails as a Matter of Law**

This Court should grant summary judgment in favor of Verizon Wireless on Greenfield's misappropriation of trade secret claim for several independent reasons. First, there is no trade secret that could have been misappropriated. Greenfield cannot identify his alleged trade secrets with any specificity, and the "trade secrets" that Greenfield loosely describes in the most general terms are not protectable under the South Carolina Trade Secrets Act because it involves information that is readily

ascertainable by proper means by the public, and Greenfield failed to maintain the requisite level of secrecy specified under the Act.

Second, even assuming Greenfield was able to claim a trade secret (and he is not), he still cannot sustain a misappropriation claim against Verizon Wireless. Verizon Wireless came upon the information that Greenfield claims is his trade secret through proper means in that Greenfield himself freely disclosed that information at a pitch held at Verizon Headquarters and attended by Erwin-Penland and several third-party agencies that compete directly with Greenfield. Even if Greenfield had not voluntarily presented this information without a non-disclosure agreement, Verizon Wireless did not know of and had no reason to know of any purported improper conduct in connection with the disclosure of that information, and did not know of any circumstances giving rise to a duty to maintain the secrecy of the material.

### A.     Greenfield Cannot Establish a Valid Trade Secret Under the South Carolina Trade Secrets Act

"The first determination which must be made in a trade secrets case is 'whether, in fact, there was a trade secret to be misappropriated.'" <u>Servo Corp. of Am. v. Gen. Elec. Co.</u>, 393 F.2d 551, 555 (4th Cir. 1968) (quoting <u>Van Prod. Co. v. Gen. Welding & Fabricating Co.</u>, 213 A.2d 769, 780 (Pa. 1965)). The South Carolina Trade Secrets Act ("SCTSA") defines a trade secret as information that:

> (i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by the public or any other person who can obtain economic value from its disclosure or use, *and*
> (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

S.C. Code Ann. § 39-8-20(5)(a) (2008).  The burden of proving the existence of a valid

trade secret under South Carolina law falls on the party making the claim.  <u>Nucor Corp.

v. Bell</u>, 482 F. Supp. 2d 714, 726 (D.S.C. 2007).  Greenfield cannot satisfy this burden.

     1.     <u>Greenfield Cannot Articulate His Alleged Trade Secrets</u>

After extensive discovery, Greenfield cannot identify any protectable trade secret.

Instead, Greenfield claims that he combines various known marketing elements in a

unique way, much like a Mrs. Fields' cookie.  (Greenfield Dep. at 64:2–65:5).  Unlike a

Mrs. Fields' cookie, however, Greenfield is unable to consistently define the ingredients

to the trade secret, or to describe the manner in which they are uniquely combined.

(Third-Party Compl. ¶¶ 7, 12; Greenfield Dep. at 62:18–23; 63:13–18).  Moreover, while

he claims that HSTS embodies all elements of his trade secret, Greenfield cannot even

remotely describe the elements of HSTS other than in the broadest, most self-serving

terms.

To be clear, Greenfield alleges that the April Deck contains all of his purported

trade secrets.  (Greenfield Dep. at 65:16–19).  In short, the "sum total of the basis of [his]

claim against Verizon [Wireless] for misappropriation of trade secrets" flows from this

deck.  (<u>Id.</u> at 267:21–268:3).  The April Deck, however, clearly reveals the stark

differences between the program as executed and Greenfield's self-serving allegations.

According to the deck, the alleged trade secrets include a television competition like

American Idol, four rounds of competition, and six regional markets as the "core

elements" of the gospel choir competition.  **Ex. 5**.  Setting aside the fact that such general

elements cannot be considered secret, it is undisputed that no version of HSTS has ever

incorporated these elements.  Rather, the execution of HSTS involves many significant

elements that are clearly absent from the proposal presented in the April Deck and were developed over the course of executing this program for more than three years without Greenfield. These elements include: a youth gospel showcase, local artist competition, concourse festival, gospel trivia, gospel karaoke, charity phone donation, and merchandising. **Ex. 13 at 26–32; Ex. 19 at 13–16, 19**. These elements are clearly beyond the broad strokes of the April Deck and Greenfield's alleged trade secrets.

The simple fact is that Greenfield is attempting to capitalize on his fortuitous invitation to the April presentation. He claims that Verizon Wireless' unsurprising use of broad marketing techniques such as the internet, grassroots marketing, and media partnering, in executing HSTS amounts to misappropriation. These generic elements do not give rise to a trade secret claim solely because Greenfield made a five minute presentation to Verizon Wireless, and he should not receive a financial windfall for such *de minimis* participation. Indeed, the only shred of evidence to support his claim is the sweeping and the very convenient, after-the-fact conclusion by Greenfield that "the program as it exists today, the core elements of the program" are his trade secrets. (Greenfield Dep. at 81:7–8).

2.     Greenfield's Alleged Trade Secrets Are Readily Ascertainable

Even assuming that Greenfield could identify a potential trade secret, the information does not derive "economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by the public or any other person who can obtain economic value from its disclosure or use." S.C. Code Ann. § 39-8-20(5)(a) (2008). As further described in the comments to the statute, the general knowledge exception is pertinent here:

> The language "not being generally known to and not being readily ascertainable by proper means by other persons" does not require that information be generally known to the public for trade secret rights to be lost. If the principal persons who can obtain economic benefit from information are aware of it, there is no trade secret. A method of casting metal, for example, may be unknown to the general public but readily known within the foundry industry.

1992 S.C. Acts 437, Commissioner's Comment.

       a.     Greenfield's Alleged Trade Secrets Were Generally Known to the Public

In his Third-Party Complaint and deposition, Greenfield described his branded entertainment program as including the following elements: local events promoted with media, internet, blogs, word-of-mouth, product placement, buzz marketing, local celebrities, and the power of television cameras. (Third-Party Compl. ¶¶ 7, 12; Greenfield Dep. at 62:18–23). Every one of these elements alone, or in combination, is readily ascertainable by the public and especially by a sophisticated advertiser like Verizon Wireless, or a sophisticated agency such as Erwin-Penland.

The elements of the program proposed in the April Deck, however, have clearly been executed by others in the past and are obvious in a way that protection is not warranted. In fact, as Greenfield admits in his deposition, these exact elements are used in "American Idol," a show in its ninth season and the basis for the pitches to Captain D's and Verizon Wireless. (Greenfield Dep. at 82:22–83:5, 113:16–114:13) In addition, as noted in the April Deck, HSTS is an event similar to McDonald's Gospel Fest, a program in its twenty-seventh season. **Ex. 5 at 6**; (Rossi Dep. at 81:13–25). Like HSTS, Gospel Fest is a national gospel choir competition with local events, and McDonald's USA Marketing Director cites Gospel Fest as an example of how McDonald's is "deeply rooted in the African American community." **Ex. 20 at 1.**

Greenfield himself acknowledged the generic and public nature of the concept when he noted that Black Entertainment Television was beating Verizon Wireless to the market with its own "Gospel American Idol-type show" in 2006. **Ex. 21**. In response to the news, he stated: "This is why we move quickly on this stuff." Id. Greenfield cannot legitimately claim trade secret protection when the "stuff" in question was already well known to the public.

> b. Greenfield's Alleged Trade Secrets Were Readily Ascertainable Through His Public Dissemination of the Information

Even assuming that the elements of his alleged trade secrets were not already public knowledge, Greenfield's careless dissemination of materials referencing his alleged trade secrets before he discussed the gospel choir concept with Verizon Wireless precludes protection. It is well settled that information is "readily ascertainable" if it is available in trade journals, reference books, or published materials. See 1992 S.C. Acts 437, Commissioner's Comment. Thus, the public disclosure of information through display, advertising, or other carelessness can preclude protection. Id.

Here, Greenfield publicly disclosed many of his alleged trade secrets at the Intermarket Agency conference in October 2005 where he first met Mr. Erwin, (Greenfield Dep. at 98:19–102:17), **Ex. 22**, and during a National Association of Television Program Executives ("NATPE") conference around the same time, (Greenfield Dep. at 67:8–69:4). Subsequently, Greenfield also disseminated his trade secrets during a presentation to the class of his expert, Ms. Susan Fournier, at Boston University. (Id. at 218:19–219:22), **Ex. 23**. Moreover, Greenfield attached the April Deck to the Third-Party Complaint in this case, a publicly filed document; he made no

effort to claim the deck as a trade secret and no effort to protect it from disclosure to the public.

Thus, the information willfully disclosed by Greenfield would not be protected in any event as it has in fact been widely used for years to implement nearly identical programs by other organizations. To the extent it was not already general knowledge, Greenfield made it readily ascertainable by recklessly disseminating the information.

3.    Greenfield Failed to Maintain the Requisite Level of Secrecy to Establish a Protectable Trade Secret

Even if Greenfield manages to identify a protectable trade secret, he cannot establish that he undertook any efforts to reasonably maintain its secrecy. A valid trade secret involves a substantial element of secrecy such that there would be difficulty in acquiring the information except by the use of improper means. Wilkes v. Pioneer Am. Ins. Co., 383 F. Supp. 1135, 1141 (D.S.C. 1974). Moreover, the holder of the information bears the burden to take all proper and reasonable steps to keep the otherwise protectable information secret. Lowndes Prods., Inc. v. Brower, 191 S.E.2d 761, 766 (S.C. 1972).

Comment b of the First Restatement of Torts, the basis for the South Carolina Trade Secrets Act, details various factors used to determine whether the holder of the information has established the requisite secrecy for trade secret protection:

> 1) the extent to which the information is known outside of his business; 2) the extent to which it is known by employees and others involved in his business; 3) the extent of measures taken by him to guard the secrecy of the information; 4) the value of the information to him and to his competitors; 5) the amount of effort or money expended by him in developing the information; 6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Restatement First, Torts § 757 Comment b (1939).

As noted above, Greenfield previously and subsequently disclosed his alleged trade secrets during various public presentations where there was no expectation of confidentiality prior to the presentation at Verizon Headquarters in April 2006. And since then, he attached the document that he claims contains his trade secret to a publicly filed pleading in this case. Even if Greenfield could assert that the local programs Verizon Wireless implemented contained his trade secrets, a claim not supported by the facts, Greenfield took no measures to protect the secrecy of the information presented to Verizon Wireless. Despite the fact that this sophisticated businessman had used such agreements before, it is undisputed that Greenfield failed to request that Verizon Wireless or Erwin-Penland execute a confidentiality or non-disclosure agreement before the April 2006 presentation, or at any time. Similarly, Greenfield failed to request that any of the numerous agency representatives that also attended that presentation execute a confidentiality agreement. South Carolina courts have made clear that the lack of such agreements between parties suggests a lack of the mandatory understanding of confidentiality required to protect a trade secret. Brower, 191 S.E.2d at 765–66.

Similarly, none of the materials presented to Verizon Wireless contained confidentiality disclaimers.[7] **Exs. 3, 5**. The December Deck contains no mention of Greenfield, bears only the Erwin-Penland logo, and includes a copyright solely in the name of Erwin-Penland. **Ex. 3**. Likewise, the April Deck was presented as an Erwin-Penland deck, with the Erwin-Penland logo appearing on nearly every page, including the title page. **Ex. 5**. Although the last page of the deck contained the words: "Copyright by Erwin-Penland/1st Approach," this legend does nothing to salvage Greenfield's claims.

---

[7] According to Greenfield, there were such confidentiality disclaimers on the materials he provided for the pitch to Captain D's Restaurant. (Third-Party Compl. ¶ 13(b)).

Id. at 36.  Even assuming that this copyright reference is sufficient notice of a copyright, it is insufficient for protecting an alleged trade secret as such designations protect only "the tangible medium of expression" and not facts, ideas, systems, or methods of operation of the sort that were allegedly included in the deck.  See 17 U.S.C. § 102 (2009).  In short, it is black letter law that copyrights protect only tangible expressions, not an idea or concept itself.

Greenfield cannot identify information that is not readily ascertainable or establish that the information was the subject of reasonable efforts of secrecy.  As a result, Greenfield cannot establish trade secrets protectable under the South Carolina Trade Secret Act and Verizon Wireless is entitled to summary judgment.

**B.     Verizon Wireless Did Not Misappropriate the Trade Secrets**

Setting aside the fact that Greenfield has no valid trade secrets under South Carolina law, Verizon Wireless did not misappropriate the trade secrets both because they were properly disclosed to Verizon Wireless and Verizon Wireless had no knowledge of improper means.

1.     <u>The Alleged Trade Secrets Included in the April Deck were Freely Disclosed to Verizon Wireless and Thus Discovered by Proper Means</u>

"A trade secret endures and is protectable and enforceable until it is disclosed or discovered by proper means."  S.C. Code Ann. § 39-8-30(A).  The term "improper means," in turn, is defined as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, duties imposed by the common law, statute, contract, license, protective order, or other court or administrative order, or espionage through electronic or other means."  Id. § 39-8-20(1).

It is undisputed that Greenfield and Erwin-Penland jointly presented and disclosed any alleged trade secrets to Verizon Wireless on their own accord. (Third-Party Compl. ¶ 29) (discussing "Defendants' presentation of the Trade Secrets to Verizon Wireless in-person"); (Greenfield Dep. at 183:17–21). Thus, when Erwin-Penland and Greenfield presented HSTS to Verizon Wireless without any confidentiality agreement, the trade secrets were disclosed to and "discovered by" Verizon Wireless by proper means. Any argument to the contrary is belied by the undisputed facts.

Moreover, by his own actions, admissions and allegations, Greenfield designated Erwin-Penland as an "owner" of the alleged trade secrets under the SCTSA: a "person or entity in whom or in which rightful legal or equitable title to the trade secret is reposed." S.C. Code Ann. § 39-8-20(3). The undisputed evidence shows that the April Deck identifies Erwin-Penland as a "co-creator" and joint copyright holder, both decks bore only the Erwin-Penland logo, and Greenfield registered the concept with the Writers' Guild of America as "written by Jeff Greenfield & Joe Erwin." (Third-Party Compl. ¶ 21). Additionally, Greenfield asserts that Erwin-Penland and Defendants formed a partnership when they presented the material to Verizon Wireless. To the extent the alleged trade secrets were incorporated into the April Deck, Erwin-Penland was free to disclose the alleged trade secrets to other parties, such as Verizon Wireless, as an "owner" of the April Deck.

2.     Verizon Wireless Had No Knowledge of Improper Means

Even if the alleged trade secrets were not disclosed by proper means, Verizon Wireless did not have the requisite knowledge of improper means to constitute misappropriation.

       a.      Verizon Wireless Did Not Directly Misappropriate the Trade Secrets

The South Carolina Trade Secrets Act defines misappropriation as: directly acquiring, disclosing, or using a trade secret by a person using improper means, knowing that the trade secrets were acquired by mistake, *or* by a person owing a duty of secrecy to the holder of the trade secret. S.C. Code Ann. § 39-8-20(2). As discussed above, the record is devoid of any evidence that Verizon Wireless directly acquired the trade secrets by improper means. The record also shows that Greenfield and Erwin-Penland pro-actively pitched the alleged trade secrets to Verizon Wireless such that it did not acquire the alleged trade secrets by mistake or illicit means. Given the lack of any improper conduct or mistake resulting in the disclosure of his alleged trade secrets to Verizon Wireless, Greenfield must show that Verizon Wireless acquired the trade secrets under circumstances giving rise to an independent duty to maintain their secrecy for Greenfield's benefit. He cannot do so.

It is undisputed that Greenfield and Verizon Wireless did not have a contractual relationship creating such a duty and Greenfield cannot point to a single interaction he had with Verizon Wireless outside the April pitch that would give rise to such a duty— not one e-mail, conversation, or transaction. Instead, Greenfield argues that Verizon Wireless owed this duty to him as a "separate agency." (Greenfield Dep. at 312:14–17). The argument, however, is also defeated by his claims that Erwin-Penland and he were *de facto* partners. (Third-Party Compl. ¶ 21). If Erwin-Penland had not invited Greenfield to the April pitch, it is undisputed that Greenfield would never have secured an audience with Verizon Wireless in connection with this program. Greenfield admits that he had to rely on Erwin-Penland to take the lead on the "team presentation" since Verizon Wireless

"knew, trusted, and counted on" Erwin-Penland.  (Id. ¶ 24).  As a supposed partner of Erwin-Penland deferring to its long-standing relationship with Verizon Wireless, Greenfield cannot now establish that he was a separate agency recognized by Verizon Wireless and was owed a separate special duty.  The undisputed fact is that no one at Verizon Wireless had any idea Greenfield was in the room.

The agreement between Erwin-Penland and Verizon Wireless was the only existing contract governing any relationship in this case, and Verizon Wireless relied on that agreement.  In the 2004 Master Advertising Agreement with Verizon Wireless, as amended in 2005, Erwin-Penland warranted that its services would not "give rise to or result in any infringement or misappropriation of any patent, copyright, trade secret, or any violation of any other intellectual property right of any third party."  **Ex. 24 § 10.1.3**.  Erwin-Penland also warranted that any work product it presented to Verizon Wireless belonged to Verizon Wireless, and that Erwin-Penland would secure ownership rights for Verizon Wireless from any third parties, like Greenfield, it used to develop work product.  Id. §§ 13.2.1, 13.2.5.  Such reliance on agency agreements in relation to third-party involvement is standard agency practice. (Sealey Dep. at 285:11–287:8, attached hereto as **Ex. 25**).[8]  Assuming that Verizon Wireless recognized Greenfield at all, the agency contract and standard industry practice reveal that Greenfield had no special relationship.

        b.      Verizon Wireless Did Not Know or Have Reason to Know That the Trade Secrets Were Misappropriated by Another

---

[8] Even without such an agreement, however, the advertising industry has a well-established "give it away before being hired" approach that protects clients who pick and choose from various ideas pitched by different agencies.  **Ex. 8 at 6–7**.

A trade secret can also be misappropriated indirectly by a person acquiring, disclosing, or using the trade secret while *knowing or having reason to know* of improper means by another, that the trade secret was acquired by another by mistake, or that the trade secret was acquired by another owing a duty of secrecy to the individual holding the trade secret. S.C. Code Ann. § 39-8-20(2). Here, Greenfield must show that Verizon Wireless knew or had reason to know that Erwin-Penland acquired the alleged trade secrets by improper means, by mistake, or under circumstances in which Erwin-Penland owed a duty of secrecy to Greenfield because it is clear that Verizon Wireless did not directly misappropriate anything.

As discussed above, Verizon Wireless had no knowledge of Greenfield prior to his five minute presentation and no knowledge that the presentation contained any trade secrets. Even assuming that Erwin-Penland acquired Greenfield's trade secrets by improper means or mistake, a fact not supported by any evidence, it is undisputed that Verizon Wireless had no knowledge that was so. When Erwin-Penland made its first, unsolicited presentation to Saracino and Shafer without Greenfield, Verizon Wireless had no knowledge of any relationship between Erwin-Penland and Greenfield as the Verizon Wireless employees had *never* interacted with Greenfield. Even after that first presentation, Verizon Wireless did not know Greenfield or his relationship to Erwin-Penland. Given that there was not even clear notice that the presentation contained any trade secrets, Verizon Wireless could not possibly have known trade secrets were misappropriated.

Because Greenfield cannot establish trade secrets protectable under the South Carolina Trade Secrets Act or that such alleged trade secrets were misappropriated by

Verizon Wireless, this Court should grant summary judgment in favor of Verizon Wireless on Greenfield's misappropriation of trade secrets claim.

### III.  **Breach of Fiduciary Duty; Constructive and/or Resulting Trusts**

Whether a fiduciary duty "should be imposed between two classes of people is a question for the court." Hendricks v. Clemson Univ., 578 S.E.2d 711, 715 (S.C. 2003). "A confidential or fiduciary relationship exists when one imposes a special confidence in another, so that the latter, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one imposing the confidence." Island Car Wash, Inc. v. Norris, 358 S.E.2d 150, 152 (S.C. Ct. App. 1987). To reach the level of a fiduciary relationship, interactions between the parties must be more than casual. Steele v. Victory Sav. Bank, 368 S.E.2d 91 (S.C. Ct. App. 1988). Indeed, "[t]he facts and circumstances must indicate that one reposing . . . trust has foundation for his belief that the [other party] is acting not in his own behalf, but in the interests of" the individual reposing the trust. Pitts v. Jackson Nat'l Life Ins. Co., 574 S.E.2d 502, 507 (S.C. Ct. App. 2002) (quoting Burwell v. S.C. Nat'l Bank, 340 S.E.2d 786, 790 (S.C. 1986)). In turn, no fiduciary relationship exists where a party is unaware of any special trust reposed in him by the other. Burwell, 340 S.E.2d at 790.

Thus, to determine whether a fiduciary relationship exists, a court must look to the particulars of the relationship between the parties. Id. Historically, South Carolina courts have "'reserved imposition of fiduciary duties to legal or business settings, often in which one person entrusts money to another, such as with lawyers, brokers, corporate directors, and corporate promoters.'" Brown v. Green Tree Fin. Servicing Corp., No.:

2:06-2777-PMD, 2008 U.S. Dist. LEXIS 40491, at *30 (D.S.C. May 19, 2008)[9] (quoting Hendricks, 578 S.E.2d at 716).

## A.  Verizon Wireless Did Not Owe Greenfield a Fiduciary Duty

Greenfield's claim that Verizon Wireless owed him a fiduciary duty has no support in the evidence.  There is absolutely no foundation for Greenfield's alleged belief that Verizon Wireless was acting not in its own interests, but rather in the interests of Greenfield.  Indeed, all of the evidence proves otherwise.  As advertising agencies, Erwin-Penland and, later, Greenfield approached Verizon Wireless with unsolicited pitches to conduct a Verizon Wireless-branded sponsorship program specifically aimed at promoting the interests of Verizon Wireless.  However, Greenfield is asking this Court to transform unsolicited advertising pitches into fiduciary relationships between a prospective agency and a client, meaning that a client would owe an advertising agency the same duty that a lawyer owes a client or a corporate director owes the shareholders. Verizon Wireless clearly was not aware that Greenfield reposed such a trust in it during his five minute portion of a pitch for speculative work with Erwin-Penland's client. Indeed, Verizon Wireless employees do not know anything about 1st Approach or Greenfield and do not recognize Greenfield upon seeing his photograph.  (Deering Dep. at 33:11–25; Shafer Dep. at 12:20–13:12; Rossi Dep. at 104:13–19; Duval Dep. at 39:18–23).

## B.  Greenfield Is Not Entitled to a Resulting or Constructive Trust

Under South Carolina law, resulting trusts are limited to situations where one party pays for property that is then titled in the name of another.  Bowen v. Bowen, 575 S.E.2d 553, 556 (2003).  Such situations generally involve real property.  See, e.g.,

---

[9] Attached hereto as **Ex. 26**.

Hayne Fed. Credit Union v. Bailey, 489 S.E.2d 472 (S.C. 1997) (finding that a resulting trust is an equity devised theory used to effectuate the intent of parties where one party pays for real property titled in the name of another); Lollis v. Lollis, 354 S.E.2d 559 (S.C. 1987) (finding a presumption that a party who pays purchase money for real property intends to benefit himself and a resulting trust is created in connection with the real estate conveyance).  Because Greenfield did not pay for HSTS which was then titled in the name of Verizon Wireless, a resulting trust is not a proper remedy under these facts.

A constructive trust arises entirely by operation of law, Scott v. Scott, 57 S.E.2d 470, (S.C. 1950), when "a party has obtained money which does not equitably belong to him and which he cannot in good conscience retain or withhold from another who is beneficially entitled to it as where money has been paid by accident, mistake of fact, or fraud, or has been acquired through breach of trust or violation of fiduciary duty," SSI Med. Servs., Inc. v. Cox, 392 S.E.2d 789, 793–94 (S.C. 1990).  "Fraud is usually an element essential to the establishment of a constructive trust; though it need not be actual fraud."  Smith v. S.C. Retirement Sys., 520 S.E.2d 339, 352 (S.C. Ct. App. 1999).  Because an action to declare a constructive trust is in equity, the evidence must be clear, definite and unequivocal.  Lollis, 354 S.E.2d at 530.

As an initial matter, Greenfield cannot establish that Verizon Wireless obtained money from HSTS to which it is not entitled.  In contrast, Verizon Wireless has devoted three years and tens of millions of dollars to the program, while Greenfield has had no involvement whatsoever.  Further, any benefits that Verizon Wireless may have derived from this substantial investment are speculative, at best, (Deering Dep. at 63:16–64:25;

Duval Dep. at 31:4–15), and Verizon Wireless views such advertising and marketing programs as expenses to the company, (Deering Dep. at 64:7–9).

To the extent that Verizon Wireless received any money or revenue from the program, it is clearly entitled to it.  Further, because Greenfield failed to establish any facts or circumstances suggesting "clear, definite and unequivocal" evidence of accident, mistake of fact, or fraud by Verizon Wireless, Greenfield relies solely on the alleged breach of fiduciary duty to support his equitable claim for a constructive trust.  Because as discussed above, Greenfield's breach of fiduciary duty claim must fail, his constructive trust claim must also fail.

**IV.     Restitution; Unjust Enrichment; Quantum Meruit**

Greenfield's claim for restitution should be denied because Verizon Wireless has not been unjustly enriched.  "Restitution is a remedy designed to prevent unjust enrichment," Sauner v. Pub. Serv. Auth. of S.C., 581 S.E.2d 161, 167 (S.C. 2003), and South Carolina courts recognize that unjust enrichment is an equitable doctrine equivalent to quantum meruit, Gignilliat v. Gignilliat, Savitz & Bettis, LLP, 684 S.E.2d 756, 764 (S.C. 2009).  To receive restitution in the amount that the defendant was unjustly enriched at the expense of the plaintiff, "a plaintiff must show (1) that he conferred a non-gratuitous benefit on the defendant; (2) that the defendant realized some value from the benefit; and (3) that it would be inequitable for the defendant to retain the benefit without paying the plaintiff for its value."  Id. (citing Niggel Assocs., Inc. v. Polo's of N. Myrtle Beach, Inc., 374 S.E.2d 507 (S.C. Ct. App. 1988)).

Greenfield cannot prove any of these elements.  Verizon Wireless paid its agencies, including Erwin-Penland, only for work performed in executing HSTS and not

for originating the concept. Greenfield never worked on any of the HSTS events. In fact, Verizon Wireless summarily rejected the television series component of the gospel choir competition that Greenfield claimed was his component and that he hoped to produce. Any claim that Greenfield conferred a benefit on Verizon Wireless must be thus limited to Greenfield's less than five minute portion of the pitch at Verizon Headquarters, as this was the only contact Verizon Wireless had with Greenfield.

Verizon Wireless did not request Greenfield to work on the unsolicited pitch, and following industry standard, Verizon Wireless does not pay agencies merely to pitch speculative programs. **Ex. 8 at 7–8**. Even assuming, *arguendo* that Verizon Wireless knew of Greenfield's alleged participation in creating the gospel choir competition concept, Greenfield cannot show that Verizon Wireless induced Greenfield to confer any benefit on it. Based on these facts, Greenfield cannot show that he reasonably relied on Verizon Wireless for payment and that Verizon Wireless should have understood that Greenfield expected such payment, particularly based on contract language specifically relating to Erwin-Penland's work product with third parties. **Ex. 24 § 13.2.5**.

Moreover, clients do not distinguish between their existing agencies and potential third-party vendors during "team presentations" like the pitch at Verizon Headquarters, because they rely on the contract in place with the existing agency. (Sealey Dep. at 284:16–286:25). Instead, the agency is similar to a general contractor and the third-party vendor is the subcontractor. (Id. at 269:7–270:12; 284:16–287:9). In analogous situations involving real property South Carolina courts "addressing a claim of unjust enrichment by a subcontractor against a property owner have typically denied recovery where the owner in fact paid on its contract with the general contractor." Columbia

Wholesale Co., Inc. v. Scudder May N.V., 440 S.E.2d 129, 130 (S.C. 1994). Here, Verizon Wireless has paid the general contractor, Erwin-Penland for work it performed on HSTS. Assuming for this argument that Greenfield performed work on HSTS, which he did not, Greenfield must turn to Erwin-Penland for any restitution.

**V.     Injunction[10]**

"An injunction is a drastic remedy and will not issue unless there is an imminent threat of illegal action." Bloodgood v. Garraghty, 783 F.2d 470, 475 (4th Cir. 1986); Strategic Res. Co. v. BCS Life Ins. Co., 367 S.C. 540, 544 (2006) ("The remedy of an injunction is a drastic one and ought to be applied with caution."). The party seeking the injunction has the burden of demonstrating "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." eBay Inc. v. MercExchange, LLC, 547 U.S. 388, 391 (2006); Super Duper, Inc. v. Mattel, Inc., 2009 U.S. Dist. LEXIS 28751, at *3 (D.S.C. Mar. 31, 2009)[11] ("[T]he standard set out in eBay Inc. v. MercExchange is the appropriate one that the Court should employ to guide its decision as to whether a permanent injunction should issue." (internal citation omitted)).

In his Third-Party Complaint, Greenfield alleges that "Defendants face an imminent danger of irreparable harm from the continuing wrongful conduct of EP and Verizon Wireless" based on the commercial exploitation of the trade secrets and "the lack

---

[10] Verizon Wireless assumes that Greenfield seeks a permanent injunction rather than a preliminary injunction as he has not filed a motion pursuant to Rule 65 of the Federal Rules of Civil Procedure or given security to cover costs and damages if such a motion was denied. See Fed. R. Civ. P. 65(c).
[11] Attached hereto as **Ex. 27**.

of attribution and credit" given to Greenfield.  (Third-Party Compl. ¶ 121).  There is no evidence of imminent, irreparable harm.  Because the HSTS program has been in existence for three years, even assuming *arguendo* that Greenfield could bring a trade secret claim, all of his purported trade secrets are in the public domain and thus no injunction is necessary.  And the harm to Verizon Wireless and the public from an injunction would be severe.

If the court issues an injunction in this case, Verizon Wireless would be forced to discontinue HSTS, which would have an impact on church choirs throughout the country planning to participate in HSTS and on Verizon Wireless' reputation after abruptly halting the community events.  In comparison to these substantial hardships, Greenfield has not been harmed.  He used what he has called his trade secrets in a similar competition for Medicis, entitled "Hottest Mom in America," and he continues to pitch his alleged trade secrets to other clients.  (Greenfield Dep. at 213:6–214:11, 216:20–217:3).  Even if Greenfield was harmed, he could be adequately compensated by damages.

## <u>CONCLUSION</u>

Based on the foregoing, Verizon Wireless respectfully requests that the Court grant summary judgment against Third-Party Plaintiffs on all counts against Verizon Wireless in the First Amended Counterclaim and Third-Party Complaint.

This the 1st day of March, 2010.

_____
Robert A. Muckenfuss
McGuireWoods, LLP
100 North Tryon Street, Suite 2900
P. O. Box 31247
Charlotte, NC  28231-1247
T:  704.343.2000
F:  704.343.2300
Email: rmuckenfuss@mcguirewoods.com
Attorneys for Verizon Wireless

<u>**CERTIFICATE OF SERVICE**</u>

This is to certify that I have this day served a copy of the foregoing **MEMORANDUM IN SUPPORT OF THIRD-PARTY DEFENDANT VERIZON WIRELESS' MOTION FOR SUMMARY JUDGMENT AND/OR JUDGMENT ON THE PLEADINGS** as indicated below, upon the below named persons:

(**X**)    Served via CM/ECF e-mail Service only

(  )    By delivering a copy personally

(  )    By leaving a copy at the office of such person

(  )    By telecopying said papers as indicated below

(**X**)    By depositing a copy of same in the United States Mail,
         postage prepaid, addressed as shown below and by electronic mail

| | |
|---|---|
| Brenda R Sharton<br>Neil Thomas Smith \<br>Goodwin Procter<br>Exchange Place<br>53 State Street<br>Boston , MA 02109<br>617-570-1214<br>Email:bsharton@goodwinprocter.com<br>       nsmith@goodwinprocter.com<br>*Attorneys for Plaintiff* | Bernie W. Ellis<br>Rita McKinney<br>McNair Law Firm<br>P.O. Box 447<br>Greenville, SC 29602<br>Email:<br>bellis@mcnair.net<br>rmckinney@mcnair.net<br>*Attorneys for Plaintiff* |
| | |
| Phillip Jeffrey North<br>P Jeffrey North Law Office<br>PO Box 7525<br>Hilton Head , SC 29938<br>843-341-5200<br>Email: attorney@pjnorth.com<br>*Attorney for Jeffrey Greenfield and 1st Approach LLC* | Frederick J. Jekel<br>Paul J. Doolittle<br>Jekel-Doolittle, LLC<br>P.O. Box 2579<br>Mt. Pleasant, SC 29465<br>Email: fritz@j-dlaw.com<br>       paul@j-dlaw.com<br>*Attorney for Jeffrey Greenfield and 1st Approach LLC* |

This the 1st day of March, 2010.

_____
Robert A. Muckenfuss
Federal No. 7333