# EXHIBIT 8

# EXPERT REPORT OF PETER SEALEY

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

|  |  |
|---|---|
| HILL HOLLIDAY CONNORS COSMOPULOS, INC., d/b/a ERWIN-PENLAND,<br><br>        Plaintiff,<br><br>  v.<br><br>JEFFREY GREENFIELD and 1st APPROACH, LLC,<br><br>        Defendants, and Third-Party Plaintiffs,<br><br>  v.<br><br>CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS, and JOSEPH A. ERWIN,<br><br>Third-Party Defendants. | CIVIL ACTION NO. 6:08-3980-GRA<br><br>**Hon. G. Ross Anderson Jr.** |

**EXPERT WITNESS REPORT OF PETER SEALEY**

**Scope of the Engagement**

The matter before me concerns allegations made by 1st Approach and Jeffrey Greenfield that they are the owners of certain ideas and marketing concepts that were "pitched" in conjunction with Erwin Penland. Greenfield and 1st Approach claim they are entitled to ownership rights based upon the purported trade secrets and proprietary information contained in these pitches. These pitches were made to one potential client of Erwin Penland, Captain D's, and one existing client of Erwin Penland, Verizon Wireless. Greenfield and 1st Approach further claim that they are entitled to compensation or remuneration based upon the same. The compensation sought includes compensation based upon Verizon's profits and attendant increases in total market capitalization.

I have been asked to give my expert opinion on these claims and my response to certain expert opinions offered on behalf of Greenfield and 1st Approach.

My opinion is contained in this report. I will discuss the normal and accepted protocols in the solicitation of new business accounts by advertising agencies and opine on the appropriateness of 1st Approach's pleadings in this matter. I will also discuss Greenfield and 1st Approach's claims that these concepts as presented in these two pitches were novel or trade secrets. I will further give my opinion on the damages claims and the basis for damages calculations made by Greenfield and 1st Approach.

I have been retained by Goodwin Procter LLP and McGuireWoods LLP on behalf of their clients Erwin Penland, Joseph Erwin and Verizon Wireless.

**Qualifications**

I have worked with and for advertising agencies for 45 years, beginning with my first job out of graduate school in the Advertising Department of the Procter and Gamble Company in 1964. I have retained, supervised and managed relationships with advertising agencies over several decades in my capacity as a senior marketing executive at The Coca-Cola Company and Columbia Pictures. I have served on the board of directors of a major advertising agency: Butler, Shine, Stern and Partners. As such, I have a deep professional understanding of how advertising agencies are selected, compensated and managed as a marketing resource.

My professional and academic career includes the following:

- The practice of marketing at The Procter & Gamble Company, The Quaker Oats Company, McCann-Erickson Advertising and The Coca-Cola Company.

- During my 24-year tenure at The Coca-Cola Company, I became the most senior marketing officer having responsibility for the global marketing of all brands of the company in 187 countries. During this time, I reported to the President and Chief Operating Office of the company. Some of my accomplishments at The Coca-Cola Company include the celebrated "Always Coca-Cola" global advertising campaign with the famous "Polar Bears" TV commercials. Coca-Cola has been identified as the most recognized and valuable brand on earth.

- I was President of Marketing and Distribution in North America at Columbia Pictures between 1983 and 1988 where I marketed and released such films as *Tootsie, Gandhi, Stand By Me, Ghostbusters, Karate Kid, The Big Chill* and others.

- I have attained four college degrees from three major universities including a Ph.D. and MA in Executive Management from the Peter F. Drucker Graduate Management School of the Claremont Graduate University awarded in 1997. My doctoral dissertation was on the strategic use of information technology in the retail grocery industry. I earned a Master's of Industrial Management degree from the Graduate School of Yale University and a Bachelor of Science degree from the University of Florida.

- I give approximately 20 lectures and speeches each year on the subject of marketing and technology to numerous industry and trade groups.

- In 1999, I published an article in the Harvard Business Review entitled: *How E-Commerce Will Trump Brand Management*.

- I have been a consultant for several major corporations including Sony Corporation of America, Johnson & Johnson, United Parcel Service, Visa USA, Anheuser-Busch and the Eastman Kodak Company. My consultancy was in the areas of marketing and the use of technology.

- I have served on the Boards of Directors or Boards of Advisors of over 50 early stage technology companies located primarily in Silicon Valley, including Facebook, Inc.

- Five of these companies had public offerings and were listed on the NASDAQ stock exchange: CyberGold, AutoWeb, MediaPlex, Bamboo.com, T/R systems and L90.

- I have co-authored two major books:

    - *Simplicity Marketing: End Brand Complexity, Clutter and Confusion* published by the Free Press. This book has been translated into several languages.
    - *Not on My Watch: Hollywood vs. the Future,* published by New Millennium Entertainment, Beverly Hills, California.

- I served as Adjunct Professor of Marketing at a major university: the Haas School of Business at the University of California at Berkeley (1995 – 2006) where I taught MBA courses in brand management and high technology marketing.

- Beginning in 1999, I co-directed the Center for Marketing and Technology at the Haas School of Business at the University of California at Berkeley.

- In 2004, I joined the faculty of the Graduate School of Business at Stanford University as a Visiting Professor where I taught MKTG 392: Marketing and Brand Strategy to MBA students.

- In the summer of 2007, I assumed my current position of Adjunct Professor of Marketing at the Peter F. Drucker Graduate School of Management at the Claremont Graduate University where I continue to teach MBA courses on Brand Management and Entertainment Marketing.

- On October 18, 2000, I was inaugurated into the Claremont Graduate University Alumni Hall of Fame in recognition of my academic and business accomplishments.

- In 2001, I was elected Marketing Educator of the Year by the Sales & Marketing Executives International organization at their 66th annual conference.

**Summary/Basis of Opinion**

**A. Background**

The era of the modern advertising agency as we know it began in 1868 by the agency pioneer J. Walter Thompson of the eponymous agency. As Mr. Thompson related:

> *"In 1864, while I was serving in the Marine Corps, William James Carlton had started selling advertising space in religious magazines. The agency was called Carlton and Smith although almost nothing is known about the Smith partner. In 1868, Carlton hired me as a bookkeeper. Eventually I found that soliciting and sales were much more profitable and I became a very effective salesman for the small company. In 1877, I bought the agency for $500 and renamed it J. Walter Thompson Company. Notably, I paid $800 for the Carlton and Smith furniture in the same transaction.*
>
> *Realizing that I could sell more space if the company provided the service of developing content for advertisers, I hired writers and artists to form the first known Creative Department in an advertising agency. I am credited as the "father of modern magazine advertising" in the US. I am responsible for some enduring brand images in popular culture, like the Rock of Gibraltar used for the Prudential Insurance Company."*[1]

Thus, the concept of the advertising agency was born consisting of an organization that would construct creative materials and purchase the time or space to place the ads. Agencies negotiated with the media, e.g., newspapers, magazines, outdoor firms, to rebate to them 15% of every client dollar spent. If a magazine ad cost $100, the client was billed for the full amount and the publisher agreed to accept $85 in payment. This compensation system exists in limited form up to the present time.

**B. The Unique Nature of the Advertising Agency Business Model**

Most large firms employ professional resources in specialized areas:

---

[1] http://www.linkedin.com/pub/j-walter-thompson/11/683/439

- Outside Legal Counsel

- Certified Public Accountants

- Advertising Agencies

Among these categories, the retention and compensation model for advertising agencies differs from the others in a singularly significant manner:

It is the accepted protocol for advertising agencies to present their work, including detailed creative executions for the various media, as well as attendant public relations and promotional aspects of their creative solution, <u>on speculation, usually without payment and before being retained by the prospective client</u>.

The reasons for this "give it away before being hired" approach is lost in the annals of the business, but it is real and exists today. It is accepted business practice, and I do not believe any agency would be invited to pitch an account if that condition were not met.

Consider the competition for the Volkswagen advertising account that took place in October of 2009 as reported by Advertising Age Magazine.[2]

As typical for such major accounts, four ad agencies competed in the final round:

- Deutsch LA
- DDB
- Goodby, Silvestein & Partners
- Lowe

As is typical, each agency spent much time and many dollars on providing Volkswagen with a complete creative proposal designed to significantly increase their sales in the US. Undoubtedly this included advertising theme lines, rough television commercials, magazine ads, outdoor billboards, event marketing activities and collateral materials. All of this would have been presented in near finished form by each of the four agencies. Such materials are typically left behind with the prospective client after the agency's presentation.

---

[2] See Exhibit I

Volkswagen management was free to pick and choose from among these proposals. Nothing was to prevent them from selecting a magazine advertising approach from DDB and later asking Deutsch LA to include it in their work. In fact, that would be expected and not at all unusual.

An interesting aside was the quote from the CEO of the winning agency:

> *Deutsch's victory will be even sweeter for those who were around in 1995, when the agency lost against Arnold in a review for the same account. Deutsch spent 95 days and $360,000 pitching VW, and even laid out $20,000 on a new black Jetta for research. After hearing he didn't win, Donny Deutsch made a quip about said Jetta, saying he wanted to "slam it into a wall."[3]*

Consider the difference with other professional services firms.

It would be inconceivable that a company would ask a major CPA firm to "go over our records and present your reports on our income statement and balance sheet and we'll decide if we like your approach". The same would hold true for outside counsel. No reputable accounting firm or legal firm would do work on speculation in the hope the account could be won. Such firms are retained based on their existing reputation and the fee structure proposed,

A part of this difference is generally held the belief that advertising agencies need not be treated with the same respect and deference as a major management consulting firm, law firm or accounting firm. True or not, this view unfortunately remains the case today. It is not by accident that the most acclaimed new TV program of the last several years is AMC's *Mad Men* about the thoroughly disreputable and sleazy fictional ad agency of the 1960's: *Sterling Cooper.*

## C. Speculative Nature of the Presentation

This well understood precedent must be kept in mind when viewing Greenfield's participation in the two pitches described in the claim and counterclaim.

When Mr. Greenfield joined with Erwin-Penland to make a minor contribution to the pitches to Captain D's and to Verizon Wireless, this accepted business practice was on the table. All ideas and concepts that were presented to Captain D's were

---

[3] Advertising Age, October 26, 2009 "How Deutsch LA Snared Plum VW Account

made in the hope of Erwin Penland being retained as its new agency of record. Similarly, all of the ideas and concepts that were presented to Verizon Wireless were made in the hope that the pitch was accepted. In both cases, compensation would occur only if they decided to go forward with the project and retained Erwin Penland and Greenfield to manage the project. If the projects were not accepted, their recourse would be akin to that of Mr. Deutsch driving a VW Jetta into a wall in frustration. In other words, they would only be entitled to compensation only if the projects were accepted and they were chosen to manage the effort.

## D. Lack of Originality of Concept

Contrary to the conclusions reported in the Fournier[4] report, the concept of "Best Choir in the USA" or "Amazing Grace" or "How Sweet the Sound" is quite ordinary and consistent with current trends in the TV industry. There is a wholesale abandonment of expensive scripted programming, e.g., 30-minute situational comedies or hour-long dramas, for so-called reality programming done without a prepared script. The announcement by NBC/Universal that the Jay Leno show would move from late fringe to primetime at 10:00 PM was a watershed event and a turning point in the TV business because the 10:00 hour was once the premier placement for scripted television dramas.

Reality programming is extant throughout the industry. For example:

- Dancing With the Stars
- American Idol
- Biggest Loser
- Extreme Makeover-Home Edition
- America's Next Top Model
- Amazing Race
- Survivor
- America's Got Talent
- Wife Swap
- Simple Life
- Project Runway
- Amazing Race

---

[4] Expert report of Susan M. Fournier, September 29, 2009

These shows are not at all different than Ralph Edwards *This is Your Life* from 50 years ago. Today, any activity that can be turned into a competition is a candidate for a realty TV series.

Therefore, suggesting a competition among church choirs is totally predictable; nothing about it is original.

As to so-called "Branded Entertainment", the Fournier[5] report says: "Branded entertainment is a provocative marketing philosophy at the intersection of advertising and entertainment whereby brands are built by leveraging culturally-resonant branded entertainment." And so it has been at least since the beginnings of the TV industry in the US. This is a clear extension of such early TV programs as the *Colgate Comedy Hour*, *Texaco Theater*, and the *US Steel Hour* from the 1950's. Branded Entertainment is simply a new name on a very old and established tradition.

In this current environment, we frequently hear the following terms:

- Branded Entertainment
- Buzz Marketing
- Viral Marketing
- Street Theater
- Event Marketing

These are new terms describing very old and established marketing principles dating at least back to the era of the traveling medicine man in his horse and buggy touting the latest patent remedy. Certainly, the Internet and wireless capability has enhanced our ability to reach consumers, but the base technique is a very old and established practice.

**E. Lack of Significance of this Project to Verizon Wireless**

Greenfield and 1st Approach claim in their counterclaim and through their expert's reports that the current "How Sweet the Sound" project as undertaken by Verizon Wireless and Erwin Penland has had a significant financial and other impacts on Verizon Wireless and Erwin Penland. These assertions include allegations that Verizon gained new subscribers resulting in increased profits and attendant increases in the company's market capitalization. Specifically, the conclusions

---

[5] Expert witness report of Susan M. Fournier, September 29, 2009

contained in the expert report of Larry Jay Namer[6] reflect a profound lack of perspective and understanding of marketing as it is conducted at the level of Verizon Wireless.

Among other claims, Namer states the following:

> "…..in at least one of the 13 target markets for the show the penetration grew from 10% to 13 percent which is a 30% growth attributable to the implementation of the How Sweet the Sound marketing program.
>
> …. I believe the overall value of Verizon Wireless was increased by $1.5 billion to $2.25 billion USD."

This reflects a profound lack of understanding of the dynamics of marketing as conducted by Verizon.

First, it is stated by Greenfield that the "Best Choir in the USA" and "How Sweet the Sound" are concepts directed at the African American audience, approximately 13% of the US population and further targeted to the Protestant denomination, church-attending, sub-segment of the African American community located predominantly in the Southeastern region of the country. If we wish to be most generous, we would estimate no more than 50% of the total African-American population would fit into this aforementioned group.

It is my estimate that the choir competition, whatever it is called, is targeting no more that 6% of the US population. Since Verizon already has 80 million subscribers[7] or about 1 in 4 persons in the US, it would be safe to assume that at least 1.5 million persons in this target group would already be Verizon customers. That leaves a total target audience of no more than 4.5 million potential new Verizon customers who might possibly be attracted through the choir competition.

Next, we need to further consider how this choir competition and its media impact fits into the overall marketing of Verizon.

We start with the fact that the Verizon brand enjoys the largest advertising budget of any brand in the United States spending over $2.2 billion dollars per year.[8]

---

[6] Expert witness report of Larry Jay Namer, September 29, 2009
[7] Exhibit 2 Information Week: Verizon Adds 1.5 Million Subs
[8] Exhibit 3 Ad Age: Verizon Tops AT&T as Most Advertised Brand

Consider the implications of this fact. Verizon has a virtual tsunami of advertising dedicated primarily to obtaining new subscribers. This amounts to over $6 million dollars in advertising spending per day each day of the year or about $250,000 per hour in media messages.

Within this context, the impact of the choir competition falls below insignificance into the realm of triviality in the total scheme of things. It could have absolutely no meaningful impact on the success of the Verizon brand to obtain new subscribers and to suggest otherwise is to fundamentally misunderstand marketing at this level.

**F. Greenfield and 1st Approaches Damages Claims are Baseless and without Merit**

In Greenfield and 1st Approach's counterclaims and through the opinions offered by their experts, they are seeking damages and compensation based upon wholly flawed and baseless metrics. They seek to be compensated for contributions made to these two pitches. They believe they should be compensated based upon Verizon's increase in profits and resulting market capitalization.

This is not the way agencies are paid. They are not paid based upon their client's profits or increases in market capitalization. They are paid for their work and nothing more. These claims are completely baseless and inconsistent with industry practices. In my decades of experience, I have never encountered an agency being compensated this way. Agencies do not share in the profits nor do they have to participate in loses of their clients. Namer's calculations are based on wholly speculative impacts of the program and are therefore baseless. Greenfield and 1st Approach could not have expected to be paid based on Verizon's profits. No reasonable person would have had that expectation going into a new business pitch.

**G. Overall Conclusions**

Based on my education and training, my 45 years as an academic and practitioner in the field of marketing and my review of relevant materials in this case, I conclude the following:

Anyone in the advertising agency business knows and expects to present their new business advertising solutions "on the come" with absolutely no ownership claims on the content. If they wished to proceed otherwise, it is my belief they would need

to negotiate an agreement that articulates this, in which case, they would likely not get the audience with the prospective client. Ad agencies are dependent upon the good intentions of their new business prospects to treat them fairly. Nonetheless, it is common that clients pick and choose ideas from among new business pitches to be incorporated in their eventual marketing programs. It is the accepted practice. I have done exactly this in my business experience.

The concept of a church choir competition, a/k/a *Best Choir in the USA, Amazing Grace, How Sweet the Sound*, is quite ordinary and predictable in today's climate of reality TV programming.

In today's focus on Multi-Cultural Marketing, it would be expected that the largest advertised brand in the US would have one or more activities directed at the important African-American market.

The so-called "Branded Entertainment" components that Greenfield claims as trade secrets are equally well known in the marketing community and would be expected to be included in a new business pitch. Such programs and activities have been used in one form or another for at least 50 years.

The impact of the choir competition on Verizon, the largest advertised brand in the US, is minor. Not because this market is unimportant, but trivial only because it is embedded is such a huge overall marketing and advertising effort by Verizon.

Accordingly, I find the allegations and damages theories of Greenfield and 1st Approach without merit.

**H. Prior Testimony**

I have previously served as an expert witness in over 20 cases. My CV including matters on which I served as an expert is attached.

**I. Compensation**

I am being compensated for my professional time at the rate of $650/hour.

## J. Materials Considered

I reviewed the claims and counterclaims in this case as well as the April 26, 2006 PowerPoint presentation to Verizon, the expert report of Susan M. Fournier and the expert report of Larry Jay Namer. I also reviewed the August 8th Demand Letter from Greenfield.

To the extent that new documents and information become available, it may become necessary for me to refine and supplement my opinion. Therefore, the analysis and opinions expressed herein is subject to revision based upon my review of additional documents or other developments. At trial, I may refer to all or a portion of the above-mentioned documents, as well as additional documents produced during this litigation, and exhibits prepared for trial.

_____
Peter Sealey, Ph.D.
October 29, 2009
Sausalito, Ca.

Exhibit I

# Advertising Age Magazine

## How Deutsch L.A. Snared Plum VW Account

### DDB, Goodby Seemed to Have Leg Up, but Shop's Chemistry, Work Won Out

Posted by Jean Halliday on *10.26.09*

DETROIT (AdAge.com) -- If there's such a thing as a surprise account win in a business in which marketers frequently defy logic when it comes to reviewing and selecting agencies, then this was it.

To be sure, last Friday's news that Volkswagen of America had tapped Deutsch, Los Angeles, as agency of record for its $200 million ad account made sense. The agency is no rank outsider: It's a sizable shop, based in a city that is increasingly thought of as a car town, and until very recently was turning out decent creative work for struggling carmaker Saturn.

But Deutsch L.A. was far from the favorite when this review cranked into high gear. In fact, most observers would have given shorter odds to at least two of the other leading contenders.

First there was DDB, which has most of VW's ad business in the rest of the world, the supposed support of the German parent company and a longtime, clearly-stated hankering to win back the U.S. business it had for so many years.

There was Goodby, Silverstein & Partners, which is not only one of the best agencies in the country by most people's reckoning, but which also did a sterling job for Hyundai until the Korean automaker decided to take its advertising in-house. Goodby also had the seeming advantage of at least being an Omnicom Group sibling to DDB, theoretically allowing it to work somewhat more seamlessly on cross-border initiatives. The only longer shot than Deutsch might have been Wieden & Kennedy, even though the Portland, Ore., indie is certainly a creative powerhouse.

**Uncertainty** Add to that highly-competitive field the fact that in the middle of the review, Deutsch parent Interpublic made the decision to fuse Deutsch together with ailing sibling Lowe, a move that had the potential to disrupt the agency, and create uncertainty in the mind of a marketer that was about to hire them.

So given the odds, just how did Deutsch snare an account that Ad Age recently estimated was the third-most desirable in the still-highly-sought-after car category? Well, firstly it has to be noted that DDB's purported advantage might actually have been a disadvantage. VW's U.S. executives wanted to maintain their independence, according to executives close to the matter.

Still this wasn't a case of the other agencies losing, insisted VW, this was a case of Deutsch L.A. winning -- by quite some margin.

Of course the hoary story that always makes the rounds after a review, often propagated by the losing finalists, is that the decision came down to price. In a marketing business populated by hundreds of procurement executives, that always seems feasible, and in this case the theory was buttressed by reports that the latter stages of the review involved a lot of finance executives -- on both agency and client side -- doing a lot of number-crunching. Yet Tim Ellis, VW of America's VP-marketing and one of the three key decision makers in this review, said price wasn't the key factor here.

"The decision was not based on price, the decision was based on the best agency," he said. "I'm sure every client today is looking for fair value for their agency. We're good Germans and we have strong processes in the way we conduct

ourselves financially." Noting that VW is a legendary brand that was advertiser of the year at Cannes, he added: "Why would a brand with that kind of success go to the lowest bidder?"

**Bottom-line focus**

Rather than besting its rivals on price, Deutsch won for the simple, but vital, reason that it stayed focused on the bottom-line issue of moving metal, and presented the work that most moved the marketer. VW has extremely aggressive growth plans in the U.S., aiming to boost annual new-vehicle sales to 800,000 units by 2018, an ambitious jump over current yearly sales under 300,000. Mr. Ellis also told Adweek that he was impressed by the agency recognizing the importance of including the dealers in all marketing thinking and execution.

Beyond that, Mr. Ellis stressed the multiple talents of the Deutsch team and said that he and his fellow executives felt they had very good chemistry with them right from the get go. He said they offered "a platform that we felt was head and shoulders above the other competitors." He added that the agency was able to find a way to keep the brand's global "Das Auto" tag "that's just been sitting under our logo" in a relevant way that will resonate with American consumers. "That's important," he said, "because it never does any good to have a tagline that doesn't do anything."

Mr. Ellis, who was joined on the decision-making panel by his boss, Stefan Jacoby, president-CEO of VW of America, as well as VW global marketing chief Luca de Meo, admitted that VW faces "an incredibly complex challenge," to "evolve the brand to be more appealing to more people without selling our soul." He indicated VW's main targets will be the top two Japanese transplants here, saying, "VW has always had trouble being relevant and gaining consideration from those who today are Honda and Toyota buyers."

Mike Sheldon, co-CEO of Deutsch, Los Angeles, called the win "a game-changer for the agency." Deutsch already has a lot of people in place for the account following the loss of the Saturn account, and will open a service office in Herndon near VW's headquarters and hire additional staff.

Key creative players on the account will include Group Creative Director Eric Springer and Creative Director Josh Rose. Both men were heavily involved in the pitch, said Eric Hirshberg, co-CEO and chief creative officer. The agency's first work will arrive early next year. Incumbent Crispin, Porter & Bogusky opted not to defend.

Jeff Goodby, co-chairman of his eponymous agency which made it to the final two in the pitch, wished VW "a lot of luck," adding, "I'm sure we'll find another car company that will be a good fit for us."

VW's media planner and buyer, MediaCom, will work closely with Deutsch on planning, said Mr. Ellis. VW did not include U.S. Hispanic creative in the review, retaining its relationship with independent CreativeOnDemand, Miami. Independent agency AKQA is handling VW's mobile work.

Deutsch's victory will be even sweeter for those who were around in 1995, when the agency lost against Arnold in a review for the same account. Deutsch spent 95 days and $360,000 pitching VW, and even laid out $20,000 on a new black Jetta for research. After hearing he didn't win, Donny Deutsch made a quip about said Jetta, saying he wanted to "slam it into a wall."

Exhibit II

# Verizon Wireless Adds 1.5 Million Subscribers, Vodafone Issues Warning

Verizon's pending merger with Alltel is expected to add another 13.2 million customers, which will likely bring Verizon's total subscriber base to 80 million.
**By W. David Gardner**
InformationWeek

**July 22, 2008 05:35 PM**

Verizon Wireless reported that it has added 1.5 million subscribers, bringing its total subscriber base to 68.7 million. The good news, however, was tempered by a report Tuesday from its equity partner Vodafone Group, which said it expected its worldwide revenue to drop.

Verizon Wireless and rival AT&T have been in a subscriber horserace for several months with AT&T, securing 71.4 million customers. However, Verizon's pending merger with Alltel is expected to add another 13.2 million customers -- a move that will likely bring Verizon's total subscriber base to 80 million.

AT&T has been adding new subscribers at a rapid clip because of its exclusive deal to market Apple's iPhone.

Late last year, AT&T added 1.7 million wireless subscribers when it acquired Dobson Communications.

While Verizon Wireless and AT&T have been adding subscribers, third-largest cell phone service provider Sprint Nextel has been losing customers, although Sprint has been showing signs of stabilizing in recent weeks. The fourth-largest wireless firm, T-Mobile, has been adding customers, but it trails the other providers by a sizable margin.

Also on Tuesday, Verizon Wireless' 45% equity partner Vodafone trimmed its revenue predictions, sending many telecom stocks into a tailspin; until the announcement from Vodafone, the largest global wireless provider, the telecom sector was viewed by many as being resistant to the economic downturn that has been spreading in recent months.

"We are beginning to see an impact from the current economic environment which is greater than we expected," said Vodafone chief executive Arun Sarin, according to media reports. Vodafone's results were hardest hit in its Spanish unit.

Verizon Wireless' financial results aren't expected to be revealed until Monday when Verizon Communications is slated to release its second-quarter results.

**Exhibit III**

**Verizon Tops AT&T as Most-Advertised Brand, Walmart Vaults Into No. 5 Spot With 66% Increase in Measured Media Spending**

*By* Maureen Morrison
*Published:* June 22, 2009

CHICAGO (AdAge.com) -- Telecom stalwarts Verizon and AT&T commanded the top two spots in Ad Age's ranking of the Top 100 megabrands for 2008, pumping more than $4 billion into measured media. Since 2001, a telecom brand -- either Verizon or AT&T (including now-jettisoned Cingular) -- has been the most-advertised brand.

Verizon in 2008 supplanted AT&T on the megabrands ranking with a lofty $2.2 billion in measured U.S. media spending. That doesn't include measured spending of Alltel Corp., which Verizon Wireless acquired in January 2009.

AT&T's measured spending was just below $2 billion, according to data from TNS Media Intelligence.

Ad Age's megabrands list is a ranking of brands with the highest U.S. measured-media spending for all goods and services that fall under that brand.

Macy's ranked third. Sprint, No. 4 in 2008, had a 22.3% drop. Walmart Stores' Walmart rounded out the top five, rocketing measured spending 66.4%. With the U.S. in recession since December 2007, Walmart has aggressively promoted its value message. Auto brands' measured media spending tumbled 15% last year, and there was a consequent reordering of brands. Toyota Motor Corp.'s Toyota brand,

No. 6 in the ranking, displaced Ford Motor Co.'s Ford in 2008 as the nation's most-advertised auto brand. Ford slashed measured spending on its flagship brand to $666.6 million -- a 33.6% drop.

Not all auto megabrands suffered blows in spending. Chevrolet, No. 8, boosted measured spending 12.2% to $797.1 million as embattled General Motors Corp. invested in its mainstay brand.

Copyright © 1992-2009 Crain Communications | Privacy Statement | Contact Us