# EXHIBIT 10

# DUVAL DEPOSITION

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION
CASE NO. 6:08-3980-GRA

CONFIDENTIAL

---

HILL HOLLIDAY CONNORS COSMOPULOS,
INC., d/b/a ERWIN-PENLAND,

      Plaintiffs,

-vs-

JEFFREY GREENFIELD and 1st
APPROACH, LLC,

      Defendants, and
      Third-Party
      Plaintiffs,

-vs-

CELLICO PARTNERSHIP d/b/a VERIZON
WIRELESS, and JOSEPH A. ERWIN,

      Third-Party
      Defendants.

DEPOSITION UNDER
ORAL EXAMINATION
OF
ROBYN DUVAL

---

    TRANSCRIPT of the deposition of the witness, called for Oral Examination in the above-captioned matter, said deposition being taken pursuant to the Superior Court Rules of Practice and Procedure by and before CHRISTINA LYNN HANSEN, a Notary Public and Certified Court Reporter of the State of New Jersey, at THE DOLCE HOTEL IN BASKING RIDGE, 300 North Maple Avenue, Basking Ridge, New Jersey, on Wednesday, December 2, 2009, commencing at approximately 12:48 in the afternoon.

MAGNA LEGAL SERVICES
Seven Penn Center
1635 Market Street - 8th Floor
Philadelphia, PA 19103
(215)207-9460

JOB # 35731

Page 22

1   Q.   When was the first time you heard of
2  How Sweet the Sound?
3        MS. McKINNEY: Objection.
4   A.   I heard about it, I'm going to say,
5  probably in '06.
6   Q.   2006?
7   A.   Uh-huh.
8   Q.   Okay. Do you remember what the
9  connection -- how you heard -- first came into
10 contact with How Sweet the Sound?
11  A.   No.
12       MS. McKINNEY: Objection.
13  A.   Just a mention.
14  Q.   Okay. And what's your next
15 recollection of How Sweet the Sound after your
16 initial hearing of it in 2006?
17  A.   It was in April of '07 when my boss
18 Andrew Shafer said, "Here's a program. Go execute."
19  Q.   Okay. And did you know anything
20 about the program before he said, "Here's a program.
21 Go execute?"?
22       MS. McKINNEY: Objection.
23  A.   Just that I had heard about it.
24  Q.   So no details. You just -- what did
25 you know about it?

Page 23

1   A.   I didn't know anything other than,
2  "Here's a program. Go execute it. It's your
3  project."
4        But when he said that, I had heard
5  about it before. I just didn't know any details
6  around it.
7   Q.   I follow you.
8        Did you know -- at the point you he
9  told you to go execute it, did you know it was a
10 choir-based competition?
11       MS. McKINNEY: Objection.
12  A.   No.
13  Q.   Okay. So you really just knew the
14 title and none of the details?
15  A.   Right.
16  Q.   Okay. What did you do after Joe
17 Shafer told you to go execute it?
18  A.   It was Andrew.
19  Q.   I'm sorry.
20  A.   It's okay. Andrew Shafer. He was my
21 boss.
22       Ultimately, I picked up the phone and
23 called Erwin-Penland and said, "Okay. I've just
24 been given this project to go execute. What do you
25 know?"

Page 24

1   Q.   All right. And what did they tell
2  you?
3   A.   They basically said it was a
4  choir-based competition that we were going to trial
5  in Memphis, that they had already selected the
6  market, and Memphis was the market they were going
7  to trial it in, and it was choir competition, and we
8  basically needed to figure out the details of how we
9  were going to execute it.
10  Q.   Is that what you were tasked with
11 doing at that point?
12  A.   Yes. I was tasked with that.
13 Uh-huh.
14  Q.   And how did you actually go about
15 filling in the details?
16  A.   Basically --
17       MS. McKINNEY: Objection.
18  A.   -- creative.
19       MR. CHROMY: Objection.
20  A.   Project plan.
21  Q.   What's a project plan?
22  A.   It's work plan of what do we need to
23 do to get this done.
24  Q.   Is that something that's in writing?
25  A.   Yes.

Page 25

1   Q.   Okay. Is it a form that you follow
2  from Verizon?
3   A.   Yes.
4   Q.   Okay.
5   A.   It's a project plan form.
6   Q.   When you're executing this project
7  plan form, did you have a hard copy of it or was it
8  on a computer?
9   A.   Both.
10  Q.   And your hard copy, would you keep it
11 in a file folder in your office or where would it be
12 stored?
13  A.   Um, I don't know if it's even stored
14 anywhere. But it would definitely be in my e-mail.
15  Q.   At the time you would have kept it --
16  A.   My e-mail.
17  Q.   -- on your desk or --
18  A.   It --
19       MS. McKINNEY: Objection to form.
20  A.   Yeah. It would have been kept in
21 e-mail.
22  Q.   Okay.
23  A.   We updated it once a week.
24  Q.   Okay. Was it saved on a shared drive
25 at all or was it just updated via e-mail?

Page 26

1  A.  No shared drive.
2  Q.  Okay. Do you have shared drives
3  there in Atlanta?
4  A.  We do, but at the time I was the only
5  one working on the project, so there was no need to
6  share it with anybody.
7  Q.  I follow you.
8      And when you say the only one working
9  on the project, you mean the only one at Verizon?
10 A.  Yes.
11 Q.  Okay.
12 A.  Project manager. I was the only
13 project manager. There were other people at
14 Verizon, such as legal folks.
15 Q.  Right.
16     Okay. But as far as the actual
17 implementation, getting Memphis off the ground, you
18 were the only hands-on person there?
19 A.  Yes. Yes.
20 Q.  Okay. And who did you work with in
21 getting Memphis off the ground?
22 A.  Erwin-Penland.
23 Q.  And outside of Erwin-Penland, was
24 there any other companies that y'all relied on in
25 order to complete the Memphis choir competition?

Page 27

1  A.  Zenith.
2      MS. McKINNEY: Objection.
3  Q.  Zenith?
4  A.  Zenith.
5  Q.  Okay.
6  A.  They did the media buying.
7  Q.  And anybody else?
8  A.  Moxie. Moxie did the on line.
9  Q.  Anybody else you can think of?
10 A.  We worked with some T.V. stations
11 and radio stations in Memphis with conjunction with
12 Zenith for the media buying. We worked with them to
13 leverage the media. So we would buy media to
14 promote the 30-second spot. So we were -- had -- we
15 created a 30-second spot, a commercial, that says
16 Come join us at the FedEx Forum for the choir
17 competition.
18     And Zenith would place the media, and
19 then we would meet with the T.V. station to get it
20 as value ad, and figure out how they can help us
21 leverage it in the community.
22 Q.  I follow you.
23     So when it came time for the actual
24 competition, were you there on-site?
25 A.  Yes.

Page 28

1  Q.  How many days were you there in
2  Memphis?
3  A.  Just one.
4  Q.  Just the one, the day of the
5  competition?
6  A.  Day of the competition.
7  Q.  Did you coordinate everything else
8  before that, I'm guessing, to make sure that it went
9  flawlessly?
10 A.  Yes.
11     MS. McKINNEY: Objection.
12     MR. CHROMY: Objection.
13 Q.  Okay. Was there anybody there
14 on-site for Verizon before the competition, other
15 than yourself?
16 A.  No. It was just me.
17 Q.  Okay. And I'm guessing, but you tell
18 me if I'm right or not, there's somebody from EP
19 that was there in Memphis?
20 A.  Prior to --
21     MR. CHROMY: Objection.
22 A.  -- the competition?
23     Yes. But there were also folks from
24 Zenith and Moxie. So all agencies were represented.
25 Q.  Good.

Page 29

1      Okay. And then the day of the
2  competition, who from Erwin-Penland was there?
3  A.  About 60 people.
4  Q.  About 60 people.
5      Was Joe Erwin there?
6  A.  No.
7  Q.  Allen Bosworth?
8  A.  No.
9  Q.  Who would you consider to be the most
10 senior person from EP that was there the day of the
11 competition?
12     MS. McKINNEY: Object to form.
13     MR. CHROMY: Object.
14 A.  Beth Carter.
15 Q.  Beth Carter.
16     What was Ms. Carter's role?
17 A.  She was making sure that the choirs
18 were getting on and off the stage in an efficient
19 manner, that the staging lighting was coming up and
20 down the way it was supposed to, and making sure the
21 plants were there and microphones set up, and...
22 Q.  How did the Memphis competition go?
23     MS. McKINNEY: Objection.
24     MR. CHROMY: Objection.
25 A.  It was a -- in my opinion, it was a

Page 30

```
 1  good events.
 2     Q.   Okay.  And why so?
 3     A.   It targeted the African-American
 4  community, and our goal was to target that
 5  community.
 6     Q.   Okay.  Did it -- was it successful in
 7  your goal?
 8          MS. McKINNEY:  Objection.
 9          MR. CHROMY:  Objection.
10     A.   To target the AA community, yes, it
11  was.
12     Q.   Okay.  Did you measure the success of
13  the program afterwards?
14          MS. McKINNEY:  Objection.
15     A.   I personally did not, no.
16     Q.   Did Verizon?
17     A.   A segmentation person within Verizon
18  did.
19     Q.   Okay.  And do you know what the
20  results were of that analysis?
21     A.   I'm aware of those results.
22     Q.   What were they?
23     A.   I don't know.
24     Q.   Okay.  Were they favorable?
25     A.   Some of them were -- you know, some
```

Page 31

```
 1  of the results were favorable.
 2     Q.   Okay.  Was some were not favorable?
 3     A.   Yes.
 4     Q.   Do you remember what those were?
 5     A.   From a financial perspective, we
 6  didn't -- we spent more than -- than what we were
 7  supposed to get back.  It was a costly program.
 8     Q.   Okay.  And when you say you spent
 9  more than you were supposed to get back, what do you
10  mean by that?
11     A.   Well, ultimately, when you spend on
12  advertising, you hope to move market share, you
13  know, you hope to -- to gain customers and market
14  share.  And we didn't -- from the results that we
15  got, I don't know that we did that.
16     Q.   You don't know that the Memphis
17  actually increased Verizon -- the Memphis How Sweet
18  the Sound increased the market share for Verizon?
19          MS. McKINNEY:  Objection.
20          MR. CHROMY:  Objection.
21     A.   Yeah.  I don't recall.
22     Q.   Okay.
23     A.   I don't recall.  I didn't put
24  together the results, so I don't know.
25     Q.   Have you ever presented the results
```

Page 32

```
 1  to anyplace?
 2     A.   Yes.  I was -- I participated in
 3  putting together a deck that was presented to Joe
 4  Saracino, Andrew Shafer and Suzy Deering.
 5     Q.   How about anybody outside of Verizon?
 6     A.   Did I present it to anyone outside of
 7  Verizon?  Yes.  I presented to the ANA.
 8     Q.   Okay.  What did you tell the ANA
 9  about the results of the Memphis How Sweet the Sound
10  choir competition?
11          MS. McKINNEY:  Objection.
12     A.   That it was -- it was good.  It was a
13  good event.  It was a good event to target the ANA
14  as part of a multi-cultural.  So they target the AA
15  community.  It's an organization.  So this was a
16  good event as a best practice for the ANA
17  multi-cultural association.
18     Q.   Did you tell the attendees that the
19  ANA presentation that you spent more than you
20  actually got back?
21          MS. McKINNEY:  Objection.
22     A.   I don't recall.
23     Q.   After Memphis, did you report back to
24  Verizon as to your opinion of the success of the
25  program?
```

Page 33

```
 1          MS. McKINNEY:  Object to form.
 2          MR. CHROMY:  Objection.
 3     A.   It was part of the presentation.
 4     Q.   Okay.
 5     A.   So it was part of the presentation.
 6     Q.   Did you recommend that you continue
 7  to invest in How Sweet the Sound?
 8     A.   Yes.
 9          MS. McKINNEY:  Objection.
10     Q.   Why is that?
11     A.   Because it was a program to target
12  the AA community, and I felt like it was a good
13  program to target that.  It's one that we
14  under-penetrate against, and this was a good program
15  to reach that audience.
16     Q.   When you say, "Under-penetrate
17  against," can you explain that for me?
18     A.   Verizon typically does very well
19  against Caucasian.
20     Q.   Uh-huh?
21     A.   But we don't do as well we under
22  index against multi-cultural and general, so
23  Hispanic or Asian or African-American.
24     Q.   Is it for cell phones in particular
25  or is it across all lines of business?
```

Page 34

1  A.   I can't answer that. I only work on
2  cell phones.
3  Q.   But for cell phones you underperform
4  in the multi-cultural area?
5  A.   Correct. And this was a good program
6  to reach them.
7  Q.   Okay. Is that still true today, that
8  Verizon still underperforms in the multi-cultural
9  area?
10 A.   I don't know.
11 Q.   Okay. Does your job involve -- no
12 longer involved that analysis?
13 A.   No.
14 Q.   Okay. And that changed when you
15 moved to the Associate Director of National
16 Advertising?
17 A.   That's correct.
18 Q.   Okay. So after the 2006 How Sweet
19 the Sound program in Memphis?
20 A.   2007.
21 Q.   Sorry. 2007. Thank you.
22      After that program in 2007, what was
23 your involvement with How Sweet the Sound from there
24 on?
25 A.   Really none. I -- when corporate

Page 35

1  decided they wanted to take the event and they
2  wanted to continue it, I basically sat in as a
3  consultant role, Don't forget to do this, Don't
4  forget -- you know, you got to figure out how to get
5  from point A to point B.
6  Q.   Right.
7       The little details that you learned
8  from Memphis?
9  A.   Right.
10 Q.   Okay. So were you involved at all in
11 the 2008 shows of How Sweet the Sound?
12 A.   No.
13 Q.   Okay. And other than consulting in
14 2007, did you have anything else to do with How
15 Sweet the Sound?
16 A.   And 2008 I consulted.
17 Q.   Still consulted?
18 A.   Well --
19 Q.   I'm sorry.
20 A.   We did the event in Memphis in 2007,
21 and then I consulted in 2008.
22 Q.   And now other than the consulting
23 role in 2008, you didn't have anything to do with
24 How Sweet the Sound?
25 A.   That's correct.

Page 36

1  Q.   Okay. After the 2007 event in
2  Memphis, did Verizon -- how did Verizon judge the
3  success of the Memphis product?
4       MS. McKINNEY: Object.
5  A.   I couldn't tell you. I don't know
6  how -- how they would judge it.
7  Q.   Did somebody -- does somebody
8  actually analyze it to see whether or not it's good
9  money spent?
10      MS. McKINNEY: Object to form.
11 A.   I don't know.
12 Q.   Okay. Your office has nothing to do
13 with analyzing whether or not it's good money spent?
14 A.   No.
15 Q.   Okay. Was the Memphis event, as you
16 understood, the How -- strike that.
17      As you understood the How Sweet the
18 Sound concept, was it an American Idol-type event?
19      MS. McKINNEY: Objection.
20 A.   We never called it that. I mean, it
21 was just a choir competition.
22 Q.   Did it always -- all right. Did it
23 always contemplate events in various cities?
24      MS. McKINNEY: Objection.
25      MR. CHROMY: Objection.

Page 37

1  A.   No.
2  Q.   No?
3  A.   No.
4  Q.   Was it a grassroots effort?
5       MS. McKINNEY: Objection.
6  A.   It was a grassroot effort to trial in
7  Memphis.
8  Q.   Did it have a T.V. component in
9  Memphis?
10      MS. McKINNEY: Objection.
11 A.   No.
12 Q.   Did it have an internet component?
13      MS. McKINNEY: Objection.
14 A.   Yes. Online registration.
15 Q.   Okay. Did you have text voting in
16 Memphis?
17      MS. McKINNEY: Objection.
18 A.   Yes, we did.
19 Q.   Do you think How Sweet the Sound was
20 a successful marketing tool for Verizon to raise
21 company perception of the African-American
22 community?
23      MS. McKINNEY: Objection.
24      MR. CHROMY: Objection.
25 A.   Yes. My opinion is I think it took

Page 38

1  -- it was a good marketing tool to reach the AA
2  community. Uh-huh. Yes.
3      Q.  Do you know anything about the
4  decision that was made in order to get to the point
5  of doing the Memphis competition?
6      A.  No, sir.
7      Q.  Okay. Again, your role came in just
8  simply after Mr. Shafer told you to go ahead and
9  implement it?
10     A.  You got it.
11     Q.  The decision had already been made by
12 Verizon at that point somewhere above your head, so
13 to speak, to do the event?
14     A.  Yes, sir.
15     Q.  How did you -- well, let me ask you
16 this.
17         Did Mr. Shafer give you a budget to
18 do the Memphis event with or did you develop that
19 after Mr. Shafer said, "Run with it?"
20     A.  I don't recall. But we did have a
21 budget, and we did meet until he -- he departed in
22 July and moved up to New Jersey.
23         So prior to him departing, we did
24 meet pretty regularly about the budget. But I don't
25 recall if he gave me a budget or we had to determine

Page 39

1  it.
2      Q.  Right. What you're saying is that
3  when he said, "Run with it," you weren't sure if he
4  had a budget in hand or you developed it in
5  conjunction with him and other people at that point?
6         MS. McKINNEY: Objection.
7      A.  Exactly. I don't recall.
8      Q.  Okay. Had you done budgeting before
9  for other similar advertising things?
10     A.  Yes.
11     Q.  Okay.
12     A.  Yes.
13     Q.  Who took over Mr. Shafer's role when
14 he left?
15     A.  No one.
16     Q.  Did anybody who assumed his duties?
17     A.  Diane Whitehead up in New Jersey.
18     Q.  Okay. Do you know who Jeff
19 Greenfield is?
20     A.  No, sir.
21     Q.  Have you ever heard of him prior to
22 hearing about this litigation?
23     A.  No, sir.
24     Q.  Okay. When you were doing the
25 Memphis event, how did you select the contractors

Page 40

1  there to that were going to provide various
2  services, for instance, the stage crew?
3      A.  Basically, Erwin-Penland put together
4  an estimate of what we needed from florist to
5  catering to lighting. And that's pretty standard
6  with everything that we do, they put together an
7  estimate.
8      Q.  Right.
9      A.  And we approved it.
10     Q.  Okay. All right. Is Verizon able to
11 direct any of those specific categories? For
12 instance, if you wanted a particular florist to
13 provide the flowers, are you able to direct --
14         MS. McKINNEY: Objection.
15     Q.  -- and determine who the florist is
16 going to be for the event?
17     A.  Yes.
18         MR. CHROMY: Objection.
19     Q.  Okay. I'm going to show you what
20 looks to be an e-mail thread that you're involved
21 in, Ms. Duval. It's Verizon document number 223429
22 through 223431. And we're going to mark this as
23 Exhibit Number-1 to your deposition.
24         (Document Bates labeled VZW-223429
25         through VZW-223431 is received and marked

Page 41

1          Exhibit-1 for identification.)
2          MR. DOOLITTLE: The highlights on
3  this document are mine.
4      Q.  Let me show you that, and ask you if
5  you remember this e-mail in 2007?
6      A.  Okay.
7          MR. CHROMY: Do you have copies,
8  Paul?
9          MR. DOOLITTLE: No, I don't. But
10 you're welcome to --
11         MR. CHROMY: If you don't mind, I'm
12 going to go look over her shoulder.
13         MS. McKINNEY: And if we can look at
14 it before you ask her questions.
15     A.  Is it alright for me to read this for
16 a minute?
17     Q.  Absolutely, Ms. Duval. You're
18 entitled to read the entire thing?
19     A.  Okay. I just need to refresh my
20 memory.
21     Q.  Sure. I don't have a lot of
22 questions on it, but you're entitled to read
23 everything you want to on it.
24     A.  Okay.
25     Q.  Okay. Ms. Duval, looking at Exhibit