IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| HILL HOLLIDAY CONNORS COSMOPULOS, INC. d/b/a ERWIN-PENLAND, <br>     Plaintiff, <br><br> vs. <br><br> JEFFREY GREENFIELD and 1st APPROACH, LLC, <br>     Defendants, and <br>     Third-Party Plaintiffs, <br><br> vs. <br><br> CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS, and JOSEPH A. ERWIN, <br>     Third-Party Defendants. | Case Number: 6:08-CV-3980-GRA |

Defendants' Motion for Partial Summary Judgment
and Memorandum of Law in Support
as to Breach of Fiduciary Duty Claim

**Motion**

Comes now the Defendants and Third-Party Plaintiffs, 1st Approach LLC and Jeffrey

Greenfield (collectively referred to hereinafter as "Greenfield"), and move for an Order granting

partial summary judgment to Greenfield, and against Hill Holliday Conners Cosmopulos, Inc.

d/b/a Erwin-Penland (collectively referred to hereinafter as "Erwin-Penland" or "EP") with

respect to the following questions of law, as to which no *genuine* issue of material fact exists:

    1. **Existence of a Fiduciary Relationship.** As a matter of law, Greenfield and Erwin-

Penland formed a partnership and/or joint venture to co-conceive, co-develop, and co-

commercialize "*How Sweet the Sound*," a marketing plan initially developed by Greenfield,

presented by Erwin-Penland one of its prospective clients, and then subsequently co-presented to Verizon Wireless senior management, who adopted the program as their own. As Greenfield's partner in this collaboration, Erwin-Penland owed to Greenfield, and to the partnership itself, certain fiduciary duties, including the duties of good faith, fair dealing, and full disclosure.

2. **Breach of Fiduciary Duty.**  As a matter of law, Erwin-Penland has breached the aforesaid fiduciary duties by failing to act in the best interest of the partnership, by failing to make full disclosure to Greenfield of facts affecting the partnership / joint venture, by its conversion for its own benefit of certain trademarks and domain names, and in its refusal to share the benefits flowing therefrom with its co-partner and co-venturer, Greenfield.  By refusing all of Greenfield's demands for an accounting for profits arising from *"How Sweet the Sound,"* after Greenfield successfully co-created and co-presented his branded entertainment marketing program involving a series of church choir competitions to Verizon Wireless (hereinafter, "VZW"), Erwin-Penland has breached its fiduciary duties to the partnership and specifically those duties owed to its partner, Greenfield / 1st Approach.

Statement of Undisputed Material Facts

1. <u>Prior to October 24, 2005</u>: Erwin-Penland had not created any marketing campaign incorporating a client-sponsored choir competition similar to *"How Sweet the Sound."*

2. <u>October 24, 2005</u>:  Erwin-Penland's Joseph Erwin (hereinafter, "Joe Erwin" or "Erwin") made initial contact with 1st Approach's Jeffrey Greenfield immediately after Greenfield gave a speech to a trade group on "branded entertainment" in Los Angeles. <u>See</u> Greenfield Deposition, at p. 101, line 2 through p. 108, line 7, a copy of which is attached hereto as <u>Exhibit A</u>.

3. <u>October 24, 2005</u>:  Greenfield informed Erwin that he had no interest in being a "gun-for-hire," but that he expected to receive an equity stake in any property created to justify becoming involved in any collaboration with Erwin:

> "A. And I [Greenfield] explained to him [Erwin] that, great, I definitely would be interested in working with him. And that, you know, the way that I work now, is that -- you know, I can definitely work with him. That's fine. But anything that we work on and work on together -- I'm not like a "gun for hire" type thing. If you want to hire me to come to and speak to your group, get them excited, you can do that. I'll do that. But if we're going to work on a project together, I have got to still have a piece of it. Q. Is it your testimony that you had a conversation with Mr. Erwin at that conference about working together on a project and getting a piece of it? A. Yes.

<u>See</u> Greenfield Deposition, at p. 104, line 17 through p. 105, line 9, a copy of which is attached hereto as <u>Exhibit A</u>.

4. <u>October 24, 2005</u>:  Greenfield and Erwin exchanged e-mails in which Greenfield offered to assist Erwin with an upcoming "pitch," and Erwin accepted Greenfield's offer of assistance and suggested continued communication to accomplish that end. <u>See</u> document Bates-labeled Greenfield/1st Approach 000618 – 000619, labeled as <u>Defendant's Exhibit 48</u> to Joseph Erwin Deposition; this document has been filed contemporaneously with this Motion, under seal, to protect claimed confidentiality of the document pursuant to Protective Order filed 8/7/2009, and here identified as <u>Confidential Exhibit B</u> (filed in sealed envelope with <u>Motion to Seal</u> pursuant to Local Rule 5.03). Erwin Deposition, p. 88, lines 14-18; Erwin Deposition, p. 115, lines 9-12, <u>Confidential Exhibit C</u> (filed with <u>Motion to Seal</u>.)

5. <u>October 27, 2005 through November 2, 2005</u>:  A series of e-mail and conference call communications took place, with Erwin-Penland sending Greenfield confidential details concerning one of Erwin-Penland's prospective clients for the upcoming "pitch." <u>See</u> documents

Bates-labeled EP000029 through EP000034, identifiable as <u>Confidential Exhibit D</u> (filed with <u>Motion to Seal</u>).

6. <u>November 4, 2005</u>: Jeffrey Greenfield sent the marketing campaign entitled <u>Amazing Grace</u>, to Erwin-Penland in the form of a marketing "deck," which included graphic depictions of church choirs. The theme was the "... top 20 church choirs in the US competing for over $250,000 in prizes and the title of the Best Choir in the USA." <u>See</u> documents Bates-labeled EP000124 and EP000132, <u>Confidential Exhibit E</u> (filed with <u>Motion to Seal</u>). Erwin confirmed that Greenfield came up with the name "Amazing Grace." <u>See</u> Erwin Deposition at 229, lines 6-9; 13-14, <u>Confidential Exhibit C</u> (filed with <u>Motion to Seal</u>).

7. <u>February 15, 2006</u>: To document the creative co-authorship and attributes of the new marketing campaign concept, Greenfield registered *"How Sweet the Sound"* as a "gospel music contest" with the Writer's Guild of America ("WGA") with the ownership thereof vested in himself and in Joseph Erwin, President of EP, and he informed EP's Erwin in writing of the registration. Erwin did not object to the registration in the names of both Greenfield and Erwin. <u>See</u> document Bates-labeled EP226789, the WGA registration, <u>Confidential Exhibit F</u> (filed with <u>Motion to Seal</u>) and Pages 342-347 of Joseph Erwin's Deposition, <u>Confidential Exhibit C</u> (filed with <u>Motion to Seal</u>).

8. <u>February 15, 2006</u>: In one of the many e-mails addressing details of the planned church choir competition, Jeff Greenfield asked Joe Erwin whether transportation costs of the choirs that win regional competitions should be included [implied: in a budget that Greenfield is preparing]. Erwin responded with a series of thoughts to guide the collaborative discussion as to both regional and national competitions. <u>See</u> document Bates-labeled Greenfield/1[st] Approach

000346, Erwin Deposition Defendant's Exhibit 79, Confidential Exhibit G (filed with Motion to Seal).

9. March 13, 2006: Jeff Greenfield forwarded to Joe Erwin a detailed budget for production costs in seven venues, with over two dozen line items, together with a proposed profit split arrangement that had worked for Greenfield's pharmaceutical industry client. Greenfield's proposal included two options, both with a 50-50 split of any profits exceeding $12 million. See document Bates-labeled EP000276 & EP000422, Erwin Deposition Defendant's Exhibit 82, Confidential Exhibit H (filed with Motion to Seal).

10. March 13, 2006: Erwin acknowledged receiving Greenfield's budget and profit split proposal, and he circulated it to executive management within Erwin-Penland. See document Bates-labeled EP000690, Erwin Deposition Defendant's Exhibit 83, Confidential Exhibit I (filed with Motion to Seal).

11. March 16, 2006 and March 17, 2006: Having submitted his budget proposal to EP, which included the fee split arrangement between EP and Greenfield, and while preparing the presentation "deck" for the April 26, 2006 meeting with VZW senior management, and with two VZW presentations looming, in Atlanta and New Jersey, Greenfield asked Erwin whether Erwin wanted Greenfield to keep working on the presentation deck. Erwin explicitly asked Greenfield to continue his creative efforts on behalf of the partnership and/or joint venture, thereby inducing him to believe that Erwin had agreed to the fee split proposal and would forward EP's budget requirements for its role in the creation of the campaign. See document Bates-labeled Greenfield/1st Approach 000281, Erwin Deposition Defendant's Exhibit 84, Exhibit J (filed with Motion to Seal).

12. <u>April 26, 2006</u>: 1st Approach and EP jointly presented *"How Sweet the Sound"* to VZW's senior management at Verizon headquarters in Basking Ridge, NJ. The presentation "deck" identified Erwin-Penland and 1st Approach as the two entities responsible for conceiving and promoting "How Sweet the Sound" (at p. 8), as well as a copyright notice (at p. 36) that plainly identified Erwin-Penland and 1st Approach as holders of the copyright to the presentation. Document Bates-labeled EP226815, and designated as <u>Confidential Exhibit K</u> (filed with <u>Motion to Seal</u>),

13. <u>October 24, 2005 through April 26, 2006</u>: In the six-month period during which Erwin-Penland and 1st Approach were in regular communication, and making daily collaborative efforts to commercialize the marketing concept, *"How Sweet the Sound,"* Erwin never asked Greenfield to sign any formal agreement, be it a work-for-hire, license, assignment, or otherwise. <u>See</u> Erwin Deposition, p. 110, line 8 through p. 112, line 1, <u>Confidential Exhibit C</u> (filed with <u>Motion to Seal</u>), and Erwin confirmed that his firm, Erwin-Penland, worked together with Greenfield and 1st Approach in an undefined relationship, motivated by joining their respective fields of expertise to obtain business opportunities that would benefit both. Erwin Deposition, p. 111, lines 21-22, copies of said pages 110-112, <u>Confidential Exhibit C</u> (filed with <u>Motion to Seal</u>).

14. <u>April 26, 2006 through June, 2006</u>: In the two-month period immediately following the Verizon pitch, Greenfield continued working with Erwin-Penland's staff to fine-tune the proposal to incorporate VZW's feedback at the April 26, 2006 presentation, scaling back the originally-proposed television/film component to a one-hour televised special or documentary. <u>See</u> <u>Greenfield Affidavit in Support of Motion for Summary Judgment</u>, paragraphs 13-15, a copy of which is attached hereto as <u>Exhibit L</u>.

15. June 9, 2006: Greenfield participated in a conference call, during which Erwin again openly referred to the Erwin-Penland / 1st Approach arrangement as a "partnership." See Greenfield Affidavit in Support of Motion for Summary Judgment, paragraph 15, a copy of which is attached hereto as Exhibit L.

16. November 22, 2006: Jeffrey Greenfield wrote to Erwin-Penland's Executive Vice President and Director of Client Services, Allen Bosworth, to ask (1) whether VZW has approved or turned down *"How Sweet the Sound"* and (2) indicated that if Verizon has turned it down, that Greenfield would like to take the offer to other clients. See document Bates-labeled EP003252, designated as Confidential Exhibit M (filed with Motion to Seal).

17. May 9, 2007 to May 11, 2007: Staffers at Erwin-Penland inquired of Erwin-Penland management about Greenfield's rights in *"How Sweet the Sound"* and Joe Erwin explicitly acknowledged that *"How Sweet the Sound"* is 50% Greenfield's idea. See documents Bates-labeled EP050532 and EP050535, Confidential Exhibit N (filed with Motion to Seal).

18. January 2007 through July 2007: Greenfield made inquiries on January 26, 2007, March 29, 2007, and July 26, 2007, asking Joe Erwin about the status of VZW's acceptance or rejection of *"How Sweet the Sound,"* and Erwin did not respond. See Greenfield Affidavit in Support of Motion for Summary Judgment, paragraph 18, a copy of which is attached hereto as Exhibit L.

19. March 2008: Greenfield first learned that a pilot of *"How Sweet the Sound"* had been carried out in Memphis in October 2007. See Greenfield Affidavit in Support of Motion for Summary Judgment, paragraph 19, a copy of which is attached hereto as Exhibit L.

20. July 2008 through November 2009: Erwin-Penland produced *"How Sweet the Sound,"* including 11 events and a final competition in 2008, and 11 events and a finale in 2009; a one-hour documentary film; and a one-hour televised finals competition that aired on the Gospel

Music Channel, all as contemplated in the final presentation that Erwin-Penland and 1st Approach made to Verizon Wireless. See Greenfield Affidavit in Support of Motion for Summary Judgment, paragraphs 20-23, a copy of which is attached hereto as Exhibit L.

21. March 1, 2010: To date, neither Greenfield nor 1st Approach have been compensated for their extensive work upon, and contributions to, the partnership and co-venture with Erwin-Penland with regard to *"How Sweet the Sound."* See Greenfield Affidavit in Support of Motion for Summary Judgment, paragraphs 24-26, a copy of which is attached hereto as Exhibit L.

Memorandum of Law

### 1. Fact Summary

Jeff Greenfield and Joe Erwin first met in Los Angeles in October, 2005. Defendants' Undisputed Facts 2-3, supra. Shortly thereafter, at Erwin's request, Greenfield and Erwin began working together on developing a church choir competition concept, a business plan that Greenfield initially named *"Amazing Grace."* Undisputed Facts 4-6. Both Greenfield and Erwin-Penland expected to benefit financially once a commercial sponsor agreed to fund the competition. Undisputed Fact 13. The initial pitch to an Erwin-Penland prospect was essentially the same *"How Sweet the Sound"* program that VZW later adopted, commercialized, filmed, and televised. Undisputed Facts 6, 12, 20 and 21.

Following rejection of the initial pitch of *"Amazing Grace,"* Erwin-Penland and Greenfield continued working together, in a collaboration to reformulate the choir-competition concept to meet the specific needs and capabilities of Verizon Wireless, incorporating elements that both Erwin-Penland and Greenfield had co-conceived and co-developed as reflected in a series of e-mails, phone calls, and co-presentations. Undisputed Facts 7-14. Again, it was understood that if the pitch met Verizon's needs and was accepted, Erwin-Penland and

Greenfield would both benefit financially from that sponsorship. <u>Undisputed Facts 9-11</u>. After a successful pitch to VZW's head of marketing in New Jersey, at which both Erwin-Penland and Jeffrey Greenfield presented, VZW informed Erwin-Penland that it wished to proceed with a scaled-down version of the church choir contest, which Erwin-Penland and Greenfield then continued to develop in tandem. <u>Undisputed Facts 14-15</u>. However, Erwin-Penland thereafter concealed from Greenfield the fact that Verizon Wireless wished to move forward, and Erwin-Penland completely excluded Greenfield from participating in the project through a series of false and intentionally misleading communications with Greenfield. <u>Undisputed Facts 16-21</u>.

### 2. Legal Analysis

*Introduction and Threshold Issue:  What Legal Relationship Applies?*

At its core, the question this case presents is the following:  after recruiting and joining forces with Greenfield & 1st Approach LLC to co-conceive, co-develop, and co-promote the award-winning *"How Sweet the Sound"* marketing campaign, a project that required over eight months of intensive collaboration, should Erwin-Penland retain 100% of the resulting profits, leaving Greenfield with nothing?  That is the gist of Erwin-Penland's declaratory judgment action.

The facts clearly documenting an eight-month collaboration of Erwin-Penland and Greenfield from October 2005 through June 2006 show that this case is far more than an intellectual property rights or trade secrets case.  It is a case testing the bounds of business ethics in connection with all the fruits of an enormously creative and successful collaboration that two business entities enthusiastically joined together to produce, both seeking to tap a unique business opportunity made ripe by the convergence of wireless telecommunications, Internet and television media convergence, new Internet "buzz"-marketing methods in 2005-2006, all in the

context of VZW's perceived opportunity (and need) to expand its sales to the African-American community. These converging trends, and Greenfield's creative genius in recognizing them and knowing how to synthesize and package them, all resulted in his central role in creating a unique, successful, and award-winning marketing campaign that was eight full months in the making prior to Verizon's enthusiastic acceptance. The extraordinary injustice in this case arises from the larger of the two collaborators, Erwin-Penland, seizing 100% of the joint venture spoils, and then suing for a declaratory judgment to prevent its smaller collaborator from receiving its share.

A critical threshold question in this case is the legal relationship between the Declaratory Judgment Plaintiff, Erwin-Penland, and the Counterclaimant, Greenfield. Do the undisputed facts provide any reasonable basis for finding that Greenfield was simply a "volunteer" of Greenfield's time, efforts, creative, and marketing genius, as Erwin-Penland's declaratory judgment action claims? Or, as a matter of law, and based on the absence of any probative facts to show otherwise, did Erwin-Penland and Greenfield in fact enter into a **partnership or joint venture** to exploit a business opportunity that neither could effectively conceive, sell, and implement alone? For his counterclaim, Greenfield seeks this Court's judgment, that, as a matter of law, the parties clearly did form a *de facto* or implied-in-law partnership, if not as an expressly agreed partnership, to conceive and commercially exploit *"How Sweet the Sound"*; and that Erwin-Penland, as a matter of law, clearly breached its fiduciary duties arising from that *de facto* or implied partnership by shutting out Greenfield once the church-choir competition concept hit paydirt with VZW. In this case, the parties' actions speak far louder than their words.

### A. Standard for Grant of Summary Judgment

Parties making claims are entitled to move for summary judgment on all *or part* of a claim. Fed. R. Civ. P. 56(a). To prevail on a motion for summary judgment, the moving party

must initially show there are no genuine issues of material fact and that it is entitled to summary judgment as a matter of law.  Fed. R. Civ. P. 56(c); Drs. Steuer and Latham, P.A. v. National Medical Enterprises, Inc., 672 F. Supp. 1489 (1987), *affd.* 846 F.2d 70 (1988).  Thereafter, the non-moving party "may not rest upon the mere allegations or denials of his pleading, but his response ... must set forth specific facts showing that there is a genuine issue for trial." *Id.*; Fed. R. Civ. P. 56(e).

To survive a motion for summary judgment, the non-moving party must demonstrate a genuine issue of material fact that precludes a ruling on the law alone.  However, when the moving party has carried its initial burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial." Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 1355-56, 89 L.Ed.2d 538 (1986).

### B. Existence of Partnership

Whether a fiduciary relationship exists between two people is an equitable issue for the judge to decide.  Hendricks v. Clemson Univ., 353 S.C. 449, 458-59, 578 S.E.2d 711, 715 (2003) (citing Island Car Wash, Inc. v. Norris, 292 S.C. 595, 358 S.E.2d 150 (S.C. App.1987)). However, the determination of a breach of a fiduciary relationship can be a question for the jury. *Id.*  In this case, it is clearly the province of the trial judge to determine whether a partnership of the parties gave rise to a corresponding fiduciary duty.

A partnership is an association of two or more persons to carry on as co-owners a business for profit. S.C. Code Ann. § 33-41-210 (Supp. 2009); see Wyman v. Davis, 223 S.C. 172, 174, 74 S.E.2d 694, 698 (1953); Halbersberg v. Berry, 302 S.C. 97, 101, 394 S.E.2d 7, 10

(S.C. App. 1990); Beck v. Clarkson, 300 S.C. 293, 301, 387 S.E.2d 681, 685 (S.C. App. 1989); Buffkin v. Strickland, 280 S.C. 343, 345, 312 S.E.2d 579, 580 (S.C. App. 1984).

Where the parties to a contract, by their acts, conduct, or agreement show that they intend to combine their property, labor, skill and experience, or some of these elements on one side, and some on the other, to carry on, as principals or co-owners, a common business, trade, or venture as a commercial enterprise, and to share, either expressly or by implication, the profits and losses or expenses that may be incurred, such parties are partners. Stephens v. Stephens, 213 S.C. 525, 532, 50 S.E.2d 577, 580 (1948). A partnership agreement may rest in parol and it may be implied and without express intention. Wyman, 223 S.C. at 174, 74 S.E.2d at 698; Halbersberg, 302 S.C. at 101, 394 S.E.2d at 10; accord Beck, 300 S.C. at 301, 387 S.E.2d at 685; Buffkin, 280 S.C. at 345, 312 S.E.2d at 580.

A partnership may be found to exist by implication from the parties' conduct. Corley v. Ott, 326 S.C. 89, 92, 485 S.E.2d 97, 99 (1997); Stephens, 213 S.C. at 532, 50 S.E.2d at 580. To determine whether a partnership exists, the following tests are used: (1) the sharing of profits and losses; (2) community of interest in capital or property; and (3) community of interest in control and management. Wyman, 223 S.C. at 181, 74 S.E.2d 699; Stephens, 213 S.C. at 531, 50 S.E.2d at 579; Halbersberg, 302 S.C. at 101, 394 S.E.2d at 10. When all of the conditions exist which by law create a legal relationship, the effects flowing legally from such relation follow whether the parties foresaw and intended them or not." Stephens, 213 S.C. at 531, 50 S.E.2d at 579.

The undisputed facts developed through discovery show that Erwin-Penland and Greenfield established a *de facto* partnership to exploit the opportunity *"How Sweet The Sound."* They clearly joined "labor, skill, and experience" to conceive, to package, and to sell the "Amazing Grace" concept, initially to one of Erwin-Penland's prospective clients, and later, to

Verizon. Stephens, supra, 213 S.C. 532. Both Erwin-Penland and Greenfield contributed in capital to pursue *"How Sweet the Sound"* as a business plan, by spending their own funds to develop the concept, and by foregoing other business opportunities each might have pursued. Both co-venturers contributed intellectual property, both parties having contributed to developing, promoting, managing, and controlling the *Amazing Grace / How Sweet the Sound* "decks" and jointly participating in making the sales presentations.

In Moore v. Moore, 360 S.C. 241, 599 S.E.2d 467 (S.C. App. 2004) two brothers undertook to purchase Greene's Heating and Air Conditioning, an existing business that had provided contract work for the two brothers. The brothers did not create or sign any document formally creating a partnership, but they did jointly sign a purchase agreement to buy Greene's HVAC business; they jointly approached a bank seeking financing to carry out the purchase. The brothers then had an argument. One, Robert, went forward, purchasing Greene's HVAC business on his own. Craig then sued Robert for Robert's breach of fiduciary duty, refusing to allow him to continue the business. The jury found that Robert had breached his fiduciary duty to Craig, as Craig's partner, by moving forward with the purchase to the exclusion of Craig, and then enjoying all the fruits arising from Robert's purchase of Green's HVAC business. The jury awarded Craig $30,000 as his share of lost profits. *Accord*, Beck v. Clarkson, 300 S.C. 293, 387 S.E. 2d 681 (S.C. App. 1989) (three parties joined in creating a business plan to build and lease a warehouse; one partner withdrew, continuing the partners' negotiation with the intended lessee alone, and thereafter completing the project; *held*, the withdrawing partner who appropriated the lease opportunity to herself was liable to the partner she had intentionally excluded from pursuing the warehouse project).

As in <u>Moore</u> and <u>Beck</u>, Greenfield joined forces with Erwin-Penland to create a new business opportunity, in this case, conceiving and commercializing *"How Sweet the Sound."* Both contributed to defining the marketing plan, and putting that plan into tangible form as a "deck" and "video trailer" that they jointly developed and Erwin-Penland presented to its original prospect. As in <u>Moore</u> and <u>Beck</u>, Greenfield and Erwin-Penland jointly sought financing for *"How Sweet the Sound,"* which financing would have come in the form acceptance of the choir-contest concept and funding the business plan. When the original prospect chose not to finance the plan, Greenfield and Erwin-Penland then jointly worked to re-position the business plan to fit the Verizon business, in what's been described in the Amended Complaint as the Second Pitch. As in <u>Moore</u> and <u>Beck</u>, once the deal with Verizon went through, just one of the two partners (Erwin-Penland) then appropriated the entire business opportunity to itself, intentionally excluding the other (Greenfield).

Our case, however, is far more compelling than the result in <u>Moore</u> and <u>Beck</u>. Here, there was no dispute between the co-venturers that led to the breach of the fiduciary duty, as occurred in <u>Moore</u>. Instead, Erwin-Penland simply embarked on a campaign of active deceit and misrepresentation, hiding from Greenfield the fact that Verizon had already agreed to fund and carry out the business plan. Erwin-Penland then decided to, and in fact has, kept the fruits of the entire opportunity to itself, as did the partner who withdrew from the partnership in <u>Beck</u> and then appropriated the entire opportunity to herself. It is the willful deceit of Erwin-Penland in our case that both addresses and settles the question of whether Erwin-Penland breached its fiduciary duty in the partnership to Greenfield, as next discussed.

### C. Fiduciary Obligations of Partners

Partners are fiduciaries to each other and their relationship is one of mutual trust and confidence, imposing upon them requirements of loyalty, good faith and fair dealing. Redwend Ltd. Partnership v. Edwards, 354 S.C. 459, 475, 581 S.E.2d 496, 505; Few v. Few, 239 S.C. 321, 336, 122 S.E.2d 829, 836 (1961). Thus, every partner must account to the partnership for any benefit and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct or liquidation of the partnership or from any use by him of its property. S.C. Code Ann. § 33-41-540(1) (Supp. 2009).

Partners are held to a standard stricter than the morals of the marketplace, and their fiduciary duties should be broadly construed, connoting not mere honesty but the punctilio of honor most sensitive.[1] In all matters connected with the partnership, each partner is bound to act in a manner not to obtain any advantage over his copartner in the partnership affairs by the slightest misrepresentation, concealment, threat, or adverse pressure of any kind; a partner cannot act too quickly to protect his own financial position at the expense of his partners, even in

---

[1] Renowned jurist, Justice Cardozo, characterized the duty owed by partners in the often quoted Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545 (1928):

> *Joint adventurers, like copartners, owe to one another, while the enterprise continues, the duty of the finest loyalty.* Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. *Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior.* As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court.

Meinhard, 164 N.E. at 546 (emphasis added) (citations omitted).

the absence of malice. Lawson v. Rogers, 312 S.C. 498, 499, 435 S.E.2d 853, 857 (1993); *see*

*also* Edwards v. Johnson, 90 S.C. 90, 72 S.E. 638 (1911) (stating that each member of a

partnership is held to the highest degree of good faith in his dealings with reference to any matter

concerning the business of the common engagement, and each partner, being an agent of the

firm, must be held, during the existence of the relation, to the same accountability as other

trustees in all matters affecting the common interest); Redwend, 354 S.C. at 476-77, 581 S.E.2d

at 505; *accord* Kuznik v. Bees Ferry Assocs., 342 S.C. 579, 597-98, 538 S.E.2d 15, 24-25 (S.C.

App. 2000).

    As detailed previously, the undisputed facts in our case show that Erwin sought out

Greenfield's expertise in a marketing approach that Erwin-Penland both needed and desired.

Undisputed Facts 2-3, supra. The parties then began an eight month collaboration leading up to a

crucial marketing pitch of *"How Sweet the Sound"* at Verizon's headquarters in New Jersey, and

a subsequent fine-tuning of the concept to meet Verizon's expressed needs. Undisputed Facts 4-

15. Early in this process, Greenfield had even registered the *HSTS* concept with the Writer's

Guild as a joint work of Jeff Greenfield and Joe Erwin and made sure Erwin knew about the

protection he had sought for their creative collaborative work. Undisputed Fact 7. The body of

Greenfield's April 26, 2006 presentation "deck" clearly explained that *"How Sweet the Sound"*

is a collaboration between **Erwin-Penland and 1ˢᵗ Approach**. Undisputed Fact 12. The

presentation deck itself is copyrighted by **Erwin-Penland and 1st Approach**. Id.

    The undisputed facts further show that the legal relationship between Erwin-Penland and

1ˢᵗ Approach was never explicitly reduced to any single formal agreement, although there are

many writings that reflect the meeting of the partners' minds. Undisputed Fact 13. However,

Greenfield had previously informed Erwin that he had no interest in being a "gun-for-hire," but

needed an equity stake in any collaboration, and that Greenfield took his intellectual property interests seriously. Undisputed Fact 3. Erwin never subsequently asked Greenfield to sign any explicit agreement or to renounce his claims to joint ownership. Undisputed Fact 13. Rather, by his conduct, Erwin enthusiastically embraced Greenfield's creative contributions and encouraged Greenfield's eight months of day-to-day collaboration to promote the marketing concept, for the benefit of both co-venturers. Undisputed Facts 2-15.

Once VZW made its firm commitment to move forward with the program, however, Erwin consciously cut Greenfield out of the deal. Undisputed Facts 17-18. In so doing, Erwin-Penland seized all compensation and attribution flowing from VZW's decision to fund the pilot and nationwide launch of the church-choir competition, *"How Sweet the Sound,"* and simply ignore all of its previous commitments to its co-partner, Greenfield. Undisputed Facts 19-21. This clearly represents Erwin-Penland's protection of its own financial position at the expense of its partner, Greenfield. Lawson, at 435 S.E. 2d at 857. This was not only dishonest, it represents the diametric opposite of that "punctilio" Justice Cardozo made famous, which South Carolina's legislature and courts have always embraced.

### D. Conclusion

The South Carolina *Uniform Partnership Act*, together with Moore, Beck, and an unbroken line of South Carolina cases concerning partnership, all compel the conclusion that Erwin's firm and Greenfield's firm, for many months of protracted effort, were not mere friends, acquaintances, volunteers, or independent contractors with one another. In legal parlance, and in reality, they were co-venturers or partners. They joined their combined ingenuity, resources, and efforts to co-conceive, co-create, and co-promote *"How Sweet the Sound."*

Based on the foregoing, Greenfield is entitled to summary judgment as to (1) the existence of a partnership between Greenfield and Erwin-Penland, and the existence of a corresponding fiduciary duty owed by Erwin-Penland to Greenfield; and (2) the breach of said fiduciary duty by Erwin-Penland.  While Erwin-Penland may question the extent of damages flowing therefrom, there remains no *genuine* issue of material fact as to the existence of the partnership, or of Erwin-Penland's breach of its fiduciary obligations toward Greenfield and 1st Approach.

The matter of damages arising from Erwin-Penland's breach of fiduciary duty is properly the province of the jury.   The jury should be instructed upon the existence of the fiduciary duty, which is incident to the Court's finding of a partnership, and the breach thereof by Erwin-Penland, and then the jury may determine the proper amount of damages flowing therefrom.

**The Law Office of P. Jeffrey North LLC**

By:    **P. Jeffrey North, Esq.**
**Attorney Identification Number 9885**
**PO Box 7525**
**Hilton Head SC 29938**
**Phone (843) 341-5200**
**Fax    (888) 487-7624**
**Email  attorney@pjnorth.com**

## CERTIFICATE OF SERVICE

This is to certify that on March 1, 2010, the undersigned, attorney for the Defendants,

served the Defendants' Motion for Partial Summary Judgment and Memorandum of Law in

Support upon all counsel of record by email.

**The Law Office of P. Jeffrey North LLC**

**By:**

P. Jeffrey North, Esq.
PO Box 7525
Hilton Head Island, SC 29938
Phone (843) 341-5200
Fax    (888) 487-7624
Email  attorney@pjnorth.com

**March 1, 2010**
**Hilton Head Island, SC**