## INDEX

| Exhibit No. | Description |
|---|---|
| 1 | Greenfield deposition testimony |
| 3 | 2001 Agreement between Verizon and E-P with 2003 Addendum- AEO  Bates no. EP235629-EP235668 |
| 4 | 11/04/05 Amazing Grace Presentation Deck |
| 5 | Bill Reynolds deposition testimony, pages 8-10, 29-30, 31-32, 38, 56 |
| 6 | 11/7/05 Wilbanks to Erwin/Greenfield follow up with the name change- EP000580 |
| 7 | Metalmeccanica Del Tiberina v. Kelleher, 2005 US App. Lexis |
| 8 | 11/3/05 Email from Greenfield to Wilbanks with accompanying attachment of Internet Buzz Campaign; Bates no. E-P00035-E-P00056 |
| 9 | E-P deposition exhibit 54, Bates no. EP000142-EP152; 11/28/05 E-mail Greenfield to Erwin |
| 10 | 11/4/05 Email from Greenfield to Wilbanks Bates no. E-P000124 and E-P226852 – E-P226856 |
| 11 | 08/23/06 E-mail correspondence- EP0003166 |
| 12 | Verizon Wireless Branded Entertainment Opportunity December 29, 2005- EP000837-EP000850 |
| 13 | 12/27/05 Email from Wilbanks to Greenfield Bates n. Greenfield/1st Approach 000418-000419 |
| 14 | 3/28/06 Email from Wilbanks to Greenfield and Bosworth |

| | |
|---|---|
| 15 | Greenfield/1st Approach –November 2005 Various Email Communication between Greenfield, Wilbanks, Erwin and Bosworth-000318-000321 |
| 16 | 2/13/06 Email from Wilbanks to Erwin, Bosworth and Greenfield- Bates no. Greenfield/1st Approach 000413- E-P 000415 |
| 17 | 2/9/06 Email from Stratton to Bosworth- E-P000874-EP000875 |
| 18 | 4/25/06 Email with attachments; E-P deposition exhibit 85, bates no. E-P000884-E-P000895, 4/26/06 presentation deck- Bates No. E-P000295-E-P000330 |
| 19 | Joe Erwin deposition, pages 374, 377 and 378 |
| 21 | "How Sweet the Sound" 2008 Program Status- Bates No. VZW000219602-VZW000219643; **VZW000219615 |
| 24 | 12/18/09-Verizon Wireless "How Sweet the Sound" 2010 Activation Plan AEO VZW 000266389-000266469 |
| 26 | 12/9/05 Email from Greenfield to Erwin- Greenfield/1st Approach 000423 |
| 27 | 3/2006 Email Communications between Greenfield, Bosworth, Erwin and Wilbanks- Greenfield/1st Approach 000202-000206, 000204** |
| 28 | Agreement between Verizon and E-P AEO3-VZW000000020-VZW000000098 |
| 28.1 | Agreement between Verizon and E-P AEO4 EP031678-E-P031686 |
| 28.2 | Agreement between Verizon and E-P AEO 7 |
| 28.3 | Agreement between Verizon and E-P AEO 8- E-P147520-E-P147528 |
| 29 | Duvall Deposition, pages 30, 33, 37 |

| 31 | Verizon Wireless "How Sweet the Sound" Sponsorship Evaluation VZW000006930-000006974 |
| 32 | 2010 Planning Meeting- AEO VZW000266362 – VZW0002663880 |
| 34 | 2/15/10 Oliver Wood Report |
| 36 | Lou Rossi Deposition, page 71 |
| 39 | Larry Namer Report |
| 40 | Greenfield Affidavit- Not Sealed |
| 41 | April 26, 2006 Presenters Deck for Verizon "How Sweet the Sound" presentation |
| 42 | Allen Bosworth Depo. pgs. 30, 33 and 37 |
| 43. | May 12, 2006 Verizon "How Sweet the Sound" presentation Deck |
| 44 | 7/12/06 Bosworth to Greenfield 1st Q initiative EP000228 |
| 45 | BET Internet |
| 46 | GMC Internet |
| 48 | EP Dep. Exh. 40 |
| 50 | Erwin to Bosworth Memo-Greenfield ownership –EP Dep. Exh. 88 |
| 51 | AMA EFFIE Description |

# EXHIBIT 1

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

HILL HOLLIDAY CONNNORS
COSMOPULOS, INC., d/b/a
ERWIN-PENLAND,                    C.A. 6:08-3980-GRA
            Plaintiff,

        vs.

JEFFREY GREENFIELD and
1ST APPROACH, LLC,
        Defendants and
Third-Party Plaintiffs.

        vs.

CELLCO PARTNERSHIP d/b/a
VERIZON WIRELESS, and
JOSEPH A. ERWIN,
Third-Party Defendants.


DEPOSITION OF:   JEFFREY GREENFIELD

DATE:            October 21, 2009

TIME:            9:00 a.m.

LOCATION:        McNair Law Firm
                 104 South Main Street
                 Greenville, SC 29601

TAKEN BY:        Counsel for Plaintiffs

REPORTED BY:     KENNETH McCLURE,
                 Registered Merit Reporter

---

A. WILLIAM ROBERTS, JR. & ASSOCIATES
Fast, Accurate & Friendly

| Charleston, SC | Hilton Head, SC | Myrtle Beach, SC |
| (843) 722-8414 | (843) 785-3263 | (843) 839-3376 |
| Columbia, SC | Greenville, SC | Charlotte, NC |
| (803) 731-5224 | (864) 234-7030 | (704) 573-3919 |

172

1    put together an Excel spreadsheet showing what the

2    different options were.  And the spreadsheet was

3    sent off to someone at Verizon.

4        Q.    You had no input into that, did you?

5        A.    No.  I didn't think it was appropriate for

6    me to, because I was intimately involved, so,

7    obviously, I would, you know, vote more for my

8    different options.  I didn't want to do a

9    partnership with AOL or anything like that.  But it

10   wasn't -- I wasn't tasked to do that.

11           And there was -- after that, I think we

12   followed up, and then there was -- that was in May.

13   And then I think there was another deck, or

14   something, that was done in June.

15           We had a conference call to talk about what

16   the different options were, and going back to

17   Verizon again.  The substance of the conference call

18   was, you know, we sent them off these different

19   options, and there is interest, but we have to move

20   fast because they are going out to other agencies,

21   essentially.  Something like that.  So we had to get

22   back to them with a different model so that they can

23   test it, kind of a lower-cost type model.

24       Q.    Because Verizon had rejected the idea that

25   you had put forth in the second pitch, correct?

113

1  Caucasian patrons.

2          And they said no.  Because they had --

3  apparently they had accessed all their current

4  marketing that they were doing.  So I said okay.

5  And then -- I'm trying to think the sequence of

6  things at this point.

7          They told me that it was fried -- a lot of

8  fried food.  And I recall it was primarily Joe doing

9  a lot of the talking at this point.  I don't

10  remember Shannon saying much.  She was mainly there,

11  probably taking notes or something.  And, I think,

12  whoever else was there interjected some things about

13  locations and stuff like that.  That's what I've got

14  so far.

15      Q.   That was the whole conversation?

16      A.   You know, I don't think so.  I think, on

17  that call is where I said, well, you know, we should

18  do something -- at this point, if it's African

19  American, and you've got African Americans, and

20  you're down in the south, we should try to do

21  something -- if you want to do something branded and

22  something big, we should do something utilizing the

23  church and utilizing church choirs.

24          I said, I could create and I could put

25  together a program kind of like an "American Idol"

112

1        They told me what the spend was per year,

2    their budget.  I don't remember what that was.  And

3    they wanted to know, you know, how can we integrate

4    brand entertainment into this?  What can you do?  So

5    I --

6        Q.    Did they literally say that?

7        A.    Well, I mean, that was the purpose for the

8    call, was to see what I could kind of come up with.

9    So my understanding was, the purpose of the phone

10   call was, they were going to be presenting to me,

11   explaining to me, who the client was that they were

12   pitching, what the parameters of it were, and then,

13   you know, let's enter into a discussion and see what

14   we can kind of come up with.

15       Q.    Okay.  Tell me as best you can recall who

16   said what.

17       A.    So then I asked a series of questions,

18   asking about, you know, where were the -- where was

19   the restaurant chain located?  And someone said it

20   was primarily in the south.  I said, all right.

21       And then I said, you know, what is the -- I

22   think that they told me it skewed African American.

23   And I said, what have they done marketingwise for

24   African American.  Meaning, have they done different

25   types of marketing for African American versus their

1    Q.    What did you say back?  Did you tell me

2    what you said back, other than, "Yes, I'm still

3    interested"?

4         MR. JEKEL:    Objection to the form of the

5    question.  Asked and answered.

6    A.    Yes, that's what I said:  Yes, I'm still

7    interested.

8    Q.    Okay.  That's it.  All right.

9         When you went on the pitch for Verizon, you

10   said you paid your own way there, correct?

11   A.    Yes.

12   Q.    You understood that it was a pitch to get

13   business, right?

14   A.    Of course.

15   Q.    That, if you didn't get the business, then

16   you wouldn't have the work, right?

17   A.    That's correct, yes.

18   Q.    You had no agreements with anyone as to how

19   you were going to be paid, right?

20   A.    No, ma'am.

21   Q.    Even if --

22   A.    Excuse me.  I'm sorry.  There were

23   agreements as to how I would get paid.

24   Q.    What agreements were those?

25   A.    The agreements were that -- they were all

# EXHIBIT 3

Contract #730-00970-2001

# AGREEMENT

# BETWEEN

# VERIZON WIRELESS

# AND

# Erwin-Penland, Inc.

This Agreement is between Cellco Partnership dba Verizon Wireless (hereinafter "Verizon Wireless"), having its principal place of business at 180 Washington Valley Road, Bedminster, New Jersey 07921 and Erwin-Penland, Inc. ("Agency"), a Corporation organized and existing under the laws of the State of South Carolina having its principal place of business at 125 East Broad St., Greenville, SC 29601.

Now, THEREFORE, Verizon Wireless and Agency enter into this Agreement on the following terms and conditions:

## 1. SCOPE OF AGREEMENT

1.1. Verizon Wireless hereby appoints Agency as its agent on a non-exclusive basis to perform advertising and marketing communication services for Verizon Wireless and its designated affiliates and subsidiaries ("Affiliates") including Direct and Indirect agents throughout the Verizon Wireless South Area footprint as shown in Exhibit II. The designation of Affiliates shall be in Verizon Wireless' sole discretion. The appointment of Agency shall be in the manner set forth herein and Agency accepts such appointment subject to the terms and conditions hereof. Agency will perform for Verizon Wireless the services for advertising and marketing communication and other services as may be required and requested by Verizon Wireless. Agency shall perform all such services on behalf of Verizon Wireless, as outlined in Attachment A-1 – Scope of Work, attached hereto and included herein by reference.

1.2. EXCLUSIVITY: Agency, defined as any branch of Agency or subsidiary of Agency, will not accept an assignment or assist or provide its services during the life of this Agreement to any other person, firm or entity which provides telecommunications products or services competitive with Verizon Wireless within the United States or any other countries without prior written consent of Verizon Wireless. Telecommunications products or services shall be defined as any company providing wireless based communications services to business and consumers. If Verizon Wireless consents, in addition to the terms and conditions of the NDA (Exhibit I), the following additional safeguards are required:

    1.2.1. No information about Verizon Wireless' account may be shared with the office handling the competitive account or with any office of the Agency handling a similar account.

    1.2.2. No Senior Staff, defined as Senior Management Supervisor, Chief Media Director, Director of Account Planning, Integration and/or Research,

1

Attorneys' Eyes Only

DEFENDANT'S
EXHIBIT
AEO 1
11-23-09  SE

EP235629

Contract #730-00970-2001

working on the Verizon Wireless account may be assigned to a Competitor's account or part of a competing new business venture while working on the Verizon Wireless account for a minimum of six (6) months after being removed from or leaving the Verizon Wireless account.    If Verizon terminates its relationship with the Agency, the Agency shall limit the assignment of Senior Staff for one month (post termination) for every 12-month period that Verizon Wireless was a client of the Agency, with a minimum period of one month and a maximum period of six months.    If Agency terminates the relationship, then it shall be obligated to limit the assignment of Senior Staff for six months after notice of termination.

    1.2.2.1.    For purposes of this agreement, a competitor shall be defined to include but not limited to any company that sells cellular and/or PCS services, wireless voice, wireless data and paging and/or messaging services.

   1.2.3.   No individual having any staff or oversight role on a Competitor's account may have review over any activity involving Verizon Wireless' account.

   1.2.4.   No information may be shared between account executives or managers involved in Verizon Wireless' account and the Competitor's.

1.3.    COMPENSATION:  Compensation for Agency Services for services shall be in accordance with the compensation procedure outlined in Attachment B – Agency Compensation.  Attached hereto and incorporate herein by reference.

1.4.    EXPENSES:    Verizon Wireless shall not reimburse Agency for any business related travel within the Area's geographic boundaries that is account service related travel.  Verizon Wireless will reimburse the Agency for business related travel when it is required outside of the regular scope of Agency services within the Area and when it is approved by Verizon Wireless in advance of the occurrence. The following guidelines set forth the standards to be applied in reimbursing Agency for the actual cost of expenses incurred in the performance of Services, including those services associated with broadcast productions, provided the reimbursements are authorized based on the following:

   1.4.1.   AIRFARE.  Verizon Wireless will reimburse Agency for airfare, provided the travel is authorized in advance by Verizon Wireless and provided further that Agency shall not be entitled to reimbursement at the first-class or business class airfare rate, tickets will be booked with maximum lead time possible to insure lowest rates. Agency shall submit to Verizon Wireless a copy of any used airline tickets upon request by Verizon Wireless.

   1.4.2.   GROUND TRANSPORTATION.  Verizon Wireless will reimburse Agency for related ground transportation on approved trips.    The rate and type of acceptable reimbursement is as follows:

    1.4.2.1.    At the current mileage reimbursement rate set by the Internal Revenue Service for use of Agency's or Agency's personnel's personal automobile;

    1.4.2.2.    for reasonable car rental; or

2

**Attorneys' Eyes Only**

EP235630

Contract #730-00970-2001

1.4.2.3.   for use of public transportation, such as bus or rapid transit, and for reasonable taxi usage.

1.4.3. INCIDENTAL TRANSPORTATION EXPENSES.   Verizon Wireless will reimburse Agency for reasonable and customary incidental transportation expenses such as bridge tolls and parking fees incurred for travel to and from work locations.

1.4.4. LODGING AND MEALS.   Verizon Wireless will reimburse Agency for reasonable and customary lodging and meal expenses when Agency's personnel are assigned to a work location requiring an overnight stay or longer, provided such travel is authorized in advance by Verizon Wireless. Agency's lodging subject to availability shall not exceed $150.00 per day when available for hotel expenses per any employee.  Meal expenses shall not exceed $35.00 per day per any employee.  Agency shall not be entitled to reimbursement for meals purchased for persons other than Agency and Agency's personnel assigned to the project and approved for travel in advance by Verizon Wireless.

1.4.5. ENTERTAINMENT.   Verizon Wireless will not reimburse Agency for entertainment expenses.

1.5. Agency shall be reimbursed for reasonable and necessary expenses incurred which are authorized in writing by Verizon Wireless.  Agency shall provide Verizon Wireless with monthly-itemized statements of reimbursable expenses with receipts attached for any single expenditure excess of twenty-five (25) dollars.  Each statement shall contain the project numbers under which the expenses were incurred.

## 2.  GENERAL BILLING AND ESTIMATE PROCEDURES

2.1.   ESTIMATES:  Agency will furnish Verizon Wireless with estimates prior to authorizing any outsourced work on behalf of Verizon Wireless based upon the table below.  Agency must also provide a cost estimate including labor for any buying considered outside of general buying practices recommended by Agency or requested by Verizon Wireless.  The commitment or expenditure of any sum in excess of $10,000.00 will require Verizon Wireless' prior written approval.  Such estimates shall be provided to Verizon Wireless at no cost and Verizon Wireless will not be charged for time of personnel needed to prepare such items.

| Any expenditure $0 - $5000 | Verbal approval from Verizon Wireless |
| Any expenditure $5000 – $10,000 | An electronic (email) written approval from Verizon Wireless |
| Any expenditure above $10,000 | Hard copy written approval from Verizon Wireless is required. |

3

**Attorneys' Eyes Only**

**EP235631**

Contract #730-00970-2001

2.2.    VENDOR/AGENCY AFFILIATION.    In the event that any Services are to be performed or materials sold by a vendor in which Agency or Agency's personnel have any financial interest, disclosure of the relationship must be made to Verizon Wireless, and Agency must obtain Verizon Wireless' prior approval of the engagement or purchase from such vendor. Notwithstanding anything to the contrary above, the ownership of stock by Agency or Agency's personnel in a vendor, which is a public company, shall not be considered to be a financial interest.

2.3.    ITEMIZED INVOICES.    All bills and invoices submitted to Verizon Wireless for payment shall be itemized in detail per the specifications provided by Verizon Wireless (Attachment D). Invoices are payable within thirty-days (30) of date of invoice and Agency shall indicate a payment "due date" on the invoice as well. For outsourced work with cash discounts for early payment, all invoices must be clearly marked to indicate payment terms. These invoices will be payable within ten (10) days of the date of invoice. Verizon Wireless is not responsible for any charges or invoices submitted to Verizon Wireless by the Agency that are more than ninety (90) days after project completion. Agency will utilize its best efforts to ensure that all invoices are submitted to Verizon Wireless within five (5) business days of receipt of suppliers invoice by Agency. Rate or billing adjustments shall be credited or charged to Verizon Wireless within ten (10) business days after the date the Agency has been invoiced or credited by a supplier.

2.4.    DISPUTED INVOICES:    Verizon Wireless is not required to pay invoiced amounts in dispute until such dispute is resolved. Once the dispute is resolved the invoice shall be paid within thirty (30) days following such resolution. Verizon Wireless reserves the right, before making payments, to require Agency to furnish sufficient evidence that all claims, liens and causes of action, if any, for the payment of wages or salaries or the payment of charges for materials, tools, machinery or supplies have been satisfied, released or settled. If satisfactory evidence is not furnished, the amount of such claims, liens and causes of action may be withheld from any monies otherwise payable to Agency hereunder until such evidence of payment or a bond to indemnify Verizon Wireless against any such claims, liens, and causes of action has been furnished.

## 3. TAXES

3.1. Verizon Wireless shall pay all excise, sales and use taxes, which Agency is required by law to collect from Verizon Wireless with respect to purchases by Verizon Wireless from Agency for consideration under this Agreement (each, a "Tax"). Agency shall bill each such Tax to Verizon Wireless in the amount required by law, separately stating the amount and type of the billed Tax on the applicable invoice; Verizon Wireless shall pay such billed amount of Tax to Agency; and Agency shall remit such billed amount of Tax to the appropriate tax authorities as required by law; provided, however, that Agency shall not bill to or otherwise attempt to collect from Verizon Wireless any Tax with respect to which Verizon Wireless has provided Agency with (i) an exemption certificate prepared in accordance with applicable law, (ii) a direct pay number, or (iii) other evidence, reasonably acceptable

4

**Attorneys' Eyes Only**

EP235632

Contract #730-00970-2001

to Agency, that such Tax does not apply. Except as provided in this Section 3.1, Agency shall bear the costs of all taxes and governmental fees of whatever nature with respect to all products and services supplied under this Agreement.

3.2. Upon written request from Verizon Wireless, Agency shall provide Verizon Wireless with a written list of sales and use tax or other tax registration numbers for all states within the United States (and the District of Columbia, if applicable) in which Agency does business.

3.3. Agency shall cooperate with Verizon Wireless so as to minimize the tax liability of Verizon Wireless, including, without limiting the generality of the foregoing, liability for Tax to be billed and collected under Section 3.1. Such cooperation shall include, without limiting the generality of the foregoing, the separate statement of taxable and nontaxable charges on all invoices.

3.4. Agency shall cooperate with all reasonable requests of Verizon Wireless in connection with any contest or refund claim with respect to Taxes and other taxes. If Agency incorrectly (in the opinion of Verizon Wireless) bills and collects Tax from Verizon Wireless and the taxing authority requires that any refund from the taxing authority be sought by the billing party, then, upon request from Verizon Wireless, Agency shall seek the refund and remit to Verizon Wireless the amount of the refund actually obtained, together with interest, if any, actually received, promptly upon receiving such refund and interest, if any, from the taxing authority.

## 4. PERFORMANCE STANDARDS

4.1.    PERFORMANCE STANDARDS.  Agency warrants and agrees that qualified personnel in accordance with applicable first-class professional standards shall perform all Service as, and agrees that with respect to all materials; services, documents and reports conform to the requirements (including specifications) of this Agreement and Attachments hereto.

4.2.    NOTICE.  If, at any time, Agency's performance or conduct under this Agreement is found by Verizon Wireless to be in material breach of or in default under this Agreement, Verizon Wireless may give Agency written notice to remedy such breach or default within fifteen (15) days. If Agency fails or refuses to remedy such breach or default within that time, or to take reasonable steps to do so, due to the nature of said breach or default if same cannot be reasonably remedied within such period, Verizon Wireless may elect, in addition to other remedies which may be available at law or in equity, to: (a) cancel this Agreement immediately; or (b) suspend further performance hereunder; or (c) arrange with another Agency for performance of the Services. If the costs to correct deficiencies or obtain substitute performance exceed the original contract price, Agency agrees to pay the excess to Verizon Wireless as liquidated damages, to the extent that such costs are reasonable.

5

**Attorneys' Eyes Only**

**EP235633**

Contract #730-00970-2001

## 5. TERM OF AGREEMENT

5.1.    This Agreement shall become effective on the date of execution and shall continue in effect, until cancelled by one of the parties per the conditions of termination in Section 6 of this Agreement. Except that the following Attachments to this Agreement; Scope of Work, Compensation, Quarterly Creative Reviews and Risk/Gain Share Compensation shall be negotiated annually between the parties.

## 6. TERMINATION AND DEFAULT

6.1.    TERMINATION: The parties shall, in addition to their rights to cancel this Agreement for default, have the right to terminate this Agreement at any time, for any reason, by giving the other party written notice of termination specifying the extent to which the Agreement is terminated. and the date upon which such termination becomes effective. Verizon Wireless shall be required to provide a minimum of ninety-days (90) written notice to the Agency and the Agency shall be required to provide a minimum of one hundred and twenty (120) days written notice to Verizon Wireless.

6.2.    RIGHTS UPON TERMINATION: Upon termination of this Agreement, no rights or liabilities shall arise out of this relationship, relating to any plans, which may have been made for future advertising. However, if Verizon Wireless terminates, Agency shall be paid the balance owing for any reasonable reimbursable expenses accrued to the date of termination, and shall be paid for Services satisfactorily performed in accordance with the performance standards set forth in this Agreement to the date of termination, less any amounts previously paid. With respect to any non-cancelable contract made on Verizon Wireless' authorization (or any uncompleted work previously approved by Verizon Wireless either specifically or as part of a plan), and still existing at the termination of this Agreement, which contracts were not or could not be assigned by Agency to Verizon Wireless or Verizon Wireless' assignee, Agency shall, upon Verizon Wireless' request, use its best efforts to negotiate a termination of any such contracts on the most favorable terms possible. If a favorable termination cannot be negotiated for any such contract, it shall be carried to completion by Agency and paid for by Verizon Wireless. In such event, Verizon Wireless shall also pay to Agency compensation pursuant to Attachment B. Upon termination of this Agreement, Agency shall transfer, assign, and make available to Verizon Wireless all property and material in Agency's possession. or control belonging to and paid for by Verizon Wireless, and all information paid for by Verizon Wireless regarding Verizon Wireless' advertising or marketing communications.

6.3.    SURVIVAL OF OBLIGATIONS: The rights and liabilities, which by their sense and context are intended to Survive performance or expiration of this Agreement, shall survive termination, cancellation or expiration of this Agreement.

**Attorneys' Eyes Only**

**EP235634**

Contract #730-00970-2001

6.4.    DEFAULT: In the event the Agency is in material breach or default of any term, condition or provision of the Agreement, including the timeliness, and if such breach or default shall continue for ten (10) days without cure after Verizon Wireless notifies Agency thereof in writing, then, in addition to all other rights and remedies provided hereunder or at law or equity, Verizon Wireless shall have the right to terminate this contract in whole or in part.

## 7.  AUDIT AND FISCAL ACCOUNTABILITY

7.1.    AUDIT. At Verizon Wireless' option and expense, Verizon Wireless shall have the right to utilize its internal audit team and/or Certified Public Accountants from time to time upon reasonable notice to review Agency's books, records and accounts as it relates to this Agreement. Agency also agrees to provide Verizon Wireless with unaudited quarterly reports by no later than ninety-days (90) following the close of any fiscal quarter.

      7.1.1.  OTHER. Verizon Wireless may also, from time to time, at its own option and expense, direct internal Verizon Wireless employees and/or other appropriate consultants to conduct measuring and monitoring activities as it relates to this agreement.

7.2.    RECORDS. Agency shall maintain complete records relating to services performed hereunder, including, but not limited to, all time of staff, account team FTEs, out of pocket costs, materials purchased, accounting records, written policies and procedures, subcontracts, and such materials deemed necessary by Verizon Wireless. The records shall be maintained in accordance with generally accepted accounting principles consistently applied and in such manner as may be readily audited. The records, including all supporting documents, shall be available for audit by Verizon Wireless as provided above for three (3) years following the expiration or termination date of the Agreement, or until all disputes, if any, between Agency and Verizon Wireless have been finally resolved, whichever occurs first.

7.3.    CERTIFICATE OF AGENCY'S ACCOUNTING FIRM: Agency shall annually certify that its books, records and accounts are kept in accordance with generally accepted accounting principles, and provide Verizon Wireless with such certification as it is made publicly available.

7.4.    CHANGES IN AGENCY'S COST ACCOUNTING: Pursuant to the provisions of section 7.2, Agency shall advise Verizon Wireless of any substantive change in Agency's cost accounting system as soon as possible. Verizon Wireless shall have the right to re-negotiate the terms of this Agreement if it deems that such change will materially and adversely affect Verizon Wireless' obligations under the Agreement or, in the event agreement cannot be reached on different terms, to terminate this Agreement upon ninety (90) days' written notice.

**Attorneys' Eyes Only**

EP235635

Contract #730-00970-2001

## 8. CHANGES, TERMINATION OR SUSPENSION OF WORK

8.1. CHANGES. Verizon Wireless may, during progress of any Services hereunder, by written or oral order to Agency, require additions or modifications to the work. In the event that any additions or modifications to the Services shall substantially vary from the Services that are contemplated by this Agreement, Verizon Wireless and Agency agree to negotiate in good faith regarding any additional or decreased compensation which shall be paid to Agency.

8.2. SUSPENSION OF WORK. Verizon Wireless may suspend or terminate any or all projects or assignments at any time for any or no cause. If not originally advised in writing, Agency is entitled to receive prompt written confirmation of such suspensions or termination.

8.3. EXPENSES. Upon receipt of written instructions to suspend or terminate, however issued, Agency will take no action which may increase the expense to Verizon Wireless under this Agreement, beyond expenses inherent in those projects and assignments which had been agreed to prior to receipt of said written instructions to suspend or terminate. Verizon Wireless agrees to pay for all such inherent expenses incurred by Agency up to the date of termination or suspension of work.

8.4. BREACH OF CONTRACT. Nothing herein shall obligate Agency to breach any existing contract or agreement.

## 9. OWNERSHIP OF MATERIALS

9.1. EXCLUSIVE PROPERTY. Agency agrees that all plans, materials, reports, and other data or materials originated, generated or developed by or for Agency all such plans and paid for by Verizon Wireless in connection with this Agreement or furnished by Verizon Wireless or Agency shall be and remain the exclusive property of Verizon Wireless. Agency specifically agrees that all such plans, reports, data and materials shall be works made for hire and that such items shall, upon creation, be owned exclusively by Verizon Wireless, except for those instances in which properties have been obtained for the Verizon Wireless, with the consent of the Verizon Wireless on the basis of a license or other permission to use the same. To the extent that any such items under applicable law may not be considered works made for hire, Agency hereby assigns to Verizon Wireless ownership of all rights, title and interest in and to such items without the necessity of any further consideration, and Verizon Wireless shall be entitled to obtain and hold in its own name all copyrights in respect of such items. All such items shall be deemed to be Verizon Wireless Information under the terms of Section 18 herein.

9.2. WORK FOR HIRE. Agency shall guarantee to Verizon Wireless that all work product that is procured by Agency on behalf of Verizon Wireless shall be purchased on a work made for hire basis. All plans for advertising, all preliminary sketches, all layouts, all copy, photographs, illustrations and other art work, and all other material collected, compiled or prepared for Verizon Wireless by Agency in connection with

8

Attorneys' Eyes Only

EP235636

Contract #730-00970-2001

this agreement shall be the exclusive property of Verizon Wireless. At all times Verizon Wireless shall have full and free right to use any and all such property in any way it chooses, either directly or through agents or otherwise, without payment of any compensation to the Agency or its suppliers, for the same, wither or not these materials are copyrighted, except as herein specifically provided.

9.3.    COPYRIGHT.   Any and all copyrightable material, including but not limited to finished or unfinished copy, photographs, layouts and production created by the agency or its sub-contractors pursuant to this Agreement shall be considered work made for hire for the benefit of Verizon Wireless and all rights therein worldwide shall vest in Verizon Wireless as author and copyright owner. It is the responsibility of the agency to clearly state on all purchase orders or other such procurement documentation these copyright provisions.

9.4.    AGENCY'S RIGHTS.   If and to the extent Agency may, under applicable law, be entitled to claim any ownership interest in Agency materials, reports and other data or materials generated by Agency under this Agreement, Agency hereby transfers, grants, conveys, assigns, and relinquishes exclusively to Verizon Wireless all of Agency's right, title, and interest in and to such materials, under patent, copyright, trade secret, and trademark law, in perpetuity or for the longest period otherwise permitted by law.

9.5.    TRANSFER OF OWNERSHIP.   Agency shall perform any acts that may be deemed necessary or desirable by Verizon Wireless to more fully evidence transfer of ownership of all materials described under this Section 9 to Verizon Wireless, including but not limited to the making of further written assignments in a form determined by Verizon Wireless.

## 10. NON-EXCLUSIVITY

10.1.   The parties acknowledge and agree that Verizon Wireless has the right, in its sole and unreviewable discretion, to retain the services of other advertising and marketing communications agency services for any purpose whatsoever, and in addition to the foregoing, Verizon Wireless may acquire and place any advertising in any media and use materials produced by another Agency. It is understood and agreed by Agency that Verizon Wireless is not required to provide it with any minimum level of work or jobs or level of revenue outside the agreed upon monthly fee. Verizon Wireless will not share costs provided by Agency with any other agency.

## 11. RELATIONSHIP OF THE PARTIES

11.1.   EMPLOYEE STATUS. Except as provided for in this Agreement, Agency shall have no right to make any contracts or commitments for or on behalf of Verizon Wireless or to enter into any obligation binding upon Verizon Wireless. All persons employed by Agency in performance of services hereunder shall be for the sole and exclusive

9

Attorneys' Eyes Only

EP235637

Contract #730-00970-2001

direction and control of the Agency, and for no purposes shall they be considered the employees of Verizon Wireless. Agency shall remain at all times responsible for and shall pay all benefits, fringe or otherwise with respect to its employees.

11.2: SUBCONTRACT. Agency shall not, without prior written consent of Verizon Wireless, subcontract any portion of the work covered by this Agreement, even to an owned and operated Agency affiliate.

## 12. TESTIMONY

12.1. TESTIMONY. Matters relating to this advertising and marketing communications agency service relationship may be an issue before various regulatory bodies. Agency, including senior members of its firm, agrees to have appropriate members of its firm willing to testify at appropriate times, at their own expense regarding any aspect of this project as known to Agency or its employees.

12.2. PREPARATION. In the event of any proceeding against Verizon Wireless by any regulatory agency or in the event of any court action or self-regulatory action challenging any advertising prepared by Agency, Agency shall assist in the preparation of the defense of such action or proceeding and cooperate with Verizon Wireless and its attorneys. Verizon Wireless will reimburse Agency for any reasonable out-of-pocket costs it may incur in connection with any such action or proceeding, unless same is Agency's responsibility.

## 13. NOTICES

13.1. Any notice to be given hereunder by either party to the other shall be in writing and shall be deemed to be given when sent by postage Prepaid Certified United States mail.

13.2. Notices to Verizon Wireless shall be addressed to:

Verizon Wireless
30 Independence Rd
Warren Township, NJ 07060
Attention:    John Stratton
              Vice President & Chief Marketing
              Officer

Attorneys' Eyes Only

EP235638

Contract #730-00970-2001

| | |
|---|---|
| With copies to: | Kirk Jamieson |
| | Area General Counsel |
| | Verizon Wireless |
| | 2050 Marconi Drive |
| | Alpharetta, GA 30022 |
| | |
| | Tim Butler |
| | Director, Advertising |
| | Verizon Wireless |
| | 2050 Marconi Drive |
| | Alpharetta, GA 30022 |
| | |
| | Steve Tugentman |
| | Legal Department |
| | Verizon Wireless |
| | 30 Independence Blvd |
| | Warren Township, NJ 07060 |

Notices to Agency shall be addressed:

|  | |
|---|---|
| | Erwin-Penland |
| | 125 East Broad St. |
| | Greenville, SC 29601 |
| Attention: | Allen Bosworth |
| | Executive Vice President |

## 14. EMPLOYMENT AND LABOR LAWS, RULES AND REGULATIONS

14.1.    If required by federal law, Agency shall comply, at its own expense, with the provisions of then Fair Labor Standards Act of 1938, as amended, and all other applicable state and municipal requirements and those of state and federal laws applicable to Agency as an employer of labor or otherwise.

## 15.    WORKMANSHIP

15.1.    SATISFACTION.  The services to be provided by Agency under this Agreement shall proceed with promptness and diligence and shall be executed in accordance with high professional standards and to Verizon Wireless' reasonable satisfaction.

15.2.    REMOVAL FROM ACCOUNT.  Agency shall remove from the work, at Verizon Wireless' request, any employee furnished by Agency who, in Verizon Wireless' opinion is incapable, uncooperative or otherwise unacceptable in the execution of the work to be performed under this Agreement.

11

Attorneys' Eyes Only

EP235639

Contract #730-00970-2001

**16.    DELAYS**

16.1.    Except as provided in Article 17, neither Verizon Wireless nor Agency shall be liable to the other for additional expense or damages. In any event Verizon Wireless shall not be liable to Agency for any indirect, consequential or special charges caused by or arising out of delays or Agency's ability to proceed with work unless it is the fault of Verizon Wireless.

**17.    FORCE MAJEURE/ACTS OF GOD**

17.1.    LIABILITY. In no event shall either party have any liability for any failure to comply with this Agreement, if such failure results from the occurrence of any contingency beyond the reasonable control of the party, including without limitation, strike or other labor disturbance, riot, theft, flood, fire, lightning, storm, any act of God, power failure, war, national emergency, interference by any government or governmental Agency, embargo, seizure; or enactment of any law, statute, ordinance, rule or regulation.

17.2.    DELAY. Either party shall have the right to delay delivery, performance or acceptance where such delay is caused by natural or civil occurrences beyond its control. The affected party shall notify the other party of the delay as soon as reasonably possible, and shall cooperate in minimizing the impact of such delay. The other party may terminate this Agreement in whole or in part upon written notice.

**18. VERIZON WIRELESS' CONFIDENTIAL INFORMATION & PROPERTY**

18.1.    TITLE. Title to all property owned by Verizon Wireless and furnished to Agency shall remain Verizon Wireless' property.

18.2.    PROPERTY RIGHTS AND USE. Any property owned by Verizon Wireless and in Agency's possession or control shall only be used by designated Agency/Verizon Wireless account personnel and can only be used in the performance of this Agreement unless authorized in writing by Verizon Wireless. Agency shall adequately protect such property, and shall deliver or return it to Verizon Wireless or otherwise dispose of it as directed by Verizon Wireless.

18.3.    INFORMATION. Any specifications, computer programs, marketing plans, strategic plans, financial data, personnel statistics, or any other technical or business information or data, written, oral or otherwise (all hereinafter designated "Information") furnished to Agency hereunder or in contemplation hereof shall remain the property of Verizon Wireless. All copies of such Information in written, graphic or other tangible form shall be returned to Verizon Wireless. Agency shall not, during the period of the Agreement or after it is terminated, without Verizon Wireless' express written permission, reveal or otherwise make available to any other

12

**Attorneys' Eyes Only**

**EP235640**

Contract #730-00970-2001

person, or use for any purpose other than those set forth in this Agreement, any proprietary or confidential information or trade secrets regarding Verizon Wireless or Verizon Wireless' products, services, business, customers, or methods of operation learned by Agency in connection with providing Services hereunder, or any of Verizon Wireless' other Information.

18.4.    CONFIDENTIALITY.   Agency agrees to hold such Verizon Wireless Information in strictest confidence and shall use same solely for the purposes set forth in this Agreement unless otherwise authorized in writing by Verizon Wireless. Agency agrees not to copy such Verizon Wireless Information without express written permission and agrees not to disclose such Verizon Wireless Information to anyone except employees, agents or subcontractors of Agency to whom disclosure is necessary for the purposes set forth herein. Agency shall appropriately notify each employee, agent, or subcontractor that the disclosure is made in confidence and must be kept in confidence in accordance with this Agreement. Each employee, agent, or subcontractor who requires such Verizon Wireless Information shall review and complete the Nondisclosure of Information Agreement shown in Exhibit I of this Agreement, attached hereto and incorporated herein.

18.5.    PROPRIETARY NOTICES.   Agency further agrees that in the event permission is granted by Verizon Wireless to copy such Verizon Wireless Information, each copy shall contain and state the same confidential or proprietary notices and legends, if any, which appear on the original. Nothing herein shall be construed as granting any right or license under any copyrights, trademarks, or trade names owned or controlled by Verizon Wireless.

18.6.    SUBCONTRACTOR PROVISIONS.   The provisions of this Section shall apply separately to each subcontractor, and Agency shall be responsible for informing subcontractors of any confidential and proprietary information included in any work subcontracted hereunder, and Agency shall use reasonable precautions to ensure each subcontractor is in compliance with this Section.

## 19. INFRINGEMENT

19.1.    INFRINGEMENT.   The following terms apply to any infringement, or claim of infringement, of any copyright, trade secret or other proprietary interest based on the manufacturer normal use or sale of any materials, equipment, programs or services paid by and furnished by Agency on behalf of Verizon Wireless hereunder or in contemplation hereof. Agency shall indemnify Verizon Wireless and its affiliates and subsidiaries, jointly and severally, for any loss, damage, expense or liability that may result by reason of infringement or claim. Agency shall defend or settle, at Agency's own expense, at Verizon Wireless' direction, any action or suit for which Agency is responsible hereunder. Verizon Wireless shall notify Agency of any claim of infringement for which Agency is responsible, and Verizon Wireless shall

13

**Attorneys' Eyes Only**

**EP235641**

Contract #730-00970-2001

cooperate with Agency in every reasonable way to facilitate the defense of such claim.

19.2.    CONTINUATION OF SERVICES.  If a preliminary or final judgment shall be obtained against Verizon Wireless' use of any Services, Deliverables or Materials or any part thereof by reason of alleged infringement or if in Agency's opinion, such Services, Deliverables or Materials are likely to become subject to a claim for infringement, Agency shall, at its own expense and option and without any effect or waiver of any right Verizon Wireless may possess at either law or equity, either:  (a) procure for Verizon Wireless the right to continue using such Services, Deliverables or Materials, or (b) replace or modify the Services, Deliverables or Materials so that they become non-infringing, but only if the modification or replacement does not adversely affect Verizon Wireless' rights or ability to use same as specified in this Agreement.  If neither of those options is reasonably possible, Agency shall refund to Verizon Wireless an appropriate amount of the compensation and expenses paid hereunder, based on considering the amount of time Verizon Wireless was able to receive the benefit of Services, Deliverables or Materials and the amount of time Verizon Wireless expected to be able to receive the benefit of said Services, Deliverables or Materials.  Agency shall also pay all expenses of removing the Services, Deliverables or Materials and any expenses incurred by Verizon Wireless to install alternatives to the Services, Deliverables or Materials.

## 20.    COMPANY RULES AND SECURITY REQUIREMENTS

20.1.    The Employees and agents of each party, shall while on the premises of the other, comply with all company rules and regulations in effect at such premises, including security requirements.  Agency rights of entry shall be subject to applicable governmental security laws.

## 21. USE OF VERIZON WIRELESS NAME

21.1.    Agency agrees to submit to Verizon Wireless all advertising, sales promotion, and other publicity matter relating to the Product(s) furnished or Service(s) performed by Agency wherein Verizon Wireless' name is mentioned or language is used from which the connection of Verizon Wireless' name therein may, in Verizon Wireless' judgment, be inferred or implied.  Agency further agrees neither to publish or use such advertising, sales promotion or publicity matter nor to use Verizon Wireless' name as a reference without prior written approval of Verizon Wireless.  Approval will not be given in any case in which an endorsement might be inferred.  The provisions of this Section shall apply to all companies related to Agency, and to all subcontractors of Agency.  Notwithstanding the foregoing, Agency may list Verizon Wireless as one of its customers when furnishing proposals to provide advertising and/or marketing services to prospective clients, in industry listings of advertising agencies and clients, in press releases and in annual reports, and in public filings to the extent such listing is required by law.

Attorneys' Eyes Only

EP235642

Contract #730-00970-2001

22.    **INDEMNIFICATION**

22.1.    AGENCY INDEMNIFICATION.    Agency agrees to indemnify and save Verizon Wireless harmless from any liabilities, claims or demands (including costs, expenses and reasonable attorneys' fees on account thereof) that may be made: (1) resulting from or arising in connection with Agency's acts or omissions not authorized by Verizon Wireless other than those relating to matters already addressed and described in the section entitled "INFRINGEMENT"), or those of persons furnished by Agency hereunder; including without limitation, any breach or violation of any contracts or agreements entered into by Agency on behalf of Verizon Wireless or its subsidiaries and including claims for libel, slander, piracy, plagiarism, invasion of privacy or infringement of copyright; or failure by Agency to obtain appropriate documentation resulting from or arising in connection with any claims by third parties or regulatory agencies in connection with Agency's failure to adhere to and comply with any local, state or federal laws, regulations or guidelines regarding advertising, consumer protection and unfair trade practices, deceptive practices; or (2) by any third person for injuries, to persons or damage to, property, caused by any Materials, if any, supplied by Agency hereunder in a defective or unreasonably dangerous condition; or (3) under Workers' Compensation, or similar employer-employee liability acts, against Verizon Wireless by persons provided by the Agency.    Agency agrees to defend Verizon Wireless at Verizon Wireless' request, against such liability, claim or demand.    The foregoing indemnification shall apply whether Agency or Verizon Wireless defends such suit or claims and whether the death, injury or property damage is caused by the sole acts or omissions of Agency or by the concurrent acts or omissions of Verizon Wireless and Agency hereunder.    Verizon Wireless agrees to notify Agency promptly of any written claims or demands against Verizon Wireless or which Agency is responsible hereunder.

22.2.    RESULT OF CLAIM.    Verizon Wireless shall indemnify Agency against any loss, damage, expense or liability, including reasonable attorneys' fees, Agency may incur as the result of any claim, suit or proceeding made or brought against Agency which arises solely on information or materials supplied by Verizon Wireless.

23. **INSURANCE**

23.1.    REQUIREMENTS:    Agency shall obtain at its own cost and expense and maintain the following insurance in full force and effect during the term of this Agreement:

23.1.1. Statutory Workers' Compensation requirements

23.1.2. Employer's liability insurance with a limit of $500,000 for each occurrence so long as the Agency maintains excess coverage.

23.1.3. Comprehensive general liability insurance providing coverage for operations and contractual liability with respect to liability assumed by Agency hereunder, with limits of not less than $200,000 for bodily injury per occurrence, and $2,000,000 for property damage.

15

**Attorneys' Eyes Only**                                                                **EP235643**

Contract #730-00970-2001

23.1.4. Advertiser's Errors & Omissions liability insurance providing coverage with respect to libel, slander, piracy, copyright infringement, and similar liabilities, with limits of not less than $5,000,000 per occurrence.

23.1.5. Comprehensive automobile liability insurance covering the use and maintenance of owned, non-owned, hired and rented vehicles, with limits of not less than $2,000,000 for bodily injury per occurrence, and $1,000,000 for property damage.

23.2. SUPPLIER INSURANCE. Verizon Wireless may require Agency at any time, and from time to time, during the terms of this Agreement to obtain from certain suppliers with whom Agency will be dealing on behalf of Verizon Wireless, insurance coverage protecting Agency and Verizon Wireless during the period when such suppliers are performing work for Verizon Wireless, provided that supplier agrees to bear the expense for such supplier insurance coverage. If the supplier is unwilling to provide such coverage, Verizon Wireless will either waive the requirement or shall agree to pay the cost of same. Verizon Wireless may require such supplier to provide certificates of insurance providing coverage in amounts equal to those set forth above for Agency.

23.3. RATING. The issuing carriers shall have a BEST rating. Agency shall forward to Verizon Wireless as and when required, and shall require all suppliers used by Agency to forward as and when requested by Verizon Wireless, certificates of insurance issued by the insuring carrier or carriers, said certificates to be on an "ACCORD" form providing that thirty (30) days prior written notice of cancellation or material change of the insurance to which the certificate(s) relate shall be given to Verizon Wireless. The fulfillment of the insurance obligations hereunder however, shall not otherwise relieve Agency of any liability assumed by the Agency hereunder or in any way modify Agency's obligations to indemnify Verizon Wireless. The policies listed above shall be endorsed to name Verizon Wireless as an Additional Named Insured.

## 24. CONFLICT OF INTEREST

24.1. EMPLOYEE STATUS. Except with the written approval of Verizon Wireless, neither Agency nor any of its employees nor immediate family members of its employees may be an employee of Verizon Wireless.

24.2. GIFTS. The exchange or offering of any gift item, personal service, entertainment or unusual hospitality by either party to this Agreement to the other is expressly prohibited. This prohibition is equally applicable to either party's officers, agents or immediate family members.

24.3. FINANCIAL INTEREST. In addition, in the event that any services under this Agreement are to be performed by a vendor in which the Agency has any financial

Attorneys' Eyes Only

EP235644

Contract #730-00970-2001

interest, disclosure of the relationship will be made to Verizon Wireless prior to the Agency's execution of any order for such services.

## 25. CHOICE OF LAW

25.1.    This Agreement shall be construed in accordance with the laws of the State of New York.

## 26. DISPUTE RESOLUTION

26.1.    ARBITRATION.  If any claim, controversy or dispute of any kind or nature whatsoever arises between the parties, ("Dispute") and such Dispute cannot be settled through negotiation, the parties agree to attempt to settle the Dispute through non-binding mediation under the Commercial Mediation Rules of the American Arbitration Association ("AAA").  If the parties cannot settle the matter through mediation, then any Dispute shall be resolved by arbitration as provided in this Section.  Federal law shall govern the arbitrability of all claims.  Notwithstanding the foregoing, the parties may cancel or terminate this Agreement in accordance with its terms and conditions without being required to follow the procedures set forth in this Section.

26.2.    ARBITRATOR.  A single arbitrator engaged in the practice of law, who is knowledgeable about the subject matter of this Agreement and the matter in Dispute, shall conduct the arbitration under the then current rules of the AAA, unless otherwise provided herein.  The arbitrator shall be selected in accordance with AAA procedures from a list of qualified people maintained by the AAA.  The arbitration shall be conducted in Bedminster, N.J., and all expedited procedures prescribed by the AAA rules shall apply.

26.3.    ARBITRATOR'S AUTHORITY.  Either party may request from the arbitrator injunctive relief to maintain the status quo until such time as the arbitration award is rendered or the Dispute is otherwise resolved.  The arbitrator shall not have authority to award punitive damages.  Upon the request of either party, the arbitrator's award shall include findings of fact and conclusions of law.

26.4.    COSTS.  Each party shall bear its own costs and attorneys' fees, and the parties shall share equally the fees and expenses of the arbitrator.  The arbitrator's decision and award shall be final and binding, and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

26.5.    OTHER COSTS.  If any party files a judicial or administrative action asserting claims subject to arbitration, as prescribed herein, and another party successfully stays such action and/or compels arbitration of said claims the party filing said action shall pay the other party's costs and expenses incurred in seeking such stay and/or compelling arbitration, including reasonable attorneys' fees.

Attorneys' Eyes Only

EP235645

Contract #730-00970-2001

## 27. ASSIGNMENT

27.1.    Any assignment of this Agreement, in whole or in part, or any other interest hereunder without Verizon Wireless' written consent, except an assignment confined solely to monies due, shall be void.  It is expressly agreed that any such assignment of monies shall be void to the extent that it attempts to impose upon Verizon Wireless obligations to the assignee additional to the payment of such monies, or to preclude Verizon Wireless from dealing solely and directly with Agency in all matters pertaining hereto, including the negotiation of amendments or settlements of amounts due.  It is further agreed that Verizon Wireless, upon five (5) days written notice to Agency may assign all of its rights, duties and obligations under this Agreement to an affiliate or affiliates of Verizon Wireless or to a partnership or partnerships which Verizon Wireless or its affiliate has an interest.

## 28. WAIVER

28.1.    No provision of this Agreement shall be deemed waived, amended, or modified by any party, unless such waiver, amendment or modification be in writing and signed by the party against whom it is sought to enforce the waiver, amendment, or modification.

## 29. BANKRUPTCY

29.1.    Verizon Wireless or Agency may terminate this Agreement by notice in writing in the event that the other makes an assignment for the benefit of creditors, or admits in writing inability to pay debts as they mature; or a trustee or receiver of any substantial part of the other assets, is appointed by any court; or a proceeding is instituted under any provision of the Federal Bankruptcy Act by the other, or against the other, and is acquiesced in or is not dismissed within sixty (60) days or results in an adjudication in bankruptcy.

## 30. BUSINESS CONDUCT

30.1.    Agency shall take all measures necessary to ensure that personnel employed by, or acting under the authority of Agency shall conduct themselves in accordance with the highest standards of honesty, integrity and fair dealing including, but not limited to, compliance with all consumer clear disclosure and unfair trade practice obligations, any ethical codes or procedures promulgated by Verizon Wireless and applicable consultants.

18

**Attorneys' Eyes Only**                                              **EP235646**

Contract #730-00970-2001

## 31. ARTICLE HEADINGS

31.1.    The headings of the Articles are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement.

## 32. SUCCESSORS AND ASSIGNS

32.1    This Agreement shall inure to the benefit of, and shall be binding upon the parties hereto and their respective successors and permitted assigns.

## 33. AMENDMENTS, MODIFICATIONS AND SUPPLEMENTS

33.1.    AMENDMENTS.  Amendments, modifications and supplements to this Agreement are allowed provided:  (a) all such amendments, modifications and supplements shall be in writing signed by authorized representatives of both parties, and (b) all such amendments, modifications and supplements shall by reference incorporate this Agreement in its entirety and identify the specific sections or paragraphs contained herein which are amended, modified or supplemented, and (c) all such amendments, modifications and supplements shall not be construed to adversely affect vested rights or causes of action which have accrued prior to the effective date of such amendment, modification or supplement.

33.2.    DEFINITION.  The term "this Agreement" as used herein, shall be deemed to include any future amendments, modifications and supplements made in accordance herewith.

## 34. SEVERABILITY

34.1.    If any provision, or portion thereof of this Agreement is invalid under the applicable statute or rule of law, it is only to that extent to be deemed omitted, and such unenforceability shall not affect any other provision of this Agreement, but this Agreement shall then be construed as if such unenforceable provision or provisions had never been contained therein.

## 35. AFFILIATE(S)

35.1.    "Affiliate" means any parent, subsidiary or successor of Verizon Wireless, or any partnership, corporation or other entity in which Verizon Wireless, or a parent, subsidiary or successor of Verizon Wireless, directly or indirectly, owns at least a ten (10) percent equity interest or has at least ten (10) percent voting control.

## 36. WAIVER

**Attorneys' Eyes Only**

EP235647

Contract #730-00970-2001

36.1.    The waiver or failure of either party to exercise in any respect any right provided for in this Agreement shall not be deemed a waiver of any further right under this Agreement.

## 37. ENTIRE AGREEMENT

37.1.    This Agreement and its attachments constitute the entire Agreement between Verizon Wireless and Agency with respect to the subject matter hereof and shall not be amended or modified without specific written provision to that effect signed by both parties.  No oral statement of any person whomsoever shall, in any manner or degree, modify or otherwise affect the terms and provisions of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this, Agreement to be executed by their duly authorized officers as of the day and year first above written.

Cellco Partnership dba Verizon Wireless          Erwin-Penland

_____          _____
(Authorized Signature)                            (Authorized Signature)

John Stratton                                     Allen Bosworth
_____          _____

Vice President, Marketing                         Executive Vice President
12/3/01                                           11/12/01
(Execution Date)                                  (Execution Date)

20

**Attorneys' Eyes Only**                          **EP235648**

Contract #730-00970-2001

## ATTACHMENT "A"

## SCOPE OF WORK

This Attachment A is attached to and is a part of the Agency advertising and marketing communication services Agreement made effective as of the date of execution, between Verizon Wireless and its affiliates ("Verizon Wireless") and Erwin-Penland, Inc. ("Agency").

1) SCOPE OF SERVICES
    a) Services:
        i) Agency agrees to perform advertising and marketing communication services ("Services"), for Verizon Wireless' products (e.g. cellular service, enhanced services and cellular hardware) upon Verizon Wireless' request. The services employed may include, but are not limited to, advertising, (excluding media purchasing), promotion, fulfillment, collateral, advice on development of marketing plans, creation and execution of advertising and other marketing communications materials, act as an agent on behalf of Verizon Wireless in procurement of goods and services required for the execution of services as it relates to this agreement, plan advertising schedules in all forms of media, cooperating fully with the media agency of record (AOR) and direct mail. Agency will provide evaluation and formulate strategy based on Verizon Wireless' requirements. Agency will either perform or subcontract for the work to be performed under the guidelines of this Agreement, and be responsible for the implementation plan for execution of creative design, copywriting, production, account supervision, program management, tracking and reporting regarding all requirements requested by Verizon Wireless.
        ii) Agency will obtain at least three (3) bids in writing for all jobs that it contracts out on behalf of Verizon Wireless when such jobs are estimated to exceed $25,000.00 and shall discuss such bids and suppliers' qualifications with Verizon Wireless. During the course of the relationship with Agency, Verizon Wireless may, at its sole discretion, provide Agency with a list of qualified suppliers from which to order all goods and services on behalf of Verizon Wireless.
        iii) In either instance, however, Agency shall remain responsible for ensuring that the bidding process is conducted in an open and objective manner and further, that the Agency shall retain full and sole responsibility for all work output produced, whether by the Agency or by a subcontractor of Agency on behalf of Verizon Wireless.
        iv) Agency agrees that it will be responsible for the quality and accuracy of the work performed by Agency and Agency's vendors and subcontractors with respect to materials released for publication, broadcast or other means of public dissemination. Agency shall produce all work in conformance with Verizon Wireless specifications. Agency agrees that it will demonstrate to Verizon Wireless' satisfaction that it has established a commercially

21

**Attorneys' Eyes Only**

EP235649

Contract #730-00970-2001

reasonable process to obtain 100% accuracy of materials released for publication, broadcast or other public dissemination. In the event Agency and/or Agency's vendors or subcontractors achieve less than 100% accuracy in said materials per Verizon Wireless specifications, Agency will provide Verizon Wireless with "make good" production time and materials, media time and/or space (e.g., radio time, print space, etc.) sufficient to fully compensate Verizon Wireless for the error/failure within 15 days after receiving notice of the error/failure provided such error or failure was not directly or indirectly caused by Verizon Wireless.

v) While the Agency will use its reasonable best efforts to obtain a "Make good" for errors or failures directly or indirectly caused by Verizon Wireless, it cannot guarantee that a "Make Good" will be obtained.

vi) Sole sourcing will be permitted upon Verizon Wireless' prior approval.

**b) Specific Services**

i) Agency will advise and assist Verizon Wireless in the development of its marketing plans and advertising campaigns for the geographic Area as designated by Verizon Wireless.

ii) Agency shall plan and perform work based upon Attachment A-1 Scope of Work. This document outlines Area specific requirements, promotions, promotional media and other elements required by the Area in the performance of this contract by Agency.

iii) Agency shall perform this work under the direction of a designated Verizon Wireless representative and from time to time will work with and through other Agencies as may be employed by Verizon Wireless in the area of advertising and marketing communications services.

iv) Agency shall provide planning and research (including fieldwork when needed) directly related to the development of advertising (including the following activities that lead to the development of a strategic positioning and creative brief: strategic exploration and development, positioning, and competitive positioning research).

v) Agency will furnish Verizon Wireless, in advance, with at least three written cost estimates for all expenditures in connection with all services or projects recommended by Agency or requested by Verizon Wireless, when the cost to Verizon Wireless for either a specific service or project is estimated to exceed $25,000.00. Prior to undertaking such service or project or committing Verizon Wireless' funds, Agency will obtain written authorization from, or oral approval confirmed in writing by a designated Verizon Wireless representative. Agency will not exceed the estimated amount provided by more than (10%) without re-submitting an estimate to Verizon Wireless for approval.

vi) Upon Verizon Wireless' authorization, Agency shall provide the materials and services necessary to execute the marketing plans and advertising campaigns approved by Client. In this connection, Agency shall:

**Attorneys' Eyes Only**

EP235650

Contract #730-00970-2001

(1) Formulate and submit for approval advertising strategies, campaigns, and recommendations; consult, supervise , and prepare proposals for research projects.

(2) Perform consultative services concerning promotional concepts, including strategic considerations and communications concepts; packaging considerations and advice regarding providers; and planning for interactive media and direct marketing.

(3) Design and produce promotional point-of-sale materials, promotional flyer templates and employee communications about various promotions within and on behalf of the Area.

(4) Prepare and submit estimates of productions costs.

(5) Incorporate the advertising message in mechanical, electromagnetic, or other form and forward it with proper instructions to the appropriate media agent.

(6) Plan media commitments consistent with budgeted and approved funds and support these media commitments with advertising strategy and rationales (if awarded media planning assignment).

(7) Prepare and submit detailed estimates of these media commitments (if awarded media planning assignment).

c) Ancillary Services — *All line item would be billable. Web, etc.*

i) Agency may be requested to provide "Ancillary Production Services" to develop and execute materials associated with non-promotional collateral; channel communications (including retail kits) for agents, retailers and other types of accounts (both promotional and non-promotional); direct marketing (including promotional and non-promotional direct mail templates and customer marketing); web site design; package; merchandising; or other services as may be requested and required by Verizon Wireless.

ii) Agency may be requested to provide other services as may be requested and required by Verizon Wireless. These unique work projects will be designated on a per project basis and Agency shall provide to Verizon Wireless a separate estimate/quote for the work to be performed by Agency. Verizon Wireless must approve in writing all such types of unique work projects prior to Agency beginning work.

2) ORDERS:

a) Verizon Wireless will jointly develop with Agency a method for the placing, authorizing and execution of orders in connection with this Agreement. All orders that authorize the Agency to commit funds on behalf of Verizon Wireless shall require proper documentation and authorization by Verizon Wireless for payment. Verbal authorizations may be given by Verizon Wireless, but must be confirmed by the method jointly developed by Agency and Verizon Wireless within seven (7) business days of the verbal order. Regardless of mode of communication for an order, this Agreement shall control over any other pre-printed terms and conditions of any other document connected to orders associated with this Agreement.

Attorneys' Eyes Only

EP235651

3) IRS TIME REPORTING REQUIREMENTS:

a) If Agency's employees will be working on Verizon Wireless' premises, Agency will maintain all information required for IRS reporting purposes, including the total number of hours spent by each of its employees or agents performing services and any other work for any Verizon Wireless entity.

4) LABOR, TOOLS, EQUIPMENT AND MATERIALS:

a) Agency shall be responsible for supplying all labor, tools, equipment and materials necessary to provide the Services as outlined herein, including any licenses, bonds, permits or other items required for Agency to perform Services for Verizon Wireless at no additional cost to Verizon Wireless.

5) AGENCY STAFFING REPORTS:

a) Agency shall provide monthly reports by project showing the names and positions of key individuals working on the Verizon Wireless account, the hours billed to the account by the individual(s), and the percentage of overall hours by individual that this figure represents. Other support working on the project can be reported by department or type of work provided. Verizon Wireless reserves the right to revise the reporting parameters, with thirty days notice, at any time during the course of the agreement.

6) STAFFING:

a) ACCOUNT MANAGEMENT: Agency will assign a dedicated account manager responsible for the entire Verizon Wireless account. This individual shall be responsible for the overall management of the Verizon Wireless account and shall review, supervise and oversee all activities related to the Verizon Wireless account on behalf of Agency.

b) STAFFING: Agency will establish a staff of 37.15 F.T.E. (Full Time Equivalent) dedicated Agency employees to serve the Verizon Wireless account as outlined on Attachment A-2. Based upon the scope of work at any given time, staffing levels will be reviewed to evaluate current scope of work, number of products and services, and projected activity and billing by market as agreed to by Verizon Wireless. This staff must be able to perform independently and cannot be restructured due to events such as Corporate Mergers or changes in corporate ownership or management on the part of the agency or its corporate parents. This includes, but is not limited to:

    i) Proprietary rates

    ii) Direct accountability of the dedicated staffing with relatively few shared functions

    iii) Independent profit/loss responsibility as part of this contract

    iv) Independent management responsible for driving performance and goals

    v) The offices will interface with Area and Region personnel on a daily basis including regular status calls and meetings.

**Attorneys' Eyes Only**

EP235652

Contract #730-00970-2001

## SOUTH AREA SCOPE OF WORK

### Attachment A-1

6 Regions, 9 States, 28 TV DMA's, 50 Radio Metros, 120 Newspapers

#### CREATIVE DEVELOPMENT & PRODUCTION

*4-6 Area-wide Promotions  & adaptation of 4 national promotions*

- Includes :30/:10 TV spots, if need not filled by Corporate Marketing's promo TV creative.
- 30 radio spots  (10 promos x 3 refreshes = 30 spots with version tags)
- Newspaper with 2 standard sizes and versions to support technology variations
- Provide Hispanic transcreation for each promotion / revision

*Change out promotion creative* (newspaper/radio) 2-4 revisions per promo period with offer overlays, equipment specials, countdowns on final days of sale, etc.

*AdSend Activity:*  120 NPs x 10 promos x 2 ad sizes x avg 3 revisions per promo = 7,200 transactions forecasted annually

*POP/Retail Merchandising*  Develop promotional offer posters, feature item inserts, duratrans and other such POP for each major promotion (10)

### Agent/Local Store Support

- Provide GA agent support; 2 print ad versions/4 sizes and 2 radio scripts per promotion. Post to web site.

*Business Publication Advertising*  ( in addition to the 120 NPs above)
- 20 publications
- Typically change out creative each month in coordination with 10 promos

## Store Openings/Relocations   *Average of 25 openings/relocations per quarter*

- Provide budget and tactical recommendations
- Provide dedicated print ads, direct mail, remote copy points and on occasion, outdoor; e.g., "Grand Opening" materials
- On-site support/implementation in the Carolinas

*Sales Collateral*  Produce Rate and other sales brochures, bill inserts, buck slips, loyalty kits, disclosure kits for each region. 100 pieces (some with multiple components) in Q1.  Reprints forecasted at approx. 35 pieces per month

*Direct Mail*
- Includes 4-6 loyalty/retention/billing conversion letters per quarter to existing customers.
- 4 targeted mailings to prospective customers (acquisition)

**Attorneys' Eyes Only**

EP235653

Contract #730-00970-2001

Quarterly newsletters (2 versions) to existing customers

**Sponsorships** Provide materials including print ads, banners/signage, radio
- Evaluation/recommendations – provided significant support for 1 region
- Sales Kick Off Meetings
- Implementation support provided for one region

*Out-of-Home*   Provide occasional creative for directional boards

*MISC Projects*   Produce trade show booth signage, partnerships, civic center signage/logo development

*Diversity Agency*
Agency shall be responsible for coordinating, reviewing and supervising any/all work performed on behalf of Verizon Wireless by VIVA Associates as the diversity agency for the account as designated by Erwin -Penland.

## MEDIA PLANNING

*Research/Analysis* - Demographic profiling, Product Usage analysis, Media penetration analysis, Brand/Category analysis, Alternative Media analysis
*Budget Development* - Application of planning costs in market tiering structure
*Media Plan Development* - By market, by promo period, by medium

## Buying Guidelines Development

*Initiation of Buy Authorization*
*Review and Approval of all Media Buys and revisions*
*Evaluation, Approval and Coordination of Value Added promotions*
*Evaluation, Negotiation of Media Promotions/Sponsorship*
*Ad Trafficking*
*Media Budget Maintenance and Reports*
*Post Buy Analysis* – delivery, reach/frequency, positioning, etc.

26

**Attorneys' Eyes Only**

**EP235654**

Contract #730-00970-2001

## ATTACHMENT A-2

## AGENCY FTE STAFFING PLAN FOR SOUTH AREA

STAFFING PLAN

| Job Title | % of Time | Total Hours | Billable Hourly Rate |
|---|---|---|---|
| **Account Management** | | | |
| President | 10% | 195 | $227.49 |
| Director of Client Services | 40% | 780 | $229.72 |
| Management Supervisor | 95% | 1,852.5 | 94.81 |
| Account Supervisor | 95% | 1,852.5 | 93.29 |
| Senior Account Executive | 95% | 1,852.5 | 55.90 |
| Senior Account Executive | 95% | 1,852.5 | 54.64 |
| Senior Account Executive | 95% | 1,852.5 | 54.16 |
| Account Executive | 95% | 1,852.5 | 47.37 |
| Account Executive | 95% | 1,852.5 | 59.37 |
| Junior Account Executive | 95% | 1,852.5 | 35.73 |
| Junior Account Executive | 95% | 1,852.5 | 32.90 |
| Junior Account Executive* | 95% | 1,852.5 | 33.85 |
| Junior Account Executive* | 95% | 1,852.5 | 33.85 |
| Junior Account Executive* | 95% | 1,852.5 | 33.85 |
| **Subtotal** | | | |
| **Media** | | | |
| Director of Media Services | 40% | 780 | $218.33 |
| Media Supervisor | 90% | 1,755 | 61.41 |
| Media Supervisor | 90% | 1,755 | 54.30 |
| Media Supervisor* | 90% | 1,755 | 51.75 |
| Media Planner | 90% | 1,755 | 30.69 |
| Media Planner | 90% | 1,755 | 37.24 |
| Media Planner* | 90% | 1,755 | 37.24 |
| Media Coordinator | 90% | 1,755 | 27.87 |
| Media Coordinator* | 90% | 1,755 | 28.21 |
| **Subtotal** | | | |
| **Creative Services** | | | |
| Creative Director   Mark | 25% | 487.5 | $135.39 |
| Senior Art Director  Barb | 95% | 1,852.5 | 80.56 |
| Senior Copywriter  Sean | 95% | 1,852.5 | 80.56 |
| Art Director*  Alan | 95% | 1,852.5 | 67.70 |
| Copywriter*  Matt | 95% | 1,852.5 | 67.70 |
| Junior Copywriter Keller  Kristen | 95% | 1,852.5 | 40.90 |
| Studio Artist  Nathan | 95% | 1,852.5 | 39.19 |
| Studio Artist  Melanie | 95% | 1,852.5 | 38.18 |
| Studio Artist  Heather | 95% | 1,852.5 | 36.68 |
| Studio Artist  Jeremy | 95% | 1,852.5 | 36.68 |
| Studio Artist#  Kim | 95% | 1,852.5 | 32.10 |
| Studio Artist*  Travis | 95% | 1,852.5 | 39.49 |

Lisa

**Attorneys' Eyes Only**

EP235655

Contract #730-00970-2001

| Job Title | % of Time | Total Hours | Billable Hourly Rate |
|---|---|---|---|
| Studio Artist* _Tammy_ | 95% | 1,852.5 | 39.49 |
| Subtotal | | | |

| Job Title | % of Time | Total Hours | Billable Hourly Rate |
|---|---|---|---|
| **Production** | | | |
| Director of Print Production _Kurt_ | 50% | 975 | $82.12 |
| Senior Print Production Manager _Corey_ | 95% | 1,852.5 | 53.74 |
| Production Coordinator* _Melissa_ | 95% | 1,852.5 | 37.24 |
| Director of Broadcast Production# _Randall_ | 45% | 877.5 | 67.69 |
| Traffic Manager _TBD_ | 95% | 1,852.5 | 37.92 |
| Subtotal | | | |

_{ Inc. Justin_

| Job Title | % of Time | Total Hours | Billable Hourly Rate |
|---|---|---|---|
| **Events/Sponsorships** | | | |
| Director of Events/Sponsorships ✓_Mary_ | 85% | 1,657.5 | $71.92 |
| Sponsorships Coordinator ✓ | 85% | 1,657.5 | 30.22 |
| Sponsorships Coordinator* ✓_Allison_ | 50% | 975 | 28.21 |
| Subtotal | | | |

| Totals | | Total Hours | Billable Hourly Rate |
|---|---|---|---|
| | | | |

28

**Attorneys' Eyes Only**

EP235656

Contract #730-00970-2001

# ATTACHMENT B
# AGENCY COMPENSATION

This Attachment B is attached to and is a part of the Advertising and Marketing Communication Services Agreement made effective as of the date of execution, between Verizon Wireless and its affiliates ("Verizon Wireless") and Erwin-Penland, Inc. ("Agency").

Compensation:

*2/1/03 increased to 4,929,607*

Except as otherwise provided herein, Verizon Wireless shall compensate, against a labor-based annual base fee not to exceed $4,285,600 to Erwin-Penland, Inc. A labor-based fee shall mean Agency shall provide a blended hourly rate to Verizon Wireless based on the annual FTEs hours of 72,443 inclusive in the fee. That fee shall include all required agency staff to fulfill the requirements as outlined by Verizon Wireless in this agreement, operating expenses, Direct and Indirect Payroll, non-payroll, facilities, services & supplies, communication & promotion, and employee benefits. This annual fee also includes a flat fee of $360,000.00, which is the total lump sum fee for all diversity agency work and activity performed on behalf of Verizon Wireless through Agency's designated subcontractor.

This annual fee shall be payable each month of the contract year on the basis of one-twelfth (1/12th) of the agreed upon annual fee. Agency is responsible for submitting the invoice monthly as outlined in Attachment "D".

## 1. Agency Compensation

*All WEB Inv is billed*

### A. Annual Compensation Review

Compensation shall be based on several components, which shall be reviewed and adjusted annually. Verizon Wireless may consider mid-year adjustments to the total number of FTEs required, if Agency provides Verizon Wireless with an analysis detailing the increase or decrease in the annualized number of FTEs specified. Any change in the annualized total number of FTEs hours must be based upon a demonstrated need for additional and specific headcount to handle the business required by Verizon Wireless. Agency will be responsible for holding and coordinating the annual compensation review, and for contacting Client to communicate this information. Verizon Wireless and Agency agree to an eight percent annual variable (8%) in the total FTE hours worked and reported on the account based upon the total number specified above under "Compensation". If the final annual FTE hourly report is within 8%, either below or above the stipulated total number indicated above of FTE hours, and associated with the annual fee, neither Verizon Wireless or Agency will be required to refund or pay any differences to the other party for these hours reported and worked.

29

**Attorneys' Eyes Only**

EP235657

Contract #730-00970-2001

However, should the difference between the stipulated FTE hours to be provided and the annual FTE hourly report exceed eight percent (8%) either way, a refund or additional payment shall be made to the appropriate party, based on an average FTE hourly rate of $54.19.

It is the responsibility of the Agency to maintain a strict accounting of all hours and projects on behalf of Verizon Wireless and to immediately inform Verizon Wireless if the hours used is exceeding the forecasted number of hours. Verizon Wireless will use its reasonable best efforts to provide Agency with an accurate forecast and work plan for the year as well as providing Agency with updates to the forecast and work plan from time to time during the operating year.

Fees will not exceed the agreed upon monthly amount unless specifically authorized, in advanced and in writing, by Verizon Wireless.

B. Agency Compensation
     Compensation to Agency shall consist of the several components: (1) A labor based fee that is inclusive of direct salary X 2.10 , the agreed multiplier for benefits, overhead and negotiated profit margin, 2) an incentive compensation program, and (3) other compensation.

1) Direct Salary, Benefits, Overhead and Profit
     a) Shall be paid according to the FTE schedule provided for in Attachment A-2.
     b) Agency shall receive payment for overhead expenses
     c) Verizon Wireless agrees to pay Agency a reasonable profit margin, calculated on the blended hourly rate, of 10%.

2) Incentive Compensation Component
     a) Agency shall have the opportunity to participate in an Incentive based compensation program as set forth in Attachment C.

3) Other Compensation
     a) Billings of Outside Purchases -- Acting on behalf of Verizon Wireless, Agency will bill all outside purchases such as graphics art production and materials, photography, printing, film, broadcast production, etc. to Verizon Wireless at the Agency's net cost, after deducting any discounts or commissions allowed by vendors. Any and all awards, incentives from media or other suppliers must be passed along to the CLIENT for use as prizes, incentives or as otherwise determined.

Attorneys' Eyes Only

EP235658

Contract #730-00970-2001

## ATTACHMENT "C"

## INCENTIVE COMPENSATION – RISK/GAIN SHARE PROGRAM
### SERVICE LEVEL AGREEMENT

This Attachment C is attached to and is a part of the Agency advertising and marketing communication services Agreement made effective as of the date of execution, between Verizon Wireless and its affiliates ("Verizon Wireless") and Erwin-Penland, Inc. ("Agency").

Based upon the total profit margin of the total agency compensation associated with the blended hourly rate, Agency agrees to put 10% of profit at risk and Verizon Wireless agrees to put up an amount equal to 10% of Agency's total profit for incentive compensation gain by Agency based upon the following Service Level Agreement.

RISK/GAIN SCENARIOS
The risk/gain calculation is based $3,889,600
($4,285,600 annual fee - $360,000 fee for Viva Hispanic Agency - $36,000 in miscellaneous overhead expenses such as copies, phone calls, etc.). Viva and miscellaneous overhead are pass-through costs, and are not subject to profit.

| On a 5 point scale, if Erwin-Penland rates | Then |
|---|---|
| 5 points | Verizon Wireless pays Erwin-Penland a $38,896 bonus |
| 4-4.99 points | Verizon Wireless pays Erwin-Penland a $19,448 bonus |
| 3-3.99 points | Erwin-Penland does not earn a bonus or risk compensation. |
| 2-2.99 points | Erwin-Penland rebates Verizon Wireless $19,448 |
| 1-1.99 points | Erwin-Penland rebates Verizon Wireless $38,896 |

### Elements of Evaluation (Performance Criteria)

Agency shall be scored on the following performance criteria.

| | | |
|---|---|---|
| Retail Gross Add Achievement | Total gross adds achieved per month, rolled up to quarterly results. (Rating: 5 = ≥110% of Gross Plan, 4 = 101% - 109% of Gross Plan, 3 = 95% - 100%, 2= 80%- 94% and 1 = < 79% of gross plan.) | 110% |
| Net Add Achievement | Same as above, except with Net Add Numbers (Rating: 5 = ≥110% of Gross Plan, 4 = 101% - 109% of Gross Plan, 3 = 95% - 100%, 2= 80%- 94% and 1 = < 79% of gross plan.) | 110% |
| Agency Performance | Agency's customer satisfaction performance rating based on the 5 Point scale as defined below. The questionnaire shall be administered quarterly & reviewed bi-annually. | ≥3.99 |

31

Attorneys' Eyes Only

EP235659

Performance Scale – 5 points

| | |
|---|---|
| 5 | **Outstanding**. Agency significantly exceeds expectations, receives a bonus equal to the maximum at-risk amount. |
| 4 | **Above expectations**.  Agency performance exceeds expectations VZW pays Agency ½ of maximum at-risk amount. |
| 3 | **Satisfactory**.  Agency fully meets, but does not exceed expectations.  No Gain. No Loss. |
| 2 | **Below expectations**.  Agency partly, but not fully meets expectations.  Agency forfeits one-half of the at-risk amount. |
| 1 | **Unsatisfactory**.  Agency performance does not meet expectations.  Agency loses the total amount put at risk. |

The following questions will be used in the Qualitative survey.  The survey will be administered quarterly to the Area Director of Marketing and four other designated Marketing team members to be identified.  The combined scores shall be tabulated and calculated and the average of these scores will be the final "Qualitative Survey" score and is worth 50% of the Agency's overall Incentive Compensation score.

Agency & Account Team Support:

Account team understands client's business, including its competition and the marketplace.

Account team listens to the client and takes direction well.

Agency has enhanced client's creative product through strong relationships with quality vendors.

Account team keeps projects on time and on budget.

Creative Services:

Creative team interprets facts, strategies and objectives and turns them into usable advertisements and plans.

Creative team is knowledgeable about client's products, markets and strategies.

Production Services:

Agency holds to production budgets and meets due dates.

Media Services:

Media team recommendations reflect knowledge of client's markets, audiences, products and objectives

Media team understands and recommends best media mix

Interactive Services:

32

**Attorneys' Eyes Only**

EP235660

Interactive team understands the marketing needs of the client.

## Overall Comments:

Please provide your comments on areas for improvement and/or change to how the agency services your requirements.

33

**Attorneys' Eyes Only**

**EP235661**

Contract #730-00970-2001

## ATTACHMENT "D"
## BILLING POLICY PROCEDURES AND SCHEDULE

This Attachment D is attached to and is a part of the Agency advertising and marketing communication services Agreement made effective as of the date of execution, between Verizon Wireless and its affiliates ("Verizon Wireless") and Erwin-Penland, Inc. ("Agency").

1) Agency will bill Client for Services on the final day of the month in which Services are provided. All bills and invoices submitted to Client for payment shall be itemized and identified by Client's regions and sub-accounts as may be defined by Client. All fees and charges shall be specified in the invoice. Client shall only be bound to pay the amount specifically agreed to in writing.

2) All taxes which Agency is permitted to collect from Verizon Wireless under Section 3 will be listed on the invoice as a separate item, and charges for taxable and nontaxable items shall be separately stated. All undisputed invoices will be paid within thirty (30) days of receipt.

3) Any credits or rebates issued by Agency shall be stated on a separate invoice. At Client's request, any credits or rebates due shall be paid to Client within thirty (30) calendar days after notification to Agency.

4) Cash discounts, if any, allowed on purchases of whatever nature on Client's account will be passed on to Client, provided that there is no overdue indebtedness than owing by Client to Agency. For outsourced work with cash discounts for early payment, all invoices must be clearly marked to indicate payment terms. These invoices will be payable within ten (10) days of the date of invoice.

5) Written notice of any disputed amount must be given to Agency within thirty (30) days following invoicing, or invoices amounts shall be deemed undisputed.

6) Agency will credit to Client any and all excess amounts (over and above cost estimates) which are billed to and paid for by Client, whether such excess amounts are ascertained during the term of this Agreement or thereafter. Agency will be responsible for and will pay other appropriate third-party vendors the full amount of their charges, which were reflected in the cost estimate or otherwise billed to and paid for by Client. In the event that Agency shall receive any refund, rebate or other payment relating to Services provided by Agency and paid for by Client, Agency will credit such amount to Client forthwith, subject to the terms herein and provided there is no overdue indebtedness then owing by Client to Agency.

7) Invoices must include the following information:
   a) A unique invoice number for each unique transaction.
   b) the name of the person ordering on the invoice.
   c) A full and complete description of the services
   d) The FULL and CORRECT PeopleSoft Account number for the project.
   e) Attach any back up that is necessary for payment.

8) Verizon Wireless is not responsible for any charges or invoices submitted to Verizon Wireless by the Agency that are more than ninety (90) days after project completion.

34

**Attorneys' Eyes Only**

**EP235662**

Contract #730-00970-2001

Agency will utilize its best efforts to ensure that all invoices are submitted to Verizon Wireless within five (5) business days of receipt of suppliers invoice by Agency. Rate or billing adjustments shall be credited or charged to Verizon Wireless within ten (10) business days after the date the Agency has been invoiced or credited by a supplier.

9) In addition, Verizon Wireless requires that any/all accrued charges be submitted for accrual to Verizon Wireless no later than December 15th of the current fiscal year and invoices for those same charges be submitted to Verizon Wireless no later than January 15th of the following calendar year in order to process for payment. Verizon Wireless cannot honor any invoices received after this date for charges in the previous year; therefore, it is imperative that Agency takes all necessary steps to comply with these requirements.

Attorneys' Eyes Only

EP235663

Contract #730-00970-2001

## EXHIBIT I
## NON-DISCLOSURE AGEEMENT

1.    SCOPE

Verizon Wireless possesses certain information, which is not generally available to the public, and which Verizon Wireless desires to protect against unrestricted disclosure or competitive use. During the performance of the Agreement, certain of its confidential and/or proprietary information may be disclosed to Seller and Verizon Wireless desires to maintain the confidentiality of such information to be disclosed to Seller.

2.    DEFINITIONS

    (a)    "Information" is defined as all data and information, including, without limitation, data and information of a technical, business or financial nature which has been disclosed to Seller by Verizon Wireless, whether such disclosure is made visually or orally or documented on any tangible media, including, without limitation, writings, drawings, sound recordings, computer programs and codes, system specifications, pictorial representations and graphs. This Agreement shall cover Information disclosed by, or the property of a parent, affiliate, partner, agent or subsidiary of Verizon Wireless, and in any event all Information disclosed by Verizon Wireless.

    (b)    "Confidential Information" is defined as Information that is in the possession of Verizon Wireless, and which Verizon Wireless desires to protect against unrestricted disclosure or competitive use.

3.    Seller shall use reasonable care and discretion to limit disclosure of such Proprietary Information as it uses to protect the proprietary, confidential, or trade secret status of its own information.

4.    The parties acknowledge and agree:

    a.    All Confidential Information disclosed by Verizon Wireless shall be and shall remain the exclusive property of the source;

    b.    Seller shall receive in confidence any Confidential Information; shall limit access to such Confidential Information to authorized employees who have a need to know the Confidential Information in order for Seller to perform in accordance with the terms of the Agreement; and Seller shall not disclose such Confidential Information to others (to include consultants, advisors and other such entities and persons who are not full-time, regular employees of Seller) without the prior written approval of Verizon Wireless

    c.    Seller shall advise all of its employees, agents, advisors, consultants, contractors and/or subcontractors with access to the Proprietary Information of the obligation to protect Proprietary Information provided hereunder and obtain the agent's, advisor's, contractor's and/or consultant's agreement to be so bound as evidenced by their signature on the form attached hereto as Exhibit E-1;

    d.    Seller shall use such Confidential Information only for purposes of work, services or analysis related to performance of the Agreement, and for other

36

Attorneys' Eyes Only

EP235664

purposes only upon such terms as may be agreed upon between the parties in writing;

e.   Seller shall return promptly to Verizon Wireless, or shall destroy any copies of such Confidential Information in written, graphic or other tangible or intangible form at Verizon Wireless' request, and provide, at Verizon Wireless' request, a list of all such material destroyed;

f.   The obligations with respect to Confidential Information shall extend in perpetuity following the date of initial disclosure of that Confidential Information, and such obligations shall extend beyond completion of the term of this Agreement, unless otherwise stated herein; and

g.   Neither disclosure of Confidential Information nor this Agreement shall be construed as a license to make, use or sell the Confidential Information or products derived there from.

5.   These obligations do not apply to Confidential Information which:

a.   As shown by reasonably documented proof, was in the Seller' possession prior to receipt thereof from Verizon Wireless; or

b.   As shown by reasonably documented proof, was received by the Seller in good faith from a third party not subject to a confidential obligation to Verizon Wireless; or

c.   Now is or later becomes publicly known through no breach of confidential obligation by Seller; or

d.   Is disclosed to a third party by Verizon Wireless without a similar non-disclosure restriction; or

e.   Is disclosed pursuant to a requirement imposed by a governmental agency or is otherwise required to be disclosed by operation of law, except that prior to any disclosure pursuant to this subsection, Seller shall notify Verizon Wireless and shall give Verizon Wireless an opportunity to participate in objecting to production of the Confidential Information; or

6.   It is agreed that a disclosure of Confidential Information in violation of any of the provisions of the Agreement will cause irreparable harm and injury and Verizon Wireless shall be entitled, in addition to any other rights and remedies it may have at law or in equity, to an injunction enjoining and restraining Seller from doing or continuing to do any such act and any other violations or threatened violations of the Agreement.  Absent a showing of willful violation of the Agreement, neither party shall be liable to the other, whether in contract or in tort or otherwise, for special, indirect, incidental or consequential damages.

**Attorneys' Eyes Only**

EP235665

### EXHIBIT I-A
### ACKNOWLEDGMENT OF NON-DISCLOSURE OBLIGATIONS

I have read the Non-Disclosure Agreement dated _Nov. 12_ , 2001

between CELLCO PARTNERSHIP, doing business as Verizon Wireless and

(Seller) and shall be bound by the terms and conditions therein.

_AlBosworth_
Signature

_ALLEN BOSWORTH_
Print Name

_EXECUTIVE VICE PRESIDENT_
Title

_ERWIN-PENLAND, INC._
Company

_11/12/01_
Date

38

**Attorneys' Eyes Only**

**EP235666**

Contract #730-00970-2001

# EXHIBIT II

## Map



39

**Attorneys' Eyes Only**

EP235667

AMENDEMENT TO AGREEMENT BETWEEN

VERIZON WIRELESS

AND

ERWIN-PENLAND, INC.

This amendment is to contract #730-00970-2001 between Verizon Wireless and Erwin-Penland, Inc.

As of March, 2003, the retainer shall increase to $4,929,607 ($410,800.60 per month) and annual hours shall increase to 89,018. The annual fee also includes a flat fee of 390,000 ($32,500 per month) for diversity work through a subcontractor. This amounts to an hourly cost of $51.00 for Erwin-Penland work.

Cellco Partnership dbz Verizon Wireless

_S.N. Deering_
Signature

_Suzy Deering_
Name

_March 2003_
Date

Erwin-Penland, Inc.

_Albert_
Signature

_Allen Bosworth_
Name

_March 1, 2003_
Date

**Attorneys' Eyes Only**

**EP235668**

# EXHIBIT 4

**From:** Jeff Greenfield <jeff@1stapproach.com>
**Sent:** Friday, November 4, 2005 10:00 AM
**To:** Shannon.Wilbanks@erwinpenland.com
**Cc:** joe.erwin@erwinpenland.com; gretchen.erwin@erwinpenland.com; bill.reynolds@erwinpenland.com;
**Subject:** RE: Captain D's customer numbers
**Attach:** ~~DLNK0.URL;~~DLNK1.URL;~~DLNK2.URL;~~DLNK3.URL;~~DLNK4.URL;~~DLNK5.URL

Here is the Amazing Grace concept with the payment structure explained.

A PowerPoint will be coming prior to our conference.

**Jeff Greenfield**

EVP - 1st Approach

Publisher - Branded Entertainment Monthly http://www.1stapproach.com <<...>>

tel:  888.221.7923 ext 717

cell: 603.866.1342

fax:  603.299.0775

Product Placement Blog: http://www.productplacement.biz <<...>>

In The News: http://www.brandedentertainment.tv <<...>>

**From:** Shannon.Wilbanks@erwinpenland.com [mailto:Shannon.Wilbanks@erwinpenland.com]

**Sent:** Friday, November 04, 2005 9:05 AM

**To:** Jeff Greenfield

**Subject:** RE: Captain D's customer numbers

hey, Jeff -- just making sure I haven't missed it -- do we have the Amazing Grace piece yet?  Our servers went down for about 15 minutes yesterday, and I'm a little freaked out that we may have missed some emails!

Shannon Wilbanks

Business Development Manager &

Asst. to President Joe Erwin

Erwin-Penland, Greenville, SC

DEFENDANT'S
EXHIBIT
58
11/20/09 Ryn

**EP000124**



**'Amazing Grace'**
**Captain D's Branded Reality Show**

The ideas and concepts contained within this document are the sole and confidential property of 1st Approach LLC and will not be shared with any other agency or utilized without prior written consent.

**CONFIDENTIAL**

EP226852





## Captain D's presents authentic, inspirational television!

The top 20 church choirs in the US competing for over
$250,000 in prizes and the title of
the Best Choir in the USA!

- 2 -

CONFIDENTIAL

EP226853

# 1st Approach



### PHASE I.  LOCAL PARTICIPATION

## "Producers from TV's 'Amazing Grace' will be visiting Captain D's on Wednesday from 2 – 4 PM."

The big secret behind American Idol's success is all of the local work that never makes it to the show!  As contestants are selected to compete in Hollywood – a team of Hollywood PR experts sends off a flood of press releases to the local press alerting them that one of their locals may be the *'next American Idol*.  This results in massive local involvement – all months before the show is on the air!

**Our production team of experienced network cameramen and producers will cross the country in their 6 week trek of visiting EVERY Captain D's location!**

The local press (newspaper, radio, broadcast) will be alerted several weeks prior and invited to participate.



Cameraman @ Captain D's in Atlanta

Every Captain D's location will have a set date and time when the Captain D's Amazing Grace team will arrive.

After setting up their equipment and 'red carpet' region, our production team will interview people about their local choir and why they think they are the best in the US!



## Amazing Grace Spokesperson Contest

Our production team will also be on a national talent search for the Captain D's Amazing Grace Spokesperson.  Similar to Ryan Seacrest on American Idol, the winner will be a paid spokesperson for all of the live events, will be flown to all of the events and (most importantly) be paid!

Every location can hold a local contest and the winner would be that locations representative in the Spokesperson contest.

- 3 -

CONFIDENTIAL

EP226854



## PHASE II. REGIONAL COMPETITIONS



After selecting the 'best of the best', 25 choirs from each region will be invited to person in a contest in one of these locations:

- Atlanta, GA
- Jackson, MS
- Birmingham, AL
- Charleston, SC

These will be huge shows in large arenas that will be well attended. Each show will have a large panel of celebrity judges who will vote on the best overall performance. The winner from each region will be invited to attend the National competition in Nashville.

This competition will be filmed by our production team and edited at a later date.

## PHASE III. FINALS



The National competition will feature the 4 best church choirs in the country in an authentic inspirational contest to find the #1 Choir in the USA!

- 4 -

**CONFIDENTIAL**

EP226855



## Reality Show Cost

Traditional model of branded reality shows (Apprentice, Survivor, etc.) calls for the brand to participate by paying upfront the cost of production plus profits for the producers and in return getting significant product integration. As the number of impressions increase from increased ratings, syndication & DVD sales -- the value to the brand increases. In addition, the producers make additional money from the sale of commercial time and other profit channels. Under this option, the cost for 6 episodes of 'Amazing Grace' is $3,000,000.

The U.S. government has recently chosen to incentivize the production of film and TV shows that are produced within the borders of the United States. Prior to the tax incentives enacted by the Jobs Act, the United States was know as the "runaway production" country. Because the U.S. did not offer incentives but other countries did, production (and, hence, jobs) migrated off-shore.

Now, at least for a small window of time (until 2008), the U.S. government is willing to trade tax incentives for bringing back these jobs. These structures are similar to the structures we used to finance films in the U.K. and Germany.

The new model of branded entertainment treats the brand as a partner and allows them to enjoy ALL of these new tax benefits. Under this new model, the production team is willing to risk a significant portion of their profits in return for a potential windfall upon the success of the program.

In this new model, our team would prepare 12 episodes at a cost of $6,000,000. Your company would only pay $3,000,000 and then provide a note for the additional $3,000,000. This would provide your company with an immediate deduction of $6,000,000 – a tax savings of approximately $3,000,000.

Our team has utilized this same financing structure in Europe to finance such films as Harry Potter I & II, Lord of the Rings I, II & III, Mission Impossible I & II, The Core, Blade II, Lara Croft I & II, The Bourne Identity, Marci X, The Life of David Gale, Clockstoppers, Beyond Borders, Looney Tunes, Back in Action!, Paycheck, The Fighting Temptations, Malibu's Most Wanted, among others.

CONFIDENTIAL

EP226856

# EXHIBIT 5

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION


CONFIDENTIAL

VIDEOTAPED

DEPOSITION OF WILLIAM W. REYNOLDS


HILL HOLLIDAY CONNORS
COSMOPULOS, INC. d/b/a
ERWIN-PENLAND,

        Plaintiff,
   vs.                CASE NO. 6:08-3980-GRA


JEFFREY GREENFIELD and 1st APPROACH, LLC,

       Defendants, and
         Third-Party Plaintiffs,
   vs.

CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS, and JOSEPH A.
ERWIN,

       Third-Party Defendants.

---

DEPONENT:   WIILLIAM W. REYNOLDS


DATE:      NOVEMBER 11, 2009


TIME:      12:00 P.M.


LOCATION:   MCNAIR LAW FIRM, P.A.
            104 SOUTH MAIN STREET, SUITE 700
            GREENVILLE, SOUTH CAROLINA


REPORTED BY:  DENISE MCCAULEY, RPR, IA-CSR, GA-CCR

Page 6

1  you graduate?
2      A.  May, '77.
3      Q.  And have you always been in the marketing
4  and advertising field --
5      A.  Yes.
6      Q.  -- professionally?
7      A.  Yes.
8      Q.  Would you just give me a quick rundown of
9  the firms you've worked with before?
10     A.  From '77 to '79, I worked at Cunningham &
11 Walsh in New York.  In early '79, I moved to Wells,
12 Rich, Green in New York.  In December of '80, I moved to
13 Henderson Advertising in Greenville.  And I was there
14 until I came to Erwin-Penland.
15     Q.  How did you did you learn about an opening
16 at Erwin-Penland?
17     A.  Well, it's a small community of advertising,
18 and several people from Henderson had been recruited by
19 Erwin-Penland, and they contacted me.
20     Q.  And what position, do you remember -- did
21 you interview for the position at Erwin-Penland?
22     A.  Yes.  Had several interviews.  I came in as
23 associate media director.
24     Q.  Who was the media director when you came on
5  board?

Page 7

1      A.  Gretchen Erwin.
2      Q.  Gretchen is no longer with Erwin-Penland?
3      A.  She retired in March of '06.
4      Q.  And then did you take over the --
5      A.  Yes.
6      Q.  -- media director role?
7      A.  Correct.
8      Q.  And you've had that ever since?
9      A.  Yes.
10     Q.  Would you briefly describe for me what your
11 job responsibilities are at Erwin-Penland?
12     A.  I supervise the people who are responsible
13 for recommending media purchases, media plans, and
14 making those purchases on behalf of our clients.  I also
15 have some responsibility for what we call analytics, but
16 basically analyzing the results of our activity.
17     Q.  Are you ever involved in analyzing the
18 results on behalf of Erwin-Penland clients?
19     A.  Yes.
20     Q.  Have you had any involvement -- you
21 understand we're here today to talk about the How Sweet
2  The Sound concerts --
23     A.  Yes.
24     Q.  -- and concept?
25     A.  Yes.

Page 8

1      Q.  And you know who Verizon Wireless is?
2      A.  Pretty much, yes.
3      Q.  Have you ever been asked to do any
4  analyticals on increased sales that have resulted from
5  the How Sweet The Sound concerts on behalf of Verizon?
6          MR. SMITH:  Objection.
7          THE WITNESS:  Have I ever been asked?
8  BY MR. JEKEL:
9      Q.  First, have you ever been asked, yes.
10     A.  Yes.
11     Q.  And did you do that?
12     A.  I attempted to do that, yes.
13     Q.  When was the request made for you to look at
14 that issue?
15     A.  Around the beginning of 2009.
16     Q.  Very well.  Who was your contact -- or,
17 first, did you have a contact at Verizon as it related
18 to this job?
19     A.  The request came through Allen Bosworth, our
20 director of client services.
21     Q.  Was the request made in writing or via email
22 or some other mechanism?
23     A.  I don't remember.
24     Q.  Do you remember specifically what you were
25 asked to look at?

Page 9

1      A.  We had some survey research that was done to
2  measure attitudes toward Verizon among -- in the markets
3  where How Sweet The Sound concerts were performed in
4  2008, and we had a -- well, we requested data from
5  Verizon regarding subscriptions and the activations in
6  those markets.
7      Q.  And did you make the request of the data
8  from Verizon?
9      A.  Not myself, no.  I think probably Allen did,
10 but I would request through Allen and somehow it got
11 back to me through the chain.
12     Q.  Do you know who Mr. Bosworth requested give
13 him the data from Verizon?
14     A.  No.
15     Q.  Did you get data?
16     A.  Yes.
17     Q.  Were you able to analyze the data?
18     A.  Yes.
19     Q.  Were you able to draw -- did you form any
20 conclusions as a result of the data?
21     A.  We found the qualitative research or the
22 survey research was very positive.  The sales results
23 were pretty inconclusive.  We found possibly a one
24 percent lift in among African-Americans.
25     Q.  And if you would, please, can you describe

Page 10

1   for me what you mean by lift?
2       A.   Well, I would say that what we found was
3   probably not statistically significant.  We compared the
4   subscriptions among people who Verizon thinks are
5   African-American based on appending their data prior to
6   the, prior to the concerts and after the concerts.  And
7   we compared those in markets that had concerts versus
8   those that didn't.
9       Q.   Okay.
10      A.   Some of them were up.  Some of them were
11  down.
12      Q.   Can I -- if I could stop you there for just
13  a second.
14      A.   Uh-huh.
15      Q.   For how long after the concert was data
16  tracked?  Was it -- if it was a week, 30 days, 90 days,
17  do you recall?
18      A.   A few months, two to three months.
19      Q.   Do you know -- and we'll get back to the
20  analysis.  Do you know if there were any or if you were
21  provided any information on Verizon promotions, either
22  free phones or extra minutes, that coincided with the
23  How Sweet The Sound event?
24          MR. SMITH:  Objection.
25          MR. CHROMY:  Objection.

Page 11

1          THE WITNESS:  I don't know if I was or not.
2   BY MR. JEKEL:
3       Q.   All right.  So you got the data before and
4   after.  Can you walk me through what else you did in
5   analyzing the lift, if you will?
6       A.   Well, first of all, I did not personally do
7   the work.
8       Q.   Okay.
9       A.   The analysts who worked on it essentially
10  had a spreadsheet and totaled up subscriptions before
11  and after.  I believe the time period was six months
12  prior to the announcement of the event and six months
13  after the announcement of the event.  And then we tried
14  a bunch of different ways to analyze that and
15  essentially could show almost nothing.
16      Q.   Who were the analysts at Erwin-Penland that
17  did some of the work on that, if you remember?
18      A.   Tomika Jackson.
19      Q.   Is that the only one?
20      A.   At Erwin-Penland.
21      Q.   Yes.  All right.  Are you aware of others
22  that were involved in the analysis?
23      A.   Let me think about that.
24      Q.   Sure.
25      A.   In terms of the data analysis, no.

Page 12

1       Q.   When you finished the analysis, was any type
2   of presentation put together?
3       A.   Yes.
4       Q.   Or a summary of your results?
5       A.   Yes.
6       Q.   And do you remember what that document was
7   entitled --
8       A.   No.
9       Q.   -- or captioned?
10      A.   No.  It -- no.
11      Q.   Did you make a formal presentation to
12  Verizon?
13      A.   As I recall, we presented that over the
14  telephone to a couple of people at Verizon, and that's
15  all I remember.
16      Q.   Do you remember who the folks were on the
17  phone on the Verizon end?
18      A.   One I'm sure of.  His name is Lou Rossi.
19      Q.   Okay.
20      A.   My recollection is that there were other
21  people on the call, but I'm not sure who they were.
22      Q.   And it's -- again, as best you recall, the
23  timing of the phone call?
24      A.   Some time around March of this year.
25      Q.   March, 2009.  All right.  Very good.  Well,

Page 13

1   are you aware of any -- are you aware if your results
2   from that analysis have impacted whether there will be
3   How Sweet The Sound concerts in 2010?
4           MR. SMITH:  Objection.
5           MR. CHROMY:  Objection.
6           THE WITNESS:  I don't know the answer to
7   that.
8   BY MR. JEKEL:
9       Q.   Were you asked, after giving your
10  information to Verizon in around March of 2009, were you
11  asked to do any follow-up work on that?
12      A.   Everyone on the phone call -- I say
13  everyone.  The consensus on the phone call was that we
14  did not have definitive sales results, and they asked us
15  to talk to their data people to see if there was a way
16  to mine the data and to find more insight there.
17      Q.   And let me ask you this.  Do you remember
18  who the I'm going to say Verizon data person was that
19  you had these discussions with?
20      A.   There were two people, Grace Huang,
21  H-U-A-N-G, and I believe his name is Brian O'dell.
22      Q.   And have you personally been involved in
23  that type of work or somebody under you?
24          MR. SMITH:  Objection.
25          THE WITNESS:  What do you mean by involved?

Page 26

1    Q.   So you were present at the Warren, New
2  Jersey, pitch?
3    A.   Yes.
4    Q.   And that pitch included the gospel choir
5  competition as a TV show?
6        MR. SMITH:  Objection.
7        MR. CHROMY:  Objection.
8        THE WITNESS:  That -- I'm not sure what you
9    mean that included.
10  BY MR. JEKEL:
11    Q.   Did the pitch have aspects that talked about
12  the gospel choir competition being a TV show?
13    A.   Yes.
14    Q.   And, now, prior to the pitch, let me ask you
15  this, prior to that Warren, New Jersey, pitch, were you
16  involved in discussions with Mr. Greenfield about the TV
17  aspects of the gospel choir competition?
18        MR. SMITH:  Objection.
19        THE WITNESS:  The preparation for the
20    meeting in April approximately, if that's when it
21    was, Allen Bosworth was the lead on that from our
22    side.  I worked with him.
23  BY MR. JEKEL:
24    Q.   Okay.
25    A.   I was aware that Jeff was working with him

Page 27

1  as well.
2    Q.   And we're going to talk to Mr. Bosworth, and
3  I appreciate that response.  But did you have any direct
4  dealings with Mr. Greenfield as it relates to the gospel
5  choir competition and TV prior to the meeting in Warren,
6  New Jersey?
7        MR. SMITH:  Objection.
8        THE WITNESS:  I -- not as it related to
9    Verizon.
10  BY MR. JEKEL:
11    Q.   Okay.  In what way were you involved in
12  discussions or involved with Mr. Greenfield as it
13  related to TV?
14    A.   The concept was originally created for a
15  pitch to another client.
16    Q.   Captain D's?
17    A.   Correct.
18    Q.   So you had some involvement, if I understand
19  correctly, Mr. Reynolds, with Mr. Greenfield as it
20  related to the Captain D's pitch?
21    A.   Yes.
22    Q.   One aspect of that entire pitch related to a
23  gospel choir TV show; right?
24        MR. SMITH:  Objection.
25        THE WITNESS:  What aspect of it?

Page 28

1  BY MR. JEKEL:
2    Q.   I said one aspect of the Captain D's pitch
3  that Erwin-Penland was making.
4    A.   We presented it to them.
5    Q.   Right.  And I was just suggesting that
6  wasn't the only thing you presented to Captain D's?
7    A.   Oh, no.  Absolutely.
8    Q.   And you may have been involved in a lot of
9  the other aspects?
10    A.   Mostly.
11    Q.   All right.  Can you tell me what
12  involvement -- and at that, at the initial stages, is it
13  your understanding that the concept what with we now
14  know as How Sweet The Sound started as Amazing Grace?
15        MR. SMITH:  Objection.
16        THE WITNESS:  That was the first name that
17    was used.  I think it went away almost immediately.
18  BY MR. JEKEL:
19    Q.   Do you know why it went away?
20    A.   Our side of the Erwin-Penland group that was
21  working on the Captain D's pitch was concerned that it
22  sounded a little too religious.
23    Q.   Did you -- are you aware of any search done,
24  whether Amazing Grace was trademarked, copyrighted by
25  anybody else and was it available to actually title a

Page 29

1  campaign?
2    A.   I'm not aware of that, no.
3    Q.   Do you know who came up with the name
4  Amazing Grace?
5    A.   I was on a conference call with Joe Erwin,
6  as I recall, Joe Erwin, Shannon Wilbanks, and Jeff
7  Greenfield discussing the Captain D's pitch and how
8  could we enhance our presentation beyond what was
9  requested.
10    Q.   Okay.
11    A.   We had a discussion about who Captain D's
12  was trying to reach and how we might impact them, and
13  the idea developed in the course of that conversation.
14  Who said it first, I have no idea.
15    Q.   But the idea -- is it fair to say that the
16  idea that you just talked about was a gospel, a gospel
17  choir competition?
18        MR. SMITH:  Objection.
19        THE WITNESS:  On that -- the idea was a TV
20    show.
21  BY MR. JEKEL:
22    Q.   But the TV show centered around -- the
23  substance of the TV show was a gospel choir competition;
24  was it not?
25        MR. SMITH:  Objection.

Page 30

1    THE WITNESS: It was, it was a gospel
2 choir -- it involved gospel choirs.
3 BY MR. JEKEL:
4    Q.  Okay.
5    A.  We struggled a lot with the word competition
6 related to church.
7    Q.  Okay.  Fair.  And I appreciate that too.
8 All right.  Fair enough.  And do you -- you've mentioned
9 one conference call as part of the Captain D's
10 development.  Were you on additional conference calls
11 subsequent to that as the idea kind of formed more
12 shape?
13    A.  As I recall, we had one more conference call
14 with a larger group from Erwin-Penland --
15    Q.  Okay.
16    A.  -- two or three more people besides Joe,
17 Shannon, myself, and I believe it was a conference call
18 with Jeff on the other end.  I recall the meeting, but I
19 frankly can't recall the details.
20    Q.  Was it still -- I mean, was the focus of the
21 other conference call still a gospel choir TV show?
22    MR. SMITH: Objection.
23    THE WITNESS: Yes.
24 BY MR. JEKEL:
25    Q.  Now, do you know if it was during that --

Page 31

1 either one of these conference calls where the red
2 carpet idea was discussed?
3    MR. SMITH: Objection.
4    THE WITNESS: I don't know of any red carpet
5 idea.
6 BY MR. JEKEL:
7    Q.  Well, let me -- my understanding of the red
8 carpet idea was it was a way to enhance foot traffic at
9 local Captain D's and that individuals who wanted to
10 participate in the gospel choir were to make application
11 to participate at local Captain D's events and that one
12 day a week or a few days a week they would have the
13 application process and there would be literally a red
14 carpet in front of the local Captain D's with what
15 appear to be TV cameras outside.
16    A.  I don't remember that.
17    Q.  All right.  Fair enough.  Never heard of that?
18    A.  I don't remember hearing about it.
19    Q.  Fair enough.  Can you tell me anything else
20 about this second conference call where you think
21 Mr. Greenfield was on?
22    A.  Can I tell you what?
23    Q.  Anything else about the call?
24    A.  My recollection is that's where we decided to
25 change the name How Sweet The Sound.

Page 32

1    Q.  Was Mr. Mendelsohn on either of these phone
2 calls, to the best of your knowledge?
3    A.  He was on -- he was in the second meeting,
4 which I think was a conference call, yes.  He was not on
5 the first.
6    Q.  I'm sorry.  And do you know who kind of came
7 up with the name How Sweet The Sound?
8    A.  I know that he's the first one who showed it
9 to me.
10    Q.  And Mr. Mendelsohn?
11    A.  Yes.
12    Q.  And how did he show it to you?
13    MR. SMITH: Objection.
14    THE WITNESS: We were -- he had written it
15 on a piece of paper.
16 BY MR. JEKEL:
17    Q.  Like a yellow pad or a white pad?
18    A.  A small note pad like -- not like a legal
19 pad, but 5-by-7.
20    Q.  Fair enough.  And he just had handwritten
21 How Sweet The Sound?
22    A.  Uh-huh.
23    Q.  And was it at -- you know, I can picture a
24 group of people sitting around a table like this, me
25 taking notes and kind of showing it to you like that.

Page 33

1 Is that what happened?
2    MR. SMITH: Objection.
3    THE WITNESS: There was a meeting with
4 several people around a table, and I was sitting
5 next to him, and he showed it to me.  That's all I
6 remember.
7 BY MR. JEKEL:
8    Q.  Okay.
9    A.  Yeah.
10    Q.  All right.  So you have those two calls.
11 Did you have any further involvement as it relates to
12 Captain D's pitch or preparation for the Captain D's
13 pitch on How Sweet The Sound?
14    A.  I was at the pitch.  I had nothing to do
15 with presenting How Sweet The Sound.
16    Q.  And is it fair to say that after that second
17 call that we've been discussing for Captain D's you had
18 no additional How Sweet The Sound responsibilities?
19    MR. SMITH: Objection.
20    THE WITNESS: I had no -- yes.  I had no
21 duties.  Yeah.
22 BY MR. JEKEL:
23    Q.  And were you privy to what all the
24 discussions were between Joe Erwin, Allen Bosworth,
25 Shannon Wilbanks, and Jeff Greenfield?

Page 38

1  Democratic Party chair and his travels through the state
2  where he visited all these African-American churches?
3      MR. SMITH: Objection.
4      THE WITNESS: That's -- he's mentioned that
5  he had to visit African-American churches or that
6  he did visit. Had to is probably the wrong word,
7  But he did that as part of his duties.
8  BY MR. JEKEL:
9      Q.  And is it your understanding that it was his
10 visits to these churches that formed the basis of the
11 gospel choir concerts that we have?
12     MR. SMITH: Objection.
13     THE WITNESS: I think it's saying too much
14 it formed the basis. The conference call that I
15 mentioned, we talked about needing to reach African
16 Americans, and all of us talked about what's
17 important to African-Americans.
18 BY MR. JEKEL:
19     Q.  All right. Fair enough. Going back to the
20 December, '05, to April of '06 time frame, and, again,
21 I'm representing to you that it's in April when you went
22 up to New Jersey. You've told me about the work you did
23 with Mr. Bosworth that's referenced in Exhibit 21. Can
24 you tell me what other responsibilities you had or tasks
25 that you had directly related to How Sweet The Sound?

Page 39

1      MR. SMITH: Objection.
2      THE WITNESS: Well, I've told you already I
3  attended the presentation in New Jersey.
4  BY MR. JEKEL:
5      Q.  Yes.
6      A.  Allen led that as he had led this.
7      Q.  Okay.
8      A.  And I haven't looked at that presentation
9  since that time, but I probably contributed to it. They
10 wouldn't have brought me if I hadn't contributed.
11     Q.  And Jeff Greenfield was there as well;
12 right?
13     A.  Yes.
14     Q.  And does the same hold true for
15 Mr. Greenfield that EP wouldn't have asked him to be
16 there unless he had contributed?
17     MR. SMITH: Objection.
18     THE WITNESS: Unless he had contributed --
19 my recollection is that Jeff was identified as the
20 producer if the show was approved.
21 BY MR. JEKEL:
22     Q.  He was actually identified as a little more
23 than that; wasn't he?
24     MR. SMITH: Objection.
25     THE WITNESS: I don't recall anything more

Page 40

1  than that.
2  BY MR. JEKEL:
3      Q.  Okay. I'm trying to find Exhibit 22, and
4  I'm sure it's probably right here in front of me. Here
5  it is. I'm going to hand you a copy of what's been
6  previously marked as Defendants' 22. It's a cover email
7  and an enclosure. And just take a minute, if you will,
8  Mr. Reynolds, and review that document.
9      A.  Okay.
10     MR. JEKEL: Just off the record for a
11 second.
12     (A discussion was held off the record.)
13 BY MR. JEKEL:
14     Q.  Back on the record, Mr. Reynolds. Have you
15 had an opportunity to review Exhibit 22?
16     A.  Yes.
17     Q.  Does that appear to you to be a printout of
18 the deck presentation that was made to Verizon in April
19 of 2006 relative to How Sweet The Sound?
20     MR. SMITH: Objection.
21     THE WITNESS: I can't vouch -- well, it
22 doesn't look like the final.
23 BY MR. JEKEL:
24     Q.  Because it doesn't have the logo on it?
25     A.  Yes.

Page 41

1      Q.  In terms of the substance or the content of
2  the document absent those issues, does it appear to be
3  the same deck?
4      MR. SMITH: Objection.
5      THE WITNESS: I can't vouch for that.
6  There's so much that I saw in there that I did not
7  recall even being in there that I don't know.
8  BY MR. JEKEL:
9      Q.  For example?
10     A.  Details of how the competition would work,
11 the audition process, the voting, I don't even remember
12 those details. So I don't know if they were still there
13 when we finally sent it.
14     Q.  Do you know on whose computer the final deck
15 or the deck that was used during the actual discussions
16 with Verizon was run off of?
17     MR. SMITH: Objection.
18     THE WITNESS: No.
19 BY MR. JEKEL:
20     Q.  Was it your computer?
21     A.  Definitely not.
22     Q.  Okay. If I might, I'm going to reach over
23 here, and I'm going to ask you whether the information
24 that is on Page 8 in the first bullet, I'm going to ask
25 you to read that into the record, the first bullet on

Page 54

1    The competition? The TV show?
2  BY MR. JEKEL:
3    Q.    Let's -- let me hand you Exhibit 33. Okay?
4    A.    Okay.
5    Q.    You know Ms. Wilbanks; right?
6    A.    Yes.
7    Q.    And you know Joe Erwin; right? Okay. And,
8  "Hi, Jeff." Shannon speaking; right?
9    A.    Okay.
10    Q.    In terms of -- all right. She said, "Joe
11  asked me to send his summary of key points that you all
12  discussed yesterday." And it's dated March 28, 2006;
13  right?
14    A.    Yes.
15    Q.    Do you believe you were on that call with
16  Joe and Jeff in March of 2006?
17    A.    I don't think I was.
18    Q.    Okay. Fair enough. But there's a section
19  and it's entitled, "The entity to manage the entire
20  effort." Do you see that?
21    A.    Yes.
22    Q.    Just read that to yourself, if you will.
23    A.    Okay.
24    Q.    Were you involved in the discussions that
25  are identified under that section?

Page 55

1    A.    No.
2    Q.    Were you aware of the fact that prior to you
3  going to Warren, New Jersey, that Joe and Mr. Greenfield
4  had talked about the holding company that would have the
5  How Sweet The Sound --
6    A.    No.
7    Q.    -- idea?
8    MR. SMITH: Objection.
9    MR. CHROMY: Objection.
10    THE WITNESS: No.
11  BY MR. JEKEL:
12    Q.    All right. So you ultimately go to New
13  Jersey and you help make the presentation; right? Can
14  you tell me what you did after that? As I understand
15  it -- well, I'm sorry. Let me back up. Did
16  Mr. Greenfield say anything during the presentation in
17  New Jersey?
18    A.    I believe he did.
19    Q.    As you sit here today, can you tell me
20  anything about what his -- what he said or did at that
21  meeting?
22    A.    Well, I just breezed through the deck, and
23  it looks like there's slides about whose going to be the
24  producer and who is going to do what. I don't remember
25  specifically him talking, but that would be what I would

Page 56

1  expect his part would have been.
2    Q.    But you do know he was there?
3    A.    Oh, yeah.
4    Q.    And as best you can recall, he said
5  something during the meeting?
6    A.    Yes.
7    Q.    So what did you understand Verizon wanted at
8  the conclusion of the presentation from either Erwin-
9  Penland and/or Jeff Greenfield?
10    MR. SMITH: Objection.
11    MR. CHROMY: Objection.
12    THE WITNESS: My recollection is that
13    Verizon, while they applauded us for coming up with
14    the idea, rejected it. They said, "We're not in
15    the business of producing TV shows."
16  BY MR. JEKEL:
17    Q.    At the same time they also indicated to you,
18  did they not, that they liked the idea of the gospel
19  choir event; is that fair?
20    MR. SMITH: Objection.
21    THE WITNESS: When I say they applauded us,
22    they applauded us for presenting an idea that was
23    outside of their scope of work.
24  BY MR. JEKEL:
25    Q.    Did they give you any indication -- I mean,

Page 57

1  isn't it true that even as early as February of 2006,
2  the folks at Verizon were telling the folks at Erwin-
3  Penland that they loved the idea of the gospel choir
4  events?
5    MR. CHROMY: Objection.
6    MR. SMITH: Objection.
7    THE WITNESS: No one told me that.
8  BY MR. JEKEL:
9    Q.    Okay. Well, what happened -- when did you
10  let -- I'm sorry. You come back from the meeting, and
11  did Verizon ask you to do additional work as it relates
12  to How Sweet The Sound?
13    A.    Not that I'm aware of.
14    Q.    Okay. I'm going to hand you what's been
15  marked previously as Defendants' Exhibit 16, and it's an
16  email from Allen to Joe. Actually, Bill, there you are.
17  It's okay. And if you -- I'm getting from your
18  testimony that you don't recall this, but take a look at
19  Exhibit 16, please.
20    A.    I don't recall this.
21    Q.    Okay. Can you give me -- I can spend all
22  day asking you questions about it, and I'm going to ask
23  one question is, other than seeing your name on there
24  and reading what the pages say, do you have any
25  information outside of the document itself that you can

# EXHIBIT 6

**From:** Shannon Wilbanks [Inc./US@HHCC]
**Sent:** 11/07/2005
**To:** Joe Erwin [Joe Erwin/Hill Holliday Advertising Inc./US@HHCC]; Allen Bosworth [Allen Bosworth/Hill Holliday Advertising Inc./US@HHCC]; Gretchen Erwin [Gretchen Erwin/Hill Holliday Advertising Inc./US@HHCC]; Roger Beasley [Roger Beasley/Hill Holliday Advertising Inc./US@HHCC]; Barry Finkelstein [Barry Finkelstein/Hill Holliday Advertising Inc./US@HHCC]; Andy Mendelsohn [Andy Mendelsohn/Hill Holliday Advertising Inc./US@HHCC]; Cynthia Davis [Cynthia Davis/Hill Holliday Advertising Inc./US@HHCC]; Bill Reynolds [Bill Reynolds/Hill Holliday Advertising Inc./US@HHCC]; Ty Thornhill [Ty Thornhill/Hill Holliday Advertising Inc./US@HHCC]; Shannon Wilbanks [Shannon Wilbanks/Hill Holliday Advertising Inc./US@HHCC]
**Cc:**
**Bcc:**
**Subject:** Notes from Monday CD meeting

Impact Lab info tomorrow.

Who's going to Nashville -- current thinking: Ray's stuff can be presented without Ray. Gretchen and Bill will both go. Don't need Kevin to run the show. Nika may be part of this, Allen will talk to her. If Barry doesn't go, Joe will jump in and represent integrated. So: Joe, Allen, Gretchen, Bill, Andy, Cynthia, Roger, Ty, Shannon, Nika.

Joe: we have our choirs for Amazing Grace. Shooting Weds/Thurs/Fri

Andy: shooting people Wednesday for anthemic thing. Will do consumer interviews in store tomorrow, as well as in store footage.

Flow of presentation, as of now.
Andy will have writers work on alternate names for Amazing Grace. JE/SW follow up with Greenfield on this. Shannon: Betsy -- get Cargill and Lexus case studies.



# EXHIBIT 7

LexisNexis® *Total Research System*

Switch Client | Preferences | Sign Out | ? Help

*My Lexis*™ | Search | Research Tasks | Get a Document | *Shepard's*® | Alerts | Total Litigator | Transactional Advisor | Counsel Selector | Dossier | History

FOCUS™ Terms                    Search Within  Original Results (1 - 1)    Go →   Advanced...

Service: Get by LEXSEE®
Citation: 2005 U.S. App. LEXIS 23946

*2005 U.S. App. LEXIS 23946, \**

METALMECCANICA DEL TIBERINA, Plaintiff - Appellant, versus TIMOTHY S. KELLEHER, a/k/a and/or d/b/a Kelleher and Company, LLC, d/b/a Clearing International, LLC, d/b/a CNB International, LLC, Defendant - Appellee, and KEVIN KELLEHER, Defendant.

No. 04-2567

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

2005 U.S. App. LEXIS 23946

September 21, 2005, Argued
November 4, 2005, Decided

**NOTICE:  [\*1]**  RULES OF THE FOURTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** Appeal from the United States District Court for the District of South Carolina, at Charleston. David C. Norton, District Judge. (CA-02-279).

**DISPOSITION:** AFFIRMED.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Plaintiff purchaser sued defendant seller for conversion and unjust enrichment. A jury returned a verdict in favor of the purchaser as to conversion and against the purchaser as to unjust enrichment. The United States District Court for the District of South Carolina, at Charleston, granted the seller's motion for judgment as a matter of law on the conversion claim and denied the purchaser's motion to amend the judgment. The purchaser appealed.

**OVERVIEW:** During negotiations for the purchase of mechanical presses, the parties entered into an agreement directing the purchaser to wire a down payment of $ 540,000 to the account of a company owned by the seller. The agreement also directed the purchaser to provide another company an irrevocable letter of credit for the balance of the purchase price. The purchaser wired the down payment, but never provided a letter of credit. The seller cancelled the contract and retained the deposit to cover damages. The appellate court determined that the district court did not err in granting judgment as a matter of law to the seller on the conversion claim, because the purchaser did not have the immediate right to possession of its deposit after voluntarily transferring the money to the account. The purchaser failed to demonstrate that the seller made material misrepresentations that induced the purchaser into voluntarily making the requested down payment. Also, the jury verdict could not be sustained under an unjust enrichment theory, because the purchaser conferred no non-gratuitous benefit on the seller.

**OUTCOME:** The appellate court affirmed the district court's decisions.

**CORE TERMS:** deposit, unjust enrichment, conversion, conversion claim, matter of law, amend, letter of credit, misrepresentation, negotiations, jury's verdict, converted, right of ownership, conferred, failed to demonstrate, substantive law, right to possession, personally liable, legal right, clear error, non-gratuitous, mechanical, personally, favorable, built, jury to find, sufficient evidence, right to possess, down payment, failure to provide, corporate veil

**LEXISNEXIS® HEADNOTES**                                              ⊟**Hide**

Civil Procedure > Trials > Judgment as Matter of Law > Postverdict Judgments
*HN1* An appellate court reviews de novo a district court's grant of judgment as a matter of law. In doing so, the appellate court views the evidence in the light most favorable to the nonmoving party. If a reasonable jury could reach only one conclusion based on the evidence or if the verdict in favor of the nonmoving party would necessarily be based upon speculation and conjecture, the district court appropriately grants a motion for judgment as a matter of law.  More Like This Headnote

Torts > Intentional Torts > Conversion > Defenses
Torts > Intentional Torts > Conversion > Elements
*HN2* South Carolina defines conversion as the unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the exclusion of the owner's rights. To prevail on a conversion claim, the plaintiff must demonstrate an immediate right to possession at the time of conversion. The defendant may defeat a conversion claim by demonstrating a legal right to the property.  More Like This Headnote

Torts > Intentional Torts > Conversion > General Overview
*HN3* Since conversion is a wrongful act, it cannot arise from the exercise of a legal right.  More Like This Headnote

Torts > Intentional Torts > Conversion > Elements

HN4 Consent obtained by misrepresentation can form the basis of a conversion action. More Like This Headnote

Torts > Intentional Torts > Conversion > General Overview
HN5 There can be no conversion where there is a mere obligation to pay a debt. Thus, where there is merely the relationship of debtor and creditor, an action based on conversion of the funds representing the debt is improper. More Like This Headnote

Civil Procedure > Judgments > Relief From Judgment > Motions to Alter & Amend
Civil Procedure > Appeals > Standards of Review > Abuse of Discretion
HN6 An appellate court reviews for abuse of discretion the denial of a motion to amend the judgment. More Like This Headnote |
Shepardize: Restrict By Headnote

Civil Procedure > Judgments > Relief From Judgment > Motions to Alter & Amend
HN7 Under Fed. R. Civ. P. 59(e), a district court may amend a judgment for three reasons: (1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice. More Like This Headnote

Contracts Law > Remedies > Equitable Relief > Quantum Meruit
HN8 In South Carolina, to recover for unjust enrichment a plaintiff must show: (1) that he conferred a non-gratuitous benefit on the defendant; (2) that the defendant realized some value from the benefit; and (3) that it would be inequitable for the defendant to retain the benefit without paying the plaintiff for its value. More Like This Headnote | Shepardize: Restrict By Headnote

**COUNSEL:** ARGUED: Walter Thomas Grabowski, HOLLAND, BRADY & GRABOWSKI, P.C., Wilkes-Barre, Pennsylvania, for Appellant.

Monica Lynn Thompson, DLA PIPER RUDNICK GRAY CARY US, L.L.P., Chicago, Illinois, for Appellee.

ON BRIEF: Bryson M. Geer, NELSON, MULLINS, RILEY & SCARBOROUGH, L.L.P., Charleston, South Carolina, for Appellant.

**JUDGES:** Before WILKINSON and WILLIAMS, Circuit Judges, and Robert J. CONRAD, Jr., United States District Judge for the Western District of North Carolina, sitting by designation.

**OPINION**

PER CURIAM:

Metalmeccanica Del Tiberina (Metalmeccanica) sued Timothy S. Kelleher for conversion and unjust enrichment. After a jury returned a verdict in favor of Metalmeccanica on its conversion claim and against Metalmeccanica on its unjust enrichment claim, the district court granted Kelleher's motion for judgment as a matter of law on the conversion [*2] claim and denied Metalmeccanica's motion to amend the judgment on the unjust enrichment claim. On appeal, Metalmeccanica contends that the record contained sufficient evidence for a reasonable jury to find that Metalmeccanica had the right to the immediate return of its deposit and, in the alternative, that the jury's verdict in favor of Metalmeccanica can be sustained on unjust enrichment grounds. For the reasons that follow, we disagree.

I.

Metalmeccanica is an Italian company that produces automobile parts. In December of 1998, Metalmeccanica entered into negotiations with CNB International, INC (CNB INC), which is owned by Kelleher, for the purchase of four mechanical presses worth a total contract value of $ 3.6 million combined. The negotiations resulted in an agreement directing Metalmeccanica to wire a 15% down payment of $ 540,000 to the South Carolina account of another company owned by Kelleher, CNB LLC. The agreement also directed Metalmeccanica to provide Clearing Niagara Bliss USA (Clearing), yet another company owned by Kelleher, an irrevocable letter of credit for the balance of the purchase price.

Metalmeccanica wired the $ 540,000 to CNB LLC's account, but [*3] never provided Clearing with an acceptable letter of credit. Immediately upon receipt of Metalmeccanica's deposit, Kelleher transferred it into his personal bank account and then into his personal brokerage account. Less than three months later, relations began deteriorating between Metalmeccanica and Kelleher and his companies. Metalmeccanica raised concerns about the quality of the construction of the presses when it learned the presses would be built in Taiwan instead of the United States. CNB INC filed for bankruptcy during that time, and Metalmeccanica became concerned that CNB INC's bankruptcy might interrupt the presses' manufacturing schedule. As Metalmeccanica urged CNB LLC for assurances on the quality of the presses and the timeliness of the delivery, Kelleher continued to urge Metalmeccanica for the letter of credit. On October 9, 1999, Kelleher informed Metalmeccanica that he was cancelling the contract due to Metalmeccanica's failure to provide an acceptable letter of credit. Kelleher retained Metalmeccanica's deposit to cover CNB LLC's damages.

Metalmeccanica initiated the present suit seeking the return of its deposit. Metalmeccanica sued Kelleher personally on various [*4] grounds, including conversion and unjust enrichment. The district court directed a verdict in favor of Kelleher on all claims, except the conversion and unjust enrichment claims. The parties tried the remaining claims to a jury, which found in favor of Metalmeccanica on the conversion theory and in favor of Kelleher on the unjust enrichment theory. Kelleher moved for judgment as a matter of law on the conversion verdict, and Metalmeccanica moved to amend the judgment on the unjust enrichment claim.

The district court granted Kelleher's motion for judgment as a matter of law on the conversion claim because Metalmeccanica failed to establish the elements of a conversion claim. The district court held that Metalmeccanica failed to demonstrate that it had the immediate right to possess its deposit, an essential element of conversion under South Carolina law. The district court also denied Metalmeccanica's motion to amend the judgment on the unjust enrichment claim. It is from these rulings that Metalmeccanica appeals.

This case is properly in federal court because Metalmeccanica is a foreign corporation organized under Italian law and Kelleher is a citizen of New York and the amount [*5] in controversy exceeds $ 75,000. 28 U.S.C.A. § 1332 (West 1993). Venue is proper

because a substantial part of the contract negotiations occurred at CNB LLC's office in Charleston, South Carolina. We have jurisdiction to review the district court's final order pursuant to *28 U.S.C.A. § 1291*.

II.

On appeal, Metalmeccanica presents two arguments. First, it argues that the district court erred in granting Kelleher's motion for judgment as a matter of law on the conversion claim. Second, it argues in the alternative that the jury verdict in favor of Metalmeccanica can be sustained on an unjust enrichment theory. We begin by addressing the conversion claim.

A.

**HN1** We review de novo the district court's grant of judgment as a matter of law. *Bonner v. Dawson, 404 F.3d 290, 293 (4th Cir. 2005).* In doing so, we view the evidence in the light most favorable to the nonmoving party. *Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005).* "If a reasonable jury could reach only one conclusion based on the evidence or if the verdict in favor of [Metalmeccanica] would necessarily be based [*6] upon speculation and conjecture," the district court appropriately granted Kelleher's motion for judgment as a matter of law. *Id.*

The parties agree that South Carolina substantive law applies to the conversion claim. **HN2** South Carolina defines conversion as the "unauthorized assumption and exercise of right of ownership over goods or personal chattels belonging to another, to the exclusion of the owner's rights." *Owens v. Andrews Bank & Trust Co., 265 S.C. 490, 220 S.E.2d 116, 119 (S.C. 1975).* To prevail on a conversion claim, the plaintiff must demonstrate "an immediate right to possession at the time of conversion." *Id. at 120* (quoting *Am. Jur. 2d Conversion § 54* (1965)). The defendant may defeat a conversion claim by demonstrating "a legal right to the property." *Mackela v. Bentley, 365 S.C. 44, 614 S.E.2d 648, 650 (S.C. Ct. App. 2005).*

On appeal, Metalmeccanica contends that because it did not form a contract with Kelleher or any of his companies for the purchase of the presses, Kelleher converted Metalmeccanica's deposit by removing it from CNB LLC's account and placing it in his personal account. [*7] Even assuming there was no contract, [1] there is no dispute that at the intermediary stage of negotiations CNB LLC requested the deposit from Metalmeccanica, Metalmeccanica voluntarily complied with the request, and CNB LLC, as a result, accepted Metalmeccanica's purchase order. By so doing, Metalmeccanica lost the right to immediate possession of the money. Because Metalmeccanica authorized CNB LLC's assumption and exercise of right of ownership over the deposit, CNB LLC could not have converted the deposit. See *Castell v. Stephenson Fin. Co., 244 S.C. 45, 135 S.E.2d 311, 313 (S.C. 1964)* **HN3** ("Since conversion is a wrongful act, it cannot arise from the exercise of a legal right."). And because CNB LLC properly held the deposit, Kelleher's disposition of the deposit pursuant to company policy could not render him personally liable for conversion. [2]

**FOOTNOTES**

1 The district court also aptly noted that Metalmeccanica's argument "is troubling because it would mean that [Metalmeccanica] transferred over half a million dollars to CNB [LLC] before it had contracted with CNB [LLC]. In other words it would mean that [Metalmeccanica] paid CNB [LLC] before CNB [LLC] had obligated itself to do anything in return for the money." (J.A. 660-N, n. 5.) We nevertheless indulge in the assumption that no contract existed. [*8]

2 It is important to note that Metalmeccanica sued only Kelleher personally for conversion -- not any of his companies. Thus, we must determine whether Metalmeccanica "presented enough evidence for a reasonable jury to find that Kelleher himself committed the tort of conversion against" Metalmeccanica. (J.A. 660-J.) Kelleher contends that the conversion claim cannot lie against him because he is not personally liable for the debts of his companies, unless or until Metalmeccanica successfully pierces the corporate veil. Because we conclude that Metalmeccanica failed to produce evidence to support a cause of action for conversion for the reason noted in the text, we need not determine whether Metalmeccanica properly sued Kelleher instead of his companies.

Metalmeccanica contends that it maintained a right of ownership over the deposit because Kelleher and his companies deceived Metalmeccanica about key aspects of the transaction. In particular, Metalmeccanica argues that Kelleher and his companies misrepresented which company was dealing with Metalmeccanica, where the presses would be built, and [*9] when the first two presses would be delivered. Although courts have recognized that **HN4** consent obtained by misrepresentation can form the basis of a conversion action, the alleged misrepresentations made by Kelleher's companies fall far short of this mark. *Austin v. Indep. Life & Acc. Ins. Co., 296 S.C. 156, 370 S.E.2d 918, 923 (S.C. Ct. App. 1988)*( Goolsby, J., concurring).

Even viewing the facts in the light most favorable to Metalmeccanica, as we must, we find no such misrepresentations. The purchase order clearly stated that the construction of the presses would be completed in Taiwan, that the first two presses would be completed in July 1999, and that CNB LLC was the contracting party. CNB LLC's failure to complete the construction of the first two presses by July 1999 does not amount to a misrepresentation because Metalmeccanica's failure timely to supply Clearing with the letter of credit meant that CNB LLC could not secure the funds to build the presses. The fault for the delayed time schedule lies as much with Metalmeccanica as it does with CNB LLC. Metalmeccanica has failed to demonstrate that Kelleher made material misrepresentations that induced Metalmeccanica [*10] into voluntarily making the requested down payment.

While Metalmeccanica's arguments might have proved useful in a breach of contract claim or perhaps an unfair trade practices claim, Metalmeccanica has not demonstrated that it had an immediate right to the possession of its deposit after voluntarily wiring it to CNB LLC. See *Andrews Bank & Trust Co., 220 S.E.2d at 119* **HN5** ("There can be no conversion where there is a mere obligation to pay a debt. Thus, where there is merely the relationship of debtor and creditor, an action based on conversion of the funds representing the debt is improper.")(internal citation omitted). The money received by CNB LLC was to be used for the design and construction of mechanical presses and the fact that negotiations between the parties fell apart does not mean that Kelleher converted the deposit. To hold otherwise "would be equivalent to saying that every unpaid debt carries with it the implication of fraud on the part of the debtor; that the debtor has converted to his own use the money of another or that he has misappropriated that which was always his own." *Dawkins v. National Liberty Life Ins. Co., 263 F. Supp. 119, 121-22 (D.S.C. 1967)* [*11] (quoting *Holland v. Spartanburg Herald-Journal Co., 166 S.C. 454, 165 S. E. 203, 208 (S.C. 1932)*)(interpreting South Carolina law). We therefore affirm the district court's grant of judgment as a matter of law to Kelleher because no reasonable jury could find that Kelleher wrongfully held Metalmeccanica's deposit to the exclusion of Metalmeccanica as its rightful owner.

B.

Having determined that the district court properly granted Kelleher's motion for judgment as a matter of law on the conversion claim, we turn to Metalmeccanica's argument that the jury verdict should be sustained on an unjust enrichment theory. After the jury returned a split verdict, finding for Metalmeccanica on the conversion claim and against Metalmeccanica on the unjust enrichment claim, Metalmeccanica moved to amend the judgment hoping to reconcile the conflicting jury verdicts. The district court denied Metalmeccanica's motion finding that sufficient evidence supported the jury's verdict. On appeal, Metalmeccanica argues that even if it did not have the immediate right to possess its deposit, it would be unjust to allow Kelleher to retain Metalmeccanica's deposit.

*HN6*We review for abuse of discretion [*12] the denial of Metalmeccanica's motion to amend the judgment. *E.E.O.C. v. Lockheed Martin Corp.*, 116 F.3d 110, 112 (4th Cir. 1997). *HN7*Under Rule 59(e) of the Federal Rules of Civil Procedure, a district court may amend a judgment for three reasons: "(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." *Id.* As the parties concede, South Carolina substantive law applies to the unjust enrichment claim. *HN8*In South Carolina, to recover for unjust enrichment the plaintiff must show: "(1) that he conferred a non-gratuitous benefit on the defendant; (2) that the defendant realized some value from the benefit; and (3) that it would be inequitable for the defendant to retain the benefit without paying the plaintiff for its value." *Sauner v. Pub. Serv. Auth. of S. C.*, 354 S.C. 397, 581 S.E.2d 161, 167 (S.C. 2003).

The district court did not commit a clear error of law by concluding that the evidence could not support a finding that Metalmeccanica had unjustly enriched Kelleher because Metalmeccanica [*13] failed to demonstrate that it conferred a nongratuitous benefit on Kelleher. At most, Metalmeccanica can demonstrate that CNB LLC, as opposed to Kelleher, received a nongratuitous benefit. Any benefit Kelleher received via the voluntary transfer from CNB LLC's account came from CNB LLC - not Metalmeccanica. While Metalmeccanica may have had an unjust enrichment claim against CNB LLC ³ ; Metalmeccanica expressly stated it is not attempting to pierce the corporate veil. Accordingly, we affirm the district court.

## FOOTNOTES

3 It is by no means a foregone conclusion that Metalmeccanica would have prevailed on such a claim. Kelleher presented evidence that Metalmeccanica's failure to provide an acceptable letter of credit and the subsequent cancellation of the order cost Kelleher's companies close to $ 850,000. Kelleher also testified that if Metalmeccanica had named Kelleher's companies as co-defendants, the companies would have counterclaimed for the additional damages.

III.

In summary, we affirm the district court's [*14] grant of judgment as a matter of law to Kelleher on the conversion claim because Metalmeccanica did not have the immediate right to possession of its deposit after voluntarily transferring the money to CNB LLC's account. We also find that the jury verdict cannot be sustained under an unjust enrichment theory because Metalmeccanica conferred no non-gratuitous benefit on Kelleher.

*AFFIRMED*

Service: Get by LEXSEE®
Citation: 2005 U.S. App. LEXIS 23946
View: Full
Date/Time: Monday, March 1, 2010 - 10:42 AM EST

* Signal Legend:
● - Warning: Negative treatment is indicated
Ⓠ - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available
Ⓘ - Citation information available
* Click on any *Shepard's* signal to *Shepardize*® that case.

 About LexisNexis | Terms & Conditions | Contact Us
Copyright © 2010 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.





## Confluence Voted Among the Top Outdoor Companies

January 22nd, 2010 - posted by Kevin

One of EP's clients, Confluence Watersports, was recently voted one of the top three outdoor companies according to the 'SNEWS Annual Retailer Survey.' As a marketer, this reminds me that the distribution channel is one of the most important components of a successful marketing strategy. In advertising, it is often easy to overlook these channels and focus on the sexy consumer marketing programs, but what good is consumer demand if nobody wants to sell your product?

This kind of recognition shows Confluence's commitment to the relationships it has with its customers. So congratulations to their team and keep up the great work!

Posted in: 'Accolades, Advertising'   |   1 Comment

## SixthSense

December 9th, 2009 - posted by Melissa

It's that time of year when all of the experts, pundits, bloggers and whatnot are posing that favorite year-end/new-year question, "What does the future hold?" While these musings tend to include prophesies on things like the wide worlds of economy, technology and healthcare, I admit I usually prefer following upcoming trends from the worlds of Bauhaus, Bourdain and Balenciaga.

Whatever the poison or passion, when a video demonstrating SixthSense technology hit my laptop screen, I was sucked in like poor Carol Anne Freeling. Here you can see the SixthSense inventor, Pranav Mistry, using the wearable device that enables interaction between the real world and the world of data. Whatever you do, be sure to hang on until the six-minute mark where the fun really begins.

Posted in: 'New Media, Uncategorized'   |   No Comments

## Would you pay for NBC?

December 3rd, 2009 - posted by Kevin

In light of the recent articles about Comcast purchasing a majority stake in NBC, the question being asked to consumers is "Would you pay for NBC content if you got your TV content from another provider (Verizon FIOS, Direct TV, etc...)?"

Whether or not you think it will happen, the question is interesting. As more and more communications companies are trying to find ways to avoid just being the "pipe," crossover into content is a logical move. Exclusive content has always been a competitive differentiator between TV providers, Direct TV's deal with Sunday NFL Ticket for example, but to my knowledge it has never really extended as far as the major networks.

I doubt NBC would want to restrict the viewing audience for its mainstay programming for non-Comcast subscribers, but it certainly opens the door for extra exclusives, pre-releases, Etc. for Comcast subscribers.

It will be interesting to watch unfold.

Posted in: 'Media'   |   No Comments

## Recent Work



BI-LO:
BI-LO Clemson Sponsorship Campaign

In this integrated campaign for BI-LO, we connect with Clemson football fans through one of the most time-honored football traditions: the tailgate.

VIEW CAMPAIGN ▶

## Job Openings

Junior Media Buyer

Is responsible for researching and compiling information used in media plans and/or media buys. Depending on account assignment(s), may plan...

Sr. Account Executive - Activations

Serves as primary contact between client and agency. Identifies client needs and opportunities, then applies appropriate agency resources by providing...

VIEW ALL JOBS ▶

© 2009 Erwin-Penland   Erwin-Penland. A Hill, Holliday Agency.

# EXHIBIT 8

**From:**      Jeff Greenfield <jeff@1stapproach.com>
**Sent:**      Thursday, November 3, 2005 10:41 AM
**To:**        Shannon.Wilbanks@erwinpenland.com
**Cc:**        joe.erwin@erwinpenland.com; gretchen.erwin@erwinpenland.com;
               bill.reynolds@erwinpenland.com; andy.mendelsohn@erwinpenland.com
**Subject:**   Internet Buzz Component
**Attach:**    ~~DLNK0.URL;~~DLNK1.URL;~~DLNK2.URL;Internet_BuzzProposal.pdf

Here is the first section .. a breakdown of the Internet component --- gives a full explanation (hopefully) of what we propose, along with pricing. This is expanded from what will be in the PowerPoint.

The fees are net to your agency ... add-on as you wish.

**Jeff Greenfield**

EVP - 1st Approach

Publisher - Branded Entertainment Monthlyhttp://www.1stapproach.com <<...>>

tel:   888.221.7923 ext 717

cell:  603.866.1342

fax:   603.299.0775

Product Placement Blog: http://www.productplacement.biz <<...>>

In The News:http://www.brandedentertainment.tv <<...>>

PLEASE NOTE:    The ideas and concepts contained within this email are the sole and confidential property of 1st Approach LLC and will not be shared with any other agency or utilized without prior written consent. This message also contains information which may be confidential and privileged. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy, re-transmit, or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail @1stapproach.com, and delete the message. E-mail communication is highly susceptible to spoofing, spamming, and other tampering, some of which may be harmful to your computer. If you are concerned about the authenticity of the message or the source, please contact the sender directly

- Internet_BuzzProposal.pdf <<...>>



DEFENDANT'S
EXHIBIT
86
11/20/09



**Internet Buzz Campaign**
mySpace & Message Boards



**Jeff Greenfield**
888-221-7923 ext. 717
jeff@1stapproach.com

The ideas and concepts contained within this document are the sole and confidential property of 1ˢᵗ Approach LLC and will not be shared with any other agency or utilized without prior written consent.

CONFIDENTIAL

*Our Unique Approach*

## Increasing Sales By Improving The Buzz About Your Biz

 "We can learn a lot from TV Shows like American Idol", says Jeff Greenfield, Executive VP for 1st Approach. "The producers of the Fox hit have followed the 'insider' Hollywood formula for increasing sales."

## They've got their Buzz machine in gear.

Buzz, word of mouth, viral, guerilla. Call it what you will but it is all really the same thing and it has been around to a long time. Buzz has been proven to be the most trusted form of marketing and advertising.

### Who are you going to trust more, an ad or a recommendation from a friend?

Movie studios have long recognized the value of Buzz Building via the Internet for that opening box office number. Over the last 3 years, studios and other savvy clients have been budgeting more towards 'online' buzz marketing.

Not only is it cost-effective, but since the success of the 'sleeper hit' Blair Witch Project, which was launched exclusively through online buzz marketing, it provides an immediate response – which is unheard of in a traditional campaign.

mySpace, the new online community for under 30 with over 32 million members provides an excellent opportunity for word of mouth marketing. Add to that the power of thousands of topic-related message boards and our team now has the ability to discuss your product directly with millions of individuals over a short period of time. That's buzz!



**JEFF GREENFIELD: 888-221-7923 ext 717**
827 Central Avenue – Suite 117 – Dover, New Hampshire 03820
- 2 -

EP000037

Internet Buzz Campaign - Adrenaline Nation TV    **CONFIDENTIAL**

# Traditional Marketing vs. 1ˢᵗ Approach



### Traditional Marketing Model
The traditional model of marketing (Procter & Gamble, GM, etc.) is to spend $$$ to send out messages to people. The only way to reach a larger audience is to spend more $$$.



### 1ˢᵗ Approach 'BUZZ' Model
Our approach builds on the power of creating ready-made *buzz currency* spread via 'Word-Of-Mouth Marketing' thru a network of trendsetters and influencers by utilizing the power of Internet contests and buzz with targeted profile marketing. This approach resonates more, travels farther (exponentially), is less costly and substantially leverages your marketing budget.



### Try It On Our Own Model
CAUTION: With Nothing to talk about except your product (which no one is currently discussing), there is No "BUZZ CURRENCY" and without an established communication network your marketing effort results in ZERO leverage!

### 1ˢᵗ Approach *creates* ready-made buzz currency!



**JEFF GREENFIELD: 888-221-7923 ext 717**
827 Central Avenue – Suite 117 – Dover, New Hampshire 03820
- 3 -

EP000038

Internet Buzz Campaign - Adrenaline Nation TV                                **CONFIDENTIAL**



# Who are today's 'Trendsetters & Influencers' and where can they be found?

Today's trendsetters and influencers are the consumer movers and shakers who hold influence over...

- Consumer trends
- Adoption of new products and services
- Public opinion

## Based on 30 years of research, Roper has proven that one in ten Americans tells the other nine how to vote, where to eat and what to buy.



Consumers have never been better at filtering out advertising and more difficult to reach through traditional marketing approaches. Word of mouth has become the most profound influence of consumer behavior.

Because these trendsetters and influencers are so networked, they are the first to know about many things, and they in turn spread the word to others. They are the major generators of word-of-mouth recommendations in our society.

Tracking this segment through Roper Reports consumer trends service, there is extensive data profiling trendsetters as thought leaders and buzz agents whose word of mouth recommendations can have a major impact on how well brands and entertainment properties fare in the marketplace.

**Since they are ALWAYS early adopters, Trendsetters and Influencers utilize the Internet frequently and are 2 X more likely to frequent Online message boards.**



**JEFF GREENFIELD: 888-221-7923 ext 717**
827 Central Avenue – Suite 117 – Dover, New Hampshire 03820
- 4 -

EP000039

CONFIDENTIAL

# The Strength of Internet Buzz



In the Harvard Study, the authors measured the buzz about new television shows by monitoring conversations about the shows in Internet chat rooms and newsgroups.

*Newsgroups remain one of the most popular features of the Internet. Almost 80% of web users access newsgroups on a regular basis, while 26% use them on a daily basis.*

The authors compared the amount of discussion about new television shows in the 1999-2000 season with the shows' Nielsen ratings to discover if there was a correlation between Internet Buzz and the number of viewers who actually tune in.

<u>They found that Internet Buzz does indeed matter.</u>  There was strong correlation between the Internet message post volume and Nielsen TV Ratings.

Based on the success of The Blair Witch Project release, <u>buzz isn't something that just happens but more often is the result of shrewd marketing.</u>



**JEFF GREENFIELD: 888-221-7923 ext 717**
827 Central Avenue – Suite 117 – Dover, New Hampshire 03820

EP000040

Internet Buzz Campaign - Adrenaline Nation TV                                    **CONFIDENTIAL**

# mySpace Marketing Program



32 million members with 130,000 more being added per day, producing over 10 billion page views per month in the 18 – 29 year old demographic makes having a mySpace profile with lots of 'friends' a fantastic marketing tool.

The most important thing about users of mySpace – they spend most of their Internet time on mySpace and rarely use traditional search engines such as Yahoo, Google, MSN and never navigate the standard discussion boards or blogs. This means that the only way to reach these 30+ million trendsetters is to communicate to them via their mySpace profile.

Both traditional brands and the studios have turned to mySpace for marketing. A Sony Pictures site promotion this summer for the Lords of Dogtown movie, for example, resulted in 1.8 million streams of the trailer. Over 32,000 users added the movie's "space" as a friend, and research showed 8 percent of Dogtown moviegoers learned of the film through the site.

**Step 1:  Establish New mySpace Profiles**
mySpace is based on individual user profiles. In a profile, members will list their age, zip codes and things they like and dislike. They also have the opportunity to display videos, graphics, text and music.


mySpace Profile

Our team will establish 50 mySpace profiles that will appear to be unique individuals on the mySpace community and will appear to reside in the same region/zip code as their friends, which allows for a perfect marketing opportunity.

Within each profile, we can include any of the following marketing materials:

- Video (commercial, etc)
- Song
- Text
- Photos or Banners
- Links to your site

On a daily basis, each profile can communicate with a maximum of 500 individuals either via mySpace email or mySpace friend request and then can leave a comment on as many of their mySpace friend accounts as they wish.



**JEFF GREENFIELD: 888-221-7923 ext 717**
827 Central Avenue – Suite 117 – Dover, New Hampshire 03820
- 6 -

EP000041

Internet Buzz Campaign - Adrenaline Nation TV                                    **CONFIDENTIAL**



### Step 2: Friend Requests

Every mySpace profile created will seek out friends in the desired demographic (zip code, age, sex, etc.) on a daily basis.

Contact will be made with the maximum 400 'new friend's per day of which 90% or 360 friends will visit our established mySpace profile.

Remember that each visit will generate views of any of the marketing materials we have placed on the profile, which include video, text, ads, music, etc.

For each of the 50 accounts, over the course of 1 month, we will initiate communications with 12,000 new friends, with the following results:

- 10,800 profile visits from potential new friends
- Minimum 5,000 new friends added



With 50 accounts, our totals will be as follows:

- 540,000 profile views
- 250,000 new friends added (minimum number)



**JEFF GREENFIELD: 888-221-7923 ext 717**
827 Central Avenue – Suite 117 – Dover, New Hampshire 03820
- 7 -

EP000042

Internet Buzz Campaign - Adrenaline Nation TV                    **CONFIDENTIAL**

### Step 3:  Friend Commenting
Leaving comments on a friend's mySpace profile is the
key to creating a massive viral impact.



It's common for friends within the mySpace community
to leave comments on another friends profile to
announce an event, just to say hello or to mention an
impressive link.

The goal of our team leaving comments is to have the
'friend' follow a sales cycle that will lead them to visit
your site.

Comments include a combination of text, images and
links -- all of which can lead to another site.

The process of leaving comments leads to:

- Massive influx of New friends
- Increase in profile traffic
- Increase in off-site traffic
- More comments left on our mySpace Account.

The most important aspect of a friend following a link in mySpace is this:

**They are not just following a link .. but listening to and following the recommendation of a
friend.**

Our team will do the following:

- Create a series of 10 - 15 'comments' to be left in a specific order during the month
- Leave comments on every friend's site in the exact order and duration established.

With 50 profiles and 250,000 friends, this equates to almost 4 million comments about your
website!



**JEFF GREENFIELD: 888-221-7923 ext 717**
827 Central Avenue – Suite 117 – Dover, New Hampshire 03820
- 8 -

EP000043

Internet Buzz Campaign - Adrenaline Nation TV                           **CONFIDENTIAL**

## Message Board Marketing Program



Message boards are then generators of a significant amount of traffic on the Internet.

Message boards are different than mySpace in that Message Boards are found in hundreds of thousands of different websites, discussing every single topic you can imagine – from how to buy the best rims for your car to the best places to practice archery shooting!

**For EVERY interest in the world, there is a unique discussion board!**

The 3 most important factors about having messages posted on discussion boards are as follows:

- **Posted messages live on for months, even years!**
  Once a message is posted, it keeps getting read over and over again. Message board owners rarely delete messages, so each message could live on for years! Even if it is not at the top of a message board, people will find and you will see the number of views increase over time.

- **Messages show up in the Search Engine Listings**
  Search engines (Google, Yahoo, MSN) aggressively spider message boards looking for new content. Posted Message end up in the search engine results when people search on a topic related to your product or service. This means that message board posting will increase traffic from the search engines.

- **Search Engines Follow & Give Credence to Links in Message Board Postings**
  The goal of posting a message in a board is to get readers to follow a link. Since search engine spiders also 'read' the message boards, they will follow the links and provide an increased 'rank' of your website in the search engine results because your website now has an increased number of incoming links.



EP000044

CONFIDENTIAL

### Step 1:  Research, Research, Research

Our team of college-educated 'conversation experts' will begin laying the groundwork for positive buzzworthy conversations.  They will locate every site that is discussing current topics relating to your website - every blog, every discussion board – any place where there is an active conversation where we can start a conversation about your company.

### Step 2:  Establish Blogs/Fan Websites

Blogs are online journals kept by both individuals and businesses.   The key to Blogs is that they are updated more frequently than a regular website.  Our team can create 2 Blogs and will post to them on a regular basis with updated news stories during the length of the campaign.

The Blogs will also announce any contest or promotion you are running and will have ads up for your website. Most importantly, these Blogs offer an additional 3rd party who is also discussing your website. For long term campaigns, our team will create 2 new Blogs every month!

### Step 3:  Online Conversations

With the research of sites completed, our team will begin laying the groundwork for positive buzzworthy conversations.

We will create 5 – 10 initial 'conversation starters' and approximately 50 'follow-up' messages to be posted in the researched sites.  Our team will deliver approximately 1000 messages in the 4 weeks of the campaign.

The goal of chatting with trendsetters online is to increase awareness of your website and to promote any contest or promotion you are running.  Our team will chat with them, let them know about the promotion and then direct them to the website.

Recommended Option:

- **Optional Contest**
  We recommend running an online contest to win something.  In our experience, holding 1 or 2 drawings per week (even small items) creates a significant amount of buzz.



**1st Approach**

**JEFF GREENFIELD: 888-221-7923 ext 717**
827 Central Avenue – Suite 117 – Dover, New Hampshire 03820

- 10 -

EP000045

Internet Buzz Campaign - Adrenaline Nation TV                    **CONFIDENTIAL**

## Campaign Fees:

**mySpace Marketing 3 Month Campaign**
Campaign will create 50 new mySpace profiles, will generate new friends for 3 months and
send a series of comments (15 in month 1, 10 in month 2, 5 in month 3).

Month #1
- Establish custom unique mySpace profiles:
  - $250 per profile (1 time fee)

  TOTAL FOR 50 PROFILES : $12,500

- Generate Maximum Friend Requests:
  - $60 per profile per month

  TOTAL FOR 50 PROFILES:  $3,000 per month

- 15 different comments per friend:
  - .005 cents per comment
  - 15 messages/friend X 5,000 friends = 75,000 comments
  - 50 accounts X 75,000 comments = 3,750,000 comments

  TOTAL:  $18,750 per month

**Month 1 Grand Total:  $34,250**


Month #2
(Using the same 50 profiles)

- Generate Maximum Friend Requests:
  - $60 per profile per month

  TOTAL FOR 50 PROFILES:  $3,000 per month


- 15 different comments per friend:
  - .005 cents per comment
  - 15 messages/friend X 5,000 new friends = 75,000 comments
  - 10 messages/friend X 5,000 Month 1 friends = 50,000 comments

  - 50 accounts X 75,000 comments = 3,750,000 comments
  - 50 accounts X 50,000 comments = 2,500,000 comments

  Total of 6,250,000 comments X .005


  TOTAL:  $31,250 per month


**Month 2 Grand Total:  $34,250**



**1st Approach**

EP000046

**CONFIDENTIAL**

Month #3
(Using the same 50 profiles)

- <u>Generate Maximum Friend Requests:</u>
  - $60 per profile per month

  **TOTAL FOR 50 PROFILES:  $3,000 per month**

- <u>15 different comments per friend:</u>
  - .005 cents per comment
  - 15 messages/friend X 5,000 new friends = 75,000 comments
  - 10 messages/friend X 5,000 Month 2 friends = 50,000 comments
  - 5 messages/friend X 5,000 Month 1 friends = 25,000 comments

  Subtotals:
  - 50 accounts X 75,000 comments = 3,750,000 comments
  - 50 accounts X 50,000 comments = 2,500,000 comments
  - 50 accounts X 25,000 comments = 1,250,000 comments

  Total of 7,500,000 comments X .005  = $37,500 per month

**Month 3 Grand Total:  $40,500**

Month #4
(Using the same 50 profiles with no additional friend requests)

<u>15 different comments per friend:</u>
- .005 cents per comment

- 10 messages/friend X 5,000 Month 3 friends = 50,000 comments
- 5 messages/friend X 5,000 Month 2 friends = 25,000 comments
- 0 messages/friend X 5,000 Month 1 friends = 0 comments (cycle completed)

Subtotals:
- 50 accounts X 50,000 comments = 2,500,000 comments
- 50 accounts X 25,000 comments = 1,250,000 comments

Total of 3,750,000 comments X .005  = $18,750 per month

**Month 4 Grand Total:  $18,750**



**JEFF GREENFIELD: 888-221-7923 ext 717**
827 Central Avenue – Suite 117 – Dover, New Hampshire 03820
- 12 -

EP000047

Internet Buzz Campaign - Adrenaline Nation TV                    **CONFIDENTIAL**

Month #5
(Using the same 50 profiles with no additional friend requests)

<u>15 different comments per friend:</u>
- .005 cents per comment

- 5 messages/friend X 5,000 Month 3 friends = 25,000 comments
- 0 messages/friend X 5,000 Month 2 friends = 0 comments (cycle completed)
- 0 messages/friend X 5,000 Month 1 friends = 0 comments (cycle completed)

Subtotals:
- 50 accounts X 25,000 comments = 1,250,000 comments

Total of 1,250,000 comments X .005 = $18,750 per month

<u>Month 5 Grand Total:  $6,250</u>

# <u>mySpace Campaign Grand Total:</u>
- <u>Month 1:  $34,250</u>
- <u>Month 2:  $34,250</u>
- <u>Month 3:  $40,500</u>
- <u>Month 4:  $18,750</u>
- <u>Month 5:  $6,250</u>

<u>TOTAL:  $ 134,000</u>



**JEFF GREENFIELD: 888-221-7923 ext 717**
827 Central Avenue – Suite 117 – Dover, New Hampshire 03820
- 13 -

EP000048

Internet Buzz Campaign - Adrenaline Nation TV                    CONFIDENTIAL

<u>Online Buzz Campaign</u>
- o   Extensive Online Research
- o   4 weeks of targeted, track able conversations (1,000 messages)
- o   2 Blogs

   $7,000/ month



**JEFF GREENFIELD: 888-221-7923 ext 717**
827 Central Avenue ~ Suite 117 – Dover, New Hampshire 03820

EP000049

Internet Buzz Campaign - Adrenaline Nation TV                                CONFIDENTIAL

# About 1st Approach

Founded in 1997, we are a global media solutions provider that helps leading organizations generate competitive value by leveraging the power of technology. From strategy and design to system integration, 1st Approach works with clients to identify and realize opportunities to increase their return on investment.



1st Approach's Team has launched Marketing Initiatives for Forest Laboratories, eBay, Hershey Foods, Jones Lang LaSalle Americas, Reckitt Benckiser, Doyle Publishing, Sony BMG, Plum Creek Timber, Black & Decker, Army National Guard, Sucrets, Adrenaline Nation TV, 'DaHv', Hollywood Poker.com, Music For A Cause, Merchant Media, Lifewaves Intl, Permission Interactive, Wright Stuff Management, PepsiCo, Pep Boys, Body by Jake and many more.

Tying Internet with broadcast media and celebrity endorsements, our Branded Entertainment team has partnered with several production companies for various celebrity events including awards shows and major motion pictures.

Mark Wills shows off his Perfect Pancake

1st Approach was one of three agencies asked to participate in a recent closed-door panel discussion on branded entertainment produced by the Academy of Television Arts & Sciences. Also in attendance were Mark Burnett, executive producer of Survivor, The Apprentice & The Restaurant and David Lyle, president of Fremantle Media (American Idol).



As editor of Product Placement News (http://www.productplacement.biz), our executive vice-president Jeff Greenfield details trends in branded entertainment for brands and how to better market themselves and increase brand awareness.

Jeff is also the publisher of Branded Entertainment Monthly, a joint effort with VNU Media, the publishers of the Hollywood Reporter, Billboard, Ad Week and Media Week.

Among our team's successes has been the re-launch of the Celexa.com marketing initiative for Forest Laboratories - where sales of their antidepressant medication increased $200+ million in a 12 month period after 1st Approach took over Internet marketing and launched dozens of depression related Internet properties targeting women ages 30-50.

Recognizing the connection between on-screen advertising and integrated television and film placement, 1st Approach entered into exclusive long term agreements with two of the largest suppliers in the US and Mexico to provide their clients with integrated marketing solutions.



**JEFF GREENFIELD: 888-221-7923 ext 717**

EP000050

CONFIDENTIAL



1st Approach's technical services encompass web site development and strategies integrated database development, custom software solutions. Internal production capabilities include: business strategies, Peer to Peer Community Marketing, Internet Branding Communities, Search Engine Placement, ROI Email Campaigns, Buzz Marketing, Direct Response Television production and marketing.

1st Approach excels in planning, evaluation, design, content development and promotion. We embody a useful mixture of intensely creative and highly business-oriented individuals. We have extensive experience in business development, marketing, print and broadcast, and what excites us the most today is utilizing electronic media to streamline communications.

Michael Imperioli
with Starbuck's
'This vs That'

We believe in meticulous planning. Taking the time to research and explore yields results with lasting value. Everything we do should produce a return: increased sales, more traffic, wider media attention or an improved brand perception. Success is something we carefully plan for and temper our creative and limit our use of technology with concern always for ROI and effective communications.

As a group, clients find us relentlessly creative, not just in the advertising sense, but in all facets of our problem-solving skills. We possess extraordinary powers of concentration and a richly diverse education in the business world.

At the heart of our approach lies this one truth:  clients have the right to expect the best we can do, think and create.  We work diligently, train extensively and play to win.

Our experienced team has been featured on ABC, CBS, CNET, Good Morning America, The New York Times, The Washington Post, Emmy Magazine, Back Stage, The Wall Street Journal, Entertainment Tonight, The Hollywood Reporter, CNN, LINK! Magazine and Investor's Business Daily.

**1st Approach Staff Structure:**
3 partners (Boston, Philadelphia & Los Angeles)
5 staff associates (2 in Boston, 2 in Los Angeles, 1 in New York)



**JEFF GREENFIELD: 888-221-7923 ext 717**
827 Central Avenue – Suite 117 – Dover, New Hampshire 03820
- 16 -

EP000051

Internet Buzz Campaign - Adrenaline Nation TV                                    CONFIDENTIAL

## 1ˢᵗ Approach in the Press

# The Philadelphia Inquirer

**Philadelphia Inquirer (7/31/05)**
**The magic behind great marketing**

Greenfield got his business off the ground by taking patients no one else wanted - those without health insurance and those in bad condition. Adopting a philosophy of treatment first, he turned no one away, regardless of ability to pay. From some he got nothing. From others he took whatever they could afford. But he insisted on another form of payment, word of mouth.

# Star-Telegram☀com

**Star-Telegram (7/18/05)**
**Saying & Selling**

Greenfield's story is one of several Hughes uses to underscore his theme of "give them something to talk about," which he says trumps the conventional marketing model in a world that has grown increasingly skeptical of traditional advertising.



**Wired Magazine (6/03/2005)**
**Gadget Promos Creep Into TV Shows**

Jeff Greenfield, executive vice president at 1st Approach, a Dover, New Hampshire-based marketing firm, has been shopping Black & Decker's new AutoTape product to TV writers. At the push of a button, the battery-driven AutoTape automatically extends and retracts a measuring tape.

Greenfield noted that gadget makers are now sending piles of products to writers and producers to infiltrate their psyches during the all-important brainstorming sessions that determine plot lines for the new TV seasons.



**JEFF GREENFIELD: 888-221-7923 ext 717**
827 Central Avenue – Suite 117 – Dover, New Hampshire 03820
- 17 -

EP000052

# The Mercury News

MercuryNews.com
San Jose Mercury News (5/19/2005)
**Ads creeping into TV programs**

"It's a whole new ballgame — shows like 'The Apprentice' have taken the practice to a new level," said Jeff Greenfield, executive vice president of 1st Approach, a product-placement firm based in Boston. "The ad has become part of the show; it's the ultimate in product integration."

# BRANDWEEK

Brandweek (5/9/2005)
**Small Screen Gets Crowded As Brand Placements Double**
If the rapid increase in brand appearances continues, the industry will soon have to face the same issue that the advertising business has been dealing with for decades: clutter.

"I think we've reached the ceiling, right now, in the top-tier shows. It hasn't made its way to the second-tier shows," said Jeff Greenfield of 1st Approach/Hollywood Product Placement, an agency which has placed Black & Decker, among others.

# Billboard

Billboard Magazine
**Bling! Bling! Ka-Ching! Pop Stars Cash In**
After three years of declining U.S. sales of recorded music, producers, agents, and artists are starting to look for additional ways to capitalize on the value of name-dropping products.

"These things are being done all the time," says Jeff Greenfield, whose 1st Approach marketing firm in product placement. In a deal signed this month, trading card company the Upper Deck agreed to sponsor European and U.S. tours for an Orlando, Fla., pop group in exchange for a song about a new game it is introducing later this year, says Greenfield, who helped negotiate the terms.



**1st Approach**

**JEFF GREENFIELD: 888-221-7923 ext 717**
827 Central Avenue – Suite 117 – Dover, New Hampshire 03820
- 18 -

EP000053

Internet Buzz Campaign - Adrenaline Nation TV                    **CONFIDENTIAL**



Hollywood Reporter
**Panel Buzzes about Branding**
But not every film has to be a blockbuster to pay off in branding buzz, according to panelist Jeff Greenfield, vp sales at the advertising firm 1st Approach.

"It's not always about how much the gross is on the film or the ratings for the show," Greenfield said. "It's about what the client does with the fact that they're integrated into the show. They need to take it to the next level and utilize (the association with entertainment) as part of an overall campaign. People want their brands to be part of Hollywood."



Video Age International
**Product Placement: Creatively Rich, Yet Discreet**

"In one million households [equipped] with a TiVo device, a 30-second commercial is losing its value," said Jeff Greenfield, vice president of sales at 1st Approach, a firm that specializes in strategic media solutions and has worked on campaigns for Forest Laboratories, Hershey Foods, Krispy Kreme and Timbuk2. "Companies are now spending more money on sponsorship than on [traditional] TV advertising."



Telegraph Morning Herald

**Secret agent 007 open to any (appropriate) offers**
David Wilson, a vice-president at Eon Productions, which produces the Bond series, said: "Nobody pays to have their product in the film. Eon wants product and technical assistance." But under interrogation he admitted that "a couple of partners paid product placement fees" but refused to reveal names or figures involved. The brands also view the deals as top secret.

However, Jeff Greenfield, a vice-president at US product placement agency 1st Approach Media, said: "We are talking numbers in the millions of dollars. There is also an increasing trend for independent film makers to raise funds from product placement, rather than via angel investors."

**1st Approach**

**JEFF GREENFIELD:  888-221-7923 ext 717**
827 Central Avenue – Suite 117 – Dover, New Hampshire 03820
- 19 -

**EP000054**

**CONFIDENTIAL**



**MediaPost**
MediaPost

**From Harvard to Hollywood — Buzz Is the Answer**
Movie studios have long recognized the value of Internet Buzz Building for that opening box office number, and over the last 3 years, studios and other savvy clients of agencies like 1st Approach have been budgeting more towards online buzz marketing.

"Not only is it cost-effective, says Jeff Greenfield, vice president of 1st Approach, a strategic media and entertainment marketing company, "but since the success of the sleeper hit 'Blair Witch Project,' which was launched exclusively through online buzz marketing, it provides an immediate response — which is unheard of in a traditional campaign."



**JEFF GREENFIELD: 888-221-7923 ext 717**
827 Central Avenue – Suite 117 – Dover, New Hampshire 03820

EP000055

Internet Buzz Campaign - Adrenaline Nation TV                    **CONFIDENTIAL**

## 1st Approach Contact Information



**Jeff Greenfield**
Executive Vice President

Phone:     888-221-7923 ext. 717
Mobile:    603-866-1342
Fax:       603-299-0775
Email:     jeff@1stapproach.com

**1st Approach**

JEFF GREENFIELD: 888-221-7923 ext 717
827 Central Avenue – Suite 117 – Dover, New Hampshire 03820
- 21 -

EP000056

# EXHIBIT 9

**From:**  Jeff Greenfield <jeff@1stapproach.com>
**Sent:**  Monday, November 28, 2005 6:21 PM
**To:**  Joe.Erwin@erwinpenland.com
**Cc:**  andy.mendelsohn@erwinpenland.com; bill.reynolds@erwinpenland.com; gretchen.erwin@erwinpenla
**Subject:**  RE: Captain D's customer numbers
**Attach:**  ~~DLNK0.URL;~~DLNK1.URL;~~DLNK2.URL;~~DLNK3.URL;~~DLNK4.URL;~~DLNK5.URL

Joe -

Got your message .. sorry to hear about that.  On  a positive note .. I've attached the overview on the Branded Entertainment Financing Tax Model.  Review it and give me your  thoughts.

**Jeff  Greenfield**

EVP - 1st  Approach

Publisher - Branded Entertainment Monthly http://www.1stapproach.com  <<...>>

tel:  888.221.7923 ext 717

cell:  603.866.1342

fax:  603.299.0775

Product Placement Blog: http://www.productplacement.biz  <<...>>

In The News: http://www.brandedentertainment.tv  <<...>>

**From:** Jeff Greenfield

**Sent:** Thursday,  November 17, 2005 10:12 AM

**To:**  'Joe.Erwin@erwinpenland.com'

**Cc:** andy.mendelsohn@erwinpenland.com;  bill.reynolds@erwinpenland.com; gretchen.erwin@erwinpenland.com; Shannon.Wilbanks@erwinpenland.com

**Subject:** RE: Captain D's customer  numbers

Absolutely & congrats on the new biz as  well!!!

I assume you mean 12 -1 PM EST --- that is perfect for  me.

DEFENDANT'S
EXHIBIT
54
11/20/09 an

EP000142

**Jeff Greenfield**

EVP - 1st Approach

Publisher - Branded Entertainment Monthlyhttp://www.1stapproach.com <<...>>

tel:   888.221.7923 ext 717

cell:  603.866.1342

fax:  603.299.0775

Product Placement Blog:http://www.productplacement.biz <<...>>

In The News:http://www.brandedentertainment.tv <<...>>


**From:** Joe.Erwin@erwinpenland.com  [mailto:Joe.Erwin@erwinpenland.com]

**Sent:** Thursday, November 17, 2005  10:10 AM

**To:** Jeff Greenfield

**Cc:** andy.mendelsohn@erwinpenland.com; bill.reynolds@erwinpenland.com;  gretchen.erwin@erwinpenland.com;
Shannon.Wilbanks@erwinpenland.com

**Subject:** RE: Captain D's customer  numbers

Jeff,

Thanks for the note.  It went well.  I was  planning to call you later today and tell you (we've been slammed with ANOTHER  new business pitch, which is today in Atlanta).  Can I call you from the  road around 9 or 10 your time?

Thanks,

Joe

joe.erwin@erwinpenland.com

www.erwinpenland.com

864.271.0500

>        "Jeff Greenfield"  <jeff@1stapproach.com>

>        11/17/2005 09:59 AM


                                                                                          To

                                  <Shannon.Wilbanks@erwinpenland.com>

                                                                                          cc

**EP000143**

<joe.erwin@erwinpenland.com>,
<gretchen.erwin@erwinpenland.com>,
<bill.reynolds@erwinpenland.com>,

<andy.mendelsohn@erwinpenland.com>

Subject

RE: Captain D's customer numbers

How did the pitch go?

**Jeff Greenfield**

EVP - 1st Approach

Publisher - Branded Entertainment Monthlyhttp://www.1stapproach.com  <<...>>

tel:  888.221.7923 ext 717

cell:  603.866.1342

fax:  603.299.0775

Product Placement Blog:http://www.productplacement.biz <<...>>

In The News:http://www.brandedentertainment.tv <<...>>

**From:** Jeff Greenfield

**Sent:** Friday, November 04, 2005 11:01 AM

**To:** 'Shannon.Wilbanks@erwinpenland.com'

**Cc:** 'joe.erwin@erwinpenland.com'; 'gretchen.erwin@erwinpenland.com'; 'bill.reynolds@erwinpenland.com'; 'andy.mendelsohn@erwinpenland.com'

**Subject:** RE: Captain D's customer numbers

Here is the Amazing Grace concept with the payment structure explained.

A PowerPoint will be coming prior to our conference.

**Jeff Greenfield**

EVP - 1st Approach

Publisher - Branded Entertainment Monthlyhttp://www.1stapproach.com <<...>>

tel: 888.221.7923 ext 717

cell: 603.866.1342

fax: 603.299.0775

Product Placement Blog: http://www.productplacement.biz <<...>>

In The News: http://www.brandedentertainment.tv <<...>>

**From:** Shannon.Wilbanks@erwinpenland.com [mailto:Shannon.Wilbanks@erwinpenland.com]

**Sent:** Friday, November 04, 2005 9:05 AM

**To:** Jeff Greenfield

**Subject:** RE: Captain D's customer numbers

hey, Jeff -- just making sure I haven't missed it -- do we have the Amazing Grace piece yet? Our servers went down for about 15 minutes yesterday, and I'm a little freaked out that we may have missed some emails!

Shannon Wilbanks

Business Development Manager &

Asst. to President Joe Erwin

Erwin-Penland, Greenville, SC

864-672-5524

        "Jeff Greenfield" <jeff@1stapproach.com>

        11/03/2005 01:51 PM

                                                                                To

                        <Shannon.Wilbanks@erwinpenland.com>

                                                                                cc

                        <joe.erwin@erwinpenland.com>, <gretchen.erwin@erwinpenland.com>,
                        <bill.reynolds@erwinpenland.com>, <andy.mendelsohn@erwinpenland.com>

                                                                                Subject

                        RE: Captain D's customer numbers

EP000145

Here is the Product  Placement piece.


Sorry to section this out bit by bit .. but just the way  my mind works ....


**Jeff Greenfield**

EVP - 1st Approach

Publisher - Branded  Entertainment Monthlyhttp://www.1stapproach.com  <<...>>

tel:  888.221.7923 ext  717

cell:  603.866.1342

fax:  603.299.0775

Product  Placement Blog:http://www.productplacement.biz  <<...>>

In The News:http://www.brandedentertainment.tv  <<...>>

**From:** Jeff Greenfield

**Sent:** Thursday,  November 03, 2005 10:36 AM

**To:** 'Shannon.Wilbanks@erwinpenland.com'

**Cc:** 'joe.erwin@erwinpenland.com';  'gretchen.erwin@erwinpenland.com'; 'bill.reynolds@erwinpenland.com'; 'andy.mendelsohn@erwinpenland.com'

**Subject:** RE: Captain D's customer  numbers

Just a quick update .. got some final numbers on cost last evening.   Will have the deck finished up soon.

**Jeff Greenfield**

EVP - 1st Approach

Publisher - Branded  Entertainment Monthlyhttp://www.1stapproach.com  <<...>>

tel:  888.221.7923 ext  717

cell:  603.866.1342

fax:  603.299.0775

Product  Placement Blog:http://www.productplacement.biz  <<...>>

In The News:http://www.brandedentertainment.tv  <<...>>

**From:** Shannon.Wilbanks@erwinpenland.com  [mailto:Shannon.Wilbanks@erwinpenland.com]

EP000146

**Sent:** Wednesday, November 02, 2005 6:51 PM

**To:** Jeff Greenfield

**Subject:** RE: Captain D's customer numbers

Hi Jeff, I'm back in the office now.  If you'd like to email your proposal to everyone, here are the addresses.  Or you can just send it to me and I'll forward it.

joe.erwin@erwinpenland.com, gretchen.erwin@erwinpenland.com,  bill.reynolds@erwinpenland.com, andy.mendelsohn@erwinpenland.com,  shannon.wilbanks@erwinpenland.com

Thanks again!

Shannon

Shannon Wilbanks

Business Development  Manager &

Asst. to President Joe Erwin

Erwin-Penland, Greenville,  SC

864-672-5524

>    "Jeff Greenfield"  <jeff@1stapproach.com>

>    11/02/2005 05:11 PM

To

<Shannon.Wilbanks@erwinpenland.com>

cc

Subject

RE: Captain D's customer  numbers

Shannon -

Can you  email me those 5 cities?

Thanks!

EP000147

**Jeff Greenfield**

EVP - 1st Approach

Publisher - Branded Entertainment Monthlyhttp://www.1stapproach.com <<...>>

tel:  888.221.7923 ext 717

cell: 603.866.1342

fax: 603.299.0775

Product Placement Blog:http://www.productplacement.biz <<...>>

In The News:http://www.brandedentertainment.tv <<...>>

**From:** Shannon.Wilbanks@erwinpenland.com  [mailto:Shannon.Wilbanks@erwinpenland.com]

**Sent:** Tuesday, November 01, 2005 4:26 PM

**To:** Jeff Greenfield

**Subject:** RE: Captain D's customer numbers

we'll call you then!

Shannon Wilbanks

Business Development Manager &

Asst. to President Joe Erwin

Erwin-Penland, Greenville, SC

864-672-5524

       "Jeff Greenfield" <jeff@1stapproach.com>

       11/01/2005 04:20 PM

To

<Shannon.Wilbanks@erwinpenland.com>

cc

Subject

RE: Captain D's customer numbers

EP000148

Perfect.


**Jeff Greenfield**

EVP - 1st Approach

Publisher - Branded Entertainment Monthlyhttp://www.1stapproach.com <<...>>

tel:  888.221.7923 ext 717

cell:  603.866.1342

fax:  603.299.0775

Product Placement Blog:http://www.productplacement.biz <<...>>

In The News:http://www.brandedentertainment.tv <<...>>

**From:** Shannon.Wilbanks@erwinpenland.com  [mailto:Shannon.Wilbanks@erwinpenland.com]

**Sent:** Tuesday, November 01, 2005 4:20 PM

**To:** Jeff Greenfield

**Subject:** RE: Captain D's customer numbers

great! Joe's in a meeting right this minute, but how about we call you at 6pm our time?

Shannon

> "Jeff Greenfield" <jeff@1stapproach.com>
>
> 11/01/2005 04:17 PM

To

<Shannon.Wilbanks@erwinpenland.com>

cc

Subject

RE: Captain D's customer numbers

EP000149

I am available right now. I have a call scheduled @ 5 PM EST that will last about 40 minutes .. but will be available after that.

My direct number is 207-439-4754.


**Jeff Greenfield**

EVP - 1st Approach

Publisher - Branded Entertainment Monthlyhttp://www.1stapproach.com <<...>>

tel: 888.221.7923 ext 717

cell: 603.866.1342

fax: 603.299.0775

Product Placement Blog:http://www.productplacement.biz <<...>>

In The News:http://www.brandedentertainment.tv <<...>>

**From:** Shannon.Wilbanks@erwinpenland.com [mailto:Shannon.Wilbanks@erwinpenland.com]

**Sent:** Tuesday, November 01, 2005 4:01 PM

**To:** Jeff Greenfield

**Subject:** RE: Captain D's customer numbers

Hi Jeff -- just checking in. Do we need to schedule a call for late today or sometime tomorrow? We're moving really fast on this, and would love to get your thoughts as soon as possible. Thanks!

Shannon

Shannon Wilbanks

Business Development Manager &

Asst. to President Joe Erwin

Erwin-Penland, Greenville, SC

864-672-5524

"Jeff Greenfield" <jeff@1stapproach.com>

EP000150

10/27/2005 07:21 PM

To

<Shannon.Wilbanks@erwinpenland.com>

cc

<Joe.Erwin@erwinpenland.com>

Subject

RE: Captain D's customer numbers

Makes perfect sense. Very impressive numbers -- especially when we double their business in the first 12 months!

**Jeff Greenfield**

EVP - 1st Approach

Publisher - Branded Entertainment Monthlyhttp://www.1stapproach.com <<...>>

tel:  888.221.7923 ext 717

cell:  603.866.1342

fax:  603.299.0775

Product Placement Blog:http://www.productplacement.biz <<...>>

In The News:http://www.brandedentertainment.tv <<...>>

**From:** Shannon.Wilbanks@erwinpenland.com [mailto:Shannon.Wilbanks@erwinpenland.com]

**Sent:** Thursday, October 27, 2005 7:11 PM

**To:** Jeff Greenfield

**Cc:** Joe.Erwin@erwinpenland.com

**Subject:** Captain D's customer numbers

Hi Jeff,

EP00015'

Great to meet you the other day -- thanks for talking & working with us! Joe's on the road, but asked that I get you the customer traffic numbers we talked about earlier this week. We know that Captain D's serves about 92 million customers annually systemwide. Of course, there are duplications in that figure, especially since they have some very loyal customers. But we also know that their average length between visits is 45 days. So if we divide that 92 million by 9, you end up with approximately 10 to 10.5 million unique customers each year.

Make sense to you? Joe's back in the office Friday, and we'll talk to you soon.

Shannon

Shannon Wilbanks

Business Development Manager &

Asst. to President Joe Erwin

Erwin-Penland, Greenville, SC

864-672-5524

- BrandedEntertainmentFinancing.pdf <<...>>

# EXHIBIT 10

**From:** Jeff Greenfield <jeff@1stapproach.com>
**Sent:** Friday, November 4, 2005 10:00 AM
**To:** Shannon.Wilbanks@erwinpenland.com
**Cc:** joe.erwin@erwinpenland.com; gretchen.erwin@erwinpenland.com; bill.reynolds@erwinpenland.com;
**Subject:** RE: Captain D's customer numbers
**Attach:** ~~DLNK0.URL;~~DLNK1.URL;~~DLNK2.URL;~~DLNK3.URL;~~DLNK4.URL;~~DLNK5.URL

Here is the Amazing Grace concept with the payment structure explained.

A PowerPoint will be coming prior to our conference.

**Jeff Greenfield**

EVP - 1st Approach

Publisher - Branded Entertainment Monthlyhttp://www.1stapproach.com <<...>>

tel:  888.221.7923 ext 717

cell: 603.866.1342

fax:  603.299.0775

Product Placement Blog:http://www.productplacement.biz <<...>>

In The News:http://www.brandedentertainment.tv <<...>>

**From:** Shannon.Wilbanks@erwinpenland.com [mailto:Shannon.Wilbanks@erwinpenland.com]

**Sent:** Friday, November 04, 2005 9:05 AM

**To:** Jeff Greenfield

**Subject:** RE: Captain D's customer numbers

hey, Jeff -- just making sure I haven't missed it -- do we have the Amazing Grace piece yet?  Our servers went down for about 15 minutes yesterday, and I'm a little freaked out that we may have missed some emails!

Shannon Wilbanks

Business Development Manager &

Asst. to President Joe Erwin

Erwin-Penland, Greenville, SC

DEFENDANT'S
EXHIBIT
58
11/20/09

EP000124



**'Amazing Grace'**
**Captain D's Branded Reality Show**

The ideas and concepts contained within this document are the sole and confidential property of 1st Approach LLC and will not be shared with any other agency or utilized without prior written consent.





**_Captain D's presents authentic,
inspirational television!_**

The top 20 church choirs in the US competing for over
$250,000 in prizes and the title of
the Best Choir in the USA!

- 2 -

**CONFIDENTIAL**

**EP226853**

# 1st Approach



### PHASE I.  LOCAL PARTICIPATION

## "Producers from TV's 'Amazing Grace' will be visiting Captain D's on Wednesday from 2 – 4 PM."

The big secret behind American Idol's success is all of the local work that never makes it to the show!  As contestants are selected to compete in Hollywood – a team of Hollywood PR experts sends off a flood of press releases to the local press alerting them that one of their locals may be the 'next American Idol'.  This results in massive local involvement – all months before the show is on the air!

**Our production team of experienced network cameramen and producers will cross the country in their 6 week trek of visiting EVERY Captain D's location!**

The local press (newspaper, radio, broadcast) will be alerted several weeks prior and invited to participate.



Cameraman @ Captain D's in Atlanta

Every Captain D's location will have a set date and time when the Captain D's Amazing Grace team will arrive.

After setting up their equipment and 'red carpet' region, our production team will interview people about their local choir and why they think they are the best in the US!



## Amazing Grace Spokesperson Contest

Our production team will also be on a national talent search for the Captain D's Amazing Grace Spokesperson.  Similar to Ryan Seacrest on American Idol, the winner will be a paid spokesperson for all of the live events, will be flown to all of the events and (most importantly) be paid!

Every location can hold a local contest and the winner would be that locations representative in the Spokesperson contest.

- 3 -

CONFIDENTIAL

EP226854



## PHASE II. REGIONAL COMPETITIONS



After selecting the 'best of the best', 25 choirs from each region will be invited to person in a contest in one of these locations:

- Atlanta, GA
- Jackson, MS
- Birmingham, AL
- Charleston, SC

These will be huge shows in large arenas that will be well attended. Each show will have a large panel of celebrity judges who will vote on the best overall performance. The winner from each region will be invited to attend the National competition in Nashville.

This competition will be filmed by our production team and edited at a later date.

## PHASE III. FINALS

The National competition will feature the 4 best church choirs in the country in an authentic inspirational contest to find the #1 Choir in the USA!



- 4 -

CONFIDENTIAL

EP226855



**Reality Show Cost**

Traditional model of branded reality shows (Apprentice, Survivor, etc.) calls for the brand to participate by paying upfront the cost of production plus profits for the producers and in return getting significant product integration. As the number of impressions increase from increased ratings, syndication & DVD sales – the value to the brand increases. In addition, the producers make additional money from the sale of commercial time and other profit channels. Under this option, the cost for 6 episodes of 'Amazing Grace' is $3,000,000.

The U.S. government has recently chosen to incentivize the production of film and TV shows that are produced within the borders of the United States. Prior to the tax incentives enacted by the Jobs Act, the United States was know as the "runaway production" country. Because the U.S. did not offer tax incentives but other countries did, production (and, hence, jobs) migrated off-shore.

Now, at least for a small window of time (until 2008), the U.S. government is willing to trade tax incentives for bringing back these jobs. These structures are similar to the structures we used to finance films in the U.K. and Germany.

The new model of branded entertainment treats the brand as a partner and allows them to enjoy ALL of these new tax benefits. Under this new model, the production team is willing to risk a significant portion of their profits in return for a potential windfall upon the success of the program.

In this new model, our team would prepare 12 episodes at a cost of $6,000,000. Your company would only pay $3,000,000 and then provide a note for the additional $3,000,000. This would provide your company with an immediate deduction of $6,000,000 – a tax savings of approximately $3,000,000.

Our team has utilized this same financing structure in Europe to finance such films as Harry Potter I & II, Lord of the Rings I, II & III, Mission Impossible I & II, The Core, Blade II, Lara Croft I & II, The Bourne Identity, Marci X, The Life of David Gale, Clockstoppers, Beyond Borders, Looney Tunes, Back in Action!, Paycheck, The Fighting Temptations, Malibu's Most Wanted, among others.

- 5 -

**CONFIDENTIAL**

**EP226856**