IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| HILL HOLLIDAY CONNORS COSMOPULOS, INC. d/b/a ERWIN-PENLAND,<br>    Plaintiff,<br>vs.<br><br>JEFFREY GREENFIELD and 1st APPROACH, LLC,<br>    Defendants, and<br>    Third-Party Plaintiffs,<br>vs.<br><br>CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS, and JOSEPH A. ERWIN,<br>    Third-Party Defendants. | Case Number: 6:08-CV-3980-GRA |

Defendants' Memorandum in Opposition to
Motion for Summary Judgment by Third-Party Defendant Verizon Wireless

Comes now the Defendants and Third-Party Plaintiffs, 1st Approach LLC and Jeffrey Greenfield (collectively referred to hereinafter as "Greenfield"), and in opposition to the *Motion for Summary Judgment* by Third-Party Defendant Verizon Wireless (hereinafter "VZW") responds as follows.

Summary of the Case

This case is about *"How Sweet the Sound"* ("*HSTS*"), an award-winning, marketing campaign ("Campaign").[1] Greenfield masterminded the Campaign, although EP and VZW dispute that fact, and Greenfield presented it, together with EP, to VZW's John Stratton.[2] Although EP and VZW have profited mightily,[3] Greenfield has not been paid or received any credit for his brilliant marketing plan. Greenfield designed *HSTS* to sell mobile phone services to the African American community.[4] EP lacked the

---

[1] **Ex. 1**: Effie 2009 Trophy Winners, at p. 1.
[2] **Ex. 2**: EP/1st Presentation Deck (Apr. 26, 2006), at p. 8, and p. 32 (last page).
[3] **Ex. 3**: VZW estimates $844 million in incremental revenue. VZW000078237 at p. 4.
[4] **Ex. 4**: GlobalHue MCM 2008 Agency Review (Mar. 20, 2009) (VZW000090289-VZW000090296).

innovative techniques and knowledge that Greenfield had mastered.[5] EP's Erwin approached Greenfield, but Greenfield made plain he was no ordinary consultant, and worked only on projects that included an equity interest.[6] EP and Greenfield then began a collaboration, and from that joint effort came *Amazing Grace*,[7] the forerunner to *HSTS*. At this time, EP's main client, Verizon Wireless (hereinafter "VZW") was fumbling to reach the African-American (AA) demographic group.[8] *HSTS* was perfect for VZW, so Greenfield and Erwin decided to pitch *HSTS* to them. Joseph A. Erwin is a founder of EP, and its CEO. EP's actions in connection with the present dispute all occurred under Erwin's watch. Accordingly, Greenfield here incorporates by reference his *Memorandum in Opposition to Joseph A. Erwin's Motion for Summary Judgment*.

VZW has predicated its entire defense on suppressing the single most damaging, undeniable, and uncontroverted fact: that VZW's CMO, John Stratton, and other VZW executives present at the April 26, 2006 presentation knew from Slide 8,[9] that Greenfield's 1st Approach and EP, together, had developed and claimed creative ownership rights in *HSTS*, and from the aforesaid actual knowledge, VZW executives knew that the commercialization of *HSTS* would result in rights accruing to EP and Greenfield, including but not limited to a reasonable expectation of compensation and attribution.

Statement of Material Facts in Dispute

While there are multiple parties in this litigation, all claims arise from a core set of disputed and undisputed facts. Accordingly, Greenfield incorporates herein those disputed material facts that are set forth fully in Greenfield's *Memorandum in Opposition to Joseph A. Erwin's Motion for Summary Judgment*, and his *Memorandum in Opposition to Erwin-Penland's Motion for Summary Judgment*. Material facts in dispute concerning the trade secret claim against VZW and EP are as noted herein.

---

[5] **Ex. 5**: Joe Erwin to Jeff Greenfield (Oct. 24, 2005): "[Y]our area of expertise might give us a competitive advantage in the pitch (not to mention a new marketing tool for these folks)"
[6] **Ex. 6**: Greenfield Dep. (Oct. 21, 2009) at pp. 104–106.
[7] **Ex. 7**: E-mail re: *Amazing Grace* (Nov. 4, 2005) and attached *Amazing Grace* Deck (Nov. 4, 2005).
[8] **Ex. 8**: African-American Media Review (Jun. 2005) (VZW000083921), showing VZW's then-current marketing to African Americans, with lagging results.
[9] **Ex. 2.**

# I. MISAPPROPRIATION OF TRADE SECRET

**A.     Fact Questions Preclude Summary Judgment as to the Trade Secret Claims**

The South Carolina Trade Secrets Act, S.C. Code Ann. §§ 39-8-10 through 39-8-130 ("SCTSA"), provides no specific guidance upon the respective roles of judge and jury in resolving the many interconnected and fact-intensive inquiries that often arise in actions under the SCTSA. In the present case, numerous complex material questions of fact must be resolved to establish liability under SCTSA including, but not limited to, the following:

1. In light of an undisputed close collaboration between Greenfield and EP over a period of many months resulting in the creation of the April 26, 2006 "deck" which was presented by Greenfield and EP to VZW's Chief Marketing Officer and others, and which stated that Greenfield was the co-creator of the campaign, and which was copyrighted to Greenfield and EP, what specific combination of ideas and methods, i.e. in SCTSA terms, what "formula", should be properly attributed to Greenfield's contribution to the creation and development of an award-winning, market-leading campaign to gain mobile phone subscribers in the African-American market known as "How Sweet the Sound," (hereinafter *"HSTS"*)?[10] <u>This is hotly disputed</u>.[11]

2. … what specific combination of ideas and methods, i.e., in SCTSA terms, what "formula", should be properly attributed to EP's contributions?  <u>This is hotly disputed</u>.

3. … what specific combination of ideas and methods, i.e., in SCTSA terms, what "formula", may have been contributed at some later date by VZW and, possibly by its other agencies, and how much significance should be assigned to those contributions, if any?  <u>This too, is hotly disputed</u>.[12]

4. Do Greenfield's alleged trade secret contributions to *HSTS*, as perceived by the factfinder, meet the statutory "trade secret" definition which expressly refers to "marketing strategies"?  <u>This is hotly disputed</u>.

5. Did Greenfield's specific combination of ideas and methods, i.e. in SCTSA terms, "formula", have *actual or potential economic value* to Erwin-Penland and/or to VZW?  <u>This is hotly disputed</u>.[13]

---

[10] **Ex. 2**: EP/1st Presentation Deck (Apr. 26, 2006), at p. 8, and p. 36 (last page); **Ex. 49**: Jeffrey Greenfield, *April 26, 2006 Deck: Content Which Originated from Greenfield.*  Shows 18 pages of 36 page deck that are fairly attributable to specific elements Greenfield contributed between Nov. 25, 2005 and April 25, 2006. *See also* **Ex. 7**: E-mail re: *Amazing Grace* (Nov. 4, 2005) and attached *Amazing Grace* Deck (Nov. 4, 2005).

[11] **Ex. 28**: Greenfield Affidavit (Mar. 1, 2010).

[12] **Ex. 15**: See Chart appearing as *Exhibit 1* to *Expert Witness Report* of Susan M. Fournier at pp. 26-30 (compares Greenfield contributions to VZW's current *HSTS*.

[13] **Ex. 32**: John Stratton e-mail to Allen Bosworth (Feb. 9, 2006). Stratton: "This is a fantastic idea. I absolutley (sic) love it. I've asked John H to get us on a call asap to discuss implementation." (EP001626-EP001627). On the other hand, EP and VZW's "experts" have panned the idea, calling it ordinary and uninspired, thus setting up diametrically opposing views, and a genuine issue of material fact.

6. Did Greenfield's "trade secret" exist in a sufficiently concrete and novel combination, or specific application of publicly-known marketing techniques, prior to its alleged misappropriation?[14]

7. Did Greenfield authorize EP and/or VZW to use his creative contributions to *HSTS* with no reasonable expectation of compensation, financial benefit, or attribution, as EP and VZW have claimed in their defense?[15]

8. Would Greenfield's "trade secret" have continued to exist, and continued to have independent value to competitors in the mobile phone industry, if Greenfield had never proposed it, and EP and VZW had never exploited it?[16]

9. Did Greenfield make reasonable efforts under the circumstances to protect the secrecy of *HSTS* so as to preserve its secrecy and corresponding value as a viable, unused marketing plan?[17]

10. How does the genesis and evolution of the collaboration between Greenfield and EP, indisputably initiated by Joe Erwin, impact the reasonableness of Greenfield's efforts to protect secrecy?[18]

11. How did EP's fiduciary and contractual duties to both Greenfield and Verizon affect the reasonableness of Greenfield's efforts to maintain secrecy of his contributions to *HSTS*?[19]

12. Did EP and/or VZW use or disclose trade secrets through *improper means,* i.e., means that fell short of commercial standards of ethics, given all the surrounding circumstances?[20]

13. Did VZW have any reason to know that Greenfield claimed rights in *HSTS*?[21]

---

[14] This is a mixed question of fact and law for the jury to resolve, taking into account all surrounding circumstances in this case, including the testimony of experts. Marketing experts retained on each side have registered diametrically opposing views in their written reports.

[15] **Ex. 6**: Greenfield Dep. (Oct. 21, 2009) at pp. 104–106; **Ex. 28**: Greenfield Affidavit (Mar. 1, 2010) at ¶ 3 (Greenfield certainly expected compensation). The jury will determine whether that expectation was reasonable.

[16] This is a mixed question of fact and law for the jury. Certainly, Greenfield believed the idea had great vitality when he wished to continue shopping it, if VZW wasn't interested. *See* **Ex. 34**: E-mail exchange between Allen Bosworth and Jeff Greenfield (Dec. 22, 2006). Greenfield: "Can you give me a final word on the status of 'How Sweet The Sound' with Verizon? If they have officially turned it down, then I would like to take the offer to other clients." Bosworth: "It's still being looked at by VZW…" (EP000235-EP000238).

[17] *See* argument at heading **Reasonable Efforts to Protect Secrecy,** *infra*.

[18] Perceptions of the overall relationship's impact on reasonableness of Greenfield's effort is a matter for the jury.

[19] These interconnected determinations argue strongly for submitting the case to the jury. As to EP's duties to VZW, *see* VZW *Memorandum in Support of Summary Judgment* (Mar. 1, 2010) at 22, and Ex. 24 appended thereto.

[20] "Improper means" is a value-laden judgment, and can arise from facts as simple as the use of aerial photography to gain knowledge of a competitor's processes. In every case, it depends on all facts and circumstances. The determination of "improper means" is certainly interdependent with fact issues bearing on Greenfield's fraud claims. In our case, the fact that EP has never offered to pay Greenfield *anything* for his team effort in connection with *HSTS* is strong circumstantial evidence from the jury can infer EP's Erwin had no intention of ever paying Greenfield anything for his involvement, regardless of the outcome. One fact bearing on this is EP's knowledge of the method by which EP received its own compensation from VZW (through FTE billings). EP's unjust enrichment at Greenfield's expense also contributes to the jury's judgment as to whether "improper means" were used.

[21] **Ex. 2**: EP/1st Presentation Deck (Apr. 26, 2006), at p. 8, and p. 36 (last page). At p. 8: "… conceived by **Erwin-Penland and 1st Approach** as a reality program that taps into the soul of America …"

14. Did VZW continue commercializing *HSTS*, in conscious disregard of Greenfield's rights, and without inquiring about his intellectual property rights therein?[22]

The majority, and nearly universal, view is that the existence of a trade secret is a question of fact, being dependent upon relationships and attending circumstances, which virtually always requires an evidentiary hearing or trial.[23] Thus, the question whether a "trade secret" exists should be submitted to a properly-instructed jury.[24] Accordingly, it has generally been found to be reversible error for the trial judge to find, as a matter of law, that no trade secret exists.[25] If the evidence submitted to the jury is such that reasonable minds can draw but one conclusion, the Court can then direct a verdict pursuant to Fed. R. Civ. P. 50(a)(1) or grant judgment notwithstanding the verdict pursuant to Fed. R. Civ. P. 50(b).[26]

**B.     All Three Elements for Trade Secret Protection Are Present.**

South Carolina's definition of "trade secret," now fixed by statute, has three core elements:

1.    Existence of one or more listed types of <u>information used in business</u>;
2.    That derives actual or potential <u>commercial value</u> by virtue of its secrecy; and
3.    That its owner has taken <u>proper steps to protect</u> from disclosure.

S.C. Code Ann. § 39-8-20(5).

**1.     "Marketing Strategies," like *HSTS*, are Expressly Protected Trade Secrets.**

South Carolina's adoption of the UTSA in 1992 extended statutory protection to any *method* used in business. S.C. Code Ann. §39-8-20(5)(a)(1). In 1997, desiring greater clarity, South Carolina's legislature

---

[22] *See* **Ex. 52**: E-mail from Allen Bosworth [EP] to Suzy M. Deering [VZW] and John Harrobin [VZW] (May 16, 2006) with cc: to "Jeff@1st Approach.com"; (VZW000076154), being VZW internal e-mail messages with Jeffrey Greenfield's e-mail address on them.) *See also* **Ex. 24**: Revised Deck (still bearing the EP/1st Approach presentation date of Apr. 26, 2006 and copyright notice acknowledging 1st Approach as copyright holder), as distributed within VZW on Mar. 10, 2008.

[23] *See generally*, L. Altman & M. Pollack, <u>Callman on Unfair Competition, Trademarks and Monopolies</u> § 14.27, at n. 62 (4th ed. Supp. 2009) (collecting cases); 4 Milgrim, <u>Trade Secrets</u> § 15.01[1], (Supp. 2008, Release 87)).

[24] <u>Chevron U.S.A., Inc. v. Roxen Service, Inc.</u>, 813 F.2d 26, 29-30 (2nd Cir. 1987) (jury should have determined whether customer lists constituted "trade secrets"); <u>Defiance Button Machine Co. v. C & C Metal Products Corp.</u> 759 F.2d 1053, 1063 (2nd Cir. 1985), *cert. denied*, 474 U.S. 844, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985) (affirming trial judge's findings of fact concluding that no trade secret existed following three-day bench trial).

[25] <u>A.F.A. Tours, Inc. v. Whitchurch</u>, 937 F.2d 82 (2nd Cir. 1991) (reversing grant of summary judgment, finding record "rife with genuine issues of fact," particularly in light of trade secret claimant's affidavit reciting affirmative efforts to safeguard trade secrets). Similarly, it is reversible error to grant or deny a preliminary injunction without having conducted evidentiary hearings to determine existence of a "trade secret." <u>Network Telecommunications, Inc. v. Boor-Crepeau</u>, 790 P.2d 901, 902 (Colo. App. 1990). <u>Gates Rubber Co. v. Bando Chemical Industries, Ltd.</u>, 9 F.3d 823, 848 (10th Cir. 1993) (held "[w]hat constitutes a trade secret is a question of fact").

[26] *See, e.g.*, <u>Woven Electronics Corp. v. Advance Group, Inc.</u>, 1991 WL 54118 (4th Cir. 1991) (pre-UTSA, pre-SCTSA case; affirming this Court's refusal to grant JNOV following jury trial; holding evidence supported jury findings both as to existence of trade secret and reasonableness of efforts to preserve secrecy).

enacted SCTSA, significantly strengthening UTSA protections, and expressly extending statutory protection to **marketing strategies** such as *"How Sweet the Sound."* A trade secret is defined as a *series or sequence of items or procedures that collectively form the basis for a <u>marketing or commercial strategy</u>*. S.C. Code Ann. § 39-8-20(5)(b). (emphasis added).[27] Moreover, the 1997 SCTSA legislation made clear that "[t]he *collective effect* of the items or procedures *must be considered* in any analysis of whether a trade secret exists and <u>not the general knowledge of each individual item or procedure</u>." *Id.* (emphasis added) (codifying holding of <u>Woven Electronics Corp. v. Advance Group, Inc.</u>, 1991 WL 54118 (4th Cir. 1991), a pre-UTSA, pre-SCTSA case holding that a trade secret may exist solely in the manner in which a group of items is put to use, even through each of the items is itself within the public domain).

Similarly, appellate courts in other jurisdictions have had little difficulty assigning trade secret status to proprietary business and marketing plans that confer a clear commercial advantage over the misappropriating recipient's competitors. The case of <u>All Pro Sports Camp, Inc. v. Walt Disney Co.</u>, 727 So. 2d 363 (Fla. 5th DCA 1999) involved aborted negotiations to implement a confidential business plan for what later became Disney's *"Wide World of Sports."*[28] Reversing a dismissal, the court held that All Pro's business plan met Florida's UTSA-based definition of "trade secret." The case subsequently went to trial, at which the jury awarded a $240 million jury verdict.[29] At least one trial court in this state has similarly granted trade secret protection for marketing plans.[30]

In our case, Greenfield's trade secret consists of a brilliant business and marketing plan, like those described in <u>Wilkes</u> and <u>Disney</u>, *supra*. VZW has adopted Greenfield's plan with inconsequential

---

[27] *See also* <u>Wilkes v. Pioneer Am. Ins. Co.</u>, 383 F. Supp. 1135 (D. S.C. 1974) (applying Restatement (First) of Torts, §757, comment b, holding trade secret protection extends to innovative marketing techniques).
[28] The theme park became Disney's *Wide World of Sports*, where the Atlanta Braves train each spring.
[29] *See* ABC News, *"Disney Owes $240 Million for Stealing Ideas,"* http://abcnews.go.com/Business/story?id=89515&page=1 (last visited March 7, 2010).
[30] *See* <u>Wilkes v. Pioneer Am. Ins. Co.</u>, 383 F. Supp. 1135 (D. S.C. 1974) (applying Restatement (First) of Torts, § 757, comment b, and holding trade secret protection extends to innovative marketing techniques; granting temporary injunction); *accord*, <u>Nilssen v. Motorola, Inc.</u>, 963 F. Supp. 664, 672-675 (N.D. Ill. 1997) (denying defense motion for summary judgment, and finding that a strategic business plan can be afforded trade secret protection, if identified with some reasonable degree of specificity).

modifications to his original concepts.[31] Greenfield co-designed and put into tangible form, through a series of presentation "decks," each with increasing levels of refinement, an entertainment-based plan to enhance sales and brand name recognition to remedy Verizon's lackluster efforts at reaching affluent African American consumers.[32]

Prior to receiving the Greenfield-EP proposal describing *HSTS* as a strategy for increasing Verizon's share of the African-American market, Verizon had fumbled badly at reaching this demographic.[33] Its *"Can You Hear Me Now?"* campaign simply didn't connect with African-Americans; failed to connect with them in an authentic way; and failed to differentiate Verizon from AT&T, MetroPCS, or any of its other competitors vying for that market demographic.[34]

John Stratton's initial response to the Greenfield/EP proposal was energetic and enthusiastic: *"I really love this concept. I told Allen [Bosworth, of Erwin-Penland] and John Harrobin [Verizon South Marketing] that I want to be personally involved as we move from concept to reality. This is a great idea."* (Emphasis added.)[35] In 2007, after distancing himself from Greenfield and cutting him out of the deal, Erwin admitted that 50% of *HSTS* was Greenfield's idea.[36]

Greenfield makes no claim to owning a trade secret in the generalized concept of "branded entertainment," although it was clearly Greenfield's national recognition in that field,[37] that originally attracted Joe Erwin to him. Nor does Greenfield claim trade secret status for the concept of an "American Idol" style televised singing competition. Nor does he claim protection for the general concept of gospel choir competitions. What Greenfield claims is a right to protection for the brilliant marketing plan that

---

[31] **Ex. 15**: See Chart appearing as *Exhibit 1* to *Expert Witness Report* of Susan M. Fournier at pp. 26-30 (compares Greenfield contributions to VZW's current *HSTS*.
[32] **Ex. 15**: Susan M. Fournier, Expert Witness Report, at pp. 3-12.
[33] **Ex. 8**: African-American Media Review (Jun. 2005) (VZW000083921), showing VZW's then-current marketing to African Americans, with lagging results; *compare* **Ex. 4**: GlobalHue MCM 2008 Agency Review (Mar. 20, 2009) (VZW000090289-VZW000090296), showing dramatic improvement in results from *HSTS*.
[34] **Ex. 8**: African-American Media Review (Jun. 2005) (VZW000083921), showing VZW's then-current marketing to African Americans, with lagging results.
[35] **Ex. 32**: John Stratton e-mail to Allen Bosworth (Feb. 9, 2006). Stratton: "This is a fantastic idea. I absoutley (sic) love it. I've asked John H to get us on a call asap to discuss implementation." (EP001626-EP001627)
[36] **Ex. 17**: E-mail from Joe Erwin to Allen Bosworth (May 9, 2007).
[37] **Ex. 15**: Susan M. Fournier, Expert Witness Report, at pp. 4-12.

Greenfield conceived with his partner, Erwin-Penland, one that had tremendous value to VZW, under facts closely tracking Justice Sotomayor's decision in Nadel, discussed *infra*.

The actual trade secrets at issue consist of Greenfield's specific application of his unique and specialized marketing knowledge to the characteristics of the particular demographic that EP and Verizon needed to reach: the under-served, increasingly-affluent market for mobile phone and data services within the African-American (hereinafter "AA") demographic.[38] More specifically, it was Greenfield's genius in selecting and identifying this perfect branding opportunity for Verizon: the concept of a national gospel choir competition that *by its very nature* personally involved tens of thousands of the targeted AA consumers; and within that format, conceiving and developing a series of specific steps needed to build brand identification and loyalty[39] Again, in the words of John Stratton, Chief Marketing Officer of Verizon: "*I really love this concept … I want to be personally involved. This is a great idea.*" (Emphasis added.) In the corresponding language of the SCTSA, it was this *unique combination of elements* in a specific *marketing plan* that made Stratton want to exploit the concept for its *economic value,* arising from VZW's potential adoption of this secret plan, but its value depended on VZW adopting such a secret plan before one of its competitors did so.

### 2. Greenfield's Innovation Has *Independent Economic Value.*

Not all secrets used in trade or business deserve legal protection. Perfectly kept secrets with *de minimus* commercial value do not give rise to liability for misappropriation. Accordingly, South Carolina's definition of "trade secret," carried forward from the UTSA, requires secrets to have *"independent economic value, actual or potential.*" S.C. Code Ann. § 39-8-20(a)(i). Secrets with "independent economic value" are protected since they confer some specific *advantage over competitors* in a particular trade or business.[40]

---

[38] **Ex. 4**: GlobalHue MCM 2008 Agency Review (Mar. 20, 2009) (VZW000090289-VZW000090296) (showing that HSTS was an outstanding vehicle for connecting with African-American consumers and increasing VZW's position in that market).
[39] **Ex. 15**: *See* Chart appearing as *Exhibit 1* to *Expert Witness Report* of Susan M. Fournier at pp. 26-30 (compares Greenfield contributions to VZW's current *HSTS.*
[40] *See* Kewanee Oil v. Bicron Corp., 416 U.S. 470, 474-475 (1974).

Some courts, particularly in cases involving *unsolicited submission of ideas*, have held that some modest degree of true novelty is required, or it cannot be said that the submitted secret has potential *independent* economic value.[41] The present case, however, is plainly not one involving *unsolicited submissions of ideas*. EP specifically requested Greenfield's help with its upcoming Captain D's pitch,[42] under circumstances plainly giving Greenfield a right to expect compensation. It was EP that then asked Greenfield to continue refining concepts originating in the Captain D's pitch,[43] adding new concepts, such as the Pastor Packet,[44] tax advantages, and innovative ownership concepts[45] and crafting it all into what became *HSTS*, creating tremendous competitive advantage for VZW. It was VZW's agent, EP, that made Greenfield the co-author of the deck, inserted his copyright[46] along with that of EP, and made Greenfield a key presenter at the VZW presentation.[47] The present case is far closer to Nadel, *at fn. 41 supra,* than it is to Murray, *at fn. 41 supra*. More importantly, the present case is far closer to Disney, since that case involved far more than unsolicited ideas.

---

[41] Kewanee Oil, *supra*, 416 U.S. at 476; Murray v. NBC, Inc. 671 F. Supp. 236 (S.D.N.Y. 1987) (an *unsolicited idea case* wherein the concept for the *Bill Cosby Show* was held not to be sufficiently novel under New York trade secret law since Bill Cosby himself had publicly pitched the idea, and NBC had already aired shows with similar themes; applying New York law). *But see* Apfel v. Prudential-Bache Sec., Inc., 81 N.Y.2d 470, 616 N.E.2d 1095 (N.Y. 1993) (distinguishing Murray; finding that when a seller's claim arises from a contract to use an idea after disclosure of the idea, the question is purely whether the idea had value *to the buyer*, for which the buyer has agreed to pay; if so, lack of novelty does not demonstrate a lack of value and becomes irrelevant); *accord*, Nadel v. Play-by-Play Toys & Novelties, Inc., 208 F.3d 368, 377 (2nd Cir. 2000) (applying N.Y. law, then-Circuit Judge Sotomayor held summary judgment was improper where fact issues remained as to existence of an implied contract that defendant would pay for its use of plaintiff's *unsolicited* toy idea; "While an idea may be unoriginal or non-novel in a general sense, it may have substantial value to a particular buyer who is unaware of it and therefore willing to enter into contract to acquire and exploit it.").

[42] **Ex. 12**: E-mail exchange between Jeff Greenfield and Joe Erwin (Nov. 24, 2005).

[43] **Ex. 51:** E-mail exchange between Jeff Greenfield and Joe Erwin (Mar. 16, 2006 and Mar. 17, 2006). *Greenfield*: "Do you want me to keep working on the deck?" *Erwin*: "Please do keep working on the deck." This will be a 'team presentation' in which Allen and I will want to (and need to) lead because they know us, trust us and count on us. We will need you to prove to them how completely we have thought this through and that basically all they have to do is say yes to one of the options we present to them. And they will want to see great chemistry from you and us as a team."

[44] **Ex. 15**: See Chart appearing as *Exhibit 1* to *Expert Witness Report* of Susan M. Fournier at pp. 26-30 (compares Greenfield contributions to VZW's current *HSTS*.

[45] **Ex. 27**: E-mail from Shannon Wilbanks to Jeff Greenfield, Allen Bosworth (Mar. 28, 2006). Summary of key concepts that Jeff Greenfield discussed with Allen Bosworth, Joe Erwin, and Shannon Wilbanks at Mar. 27, 2006 conference call, integrated into the final presentation deck.

[46] **Ex. 2**: EP/1st Presentation Deck (Apr. 26, 2006), at p. 8, and p. 36 (last page); **Ex. 49**: Jeffrey Greenfield, *April 26, 2006 Deck: Content Which Originated from Greenfield.* Shows 18 pages of 36 page deck that are fairly attributable to specific elements Greenfield contributed between Nov. 25, 2005 and April 25, 2006. *See also* **Ex. 7**: E-mail re: *Amazing Grace* (Nov. 4, 2005) and attached *Amazing Grace* Deck (Nov. 4, 2005).

[47] **Ex. 54:** EP/1st Presentation Deck (Apr. 26, 2006), multiple slides on each page, and with handwritten notes believed to be those of Allen Bosworth, showing the presenter for each slide. "Jeff"=Greenfield. "JE"=Erwin. "AB"=Bosworth. "BR"= Reynolds.

Under South Carolina's Trade Secrets Act, it is sufficient that the marketing plan in question has *potential economic value*. S.C. Code Ann. § 39-8-20(a)(i). If so, it is protected from misappropriation by *"any other person who can obtain economic value from its disclosure or use." Id.* Thus, the SCTSA clearly extended protection to "works in progress," such as Greenfield's marketing pitch "decks," so long as they held *potential economic value* as against direct competitors of the party to whom they were disclosed, i.e., VZW, and who subsequently commercialized the marketing plan to its own commercial advantage and to the benefit of EP, its advertising agency.

To fully address the question of independent value, one must define the relevant *trade* (or industry) to which the *trade* secret applies. VZW and EP have both attempted to define the relevant trade, for purposes of the "value" element, as the *entirety of the advertising and marketing industry*, which would essentially encompass all of American business, since few businesses exist that conduct no advertising or marketing. VZW and EP point to its own experts' opinions, suggesting that Greenfield's general expertise in the field of "branded entertainment" was commonplace, and that branded entertainment was widely diffused, well-known, and generally used within the commercial advertising industry in 2005.[48] While the facts demonstrate otherwise,[49] and are clearly in dispute, the use of branded entertainment in American advertising practice misses what's most important under the SCTSA. VZW and EP experts have wildly mischaracterized the relevant industry in their effort to escape liability. Greenfield's unique marketing plan conferred its specific competitive advantage and *potential economic value* **within the mobile phone industry**, and that is what's principally relevant under the SCTSA. It confers economic advantage as against *"any other person who can obtain economic value from its disclosure or use,"* S.C. Code Ann. § 39-8-20(a)(i), and in particular, VZW's competitors, such AT&T, MetroPCS, and Sprint.

What particularly gave Greenfield's *HSTS* concept its tremendous *potential economic value* was the fact that **no other carrier in the mobile phone industry** had used anything like it to connect so powerfully

---

[48] *See* expert reports of EP and VZW.
[49] **Ex. 15**: Susan M. Fournier, *Expert Witness Report* (Sep. 29, 2009).

with the African-American community, and thereby increase both sales and market share. Often described in the business literature as a "first-mover" advantage, Greenfield teamed with EP to present VZW with an imaginative and unique opportunity to take market share from VZW's competitors. In that limited market space, *HSTS* would completely occupy and preempt it, as against VZW's direct competitors.[50]

The fact question as to whether HSTS held *potential economic value* when Greenfield disclosed it to VZW is purely one for the jury. Since John Stratton, VZW's Chief Marketing Officer, who is exposed to literally *thousands* of marketing ideas annually, reacted as strongly as he did to *HSTS*, the jury will be hard-pressed to overrule him. *HSTS* was perfect for VZW; Stratton knew it immediately; and Stratton wanted it before his competitors got it. If *HSTS* cannot qualify as an SCTSA-protected *"marketing plan,"* one is left to wonder what the Legislature might have had in mind.

### 3. Reasonable Efforts to Protect Secrecy

Under the SCTSA, the owner of a trade secret must show that he made "efforts that are reasonable under the circumstances to maintain its secrecy." S.C. Code Ann. § 39-8-20(5)(a)(ii). The relevant standard is "reasonableness of efforts, not perfection."[51] This is particularly the case where precautions to protect secrecy actually fall within the alleged misappropriator's area of responsibility.[52]

Of all the elements addressed in SCTSA cases, the reasonableness of steps taken to protect secrecy is most clearly and distinctly the province of the jury; it is completely unsuited for resolution on a motion for summary judgment. Rockwell Graphic Systems, Inc. v. DEV Industries, Inc., 925 F.2d 174, 179 (7th Cir. 1991). In Rockwell, following a dismissal, Judge Posner penned a thorough and thoughtful analysis of why summary judgment on this element should rarely, if ever, be granted:

> [O]nly in an extreme case can what is a "reasonable" precaution be determined on a motion for summary judgment, because the answer depends on a balancing of costs and benefits that

---

[50] *See, e.g.*, Sirsly and Lamertz, *"When Does a Corporate Social Responsibility Initiative Provide a First-Mover Advantage?"* Business & Society (2007). Abstract available at http://www.getcited.org/pub/103434897 (last visited Mar. 17, 2010).
[51] *See, e.g.,* TouchPoint Solutions, Inc. v. Eastman Kodak Co., 345 F. Supp 2d 23 (D. Mass. 2004).
[52] La Calhene, Inc. v. Spolyar, 938 F. Supp. 523, 530 (W.D. Wis. 1996) ("the initiation and execution of a confidentiality policy fell within the defendant's area of responsibility, as chief operating officer. It would be ironic, and unfair to plaintiff, if defendant's failure to take proper measures to protect plaintiff's information inured to his benefit.")

will vary from case to case and so require estimation and measurement by persons knowledgeable in the particular field of endeavor involved.

*Id.* 925 F.2d at 179-180.[53]

Based on discovery materials of record, Greenfield made, at a minimum, all the following efforts to protect the secrecy of *HSTS*:

1. Greenfield protected the confidentiality of his early communications with EP by either including a notice at the bottom of each message, stating that the information provided therein is confidential[54] or by adding a confidentiality notice directly to the document.[55]

2. Greenfield insisted on, and in fact did, include a copyright notice on decks he circulated internally within EP, or that were later circulated to VZW.[56] The effect was to put those "need to know" employees of EP or VZW who viewed the deck on notice that nothing therein was to be copied without express written permission of the copyright holders. Note that there is no evidence that any of these decks were circulated outside EP or VZW or were viewed by any of VZW's other presenting agency at the April 26, 2006 meeting who were not already under an express duty not to reveal anything externally concerning marketing plans that had been pitched to VZW in confidence.[57]

3. The April 26, 2006 presentation to VZW included an express statement claiming ownership of *HSTS* in the collaboration between Erwin-Penland and 1st Approach.[58]

4. Greenfield reasonably relied on EP's additional and collaborative efforts to protect the secrecy of *HSTS*, given the close working relationship between Greenfield and EP. Both were under a

---

[53] *Accord*, Lowndes Products, Inc. v. Brower, 191 S.E.2d 761, 766 (S.C. 1972) (resolving issue as to reasonableness of efforts to protect secrecy only after 21 days of evidentiary hearings before a special master; affirming master's conclusion that efforts were unreasonable to support trade secret action; granting relief for breach of fiduciary duty).
[54] *See, e.g.,* **Ex. 12**, p. 3: E-mail from Jeff Greenfield to Joe Erwin (Oct. 24, 2005) ("PLEASE NOTE: The ideas and concepts within this email are the sole and confidential property of 1st Approach LLC and will not be shared with any other agency or utilized without prior written consent.")
[55] **Ex. 24**: Revised Deck (still bearing the EP/1st Approach presentation date of Apr. 26, 2006 and copyright notice acknowledging 1st Approach as copyright holder), as distributed within VZW on Mar. 10, 2008.
[56] *Id.*
[57] As to EP's duties to VZW, and the duties of other agencies attending the presentation, *see* VZW *Memorandum in Support of Summary Judgment* (Mar. 1, 2010) at 22, and Exhibit 24 appended thereto.
[58] **Ex. 2**: EP/1st Presentation Deck (Apr. 26, 2006), at p. 8, and p. 36 (last page); **Ex. 49**: Jeffrey Greenfield, *April 26, 2006 Deck: Content Which Originated from Greenfield.* Shows 18 pages of 36 page deck that are fairly attributable to specific elements Greenfield contributed between Nov. 25, 2005 and April 25, 2006.

mutual fiduciary obligation to safeguard the value of *HSTS*,[59] particularly from premature disclosure to any of VZW's mobile phone industry competitors, any of whom would derive great value from knowing VZW's plan to increase its share of the A-A market.

5. Greenfield reasonably relied on the existing agency relationship that EP had with VZW, under which EP would be in clear breach had EP revealed to anyone outside the EP-VZW relationship any detail that might jeopardize VZW's element of surprise over its competitors, particularly after VZW's John Stratton had expressed keen interest in pursuing *HSTS* as early as February, 2006.[60]

6. As evidence of Greenfield's insistence on secrecy, Greenfield sought express written permission from EP on November 22, 2006[61] before he pitched *HSTS* to any of 1st Approach's other clients. When EP assured Greenfield that VZW was still interested,[62] Greenfield still continued maintaining the secrecy of *HSTS*, up through the point where EP insisted on litigating Greenfield's rights, at which point EP was the co-venturer or partner who first disclosed Greenfield's compensation dispute over *HSTS* to the public through its declaratory judgment action.

7. Movants have suggested, but supplied no evidence, that Greenfield ever revealed any information about *Amazing Grace or HSTS* at any public speaking engagement from 2005 through 2010. Greenfield's general discussion of "branded entertainment" in public speaking engagements is a far cry from revealing the *HSTS* marketing plan to VZW's competitors.

VZW and EP have noted that Greenfield did not require either of them to execute confidentiality or nondisclosure agreements before revealing his trade secrets to them. Notably, neither EP nor VZW required Greenfield to sign nondisclosure agreements, either. The reason is readily apparent: as co-venturers, partners, and co-promoters, both Greenfield and EP had everything to gain, and nothing to lose, from shared

---

[59] See Greenfield's *Motion for Summary Judgment as to Breach of Fiduciary Duty.*
[60] As to EP's duties to VZW, *see* VZW *Memorandum in Support of Summary Judgment* (Mar. 1, 2010) at 22, and Exhibit 24 appended thereto.
[61] **Ex. 34**: E-mail exchange between Allen Bosworth and Jeff Greenfield (Dec. 22, 2006). Greenfield: "Can you give me a final word on the status of 'How Sweet The Sound' with Verizon? If they have officially turned it down, then I would like to take the offer to other clients." Bosworth: "It's still being looked at by VZW…" (EP000235-EP000238).
[62] *Id.*

responsibility for ensuring that *HSTS* was revealed only to those with a "need to know." VZW also shared this responsibility, and enforced it through their agency contract with EP. As in <u>La Calhene</u>, it would be inequitable if Erwin-Penland or VZW could now escape liability to Greenfield for their misdeeds because of EP or VZW's own failings in preserving the secrecy of *HSTS*. <u>La Calhene</u>, *supra*, 938 F. Supp. at 530.

As it stands, there is nothing in the record showing that Greenfield revealed anything about *HSTS* at any trade group or classroom presentation. For those limited "need to know" presentations to key marketing people at Verizon, Greenfield inserted on every deck both attribution to EP and to Greenfield's 1st Approach.[63] Each deck further contained a copyright notice, reinforcing the expectation that anyone internal to EP or VZW who had access to the deck, had to obtain express written permission of Erwin-Penland and Greenfield before making any copy. Under the circumstances of our case, a jury will be justified in finding that these efforts were reasonable under the SCTSA standard.

### 4. VZW's Misappropriation of Greenfield's Trade Secrets Knowing of Greenfield's Rights.

Under SCTSA, "misappropriation" means acquisition of a trade secret of another by a person who knows, or has reason to know, that the trade secret was acquired by improper means. S.C. Code Ann. § 39-8-20. Accordingly, if VZW had *reason to know* that Greenfield held rights to *HSTS* trade secrets, it is liable for its failure to acquire those rights by "proper" means, i.e., by making payment to the trade secret holder by paying to license or use those rights. That *reason to know* of Greenfield's rights is amply shown in Slide 8 of the April 26, 2006 presentation.[64]

## II. CONSTRUCTIVE TRUST

VZW and EP argue that no constructive trust can be imposed because Greenfield cannot establish that VZW or EP hold funds from *HSTS* to which Greenfield is entitled. In support of Greenfield's several claims against VZW, i.e. trade secrets, breach of fiduciary duty, and unjust enrichment, and his claims against EP, Greenfield has set forth a mountain of credible evidence which contradicts VZW's naked

---

[63] **Ex. 2**: EP/1st Presentation Deck (Apr. 26, 2006), at p. 8, and p. 36 (last page).
[64] **Ex. 2**: EP/1st Presentation Deck (Apr. 26, 2006), at p. 8, and p. 36 (last page).

claim.[65] In Wolfe v. Wolfe, 215 S.C. 530, 534, 56 S.E.2d 343 (1949), the Supreme Court held that fraud or breach of fiduciary duty will give rise to a constructive trust.[66]

Given the abundance of credible facts as to particular intentional concealments and misrepresentations set forth in Greenfield's discussion of his fraud claims against EP, together with the inescapable fact that VZW had actual knowledge on April 26, 2006 that Greenfield was co-creator of the trade secrets contained in *HSTS*, and given the many facts presented in support of Greenfield's breach of fiduciary duty and unjust enrichment claims, which Greenfield incorporates herein by reference, a constructive trust arises by operation of law.

### Conclusion

For the reasons set forth above, VZW's *Motion for Summary Judgment* should be denied.

**The Law Office of P. Jeffrey North LLC**

*[signature]*

**By:     P. Jeffrey North, Esq.**

**Attorney Identification Number 9885
PO Box 7525
Hilton Head SC 29938
Phone (843) 341-5200
Fax     (888) 487-7624
Email  attorney@pjnorth.com**

**March 18, 2010
Hilton Head SC**

---

[65] Greenfield hereby incorporates by reference his memoranda in support of his motions for summary judgment on his claims of unjust enrichment, breach of fiduciary duty, and the facts and authority set forth herein as to trade secret misappropriation.

[66] *See also* Dye v. Gainey, 320 S.C. 65, 463 S.E.2d 97, 99 (1995) (constructive trust arises whenever the circumstances under which property was acquired make it inequitable that the property should be retained by the one holding legal title). *Id.* at 99. While it has been said that fraud is an essential element, it need not be actual fraud. Lollis v. Lollis, 291 S.C. 525, 529, 354 S.E.2d 559 (1987).