IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| HILL HOLLIDAY CONNORS COSMOPULOS, INC. d/b/a ERWIN-PENLAND, | ) ) ) | Case Number: 6:08-CV-3980-GRA |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| JEFFREY GREENFIELD and 1st APPROACH, LLC, | ) ) ) | |
| Defendants, and | ) | |
| Third-Party Plaintiffs, | ) ) | |
| vs. | ) ) | |
| CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS, and JOSEPH A. ERWIN, | ) ) ) | |
| Third-Party Defendants. | ) | |

Defendants' Memorandum in Opposition to
Plaintiff Erwin-Penland's Motion for Summary Judgment

Comes now the Defendants 1st Approach LLC and Jeffrey Greenfield (collectively, "Greenfield"), and in opposition to Plaintiff Erwin-Penland's <u>Motion for Summary Judgment</u> would state as shown below.  Erwin-Penland shall be referred to herein as "EP."

Summary of the Case

This case is about *"How Sweet the Sound"* ("*HSTS*"), an award-winning, marketing campaign ("Campaign").[1]  Greenfield masterminded the Campaign, although EP disputes that fact, and Greenfield indisputably presented it, together with EP, to VZW's John Stratton.[2]  Although EP and VZW have profited mightily,[3] Greenfield has not been paid.

Greenfield designed *HSTS* to sell mobile phone services to the African American community.[4]  EP

---

[1] **Ex. 1**: Effie 2009 Trophy Winners, at p. 1.
[2] **Ex. 2**: EP/1st Presentation Deck (Apr. 26, 2006), at p. 8, and p. 32 (last page).
[3] **Ex. 3**: VZW estimates $844 million in incremental revenue.  VZW000078237 at p. 4.
[4] **Ex. 4**: GlobalHue MCM 2008 Agency Review (Mar. 20, 2009) (VZW000090289-VZW000090296).

lacked the innovative techniques and knowledge that Greenfield had mastered.[5] EP's Erwin approached Greenfield, but Greenfield made plain he was no ordinary consultant, and worked only on projects that included an equity interest.[6] EP and Greenfield then began a collaboration, and from that joint effort came *Amazing Grace*,[7] the forerunner to *HSTS*. At this time, EP's main client, Verizon Wireless (hereinafter "VZW") was fumbling to reach the African-American (AA) demographic group.[8] *HSTS* was perfect for VZW, so Greenfield and Erwin decided to pitch *HSTS* to them.

Joseph A. Erwin is a founder of EP, and its chief executive officer. EP's actions in connection with the present dispute all occurred under Erwin's watch. Accordingly, Greenfield here incorporates by reference his *Memorandum in Opposition to Joseph A. Erwin's Motion for Summary Judgment*.

## I. GREENFIELD'S CONTRACT CLAIMS.

**A.    Numerous Fact Questions Preclude Summary Judgment as to the Contract Claims**

Fact questions concerning the formation of a contract rest with the jury.[9]

**1.    The record shows that Greenfield entered into a binding oral or implied-in-fact contract with Erwin-Penland to create, co-develop, and subsequently to share in revenue and profits from *HSTS*.**

A binding contract arises when two parties, by their words or actions, or by some combination of the two, mutually assent to do, or to not do, a certain thing.[10] Defining that "certain thing" often determines the result. The "certain thing" that EP and Greenfield plainly agreed to do was to jointly create, co-own, and profit from a marketing concept known as *"How Sweet the Sound"* (hereinafter, *HSTS*).[11]

---

[5] **Ex. 5**: Joe Erwin to Jeff Greenfield  (Oct. 24, 2005): "[Y]our area of expertise might give us a competitive advantage in the pitch (not to mention a new marketing tool for these folks)"

[6] **Ex. 6**: Greenfield Dep. (Oct. 21, 2009) at pp. 104–106.

[7] **Ex. 7**: E-mail re: *Amazing Grace* (Nov. 4, 2005) and attached *Amazing Grace* Deck (Nov. 4, 2005).

[8] **Ex. 8**: African-American Media Review (Jun. 2005) (VZW000083921), showing VZW's then-current marketing to African Americans, with lagging results.

[9] Capital City Garage & Tire Co. v. Electric Storage Battery Co., 113 S.C. 352, 101 S.E. 838 (1920); *see also* Benya v. Gamble, 282 S.C. 624, 321 S.E.2d 57 (S.C. App. 1984).

[10] Benya, *supra*, 282 S.C. at 628. Mutual assent to it can be written, *oral, or implied from conduct*. Stanley Smith & Sons v. Limestone College, 283 S.C. 430, 433, 322 S.E.2d 474, (S.C. App. 1984).

[11] *See* **Ex. 7**: Captain D's *Amazing Grace* Deck (Nov. 4, 2005), at p. 10 (EP226853): "The Top 20 Church Choirs in the US Competing for over $250,000 in prizes and the title of the Best Choir in the USA transmitted by Greenfield to EP; **Ex. 21**: VZW Presentation Deck (Apr. 26, 2006).

As more fully argued elsewhere,[12] EP and Greenfield agreed to form a collaboration to create valuable intellectual property that EP could successfully pitch to Captain D's,[13] or failing acceptance by Captain D's, then to other current or potential clients.[14]

A legal obligation arises to pay the reasonable value of services requested, unless a contrary intention of the parties is disclosed.[15]  An oral or implied-in-fact contract was formed when EP invited Greenfield to help EP create a valuable new marketing concept, and Greenfield accepted by contributing to "decks" that captured the attention of VZW's Chief Marketing Officer, John Stratton,[16] and later captured a large share of VZW's marketing dollars designed to increase its share of the AA market.[17]

The following *disputed facts* preclude summary judgment against Greenfield. Interlaced with them are *undisputed facts* that complete the story, and argue strongly for Greenfield's right to recover:

1. *Undisputed fact:* Erwin approached Greenfield after attending Greenfield's presentation in Los Angeles, where they subsequently had an in-depth conversation about a number of innovate marketing techniques including branded entertainment.

2. *Disputed fact:* In connection with a potential collaboration with EP, Greenfield stated to Erwin that Greenfield expected an ownership interest in any branded entertainment program, intellectual property, or entity that Greenfield should help EP create as a prerequisite to Greenfield's involvement.[18]

3. *Undisputed fact:* Thereafter, Erwin mentioned to Greenfield that EP had an upcoming "pitch," and that Erwin believed Greenfield could "give them a competitive advantage" in winning the account.[19]

4. *Undisputed fact:*  On October 25, 2005, Greenfield was given proprietary information about Captain D's, and invited to participate in a pitch development conference call  on November 1, 2005, at which four of EP's highest-ranking executives were present and at which Greenfield

---

[12] *See* Greenfield's *Motion for Summary Judgment as to Breach of Fiduciary Duty.*

[13] **Ex. 18**: Greenfield & 1st Approach, Internet Buzz Campaign Presentation (EP000035-EP000056); Greenfield & 1st Approach, Product Placement Presentation (EP000362-EP000368), Greenfield & 1st Approach, Radio Product Placement Presentation (EP000057-EP000075).

[14] **Ex. 20**: E-mail reply from Joe Erwin (Nov. 17, 2005) (Gf./1st Approach 000423) Erwin:  "Thanks for the note.  It [the Captain D's pitch] went well.  I was planning to call you later today and tell you …

[15] Broadway v. Jeffers, 185 S.C. 523, 530-531, 194 S.E. 642, 645-646 (S.C. 1938).

[16] **Ex. 32**: John Stratton e-mail to Allen Bosworth (Feb. 9, 2006).  Stratton: "This is a fantastic idea. I absolutley (sic) love it.  I've asked John H to get us on a call asap to discuss implementation." (EP001626-EP001627).

[17] **Ex. 3**: VZW's *HSTS* 2009 Market Recommendations (internal VZW document) (VZW estimates $844 million in incremental revenue).  VZW000078237 at p. 4; **Ex. 29**: Oliver Wood, *Supplement to Preliminary Evaluation Report of the Economic Loss to Mr. Jeffrey Greenfield and 1st Approach LLC* (Feb. 17, 2010).

[18] **Ex. 6**: Greenfield Dep. (Oct. 21, 2009) at pp. 104–106.

[19] **Ex. 12**: E-mail exchange between Jeff Greenfield and Joe Erwin (Oct. 24, 2005).

expressed his willingness to help create a branded entertainment concept for the upcoming pitch.[20]

5.    *Undisputed fact:*  At no time prior to the October 25, 2005 or November 1, 2005 conference calls did either party request or require the other to sign a confidentiality or nondisclosure agreement.

6.    *Undisputed fact:*  Both parties intended to, and in fact did, keep the forthcoming Captain D's pitch confidential, except to the extent the *"Amazing Grace"* pitch was necessarily revealed directly to Captain D's.

7.    *Undisavit fact:*    The collaboration between Greenfield and EP following that initial brainstorming conference subsequently resulted in the creation of valuable intellectual property rights, consisting of valuable trade secrets, trade names, trademarks, registration with the Writer's Guild of America, and domain name registrations.[21]

8.    *Disputed fact:*  The valuable trade secret component came into being immediately, thus creating valuable ownership rights in both collaborators.[22]

9.    *Disputed fact:*  Throughout the eight-month collaboration between Greenfield and EP, the collaborating parties mutually expected, and worked jointly toward, forming a new entity to hold all intellectual property rights and other interests in *HSTS,* and each collaborator agreed it would own half the balance of ownership after deducting the share to which the sponsor agreed.[23]  This expectation was patterned after Greenfield's *"Hottest Mom"* program, which both parties acknowledged as the preferred model for the April 26, 2006 presentation.[24]

10.    *Disputed fact:*  The ownership of intellectual property and other interests created by the collaboration between Greenfield and EP was a pre-condition to Greenfield's involvement with EP from the start, and EP accepted that pre-condition by accepting Greenfield's services, fully aware that Greenfield's offer required it. As soon as valuable intellectual property came into existence through the collaboration, Greenfield owned 50% of it.

**2.    The record shows offer, acceptance, assent, and consideration.**

The essential elements of a contract are an offer, acceptance and valid consideration.[25]  An implied-in-fact contract arises if dealings between the parties show a mutual intent to be bound.[26]  *See* Moore v. Palmetto

---

[20] **Ex. 16**: Bill Reynolds Dep. (Nov. 11, 2009), at 29: "We had a discussion about who Captain D's was trying to reach and how we might impact them, and the idea developed in the course of that conversation.  Who said it first, I have no idea.  **Ex. 7**: E-mail re: *Amazing Grace* (Nov. 4, 2005) and attached *Amazing Grace* Deck (Nov. 4, 2005).

[21] **Ex. 22**: WGA Registration No. 1113274 for *How Sweet the Sound* (Feb. 15, 2006); *HSTS* Trademark App.

[22] **Ex. 6**: Greenfield Dep. (Oct. 21, 2009) at pp. 104–106. Although EP has never explicitly refuted this stated expectation, EP may come forward with an Affidavit disputing it now, making summary judgment impossible.

[23] **Ex. 41**: Jeff Greenfield e-mail to Joe Erwin & Allen Bosworth (Mar. 13, 2006) (sets 50/50 expectation for both parties, mirrors ownership plan presented to VZW in **Ex. 21** at slide 25); **Ex. 17**: E-mail from Joe Erwin to Allen Bosworth (May 9, 2007):  "I think we should talk about it, and likely then call Jeff. This is about 50% his idea and he comes from a world in which "intellectual property" is a very big thing."

[24] **Ex. 41**: Joe Erwin e-mail to Allen Bosworth (Mar. 15, 2006) (EP000690; Erwin/Bosworth meet to incorporate EP's roles and fees into Greenfield's "show ownership" model, as presented to VZW in **Ex. 21** at slide 25).

[25] Roberts v. Gaskins, 327 S.C. 478, 483, 486 S.E.2d 771 (S.C. App. 1992); Pierce v. Northwestern Mutual Life Insurance Co., 444 F. Supp. 1098 (D. S.C. 1978).

[26] *See generally,* 17 C.J.S. Contracts § 6(b) (rev. ed. 1999) *quoted in* Myrtle Beach Hospital v. City of Myrtle Beach, 341 S.C. 1, 532

State Life,[27] wherein plaintiff applied to insure her husband's life, and paid a binder. The insurer delayed processing the application until after the husband's death. The Supreme Court found, from the assurances of the agent, and all other attending circumstances, that the insurer had either manifested assent to be bound, viewed objectively from the applicant's perspective, or was estopped by its own conduct from denying acceptance.

A meeting of the minds can be implied from conduct, or a course of dealing showing a mutual intent to be bound.[28]   Any conduct of one party from which the other can reasonably infer a promise is sufficient.[29]   In our case, Greenfield accepted[30] Erwin's proposal to work in tandem with EP on non-traditional marketing campaigns by doing so … *brilliantly*.

On the other hand, a contract cannot be implied from conduct when the existence of the contract is against express declarations of the party to be charged.[31]   Nothing Erwin said or did, at least until VZW started funding *HSTS*, negated EP's assent to work with Greenfield, as Greenfield objectively observed.

### 3.    Terms of the parties' agreement to mutually benefit from *HSTS* were sufficiently definite to permit enforcement.

The "essential terms" of a contract are reasonably certain if they provide a basis for determining the existence of a breach and giving an appropriate remedy.[32]   Intent of the parties can be determined from circumstances, extrinsic evidence, and rules of construction.[33] The agreement should not be frustrated if a fair and just result requires filling some gaps the parties have left.[34]

Exactly what constitutes "essential terms," of an agreement varies with the context, since binding contracts can be formed to do, or to not do, any lawful act.[35] Matters left for later resolution can be supplied by

---

S.E.2d 868 (2000).

[27] Moore v. Palmetto State Life  Ins. Co., 222 S.C. 492, 498, 73 S.E.2d 688 (1952).

[28] Broadway v. Jeffers, 185 S.C. 523, 530-531, 194 S.E. 642, 645-646 (S.C. 1938) (a legal obligation arises to pay the reasonable value of services requested, unless a contrary intention of the parties is expressly disclosed).

[29] 17 C.J.S., Contracts § 6 at fn. 80.

[30] Ex. 11: Shannon Wilbanks, Notes of EP-Greenfield conference call, as distributed to EP management group (Oct. 27, 2005); follow-up e-mail from Shannon Wilbanks to Jeff Greenfield, and Greenfield reply (Oct. 27, 2005) (Gr./1st Approach 000608); Ex. 26: Shannon Wilbanks, Notes of Conference Call with Greenfield (Feb. 14, 2006) (Gf./1st Approach 000409; Ex. 19: Tr. of Conference Call, at 35:13 to 36:2 (Jun. 9, 2006, Greenfield, Erwin, Bosworth, Wilbanks, Mendelsohn attending).

[31] 17 C.J.S., Contracts § 6 at fn. 82 (1999).

[32] Restatement (Second) of Contracts § 33(2).

[33] See, e.g., Busching v. Griffin, 542 So.2d 860, 863 (Miss. 1989).

[34] Corbin, supra, § 4.1 at fn. 19.

[35] Benya v. Gamble, 282 S.C. 624, 628, 321 S.E.2d 57, 60 (S.C. App. 1984).

commercial practice, usage, or custom.[36]    Many a gap in terms can and should be so filled, with a result consistent with what the parties said and did and that's more just than totally refusing enforcement.[37] In cases like the present one, if one party has greatly benefited from the performance of the other, Courts have gone to great lengths to find a construction of the agreement that will salvage it.[38] In Judge Cardozo's words, "[i]ndefiniteness must reach the point where construction becomes futile."[39] After part performance has been received, just compensation must be paid even if the agreement is indefinite as to price.[40] By choosing to ignore the fact that valuable, jointly-held intellectual property was created as early as November 4, 2005, EP and Erwin disingenuously cast Greenfield's role in *HSTS* as a form of "preliminary negotiation."  EP cites Edens v. Laurel Hill, Inc., 247 S.E.2d 434, 436 (S.C. 1978) as holding that every enforceable contract requires agreement as to price, time and place of sale. But in Edens, the real estate agent, *in fact,* had no role in facilitating transfer of land acquired *by condemnation*. The legal discussion of contract formation in Eden was dicta.

EP also cites Gilbert[41] and LandBank[42], which have no bearing on Greenfield's *implied contract* claim. First and foremost, both went to trial.   In Gilbert, a bank sought to save money by outsourcing certain management tasks *but explicitly stated its need for full agreement* as to the essential terms of price and scope of work in a letter, thus expressly *negating* agreement as to price and scope of work. LandBank was to similar effect.  Gilbert and LandBank only illustrate the general rule that a contract cannot be implied-in-fact when the existence of the contract is *clearly against the express declaration of the party to be charged*, thus negating mutual assent.[43]

In the present case, EP made no express declaration negating its assent.  To the contrary, EP, by its conduct, accepted Greenfield's collaboration proposal and co-pitched to VZW a 40% ownership interest for $12

---

[36] *See, e.g.,* Busching v. Griffin, 542 So. 2d 860, 863 (Miss. 1989) ("All of [defendant's] talk about what the parties had not agreed on *cannot obscure what they did agree on*").
[37] Corbin, *supra*, § 4.3 at fn. 8.
[38] Corbin, *supra*, § 4.3 at fns. 24 – 26.
[39] Heyman Cohen & Sons, Inc. v. M. Lurie Woolen Co., 232 N.Y. 112, 133 Ne 370, 371 (1921).
[40] Corbin, *supra*, at § 4.3, fn. 26.
[41] W.E. Gilbert & Assocs. v. S.C. Nat. Bank, 330 S.E.2d 307, 309 (S.C. Ct. App. 1985).
[42] LandBank Fund VII v. Dickerson, 369 S.C. 621, 632 S.E.2d 882 (S.C. App. 2006).
[43] *See* Broadway v. Jeffers, 185 S.C. 523, 530-531, 194 S.E. 642, 645-646 (S.C. 1938) (a legal obligation to pay the reasonable value of services requested, *unless a contrary intention of the parties is disclosed*).

million, with EP and Greenfield equally dividing the remaining 60% ownership interest.[44]  Thus, EP assented to Greenfield's offer to assist Erwin in exchange for half ownership of any project in which Greenfield might be involved, as later confirmed by EP's conduct in response to Greenfield's proposed 50-50 split of profit between EP and Greenfield, to which EP raised no expressed objection.[45]  Unlike Gilbert, our parties, by their correspondence and conduct, had already reached consensus to a 50-50 split of equity ownership,  less the amount granted to the sponsor.[46]

Both parties also expected further compensation from line-item budgets that would provide a method for compensation to each party out of the funding from VZW.  So long as VZW accepted *HSTS*, whether for "Plan A" (the $12 million "joint ownership" plan presented to Verizon on April 26, 2006)[47] or "Plan B" (a reduced $3 million low-budget HSTS project, under the scaled-down June 2006 plan),[48] both co-venturers / partners would benefit under this line item approach, subject to a duty of good faith from each partner.[49]

EP was to perform some tasks, and Greenfield would perform others, according to their respective fields of expertise.[50]  Both parties consented to work together to find ways to reduce the initial $12 million price tag at which Verizon balked.  They both expected $2-3 million from VZW under Plan B.  Nothing suggests that either party stated, implied, or indicated by conduct that the other party's services were not needed … until EP made off with it all.

## II.  GREENFIELD'S FRAUD CLAIMS

### A.    After Discovery Has Been Completed, Dismissal for a Pleading Defect is Unwarranted.

---

[44] **Ex. 21** VZW Presentation Deck at Slide 25 (Apr. 26, 2006) re: "Benefits of Owning Part of the Show"

[45] **Ex. 6**: Greenfield Dep. (Oct. 21, 2009) at pp. 104–106. Although EP has never explicitly refuted this stated expectation, EP may come forward with an Affidavit disputing it now, making summary judgment impossible.

[46] **Ex. 41**: Jeff Greenfield e-mail to Joe Erwin & Allen Bosworth (Mar. 13, 2006) (sets/confirms 50/50 expectation for both parties, mirrors ownership plan presented to VZW in **Ex. 21** at slide 25); **Ex. 17**: E-mail from Joe Erwin to Allen Bosworth (May 9, 2007):  "I think we should talk about it, and likely then call Jeff. This is about 50% his idea and he comes from a world in which "intellectual property" is a very big thing."

[47] **Ex. 21**: VZW Presentation Deck (Apr. 26, 2006), Slide 25.

[48] **Ex. 19**: Tr. of Conference Call, at 36:15 to 38:17 (Jun. 9, 2006, Greenfield, Erwin, Bosworth, Wilbanks, Mendelsohn attending); **Ex. 23**: VZW Deck Revisions (May 19, 2006).

[49] **Ex. 19**: Tr. of Conference Call, at 14:17 to 17:6 (Jun. 9, 2006).

[50] **Ex. 48**. Email Exchange between Greenfield and Bosworth, June 13, 2006. (Greenfield: "Subject: How Sweet the Sound Follow Up. Working on it this pm. Thought is to provide both regional option and national option.
Thoughts?" Bosworth: "Great. Thanks. I'm writing up the revised approach this afternoon as well.")

Having filed no Rule 12(b)(6) *Motion to Dismiss* for lack of the particularity that Rule 9(b) requires, and having filed no Rule 12(e) *Motion for a More Definite Statement*, EP now contends, for the first time, that Greenfield's fraud-based claims should be dismissed for lack of particularity in *pleading* them. [51]  Any such motion for pleading deficiencies would automatically be converted to a motion for summary judgment at this stage. Carter v. Stanton, 405 U.S. 669, 671 (1972).  Greenfield's fraud claims, about which EP has had fair notice in the complaint, must be tested against everything on record.  Fed. R. Civ. P. 56(c)(2).  Moreover, Greenfield could not have pleaded what he has just newly learned through discovery.

**B.    Greenfield's Identification of Fraudulent Misrepresentations.**

The particular intentional concealments and misrepresentations that the jury is entitled to consider are as follows:

1.  When Erwin asked Greenfield to join forces with EP to create branded entertainment opportunities,[52] Erwin had no intent to pay Greenfield anything, as this litigation shows.

2.  In December 2005, Greenfield sent confidential documents to Shannon Wilbanks from his *Amazing Grace* deck, and tax incentives, which Wilbanks requested under false pretenses.[53]

3.  Bosworth concealed from Greenfield the fact that he had modified Greenfield's original deck, *eliminating all references to 1st Approach,* and then presented the modified deck to VZW's Joe Saracino on December 29, 2005 as if it were EP's sole and exclusive work product, trade secret, and marketing plan.[54] At various other times, in 2006, 2007, and 2008, EP repeated the process, passing off Greenfield's work as exclusively their own.[55]

---

[51] See EP/Erwin *Memo of Law in Support of Motion for Summary Judgment [hereinafter "EP Brief"]* at 28, fn. 21.
[52] **Ex. 12**: E-mail exchange between Jeff Greenfield and Joe Erwin (Nov. 24, 2005), aka Def.'s Ex. 48 to Erwin Dep. (Gf./1st000618-619) .  Erwin: "I don't know what we might be able to do to help one another, but your area of expertise might give us a competitive advantage in the pitch (not to mention a new marketing tool for these folks."
[53] **Ex. 30**: E-mail from Shannon Wilbanks to Jeff Greenfield (Dec. 12, 2005).
[54] **Ex. 31**: Presentation Deck (Dec. 29, 2005), as EP sent it to VZW without attribution to Greenfield.
[55] **Ex. 24**: Revised Deck (still bearing the EP/1st Approach presentation date of Apr. 26, 2006), as distributed within VZW on March 10, 2008 (VZW000007529-VZW000007558).

4. Erwin and EP did not immediately notify Greenfield that John Stratton, VZW's Chief Marketing Officer, had personally endorsed the *HSTS* Marketing Plan[56] and simultaneously concealed from Stratton and VZW the extent of Greenfield's involvement.

5. Erwin intentionally concealed from Greenfield communications EP had with VZW senior executives and marketing personnel from June 19, 2006 to April 3, 2007, at which point VZW began to commit market research resources and dollars[57] to the Memphis pilot.

6. On November 22, 2006, Greenfield e-mailed Bosworth and wanted to pitch *HSTS* to other 1st Approach clients if VZW had turned it down.[58] Bosworth vaguely mentioned developments, assuring Greenfield that he would be notified of "more to come," thereby intentionally inducing Greenfield not to pitch *HSTS* to any of 1st Approach's other clients.[59]

7. On January 11, 2007, Greenfield requested an update from EP's Erwin on the status of *HSTS*. Erwin's evasive and untruthful answer was that Erwin was "out of the loop" and that Bosworth might know of progress.[60] Thereafter, neither Erwin nor Bosworth communicated with Greenfield, intentionally concealing that the Memphis Pilot had been approved.[61]

8. Greenfield e-mailed Bosworth on January 26, 2007, requesting a copy of the "latest deck" to determine the status of the marketing program.[62] Bosworth did not respond.[63]

9. EP consciously, intentionally failed to disclose to Greenfield the fact of VZW's preliminary (and enthusiastic) commitment to fund market research for the Memphis pilot when EP first learned of it on February 19, 2007.[64]

---

[56] **Ex. 32**: John Stratton e-mail to Allen Bosworth (Feb. 9, 2006). Stratton: "This is a fantastic idea. I absolutley (sic) love it. I've asked John H to get us on a call asap to discuss implementation." (EP001626-EP001627)
[57] **Ex. 33**: Andrew Shaefer [VZW] e-mail to Beth Carter [EP] (Feb. 19, 2007); Beth Carter e-mail to Allen Bosworth (Feb. 19, 2007), and Research Proposal, February 13, 2007. (EP050162-EP050168).
[58] **Ex. 34**: E-mail exchange between Allen Bosworth and Jeff Greenfield (Dec. 22, 2006). Bosworth: "It's still being looked at by VZW…" (EP000235-EP000238).
[59] **Ex. 34**. E-mail exchange between Allen Bosworth and Jeff Greenfield (Dec. 22, 2006).
[60] **Ex. 35**. E-mail exchange between Jeff Greenfield and Joe Erwin (Jan. 11, 2007).
[61] **Ex. 28**: Greenfield Affidavit (Mar. 1, 2010) at ¶ 18.
[62] **Ex. 36**: E-mail from Jeff Greenfield to Allen Bosworth (Mar. 29, 2007).
[63] **Ex. 28**: Greenfield Affidavit (Mar. 1, 2010) at ¶ 18.
[64] **Ex. 33**: Andrew Shaefer [VZW] e-mail to Beth Carter [EP] (Feb. 19, 2007); Beth Carter e-mail to Allen Bosworth (Feb. 19, 2007), and Research Proposal, February 13, 2007. (EP050162-EP050168).

10.  Greenfield wrote to EP's Bosworth again on March 29, 2007, asking for an update to the HSTS deck, in order to test whether EP's lack of communication was keeping Greenfield from knowing the true status of *HSTS* with VZW[65]  Bosworth failed to reply,[66] knowing that on February 8, 2007, VZW had requested a presentation deck for the HSTS Pilot in Memphis,[67] which VZW had committed itself to fund on February 19, 2007.[68]  On February 21, 2007, Bosworth received a copy of the Memphis deck which was sent to VZW, from which Greenfield's role as co-creator and copyright had been removed.[69]

10.  After VZW had committed to fund *HSTS*, Erwin was reminded on May 4, 2007 of Greenfield's role in creating and developing *HSTS*. Erwin's May 9, 2007 reply acknowledged Greenfield's 50% ownership,[70] and acknowledged a duty to contact Greenfield, which Erwin did not do, in spite of Erwin's prior commitment to Greenfield in June 2006.[71]

11.  On May 15, 2007, EP registered the Internet domain name "HowSweettheSoundMemphis.com" without first notifying Greenfield, or requesting prior permission to use Greenfield's rights to the name *"How Sweet the Sound."*[72]

12.  EP filed a trademark application for HSTS on June 12, 2007, with no mention of Greenfield in the application.

13.  On July 26, 2007, Greenfield e-mailed Allen Bosworth and Joe Erwin, congratulating them on being named a national agency for VZW.  Greenfield requested news on *HSTS*.[73]  Neither Bosworth nor Erwin

---

[65] **Ex. 36**: E-mail from Jeff Greenfield to Allen Bosworth (Mar. 29, 2007).
[66] **Ex. 28**: Greenfield Affidavit (Mar. 1, 2010) at ¶ 18.
[67] **Ex. 37**: E-mail from Allen Bosworth to Beth Carter et. al. (Feb. 12, 2007) re: Memphis Next Steps.
[68] **Ex. 33**: Andrew Shaefer [VZW] e-mail to Beth Carter [EP] (Feb. 19, 2007); Beth Carter e-mail to Allen Bosworth (Feb. 19, 2007), and Research Proposal, February 13, 2007. (EP050162-EP050168).
[69] **Ex. 38**: Beth Carter e-mail to Allen Bosworth (Feb. 21, 2007) (EP50169-EP50183).
[70] **Ex. 17**: Joe Erwin e-mail to Allen Bosworth (May 9, 2007).  "I think we should talk about it, and likely then call Jeff. This is about 50% his idea and he comes from a world in which "intellectual property" is a very big thing."
[71] **Ex. 19**: Tr. of Greenfield-EP conference call (Jun. 9, 2006), 35:13 – 37:23.
[72] *See* http://www.networksolutions.com/whois-search/howsweetthesoundmemphis.com.
[73] **Ex. 39**: E-mail from Jeff Greenfield to Joe Erwin and Allen Bosworth (Jul. 26, 2007).  Greenfield:  "Congrats on the Verizon move announced today," re: VZW announcing HH/EP was named a national agency for VZW.  *See* http://www.redorbit.com/news/business/1011670/verizon_wireless_names_three_premier_ad_agencies_for_nationwide_continuity/index.html.  Greenfield:  "Any news on How Sweet the Sound?"

replied[74], thereby continuing to conceal from Greenfield the work that was well underway for the Memphis pilot, the use of *HSTS* in a domain name registration, and the use of *HSTS* in trademark registrations.

**C.    Disputed Fact Questions Concerning the Fraud Claims Rest with the Jury.**

In fraud actions, where evidence of fraud is scattered among voluminous documents, depositions, and affidavits, a premature grant of summary judgment will generally be reversed on appeal,[75] particularly if the case turns largely on the credibility of witnesses or the moving party's state of mind.[76]  Summary judgment is particularly inappropriate if critical facts about the fraud are held by the moving party and discovery delays or disputes have prevented full disclosure, as here.  XRT, Inc. v. Krellenstein, 448 F.2d 772, 772-773 (5th Cir. 1971).

**D.    Each Element of Actual Fraud Finds Factual Support in the Record; Disputed Facts Remain for the Jury.**

As to all aspects of fraud arising *after* what Greenfield claims to have been fraud in the inducement of the original contract (Oct.-Nov. 2005), EP's brief is either completely silent, or assumes them away.  EP ignores the fact that *HSTS* actually was filmed as a documentary in 2007 and 2008, and aired on TV in 2009 as a reality-show on the BET channel.[77]

**1.    Challenged Elements of Actual Fraud are Supported by Probative Fact.**

**a.    Representation as to a past or present fact.**

Greenfield has alleged that Erwin never intended to pay Greenfield for co-creating *HSTS*.  Misrepresentations must relate to a past or present fact, and *ordinarily* cannot be predicated on unfulfilled promises.[78]  But in Buzhardt v. Cromer,[79] fraud was predicated on evidence at trial that the speaker *knew* he wouldn't perform the contract.  More recently, Judge Currie submitted  "present intent not to perform" to the

---

[74] **Ex. 28**: Greenfield Affidavit (Mar. 1, 2010) at ¶ 18.
[75] *See, e.g.,* Keiser v. Coliseum Properties, Inc., 614 F.2d 406, 410-411, 413 (5th Cir. 1980).
[76] *See, e.g.,* Kubic v. Goldfield, 479 F.2d 472, 476-477 (3rd Cir. 1973).  *See generally*, 11 Moore's Federal Practice §56App.200[34] (updated through Release 156, Dec. 2007).
[77] **Ex. 40**:  E-mail from Joe Erwin to John Dukakis (Feb. 18, 2009) (EP10204-EP10205) *See also* http://www.gospelpundit.com/on-tv-bet-documentary-on-how-sweet-the-sound-6077 ("on BET at 11:00 Sunday").
[78] Tom Hughes Marine Inc. v. Am. Honda Motor Co., 219 F.3d 321, 324-325 (4th Cir. 2000, applying S.C. law).
[79] Buzhardt v. Cromer, 272 S.C. 159, 162-163, 249 S.E.2d 898 (1978).

jury based on independent evidence bearing on intent, and that verdict was affirmed on appeal.[80] To cash in on *HSTS*, EP has clearly deceived both VZW and the USPTO.  A jury will find these deceptions probative of EP's intent toward Greenfield.

### b.  Falsity of the representation.

EP's Joe Erwin knew from the start that Greenfield expected co-ownership of any successful branded entertainment property.  Yet EP denies any intellectual property came into existence *until VZW rejected the reality TV series* and began funding *HSTS* local events on a smaller scale.  EP's denials defy the reality that valuable trade secret rights *were* created in the first pitch deck that Greenfield sent to EP on November 4, 2005, and which EP re-purposed, without attribution to 1st Approach, into the December 29, 2005 pitch deck that made its way to John Stratton's desk at VZW.

### c.  Knowledge of its Falsity.

EP began deceptively appropriating Greenfield's intellectual property and passing it off to VZW as its own creation on December 29, 2005.  Clearly, EP needed Greenfield's creative input, but had no intent to pay for it.

### d.  Intent that the Representation be Acted Upon.

EP has argued that its televised, award-winning, multi-million dollar production of *HSTS*, now in its third year, never progressed with Greenfield beyond an "arm's length exploration of a business opportunity."  By characterizing Greenfield as the "TV Guy" for a TV show they didn't expect to air when this case was filed, EP now appears to admit liability for Greenfield's lost opportunity to produce the 2009 BET show.  Yet, if EP did intend to compensate Greenfield as "TV Guy," it is unclear why EP hasn't given Greenfield that opportunity or payment.

### e. (and f.) Actual Reliance and Right to Rely.

Greenfield reasonably relied on EP's illusory offer of future compensation for *HSTS*.  Greenfield spent eight months molding and shaping *HSTS* into the award-winning marketing plan it became.  Once VZW's

---

[80] <u>Hall's Reclamation, Inc. v. APAC Carolina, Inc.</u>, 1996 U.S. App. LEXIS 33040 (4th Cir. 1996) (unpublished).

Stratton was "on board" with *HSTS*, Greenfield's likelihood of payment appeared certain, so he kept working with EP. <u>Regions Bank v. Schmauch</u>,[81] cited by EP, has no bearing. There, a clear written agreement made the plaintiff a loan guarantor. Plaintiff there just had to *read the agreement*, which controlled. In our case, there is no such written agreement.

### g. Consequent and Proximate Injury

Using logic that would impress Lewis Carroll, EP argues that Greenfield wasn't damaged because he did no work on *HSTS* after VZW began paying EP to create the Memphis pilot. Never mind that EP's *concealment of the pilot* was what prevented Greenfield from working on it. Greenfield's damages have been well documented by economist Oliver Wood.

**E.     Greenfield's Negligent Misrepresentation Claim is Not Defeated by the Absence of a Duty of Care.**

EP cites <u>AMA Mgmt. Corp. v. Strasburger</u>,[82] but the present case is radically different from <u>AMA Mgmt.</u>, for the reasons argued at length in Defendants' *Motion for Summary Judgment as to Breach of Fiduciary Duty*, in Defendants' *Motion for Summary Judgment as to Unjust Enrichment*, and throughout this brief. Greenfield and EP's relationship was collaborative, not "arm's-length." Because of the shared ownership of intellectual property rights arising in 2005, each party clearly owed the other, if not a fiduciary duty, at least a *duty of care* to avoid deceiving the other. EP's duty arose once VZW began funding *HSTS*, as the Second Pitch contemplated VZW would, and as VZW did.

### III.  GREENFIELD'S TRADEMARK CANCELATION CAUSE OF ACTION

A trademark may be canceled if procured by fraud. 15 USC § 1064(3). While trademark cancelation actions have been disfavored,[83] such claims can be proved. The application oath for a trademark requires the declarant to state that to the best of his "knowledge" and "belief" that no other firm "has the right to use" the mark.[84] The oath is phrased in terms of a *subjective* belief, but failure to disclose other parties who have <u>equal</u> rights to use the mark, as in <u>Angel Flight of Georgia, Inc. v. Angel Flight America, Inc.</u>, 522 F.3d 1200 (11th

---

[81] <u>Regions Bank v. Schmauch</u>, 582 S.E.2d 432, 445 (S.C. Ct. App. 2003)
[82] <u>AMA Mgmt. Corp. v. Strasburger</u>, 309 S.C. 213, 420 S.E.2d 868, 873-874 (S.C. App. 1992).
[83] <u>Aveda v. Evita Marketing, Inc.</u>, 706 F. Supp. 1419 (D. Minn. 1989).
[84] *See, generally,* <u>McCarthy on Trademarks and Unfair Competition</u> § 31:76 at 31-169 (Supp. 12/2009).

Cir. 2008) is sufficient.

Seeding confusion, EP cites <u>Advance Stores Co. v. Refinishing Specialties</u>,[85] and <u>Intellimedia Sports Inc. v. Intellimedia Corp</u>,[86] as holding that EP's registration was not fraudulent so long as no one has a <u>superior</u> right to use the mark. Those cases involve *unrelated senior users* of the mark,[87] not those with <u>equal</u> rights to use the mark, as in <u>Angel Flight</u>, *supra*. Here, the issue is whether EP knew Greenfield had asserted any credible "right to use the mark."

EP's Erwin knew about Greenfield's WGA rights registration for *"How Sweet the Sound."*[88] EP had also asked Greenfield not to take the *HSTS* marketing concept to any other prospective client until VZW had decided whether to pursue it.[89] Contemporaneous EP-internal e-mails acknowledged Greenfield's rights.[90] Still, on June 12, 2007, EP caused its agent to file a trademark registration application that made no mention of Greenfield or VZW.[91]

On August 22, 2008, Greenfield's counsel expressly notified EP of Greenfield's asserted rights to *HSTS* in a demand letter.[92] The present case was filed September 12, 2008, and on September 15, 2008, the USPTO notified EP that it had rejected EP's registration for *HSTS* because Verizon was using the mark.[93] With the present litigation in discovery, on June 15, 2009, EP caused its agent to file a *Petition to Revive for Office Action* with the USPTO[94]. EP then disclosed VZW's use as licensed, but omitted mention of Greenfield's cancelation claim.

Thus, Greenfield has easily met his "heavy burden." EP's intentional failure to disclose the present

---

[85] <u>Advance Stores Co. v. Refinishing Specialties</u>, 948 F. Supp. 643, 654 (W.D. Ky. 1996).
[86] <u>Intellimedia Sports Inc. v. Intellimedia Corp.</u>, 1997 WL 398344, at *4 (T.T.A.B. May 20, 1997).
[87] The oath would be false if the senior user concealed rights of a junior user "clearly established," as by a court decree, settlement, or registration. <u>Rosso & Mastracco, Inc. v. Giant Food, Inc.</u>, 720 F.2d 1263 (Fed. Cir. 1983).
[88] **Ex. 22.**
[89] **Ex. 34.**
[90] **Ex. 43:** on May 11, 2007, EP staffer Beth Carter wrote to EP Vice President Allen Bosworth to inquire as follows: "As you know, we are moving forward with How Sweet the Sound in Memphis. We're planning to use the name and the graphic developed for the national program. Is there any issue with the original producer partners (Jeff Greenfield, Doug?)? Also, can we trademark How Sweet the Sound - or is this 'owned' by someone other than VZW / EP?"
[91] **Ex. 44**: On June 12, 2007, EP's attorney, Thomas L. Moses, filed Trademark Application Serial Nos. 77203718 and 77203814 with the USPTO for the mark *How Sweet the Sound*, described as "arranging of contests, entertainment services, namely, conducting contests." In so doing, EP warranted that "no other person, firm, corporation, or association has the right to use the mark in commerce."
[92] **Ex. 45**.
[93] **Ex. 46**.
[94] **Ex. 47**.

litigation was material, and thus, with acknowledgement of Greenfield's rights,[95] provides sufficient ground for invalidating the trademark.[96]

### IV-VI.  TRADE SECRETS, BREACH OF DIDUCIARY DUTY, AND DECLARATORY JUDGMENT

Greenfield opposes EP's trade secrets cause of action on all grounds set forth in Greenfield's *Memorandum in Opposition to Verizon Wireless' Motion for Summary Judgment*, all of which are incorporated herein by reference.  Greenfield opposes EP's *Motion for Summary Judgment* as to Breach of Fiduciary Duty and Constructive/Resulting Trusts on all grounds set forth in Greenfield's *Memorandum in Opposition to Joseph A. Erwin's Motion for Summary Judgment*, and in Greenfield's *Motion for Summary Judgment as to Breach of Fiduciary Duty*, both of which are incorporated herein by reference.  As co-promoter of *HSTS*, EP clearly owed Greenfield fiduciary duties. Duncan v. Brookview House, Inc., 262 S.C. 449, 456, 205 S.E.2d 707, 710 (1974). All Exhibits hereto show that EP has breached those duties.  Greenfield opposes EP's Motion for Summary Judgment as to its declaratory judgment action for all the reasons set forth herein supporting Greenfield's causes of action for breach of contract, fraud, and trademark cancelation.

**The Law Office of P. Jeffrey North LLC**

**By:     P. Jeffrey North, Esq.**
**Attorney Identification Number 9885**
**PO Box 7525**
**Hilton Head SC 29938**
**Phone (843) 341-5200**
**Fax     (888) 487-7624**
**Email  attorney@pjnorth.com**

**March 18, 2010**
**Hilton Head SC**

---

[95] **Ex. 17:** Erwin email May 9, 2007 HSTS "50% his idea."
[96] *Cf.* Nilssen v. Osram Sylvania, Inc., 504 F.3d 1223 (Fed. Cir. 2007) (failure to disclose litigation to patent examiner constituted inequitable conduct, as knowledge of the litigation would lead examiner to other relevant information).