# INDEX FOR EXHIBIT "55"

## Supplemental Authorities Pursuant to Local Rule 7.05(A)(4)

I.  Defendants' Opposition to Erwin-Penland Motion for Summary Judgment

|     | Fn. | Authority |
| --- | --- | --- |
| 1. | 26, 29, 31 | 17 C.J.S. Contracts § 6(b) (rev. ed. 1999) |
| 2. | 32. | Restatement (Second) of Contracts § 33(2) |
| 3. | 33, 36 | Busching v. Griffin, 542 So.2d 860, 863 (Miss. 1989) |
| 4. | 34. | Corbin on Contracts § 4.1 |
| 5. | 38, 40 | Corbin on Contracts § 4.3 |
| 6. | 39. | Heyman Cohen & Sons, Inc. v. M. Lurie Woolen Co., 232 N.Y. 112, 133 N.E. 370, 371 (1921). |
| 7. | 72. | http://www.networksolutions.com/whois-search/howsweetthesoundmemphis.com |
| 8. | 73. | http://www.redorbit.com/news/business/1011670/verizon_wireless_names_three_premier_ad_agencies_for_nationwide_continuity/index.html |
| 9. | 76. | 11 Moore's Federal Practice §56App.200[34] |
| 10. | 77. | http://www.gospelpundit.com/on-tv-bet-documentary-on-how-sweet-the-sound-6077 |
| 11. | 80. | Hall's Reclamation, Inc. v. APAC Carolina, Inc., 1996 U.S. App. LEXIS 33040 (4th Cir. 1996) (unpublished). |
| 12. | 84. | McCarthy on Trademarks and Unfair Competition § 31:76 at 31-169 (Supp. 12/2009) |
| 13. | 86. | Intellimedia Sports Inc. v. Intellimedia Corp., 1997 WL 398344, at *4 (T.T.A.B. May 20, 1997). |

COPY

# CORBIN ON CONTRACTS

By

**ARTHUR LINTON CORBIN**

Late Professor of Law Emeritus

Yale University Law School

## Volume 1

### Revised Edition

By

**JOSEPH M. PERILLO**

Alpin J. Cameron Professor of Law

Fordham University School of Law

## §§ 1.1–4.14

ST. PAUL, MINN.

WEST PUBLISHING CO.

1993

# TABLE OF CONTENTS

## CHAPTER 1.  PRELIMINARY DEFINITIONS

**Sec.**

1.1    The Main Purpose of Contract Law Is the Realization of Reasonable Expectations Induced by Promises.

1.2    Legal Obligation Defined.

1.3    Definition of the Term "Contract".

1.4    Contracts of Adhesion.

1.5    Formal and Informal Contracts.

1.6    Voidable Contracts.

1.7    Void Contracts.

1.8    Unenforceable Contracts.

1.9    Agreement Defined.

1.10   "Bargain" as a Contractual Expression.

1.11   Offer Defined.

1.12   Simultaneous Expressions of Assent: Contracts Without Offer and Acceptance.

1.13   What Is a Promise?

1.14   Promise and Warranty.

1.15   Expressions of Intention, Hope, Desire, or Opinion.

1.16   Letters of Intent.

1.17   Illusory Promises.

1.18   Assumpsit: Implied Assumpsit, Indebitatus or General Assumpsit, Special Assumpsit.

1.19   Express and Implied Contracts.

1.20   Contract and Quasi Contract Distinguished.

1.21   General Contract Law, The Uniform Commercial Code, and the United Nations Convention on Contracts for the International Sale of Goods.

1.22   The Uniform Commercial Code as a Source of Common Law.

1.23   Unilateral Contracts Distinguished From Bilateral.

## PART I.  FORMATION OF CONTRACT

### TOPIC A.  OFFER AND ACCEPTANCE

#### CHAPTER 2.  OFFERS; CREATION AND DURATION OF POWER OF ACCEPTANCE

2.1    Preliminary Negotiation.

2.2    Preliminary Communications Compared to Offers—Interpretation.

2.3    Request for an Offer Is Not an Offer—Auctions and Solicited Offers.

2.4    Offer by Publication or Advertisement.

2.5    Quotation of Prices; Estimates.

2.6    Authority or Instructions to an Agent.

## TABLE OF CONTENTS

**Sec.**
2.7   Offers at the Supermarket or Self–Service Shop.
2.8   Partial Agreements—Agreements to Agree and Agreements to Negoti- ate.
2.9   Formal Document Contemplated by the Parties.
2.10  What Constitutes a Written Contract—There May Be a Series of Communications.
2.11  Delivery of a Document as the Final Expression of Assent.
2.12  Printed Terms on Billheads, Letterheads, Receipts, Baggage Checks, etc.
2.13  Intention to Affect Legal Relations—Social Engagements, Gentle- men's Agreements, Jests and Sham Agreements.
2.14  Duration of Power of Acceptance Created by an Offer.
2.15  Missed Deadlines in Option Contracts.
2.16  Reasonable Time for Acceptance.
2.17  Effect of Delay in the Delivery of an Offer.
2.18  Offers Are Usually Revocable.
2.19  Notice of Revocation Necessary.
2.20  Revocation Otherwise Than by Direct Notice.
2.21  Revocation of General Offer by Publication.
2.22  Irrevocable Offers—Meaning of "Irrevocable".
2.23  Options Created by a Conditional Contract or Covenant.
2.24  Contract to Keep an Offer Open.
2.25  Effect of the Rule Against Enhancement of Damages.
2.26  Offers Made Irrevocable by Statute and Public Policy.
2.27  Deposits to Be Forfeited in Case of Revocation.
2.28  Irrevocable Offers Under Seal.
2.29  Revocation After Part Performance or Tender by the Offeree.
2.30  Real Estate Brokerage and Other Agency Cases.
2.31  Effect of Action in Reliance That Is Not Part Performance.
2.32  Part Performance and the Indifferent Offer.
2.33  When a Standing Offer of a Series of Separate Contracts Is Irrevo- cable.
2.34  Effect of Death or Insanity on Power of Acceptance.

### CHAPTER 3.   ACCEPTANCE AND REJECTION OF OFFER

3.1   Two Parties Necessary for a Contract, a Promisor and a Promisee.
3.2   In a Bargaining Transaction, Only the Offeree Has Power to Accept.
3.3   Assignment of Power by an Option Holder—Irrevocable Offers.
3.4   Motive With Which Offeree Renders Performance.
3.5   Knowledge of Offer as a Pre-requisite to Acceptance.
3.6   Knowledge of the Offer After Part Performance Already Rendered.
3.7   Acceptance "Subject to Approval" by a Third Party.
3.8   Acceptance by Overt Act.
3.9   Unilateral Contract—Acceptance by Beginning Requested Perform- ance.
3.10  Acceptance of a Published Offer of a Reward for Action or Contest Prize.
3.11  When the Words "I Accept Your Offer" Would Be Ineffective.

XVIII

# TABLE OF CONTENTS

**Sec.**

3.12 Acceptance by Forbearance From Action.

3.13 When Notice of Acceptance Is Necessary.

3.14 Notice as a Requisite of Guaranty and Letters of Credit.

3.15 Notice as a Condition Distinguished From Notice as an Acceptance.

3.16 Offer of a Promise, Requesting Non-promissory Action in Return.

3.17 Offer of an "Act" for a Promise.

3.18 Silence as a Mode of Acceptance.

3.19 Can Offeror Make Silence Operate as Acceptance?

3.20 Belated or Conditional Acceptance Followed by Offeror's Silence.

3.21 Silence Plus Additional Circumstances.

3.22 Multiple Acceptances.

3.23 Alternative Modes of Acceptance.

3.24 Acceptance by Post.

3.25 Acceptance by Telephone or Other Electronic Means.

3.26 Withdrawal of a Letter of Acceptance From the Mails.

3.27 Acceptance by Telegraph—When Operative.

3.28 Acceptance Must Manifest Assent and Be Unconditional.

3.29 An Acceptance May Be Unconditional Even Though the Acceptor Makes a Conditional Promise.

3.30 Acceptance Not Conditional, Even Though Grumbling or Accompanied by a Request or by a New Offer.

3.31 Subsequent Erroneous Interpretation Does Not Make an Acceptance Conditional.

3.32 Attempts by the Offeree to Restate in the Acceptance the Terms of the Offer.

3.33 Attempts by the Offeree to State in the Acceptance the Legal Operation of the Agreement.

3.34 Mode of Acceptance Can Be Prescribed by the Offeror.

3.35 Counter–Offers and Their Effect.

3.36 Power to Accept an Offer Is Terminated by a Counter–Offer or Conditional Acceptance.

3.37 Conditional Acceptances and Counter–Offers Under the Uniform Commercial Code and the United Nations Convention.

3.38 A Counter–Offer or Rejection by One Who Has a "Binding Option" or an Irrevocable Offer Does Not Terminate the Power of Acceptance.

3.39 Power of Acceptance Not Terminated by a Counter–Offer if Either Offeror or Offeree So Prescribes.

3.40 Inquiries and Separate Offers Distinguished From Counter–Offers.

3.41 Effect of Rejection of an Offer.

## CHAPTER 4.  INDEFINITENESS AND MISTAKE IN EXPRESSION

4.1 Vagueness and Indefiniteness of Terms.

4.2 Time of Performance Indefinite—Promises of "Permanent" Employment—At Will Employment.

4.3 Indefiniteness of Price or Terms of Payment—Money as a Commodity.

## TABLE OF CONTENTS

**Sec.**

4.4   Agreed Methods of Determining the Price or Amount.

4.5   Reasonable Price—Quasi–Contractual Remedy After Performance.

4.6   Uncertainty of Subject Matter to Be Exchanged for Price; Requirements and Output Contracts.

4.7   Effect of Subsequent Verbal Clarification or Action by the Parties.

4.8   Subsequent Action May Create a Quasi Contract.

4.9   Mistake—Difficulty and Complexity of the Subject.

4.10  Mistake as to the Words Used, or as to the Meaning Given to Words and Expressions.

4.11  Mistake in Transmission of Messages.

4.12  Objective and Subjective Theories.

4.13  Mutual Assent—"Meeting of the Minds".

4.14  Auction Sales—Offers to Sell and to Buy.

S

S

failed, and the employer may cancel the contract.[46] In the case of a contract for an indefinite term that is terminable only "for cause," its meaning may be quite different.[47]

## § 4.3  Indefiniteness of Price or Terms of Payment—Money as a Commodity

In the process of negotiating an agreement, a term that is frequently left indefinite and to be settled by future agreement, or by some other specified method, is the price in money—the compensatory exchange for the subject matter of purchase. This is true both of agreements for the rendition of service [1] and of those for the purchase, sale, or leasing of realty [2] or goods.[3] If the

**46. Ohio**—Boggs v. Avon Products, Inc., 56 Ohio App.3d 67, 564 N.E.2d 1128 (1990), covering up a production error.

**Or.**—Bewley v. Evanite Fiber Corp., 111 Or.App. 314, 826 P.2d 74 (1992), review denied 313 Or. 299, 832 P.2d 455, neglect of duty and insubordination.

**47.** See Helsby v. St. Paul Hospital and Cas. Co., 195 F.Supp. 385 (D.Minn. 1961), affirmed 304 F.2d 758 (8th Cir.), noted at § 4.2 n. 13.

**§ 4.3**

**1.** Where an agency contract empowered the agent to sell insurance and to receive premiums and provided that the agent should report monthly and should within 60 days remit all money received, less such part thereof as the parties might thereafter agree upon as his commission, the court held that the company could maintain suit on the agent's promise to remit within 60 days, even though the amount of his commission was so indefinite that a court could not enforce a promise to pay it. The contract was "in writing" sufficiently to determine the applicable statute of limitations. Meehan v. Grimaldi & Grimaldi, Inc., 240 F.2d 775 (5th Cir.1957). Observe that the writing was perfectly definite. The promise was to remit all money received, unless a deduction should later be agreed on.

Arrowhead Constr. Co. v. Essex Corp., 233 Kan. 241, 662 P.2d 1195 (1983).

**2.** See Barling v. Horn, 296 S.W.2d 94 (Mo.1956), noted herein under § 261. A lease created in the lessee a first right to buy, without specifying the

price. The court found by reasonable implication that the lessees had a preference right to buy at the price that the lessor agreed to accept from a third party. The "implication" afforded an agreed method of fixing the price. See also § 4.4.

In Duke v. Whatley, 580 So.2d 1267 (Miss.1991), on similar facts the court found the agreement to be too indefinite.

*Agreements for the sale of land* are probably less often held invalid for indefiniteness as to price. There are cases so holding in respect of the terms of payment and security.

**Cal.**—In Burgess v. Rodom, 121 Cal. App.2d 71, 262 P.2d 335 (1953), a written agreement for the sale of land was executed, with a deposit of $200 by the purchaser. It provided: "The balance of the price [$5,000] is to be paid within 30 days from date hereof, as follows: Terms to be made as soon as new purchaser arranges for new mortgage." This document was held not to be a contract, since no terms of payment were agreed on.

**Ga.**—In Williams v. Gottlieb, 90 Ga. App. 438, 83 S.E.2d 245 (1954), a contract for the sale of land was too indefinite for enforcement because, as to terms of payment of the stated price of $14,000, it merely said: "Buyer to secure $10,000 loan, Balance of $4,000 cash." The buyer was held free to refuse to complete and got judgment for restitution of his down payment.

**3.** See note 3 on page 568.

567

§ 4.3    OFFER AND ACCEPTANCE    Pt. 1

parties provide a practicable method for determining this price or compensation there is no such indefiniteness or uncertainty as will prevent the agreement from being an enforceable contract. The same is true if they agree upon payment of a "reasonable" price or compensation.[4] There are cases, however, in which it is clear that the parties have not expressly or implicitly agreed upon a "reasonable price," and also have not prescribed a practicable method of determination. Where this is true, the agreement is too indefinite and uncertain for enforcement.[5] Such cases should be rare. If

**Md.**—Fett v. Sligo Hills Development Corp., 226 Md. 190, 172 A.2d 511 (1961), purchase price of land $40,000, of which $25,000 was to be paid in cash, balance on a mortgage or rate of interest.

**N.Y.**—In Ansorge v. Kane, 244 N.Y. 395, 155 N.E. 683 (1927), rehearing denied, there was an agreement for the sale of land for "$32,625; payable $12,-625 cash; balance of $20,000 on mortgage for 5 years. The sum to be paid on signing of contract on March 26 to be agreed on. The balance of cash payment on passing of title on May 26." This was held not to be enforceable.

**Pa.**—Driebe v. Fort Penn Realty Co., 331 Pa. 314, 200 A. 62, 117 A.L.R. 1091 (1938); Stevens v. Doylestown Bldg. & Loan Ass'n, 321 Pa. 173, 183 A. 922 (1936), agreement stated that price to be paid for land "approximates $8,000" and that conveyance would be made "at the above price or less."

**3.** See U.C.C. § 2–305, reproduced in the text below.

**4. Ariz.**—Schade v. Diethrich, 158 Ariz. 1, 760 P.2d 1050 (1988), en banc, promise of fair and equitable severance payment.

**Ill.**—In Miller v. Bloomberg, 26 Ill. App.3d 18, 324 N.E.2d 207 (1975), appeal after remand 60 Ill.App.3d 362, 17 Ill.Dec. 602, 376 N.E.2d 748, later proceeding, 126 Ill.App.3d 332, 81 Ill.Dec. 540, 466 N.E.2d 1342 the lessees had an option to purchase at the "then prevailing market price."

**5.** Brooks v. Federal Surety Co., 58 App.D.C. 56, 24 F.2d 884, 57 A.L.R. 745 (1928), a doubtful decision.

In Bengimina v. Allen, 375 S.W.2d 199 (Mo.App.1964), the defendant's promise of space in his place of business for the installation and operation of

coin-operated music machines was held void for lack of consideration. The writing contained words of promise by the plaintiff to install ___ machines, and that receipts from the machines were to be divided in a stated proportions. The blank not been filled, the court held that the promise to divide receipts created no obligation. Evidence of an oral agreement as to the number of machines might be admissible to fill the blank, but the facts were stipulated and oral agreement was alleged. It appears, however, that machines were in fact installed and operated for more than 2 years. The court held that "part performance" could not make the previously void contract enforceable. This seems doubtful. No reference is made to the notion of promissory estoppel. Compare § 1.10.

**This section is cited** in Tradeways, Inc. v. Chrysler Corp., 342 F.2d 350 (2d Cir.1965), cert. denied 382 U.S. 832, in holding that oral discussions in which plaintiff was selected to develop promotional efforts for defendant's dealers did not result in the formation of a contract because the price was not determined and because defendant requested a written offer which was never signed by it.

**This section is cited** in Western Homes, Inc. v. Herbert Ketell, Inc., 236 Cal.App.2d 142, 45 Cal.Rptr. 856 (1965) in holding an agreement which contemplated the hiring of plaintiff as rental manager too vague for enforcement partly because no salary was specified. The case is noted above in § 4.1.

In Sun Printing & Pub. Ass'n v. Remington Paper & Power Co., 235 N.Y. 338, 139 N.E. 470 (1923), the plaintiff

the agreement is a commercial one it can be presumed that the parties as actors in the market intend a market or some other reasonable price. If an agreement is too indefinite as to price to be enforceable, a subsequent agreement on a specific price has sufficient consideration for enforcement.[6]

There are two distinct kinds of reasons for the refusal of a court to enforce an agreement that is too indefinite. The agreement may be too indefinite for the court to administer, no remedy can be properly framed. Secondly, the indefiniteness of the agreement may be an indicium of a lack of contractual intent. The court should be slow to come to this conclusion if it is convinced that the parties themselves meant to make a "contract" and to bind themselves to render a future performance.[7] Many a gap in terms can be filled, and should be, with a result that is consistent

agreed to buy and defendant agreed to sell 1,000 tons of paper per month during the months of September, 1919, to December, 1920, inclusive, 16,000 tons in all. Sizes and quality were adequately described. Payment was to be made on the 20th of each month for all paper shipped the previous month. The price for shipments in September, 1919, was to be $3.73¾ per 100 pounds, and for shipments in October, November and December, 1919, $4 per 100 pounds. "For the balance of the period of this agreement the price of the paper and length of terms for which such price shall apply shall be agreed upon by and between the parties hereto fifteen days prior to the expiration of each period for which the price and length of term thereof have been previously agreed upon, said price in no event to be higher than the contract price for newsprint charged by the Canadian Export Paper Company to the large consumers, the seller to receive the benefit of any differentials in freight rates." This was held, two judges dissenting, to be too indefinite to enforce as to paper after December, 1919. It was an agreement to agree. Even if the price of the Canadian Company was a maximum and should be tendered by the buyer, that price is a variable and the period for which any particular quotation is to control is not agreed upon. There are other cases in which the court was much more willing to fill the gap and hold the parties to a contract. It was precisely cases such as this that U.C.C.

§ 2–305, quoted in the text below, was designed to overturn.

In Citizens Utilities Co. v. Wheeler, 156 Cal.App.2d 423, 319 P.2d 763 (1957), a written contract for the sale of all the stock of a water company provided a method for determination of the purchase price of such an indefinite and uncertain character as to be unenforceable. It was sufficient, however, to indicate that the seller did not impliedly agree to sell at a "reasonable price", especially in view of the fact that the stock had no established market price and that there was no prior course of dealing or established practice in the industry by which reasonable value could be determined. The buyer had no right to either specific performance or damages. No binding contract existed.

6. Canadian Nat. R. Co. v. George M. Jones Co., 27 F.2d 240 (6th Cir.1928).

7. In Zucker v. Katz, 708 F.Supp. 525 (S.D.N.Y.1989), a contract for the transfer of stock in a group of corporations in exchange for continued employment was not so lacking in material terms as to be unenforceable. The court says, in deciding a motion to dismiss, that whether "[t]erms are too indefinite to be enforced is an issue better left for summary judgment or trial, at which time the court can better consider whether 'the parties themselves meant to make a contract and to bind themselves,'" quoting from Lee v. Joseph E. Seagram & Sons, Inc., 552 F.2d 447 (2d Cir.1977).

§ 4.3        OFFER AND ACCEPTANCE        Pt. 1

with what the parties said and that is more just to both than would be a refusal of enforcement.[8]

8. This part of the text is quoted and applied in Lee v. Joseph E. Seagram & Sons, Inc., 552 F.2d 447 (2d Cir.1977).

In Garmo v. Clanton, 97 Idaho 696, 551 P.2d 1332 (1976), the plaintiff had the right of first refusal on a strip of land "at a price no higher than offered by any other person." The vendor sought to circumvent the optionee's right by including it in a sale of other parcels to a third party. The court held that the optionee could exercise the right by paying "fair market value."

In Adair Homes, Inc. v. Jarrell, 59 Or.App. 80, 650 P.2d 180 (1982), a construction contract contained a total job price. It was also agreed that certain parts of the work would be eliminated so as to reduce the cost of the contract. The amount of the credits to be given by the contractor for these eliminations was not computed, but it was agreed that the contractor's profit margin would be maintained. The contract was definite enough, being considerably more definite than "reasonable value."

Where the buyer of goods permitted manufacture to begin and later requested and obtained delay in the time of delivery, the buyer was held bound by contract, even though the seller's acceptance of the order stated: "Due to the uncertainty of manufacturing, this order is accepted subject to prices in effect on shipping date, and our ability to ship." The parties had discussed fully the extent of prior unfilled orders at the seller's factory, the rapidly rising market prices, and the difficulties respecting labor and materials. Memphis Furniture Mfg. Co. v. Wemyss Furniture Co., 2 F.2d 428 (6th Cir.1924).

In Abrams v. George E. Keith Co., 30 F.2d 90 (3d Cir.1929), there was a continuing "sales agency" agreement between factory and dealer for Walk Over Shoes, the dealer's orders to be filled at prices to be agreed upon. After operating on this basis for 15 years, the seller refused, without previous notice, to fill a reasonable order by the dealer. A claim for damages held sustainable. The result is more clearly sustainable today under U.C.C. § 2–309.

Another excellent case is Mantell v. International Plastic Harmonica Corp., 141 N.J.Eq. 379, 55 A.2d 250, 173 A.L.R. 1185 (1947), where the agreement between the producer of a new invention and a distributor left the price to be paid to the later determination in large degree by the producer. The price had to be a "reasonable" one in relation to subsequent production costs and the demand to be created.

This section is cited in Laveson v. Warner Mfg. Corp., 117 F.Supp. 124, 125, 127 (D.N.J.1953), a case holding valid a sales agency agreement to supply the agent's requirements for five years, even though the price was left open for determination as experience was acquired. The parties had operated under the contract for three years without difficulty as to price.

In Schneider v. Walts, 186 Kan. 140, 348 P.2d 593 (1960), the defendant so negligently sprayed plaintiff's trees and crops that he admitted liability. It was mutually agreed that a stated amount should be paid in settlement of the injury to the crops (this amount being in fact paid) and that the parties would meet in the spring when the injury to the trees could more accurately be determined and that the defendant would then pay the amount so estimated. In a suit for damages for breach of the defendant's promise so made, the court held that the parties made a valid compromise contract and not a mere contract to make a contract. The court said that the compromise was itself substituted for the antecedent liability in tort, but an action would lie for its breach even if regarded as an executory accord. See § 1271 herein and Restatement (Second) of Contracts § 281. It was not too uncertain or indefinite for enforcement.

See also:

Cal.—Wilson v. Brown, 5 Cal.2d 425, 55 P.2d 485 (1936).

Wash.—Diettrich v. J.J. Newberry Co., 172 Wash. 18, 19 P.2d 115 (1933).

570

A good case for analysis is that of a lease with an option by the tenant to renew "for an additional period of five years at annual rentals to be agreed upon...." Some courts have found such a renewal option to be void for indefiniteness.[9] One such court plausibly, but perhaps erroneously, explained:[10]

> This liberty [to contract] is no right at all if it is not accompanied by freedom not to contract. The corollary is that, before one may secure redress in our courts because another has failed to honor a promise, it must appear that the promisee [promisor?] assented to the obligation in question.

> It also follows that, before the power of law can be invoked to enforce a promise, it must be sufficiently certain and specific so that what was promised can be ascertained. Otherwise, a court, in intervening, would be imposing its own conception of what the parties should or might have undertaken, rather than confining itself to the implementation of a bargain to which they have mutually committed themselves. Thus, definiteness as to material terms is of the very essence in contract law.

This result and this reasoning is reached despite the obvious intent to contract as demonstrated by the formal appearance of the lease, and as further shown by the entry in possession by the tenant and the tenant's payment of the rent for the leasehold term. This result was obtained despite the fact that the payment

**Ky.**—Patrick v. Howard, 243 S.W.2d 486 (Ky.1951), express promise of "reasonable pay" for services.

**Okl.**—Edens v. Miller, 315 P.2d 954 (Okl.1957), agreement to pay "costs" of paving—reasonable costs, reasonable time.

**Tenn.**—Greene v. Leeper, 193 Tenn. 153, 245 S.W.2d 181 (1951), rental to be agreed on according to business conditions.

**Tex.**—Bendalin v. Delgado, 406 S.W.2d 897 (Tex.1966), agreement to buy corporate stock was not too indefinite for enforcement, despite failure to specify the price, where the agreement was clearly proven and a reasonable price could be implied.

**9. Ark.**—Phipps v. Storey, 269 Ark. 886, 601 S.W.2d 249 (App.1980).

**Ariz.**—Cecil Lawter Real Estate School, Inc. v. Town & Country Shop-

ping Center Co., 143 Ariz. 527, 694 P.2d 815 (App.1984).

**Cal.**—ETCO Corp. v. Hauer, 161 Cal. App.3d 1154, 208 Cal.Rptr. 118 (1984).

**Fla.**—Edgewater Enterprises, Inc. v. Holler, 426 So.2d 980 (Fla.App.1982), re-hearing denied.

**Neb.**—R.A.S., Inc. v. Crowley, 217 Neb. 811, 351 N.W.2d 414 (1984).

**Idaho**—Giacobbi Square v. PEK Corp., 105 Idaho 346, 670 P.2d 51 (1983).

**N.Y.**—Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher, 52 N.Y.S.2d 105, 436 N.Y.S.2d 247, 417 N.E.2d 541 (1981).

**S.D.**—Deadwood Lodge No. 508, Benev. & Protective Order of Elks v. Albert, 319 N.W.2d 823 (S.D.1982).

**10.** Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher, 52 N.Y.S.2d 105, 109, 436 N.Y.S.2d 247, 249, 417 N.E.2d 541 (1981).

§ 4.3          OFFER AND ACCEPTANCE          Pt. 1

of rent during the leasehold term has in indivisible part been payment for the option. Thus, such a result ignores the obvious intent to contract and enrichment of the landlord at the tenant's expense by that portion of the rent attributable to the renewal option. It also provides for the forfeiture of the tenant's leasehold and its good will. Other courts have reached results more in accordance with the equities of the case which heavily favor enforcement.[11]

In the usual case of an "agreement to agree", it is implicit that the parties intended that a reasonable price would be negotiated.[12] At times the agreement is explicit that a reasonable price will be agreed upon. In such a case all should agree that the agreement is sufficiently definite.[13]

**11.** One of the better opinions is that of the intermediate court of appeal in Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher, 70 A.D.2d 1, 419 N.Y.S.2d 558 (1979), reversed by the Court of Appeals, supra note 10.

The court in Moolenaar v. Co–Build Cos., 354 F.Supp. 980 (D.V.I.1973), explained why the implication of "reasonable" rents should be found: "First, it will probably effectuate the intent of the parties better than would striking out the clause altogether. A document should be construed where possible to give effect to every term, on the theory that the signatories inserted each for a reason and if one party had agreed to the clause only in the secret belief that it would prove unenforceable, he should be discouraged from such paths."

"Secondly, a renewal option has a more sympathetic claim to enforcement than do most vague contractual terms, since valuable consideration will often have already been paid for it. The option of renewal is one factor inducing the tenant to enter into the lease, or to pay as high a rent as he did during the initial period. To this extent the landlord benefitted from the tenant's reliance on the clause, and so the tenant has a stronger claim to receive the reciprocal benefit of the option.... Finally, I might take note of the policy of construing ambiguities in lease agreements against the landlord, or, with more theoretical justification but little difference in practical result, against the party responsible for drafting the document."

**Alaska**—Berrey v. Jeffcoat, 785 P.2d 20 (Alaska 1990); Hammond v. Ringstad, 10 Alaska 543 (1945).

**Ariz.**—Hall v. Weatherford, 32 Ariz. 370, 259 P. 282, 56 A.L.R. 903 (1927).

**Nev.**—Cassinari v. Mapes, 91 Nev. 778, 542 P.2d 1069 (1975).

**N.Dak.**—Drees Farming Assoc. v. Thompson, 246 N.W.2d 883 (N.D.1976).

**Ohio**—Moss v. Olson, 148 Ohio St. 625, 36 Ohio Op. 252, 76 N.E.2d 875 (1947).

**Wash.**—Anderson v. Frye & Bruhn, Inc., 69 Wash. 89, 124 P. 499 (1912); Young v. Nelson, 121 Wash. 285, 209 P. 515, 30 A.L.R. 568 (1922); Diettrich v. J.J. Newberry Co., 172 Wash. 18, 19 P.2d 115 (1933).

**Tenn.**—Playmate Club v. Country Clubs, Inc., 62 Tenn.App. 383, 462 S.W.2d 890, 58 A.L.R.3d 494 (1970), cert. denied.

**12.** Allied Disposal, Inc. v. Bob's Home Service, Inc., 595 S.W.2d 417 (Mo. App.1980).

**13.** **Or.**—Edwards v. Tobin, 132 Or. 38, 284 P. 562, 68 A.L.R. 152 (1930), "reasonable rental under then existing conditions."

**D.C.**—George Y. Worthington & Son Management Corp. v. Levy, 204 A.2d 334 (D.C.App.1964), "prevailing fair rentals for similar property at the time."

**N.Y.**—Northrup v. Hushard, 129 A.D.2d 1005, 514 N.Y.S.2d 304 (1987), "reasonable market value price."

**Ch. 4**          **INDEFINITENESS & MISTAKE**          **§ 4.3**

In these cases the exact words of the lease must always be considered, but in many of these cases the option has been specifically enforced even though the parties could not agree.[14] The fact

**Tex.**—Aycock v. Vantage Management Co., 554 S.W.2d 235 (Tex.Civ.App. 1977), writ ref. n.r.e., "prevailing rates."

**Vt.**—Toys, Inc. v. F.M. Burlington Co., 155 Vt. 44, 582 A.2d 123 (1990), option to renew lease at "the then prevailing rate in the mall."

**14.** U.S.—A.M. Webb & Co. v. Robert P. Miller Co., 176 F.2d 678 (3d Cir. 1949); Id., 157 F.2d 865 (3d Cir.1946).

**Ariz.**—Hall v. Weatherford, 32 Ariz. 370, 259 P. 282, 56 A.L.R. 903 (1927).

**Cal.**—Streicher v. Heimburge, 205 Cal. 675, 272 P. 290 (1928).

**Mass.**—Mutual Paper Co. v. Hogue-Sprague Corp., 297 Mass. 294, 8 N.E.2d 802 (1937); Shayeb v. Holland, 321 Mass. 429, 73 N.E.2d 731 (1947), lessee's option to buy the land specifically enforced, though no price was named, the court finding "reasonable price" by implication, the lessee had made valuable improvements as the lease permitted.

**Mich.**—Bird v. Couchois, 214 Mich. 607, 183 N.W. 36 (1921).

**Mo.**—Arnot v. Alexander, 44 Mo. 25 (1869).

**Ohio**—Moss v. Olson, 148 Ohio St. 625, 36 Ohio Op. 252, 76 N.E.2d 875 (1947).

**Or.**—Edwards v. Tobin, 132 Or. 38, 284 P. 562, 68 A.L.R. 152 (1930).

**Pa.**—Kaufmann v. Liggett, 209 Pa. 87, 58 A. 129 (1904).

**S.C.**—Rainwater v. Hobeika, 208 S.C. 433, 38 S.E.2d 495, 166 A.L.R. 1228 (1946).

**Wash.**—Young v. Nelson, 121 Wash. 285, 209 P. 515, 30 A.L.R. 568 (1922).

The text here is cited in Harvey Constr. Co. v. Parmele, 253 Iowa 731, 113 N.W.2d 760, 762 (1962). In a lease of 27.51 acres out of a larger tract of 174 acres at a rental of $1,500, there was a provision for renewals and also for an option to lease additional land: "Lessors agree to lease to the Lessee any additional real property belonging to the Lessors adjacent and contiguous to the real property herein leased upon

the same terms and conditions as herein stated ... as the Lessee shall demand from time to time ..." Later, the Lessee demanded and was given several small additions amounting to perhaps 8 acres, at $50 per acre. The Lessors, in a declaratory judgment action, insisted that the terms of the option were so indefinite as to be wholly inoperative. The Lessee contended that the option included the entire remaining tract. The court held that parol evidence was admissible to remove the indefiniteness, giving special consideration to the terms "adjacent and contiguous." The Lessee leased the land for use as an airport. The lower court's judgment sustaining the Lessee's contention was erroneous. The Lessors' contention was likewise erroneous. The case was remanded with directions to determine the number of acres within the reasonably foreseeable needs of the Lessee, which must be land actually "touching" the original quantity and not separated by a road or including certain dwellings. The rental must be the average price per acre paid in the beginning: $1,500 divided by 27.51, this being 54.53. It would be highly unreasonable to interpret the option as tying up the whole large tract for a long period. The trial court must "apply the rule of reasonableness to the remaining lands." Difficult, perhaps not too difficult.

Other cases and texts state that such an option is unenforceable:

**Ark.**—Keating v. Michael, 154 Ark. 267, 242 S.W. 563 (1922).

**Fla.**—Camichos v. Diana Stores Corp., 157 Fla. 349, 25 So.2d 864 (1946).

**Ga.**—Candler v. Smyth, 168 Ga. 276, 147 S.E. 552 (1929).

**La.**—Haeuser v. Schiro, 235 La. 909, 106 So.2d 306 (1958), noted under § 266.

**Mass.**—Conos v. Sullivan, 250 Mass. 376, 145 N.E. 529 (1924).

**Miss.**—Giglio v. Saia, 140 Miss. 769, 106 So. 513 (1926).

573

§ 4.3          OFFER AND ACCEPTANCE          Pt. 1

that the lessee has acted in reliance on the option may be of controlling importance. The lessee may have made valuable improvements, and in any case, has occupied the premises and paid the rent. In must be remembered that part of the rent is attributable to the option. The result is strengthened if the option provides for some mode of determination (e.g. by arbitration) in case of failure to agree.[15]

The "subject matter" of an agreement for the sale of goods is two-fold—the goods and the price. The price is as much the subject matter of agreement, and as important a part, as are the goods. The "subject matter" of a contract for the rendition of services is both the labor and the wages. These agreements are for the exchange of two performances, agreed to be of equal value, quid pro quo. When parties agree upon an exchange of goods or services for money, they are putting an agreed valuation, in terms of money, upon the goods or services. Whether they realize it or not, they are also putting an agreed valuation upon the money in terms of goods or services. There have been long periods of time during which people have thought of the dollar, or the pound, or the franc, as if it were a mere "unit" incapable of fluctuation. Two world wars, with their astronomical expenditure and waste, followed by wars in Korea and Vietnam, and the resulting periods of inflation, have taught most of us better. These so-called "units" are indeed a convenient "medium of exchange"—of exchanging goods and services for other goods and services. This "medium" of exchange is itself a subject of exchange, one that will determine the amount of other goods and services that the receiver of the money may in the future enjoy. If, therefore, the court cannot determine how much money the parties have agreed to exchange for specified goods, the agreement is no more enforceable as a contract than it would be if the court cannot determine the amount or kind of goods to be exchanged. It is true, however, that

**N.Y.**—Shur-on Standard Optical Co. v. Viopake Co., 221 A.D. 261, 223 N.Y.S. 157 (1927).

**N.C.**—R.J. Reynolds Realty Co. v. Logan, 216 N.C. 26, 3 S.E.2d 280 (1939).

A number of cases cited in note 11 above also involved the grant of a decree for specific performance.

**15. Ky.**—Cain v. Lawrence Drug Co., 235 Ky. 12, 29 S.W.2d 550 (1930).

**Mass.**—Shayeb v. Holland, 321 Mass. 429, 73 N.E.2d 731 (1947).

**Mich.**—Maas Bros. v. Weitzman, 288 Mich. 625, 286 N.W. 104 (1939).

**N.Y.**—166 Mamaroneck Ave. Corp. v. 151 East Post Rd. Corp., 78 N.Y.2d 88, 571 N.Y.S.2d 686, 575 N.E.2d 104 (1991).

**Or.**—Houston v. Barnett, 90 Or. 94, 175 P. 619 (1918).

**Pa.**—Kaufmann v. Liggett, 209 Pa. 87, 58 A. 129 (1904).

**R.I.**—Town of Bristol v. Bristol Warren Waterworks, 19 R.I. 413, 34 A. 359 (1896).

**Wash.**—Murray v. Odman, 1 Wash.2d 481, 96 P.2d 489 (1939).

parties are much more likely to leave the "price" of goods or services open and unstated than to leave so the amount of the goods or services. The apparent gap can be more readily and justly filled by recourse to the "market" for the goods or services, or to the parties' own "course of dealing," or to a multitude of factors called "reasonableness."

In the following cases, the agreement as to price was held too indefinite for enforcement: a promise to divide profits "upon a very liberal basis"; [16] to pay "good wages" to a teacher; [17] to pay "not exceeding $300 per week"; [18] to pay "a fair share of my profits" in addition to a specified salary; [19] to pay an amount

**16.** Butler v. Kemmerer, 218 Pa. 242, 67 A. 332 (1907), promise to divide profits "on a very liberal basis."

A statute that determined the criminal or the lawful character of a contract in restraint of trade by making it depend on whether its purpose was merely the making of a "reasonable profit" was held to be so uncertain as to be unconstitutional in People v. Building Maintenance Contractors' Ass'n, 41 Cal.2d 719, 264 P.2d 31 (1953).

**17.** Ind.—Fairplay School Tp. v. O'Neal, 127 Ind. 95, 26 N.E. 686 (1891).

**18.** United Press v. New York Press Co., 164 N.Y. 406, 58 N.E. 527 (1900). Here the money was to be paid for "news." Both the news to be supplied and the amount to be paid would vary. See note 27 on this case below.

**19.** Ga.—Burney v. Jones, 140 Ga. 758, 79 S.E. 840 (1913), promise to give "part of the money that had been received."

Ky.—Gaines & Sea v. R.J. Reynolds Tobacco Co., 163 Ky. 716, 174 S.W. 482 (1915), cost plus "a nice profit".

N.Y.—Varney v. Ditmars, 217 N.Y. 223, 111 N.E. 822 (1916), with a strong dissent.

A promise to pay "a fair and equitable share of the net profits" of a business in return for expert services of the plaintiff is not too uncertain for specific enforcement after the services have been rendered and profits made. Noble v. Joseph Burnett Co., 208 Mass. 75, 94 N.E. 289 (1911).

A promise to pay an employee a "share of the profits" in addition to

salary held too indefinite for enforcement; but a new trial was granted to determine reasonable compensation. Petersen v. Pilgrim Village, 256 Wis. 621, 42 N.W.2d 273, 18 A.L.R.2d 206 (1950). The annotation cites conflicting decisions.

**This section is cited** in Turcott v. Gilbane Bldg. Co., 94 R.I. 225, 179 A.2d 491 (1962). The plaintiff, an engineer, had been employed by the defendant under a contract providing for a fixed weekly salary and that in addition to his weekly salary he was to receive "a fair and equitable share of the profits, fees and earnings of the respondent corporation resulting from complainant's efforts, the calculation of the amount ... to be based upon the particular type of project on which complainant was engaged and the provisions of the respondent corporation's construction contract with respect to such profits, fees and earnings." The plaintiff sued to enforce payment of the additional compensation and for an accounting to determine its amount. The court sustained a demurrer to the complaint, holding that the terms alleged were too "vague, indefinite, ambiguous, and uncertain" to justify an order for an accounting. The defendant's demurrer stated that the complaint showed that the plaintiff had an "adequate remedy at law." The court held that if the plaintiff had a right to reasonable compensation in addition to the weekly salary, his remedy was in an action "at law" and not in equity for an accounting. The case was "remanded to the superior court for further proceedings."

§ 4.3        OFFER AND ACCEPTANCE        Pt. 1

"commensurate with the earnings of the company" in addition to salary; [20] to pay "a satisfactory amount." [21] There are cases in which the court has been much more willing to find the meaning "reasonable compensation" in language that seems fully as indefinite as in the cases just cited.[22] If compensation is expressed in a

In a case in which there was a promise of a specified salary in addition to a "fair share," Cardozo, J., thought that the contract was not wholly unenforceable and that an action for a discharge without just cause would lie. Varney v. Ditmars, 217 N.Y. 223, 111 N.E. 822 (1916). See also Von Reitzenstein v. Tomlinson, 249 N.Y. 60, 162 N.E. 584 (1928), holding that a promise of "an appropriate percentage" was too indefinite for enforcement, but that it showed that the value of the services had not been liquidated at the stated wages, so that an action for quantum meruit would lie; Eno v. Prime Mfg. Co., 314 Mass. 686, 50 N.E.2d 401 (1943).

In Guest v. Baldwin, 104 Ga.App. 809, 123 S.E.2d 194 (1961), the owner of a farm induced a tenant to move to the farm, tend the stock, plant, cultivate, and harvest, and promised to pay him $35 per week, allow him the use of a tractor, and at the end of the year pay him enough more to "make it right." After the harvesting was done, they agreed upon $1,500 as the amount necessary to "make it right." The original agreement, too uncertain in terms for enforcement, was made sufficiently certain by their subsequent agreement. In Stan–Rich Co. v. Schneider, 105 Ga. App. 6, 123 S.E.2d 166 (1961), a provision for payment of "an equitable share of the profits from the sales" would have been too uncertain for enforcement, except for the fact that it was followed by a sufficiently definite method by which that share was to be computed. To the same effect is Shermans Food Stores, Inc. v. Campbell Food Markets, Inc., 59 Wash.2d 251, 367 P.2d 141 (1961).

20. Mont.—Donovan v. Bull Mountain Trading Co., 60 Mont. 87, 198 P. 436 (1921).

21. N.Y.—Mackintosh v. Kimball, 101 A.D. 494, 92 N.Y.S. 132 (1905).

Eng.—In re Vince, [1892] 2 Q.B. 478, "a due allowance."

22. A contract is not made invalid by a provision, assented to by both parties, that the named price is "subject to change pending tariff revision." Doubtless, this made the seller's duty to deliver at the named price conditional upon there being no increase in tariff prior to the time for delivery from abroad. If no such increase occurs, the contract is enforceable at the named price. Outlet Embroidery Co., Ltd. v. Derwent Mills, 254 N.Y. 179, 172 N.E. 462, 70 A.L.R. 1440 (1930).

Similar cases are:

U.S.—Henderson Bridge Co. v. McGrath, 134 U.S. 260, 10 S.Ct. 730, 33 L.Ed. 934 (1890); Pillois v. Billingsley, 179 F.2d 205 (2d Cir.1950).

Me.—Corthell v. Summit Thread Co., 132 Me. 94, 167 A. 79, 92 A.L.R. 1391 (1933), agreement to turn over inventions, for which "reasonable recognition will be made … the amount of recognition to rest entirely with the Company."

Mass.—Eno v. Prime Mfg. Co., 314 Mass. 686, 50 N.E.2d 401 (1943); Noble v. Joseph Burnett Co., 208 Mass. 75, 94 N.E. 289 (1911), "a fair and equitable share of the net profits."

N.Y.—Varney v. Ditmars, supra, dissenting opinion by Cardozo.

See Silver v. Graves, 210 Mass. 26, 95 N.E. 948 (1911), where in return for withdrawal of a will contest the defendant promised to "make it right" and to pay a "sum of money that would be satisfactory." The recovery here may be regarded as quasi-contractual, performance by the plaintiff being complete and having resulted in pecuniary benefit to the defendant.

In Schloss v. Davis, 213 Md. 119, 131 A.2d 287 (1957), the defendant offered to pay plaintiff "$550 or $600 a month" for specified services. The plaintiff accepted and performed the work. The court held that this was not indefinite

workable formula it is certainly expressed with sufficient definiteness.[23]

If one party has greatly benefited by part performance [24] or if one party has relied extensively on the agreement,[25] the court should go to great lengths to find a construction of the agreement that will salvage it. Indeed, as a great jurist has written, "Indefiniteness must reach the point where construction becomes futile." [26] If construction is indeed futile, it must be borne in mind that after a part performance has been received, a just compensation must be paid even if the agreement is indefinite as to price.

An agreement to sell goods or land at a price that shall not be more than a specified amount may be too indefinite for enforce-

or uncertain and gave judgment at the rate of $550. It cited similar cases and "distinguished" United Press v. New York Press Co., 164 N.Y. 406, 58 N.E. 527, 53 L.R.A. 288 (1900), adding "See also the criticism of this case in Corbin, Contracts, § 97 [now § 4.3]." See note 27 below.

In Holt v. Swenson, 252 Minn. 510, 90 N.W.2d 724 (1958), the plaintiff, an attorney, offered to conduct litigation for a contingent fee "equal to one-third to one-half of the amount recovered." The court found that the defendant accepted this offer either expressly or tacitly by his conduct instructing the plaintiff to proceed. The contract so made was not too indefinite for enforcement, since it included a definite promise to pay a minimum fee of one-third of the amount recovered. The fact that the agreement did not make it clear under what circumstances the fee might be increased to one-half was not fatal to the contract. This is true even though we draw the inference that any excess above one-third would have to be agreed upon by the parties. See also § 2.8.

**23.** In Fries v. United Mine Workers, 30 Ill.App.3d 575, 333 N.E.2d 600 (1975), the plaintiff was promised that his pension would be computed on the same basis as the pensions for officials covered by the union pension plans even though he did not qualify for the plan. This seems to have been definite enough, but later he was promised a specific monthly amount.

**24.** Blackhawk Heating & Plumbing Co. v. Data Lease Financial Corp., 302 So.2d 404 (Fla.1974), noted under § 4.1. The subsequent history of this case is too lengthy to cite here.

**25.** Cobble Hill Nursing Home, Inc. v. Henry and Warren Corp., 74 N.Y.2d 475, 548 N.Y.S.2d 920, 548 N.E.2d 203 (1989), reargument denied 75 N.Y.2d 863, 552 N.Y.S.2d 925, 552 N.E.2d 173 (1990), cert. denied 111 S.Ct. 58.

**26.** Heyman Cohen & Sons, Inc. v. M. Lurie Woolen Co., 232 N.Y. 112, 133 N.E. 370, 371 (1921) (Cardozo, J.). A good illustration of such a construction is DiMaria v. Michaels, 90 A.D.2d 676, 455 N.Y.S.2d 875 (1982). A lease provided that the tenant "shall have the first option to buy said premises at a price to be agreed upon in the event the party of the first part places the premises for sale." When the tenant learned that the appellant had contracted to sell the premises for $14,000, the tenant exercised the option. The landlord argued that the price term was an impermissible "agreement to agree" making the contract void under New York law. The court ruled instead that the term "first option to buy" was a term of art which implies that the price term is to be determined by the price at which the lessor offers the property to a third party. Therefore, the "price to be agreed upon" was the price of the acceptable offer of the third party.

It has been said that "The judicial bias is towards interpreting a contract 'so as to make it a valid and enforceable undertaking rather than of no force and

§ 4.3          OFFER AND ACCEPTANCE          Pt. 1

ment against the buyer, but in most such cases it should be operative as an offer to sell at the stated maximum.[27] An acceptance at that maximum should make an enforceable contract. If such a provision is in the form of an option contained in a lease or other more inclusive contract, the power of the option holder to buy at the specified maximum is not revocable.[28] Contracts containing minimum prices have also been found sufficiently defi-

effect.'". Finn v. McNeil, 23 Mass.App. Ct. 367, 502 N.E.2d 557, 561 (1987).

**27.** An agreement for sale of a specified amount of sugar, "price not over 26 cts. per lb." is not too indefinite for enforcement. "It is a stipulation for a reasonable price, to be determined by market conditions existing at the time of delivery, but not in any event to be more than the maximum named." Burlington Grocery Co. v. Lines, 96 Vt. 405, 120 A. 169 (1923). Whether the parties had in mind "a reasonable price to be determined by market conditions existing at the time of delivery" may be doubted, but they meant to make a "contract." Clearly the buyer should win if it offered to pay 26 cents per pound.

Cf. United Press v. New York Press Co., 164 N.Y. 406, 58 N.E. 527 (1900), agreement by plaintiff to supply for daily publication, for 8 years, its night news report, quantity and quality to be equal to its average at date of contract, the price to be not more than $300 per week. This was declared to be a valid contract. For the defendant's repudiation after 2 years, the plaintiff was awarded only 6 cents. A poor solution of the issue.

In Schloss v. Davis, 213 Md. 119, 131 A.2d 287 (1957), an oral contract for supervising construction of a home for "$550 or $600 a month" was held not too indefinite for enforcement at the smaller rate. The court cited this section for its criticism of the United Press case.

In Shaughnessy v. Eidsmo, 222 Minn. 141, 23 N.W.2d 362, 166 A.L.R. 435 (1946), the lessor gave the lessee an option to purchase at a price between $4,750 and $5,000. When the lessee accepted, there was a contract to pay $5,000.

In Pacific Mut. Life Ins. Co. v. Westglen Park, Inc., 160 Tex. 1, 325 S.W.2d 113 (1959) an agreement between vendor and vendee that the vendor's lien should be subordinated to a construction loan not exceeding $14,000 to be obtained later by the vendee was sufficiently definite for enforcement by the construction lender, so long as the loan was on reasonable terms and not in excess of the maximum stated. It was so held even though they also agreed that when the loan was obtained a specific "subordination agreement" should be executed stating the amount of the loan. See note under § 2.9.

In Lavitt v. Aberle, 144 Conn. 723, 138 A.2d 318 (1957), a broker who had produced a satisfactory purchaser testified that he had been promised a fee of $7,500 and that he had refused $5,000. The defendant testified that he had promised to pay $5,000. The court held that, although the defendant's testimony was inconsistent with that of the plaintiff, it was sufficient to sustain a judgment for $5,000. This was not a judgment for "reasonable value"; the court merely accepted the defendant's testimony as the more credible. It was the defendant who had appealed.

In Norton v. Menard Lumber Co., 523 S.W.2d 791 (Tex.Civ.App.1975), the plaintiff promised to do the work for an "approximate cost ... between $4,400 to $4,900." It was held that this meant a maximum of $4,900 with the possibility of a "reasonable variance."

**28.** Trotter v. Lewis, 185 Md. 528, 45 A.2d 329 (1946), lessee's option to buy at a price "not to exceed $2,500" was specifically enforced.

See, also, Mutual Paper Co. v. Hogue–Sprague Corp., 297 Mass. 294, 8 N.E.2d 802 (1937), enforcing an option in a lease for a renewal at a rental to be agreed upon but not to be in excess of 10 percent over the existing rental.

578

d be
ccep-
t. If
se or
er to
con-
defi-

West-
.W.2d
n ven-
's lien
istruc-
to be
i suffi-
by the
e loan
not in
It was
igreed
a spe-
should
of the

i. 723,
io had
: testi-
fee of
$5,000.
e had
t held
stimo-
of the
tain a
"; the
idant's
It was

o., 523
i, the
for an
$4,400
meant
ssibili-

528, 45
buy at
as spe-

. Hoa-
294, 8
option
il to be
cess of
al.

nite.[29]

Frequently the price is agreed upon but the terms of payment are left to be agreed upon later. Many cases have found that such an agreement is fatally defective.[30] This should not be the result in cases where the party urging the indefiniteness defense refuses to consider any offer of terms by the other.[31] The minimum obligation created by an agreement to agree is a duty to negotiate in good faith. Nor should a finding of fatal defectiveness be the result where, although the payment terms are not agreed upon, the seller refuses an offer of cash, except in circumstances where the vendor for tax or other good faith reasons had indicated to the purchaser that cash payment was unacceptable. Uncertainty as to the value of services ancillary to a basic agreement with an agreed price is less important than uncertainty as to price of the basic exchange. As one court has aptly said, "an agreement for fixing reasonable compensation for some adjunctive service in connection therewith does not render the contract so indefinite as to be unenforceable."[32]

The Uniform Commercial Code has been a spur to the relaxation of the insistence by some courts that a an agreement must have a price or a successful price mechanism. The Code recognizes that the parties are actors in the market and are normally contemplating acting in concert with market forces even if they leave the settlement of the price to later agreement or to another mechanism that proves unsuccessful.

The Uniform Commercial Code § 2–305 provides:

"(1) The parties if they so intend can conclude a contract for sale even though the price is not settled. In such a case the price is a reasonable price at the time for delivery if

29. Don King Productions, Inc. v. Douglas, 742 F.Supp. 741 (S.D.N.Y. 1990), collecting cases at p. 762 n. 21. Later proceedings in the case are too lengthy to report here.

30. Bentzen v. H.N. Ranch, Inc., 78 Wyo. 158, 320 P.2d 440, 68 A.L.R.2d 1213 (1958). However, the court refused to grant judgment to the purchaser for the restitution of its down payment. The seller was not unjustly enriched as the agreement caused vendor to take the land off the market and gave the purchaser time to inventory and appraise the subject property. Thus, the down payment could be re-

tained as if it were the price of an option.

In Willmott v. Giarraputo, 5 N.Y.2d 250, 184 N.Y.S.2d 97, 157 N.E.2d 282 (1959), the parties failed to agree on payment terms for interest and amortization. It appears, however, that negotiations took place and failed.

31. See Morris v. Ballard, 56 App. D.C. 383, 16 F.2d 175, 49 A.L.R. 1461 (1926). Failure of vendor to accept proffer of cash or to name any terms of his own is a violation of the duty to negotiate in good faith.

32. Ferris v. Jennings, 595 P.2d 857, 859 (Utah 1979).

(a) nothing is said as to price; or

(b) the price is left to be agreed by the parties and they fail to agree; or

(c) the price is to be fixed in terms of some agreed market or other standard as set or recorded by a third person or agency and it is not so set or recorded.

"(2) A price to be fixed by the seller or by the buyer means a price for him to fix in good faith.

"(3) When a price left to be fixed otherwise than by agreement of the parties fails to be fixed through fault of one party the other may at his option treat the contract as canceled or himself fix a reasonable price.

"(4) Where, however, the parties intend not to be bound unless the price be fixed or agreed and it is not fixed or agreed there is no contract. In such a case the buyer must return any goods already received or if unable so to do must pay their reasonable value at the time of delivery and the seller must return any portion of the price paid on account."

As indicated above, the rule that a contract must be reasonably definite stems from two different goals. One such goal is to avoid enforcing agreements that the parties had not intended to be final. This section of the U.C.C. commences by emphasizing that, if the parties do not intend to contract, the pricing mechanism laid out in the provision do not take effect. Subdivision 4 also emphasizes intent to contract. Once contractual intent is found, the section rejects the notion that a contract will fail for indefiniteness of price alone.[33] The mechanisms of the section will normally assure that there is an adequate and reasonable basis for administering the contract by providing a remedy.[34] Although the Code recognizes the importance of market forces, the term "reasonable price" takes cognizance of the fact that for many goods the term "market" is only a metaphor. Not all goods are traded with frequency in the marketplace. In such cases the "reasonable price" may be the seller's usual selling price, a "posted price," or a formula such as cost of production plus a reasonable profit.

It is not the goal of this treatise to give thorough treatment to the decisions reached under the Uniform Commercial Code. It is

33. U.C.C. § 2–305, comment 1.

34. Intent to contract and reasonable basis for a remedy are the two touchstones of the Code provision on indefiniteness. See § 4.1 above.

interesting to note, however, that the Code has been influential in cases not governed by it.[35]

## § 4.4   Agreed Methods of Determining the Price or Amount

An agreement is not unenforceable for lack of definiteness of price or amount if the parties specify a practicable method by which the amount can be determined by the court without any new expression by the parties themselves.[1]   An agreement to sell

---

**35.**  In Aycock v. Vantage Management Co., 554 S.W.2d 235 (Tex.Civ.App. 1977), writ denied n.r.e., a lease of real property with a missing price term was upheld by analogy to U.C.C. § 2–305.

In Allied Disposal, Inc. v. Bob's Home Service, Inc., 595 S.W.2d 417 (Mo.App. 1980), a contract between a disposer of chemical wastes and the owner of a chemical waste site was binding despite the absence of a price term.  The court found the Code to be supporting authority.

### § 4.4

**1.**  Illustrative cases:

**U.S.**—United States v. Bethlehem Steel, 215 F.Supp. 62 (D.Md.1962), affirmed, 323 F.2d 655 (4th Cir.); Palmer v. Chamberlin, 191 F.2d 532, 27 A.L.R.2d 416 (5th Cir.1951), rehearing denied, 191 F.2d 859, 27 A.L.R.2d 434.

**Ariz.**—In Graham County Elec. Cooperative, Inc. v. Town of Safford, 84 Ariz. 15, 322 P.2d 1078 (1958), the Co-op made an agreement to sell to Safford certain utility property at a price to be determined "upon a replacement new cost less depreciation basis."  The court by a majority of 3 to 2 held this method of determining the price was not so vague or indefinite as to make the agreement unenforceable.  This decision should be sustained for the same reasons that agreements to sell property at a "reasonable price" are enforced. It is not necessary for the parties to specify the price in dollars or to specify a method by which the amount to be paid can be reduced to certainty by mere mathematical calculation.  The determination of "replacement new cost" requires the introduction of the testimony of witnesses expert in the valuation of property such as that involved.  Such testimony is often conflicting and widely variant, especially in the case of large public utilities, yet such valuations are continually held sufficient in sale cases as well as in rate cases.  The dissenting judges put special emphasis upon the fact that "depreciation" may be determined by several different methods leading to different results.  This variation in method appears especially in applying the federal statute permitting "accelerated depreciation" for tax purposes in certain cases.  This statute has no bearing on the present case, where the depreciation is determined with reference to the estimated useful life of the subject matter. The fact that the litigating parties have not agreed upon an exact method of valuation of depreciated property is not fatal to the contract.  So also as to the fact that they can not now agree and are engaged in violent and expensive litigation as to the amount to be paid. So also as to the fact that even disinterested experts in valuation may reach different results.  These are the facts in practically all of the litigated cases in which the agreed price is a "reasonable price."  In enforcing such contracts, the court does not "make a contract for the parties".  They have made their own contract, intentionally leaving the exact amount to be paid to the triers of fact in a court.  This is true even though those "triers" must be aided by the testimony of engineers and accountants who must make inventories, estimate the prices and quantities of labor and material, take account of obsolescence, and predict the length of useful life.  All the judges agreed in reversing the judgment below because the plaintiff had not established its own readiness to perform on its part.

581

# INDEX FOR EXHIBIT "55"

## *Supplemental Authorities Pursuant to Local Rule 7.05(A)(4)*

I. <u>Defendants' Opposition to Erwin-Penland Motion for Summary Judgment</u>

|  | *Fn.* | *Authority* |
|---|---|---|
| 1. | 26, 29, 31 | 17 C.J.S. <u>Contracts</u> § 6(b) (rev. ed. 1999) |
| 2. | 32. | <u>Restatement (Second) of Contracts</u> § 33(2) |
| 3. | 33, 36 | <u>Busching v. Griffin</u>, 542 So.2d 860, 863 (Miss. 1989) |
| 4. | 34. | <u>Corbin on Contracts</u> § 4.1 |
| 5. | 37, 38, 40 | <u>Corbin on Contracts</u> § 4.3 |
| 6. | 39. | <u>Heyman Cohen & Sons, Inc. v. M. Lurie Woolen Co.</u>, 232 N.Y. 112, 133 N.E. 370, 371 (1921). |
| 7. | 72. | http://www.networksolutions.com/whois-search/howsweetthesoundmemphis.com |
| 8. | 73. | http://www.redorbit.com/news/business/1011670/verizon_wireless_names_three_premier_ad_agencies_for_nationwide_continuity/index.html |
| 9. | 76. | 11 <u>Moore's Federal Practice</u> §56App.200[34] |
| 10. | 77. | http://www.gospelpundit.com/on-tv-bet-documentary-on-how-sweet-the-sound-6077 |
| 11. | 80. | <u>Hall's Reclamation, Inc. v. APAC Carolina, Inc.</u>, 1996 U.S. App. LEXIS 33040 (4th Cir. 1996) (unpublished). |
| 12. | 84. | <u>McCarthy on Trademarks and Unfair Competition</u> § 31:76 at 31-169 (Supp. 12/2009) |
| 13. | 86. | <u>Intellimedia Sports Inc. v. Intellimedia Corp.</u>, 1997 WL 398344, at *4 (T.T.A.B. May 20, 1997). |

COPY

keep. The direction to retain presupposes the power to manage and collect. Tucker v. Tucker, 5 N. Y. 408; Ward v. Ward, 105 N. Y. 68, 73, 11 N. E. 373; Putnam v. Lincoln Safe Deposit Co., 191 N. Y. 166, 182, 83 N. E. 789. Whether the trustee takes by implication a power in trust (Tucker v. Tucker, supra; Post v. Hover, 33 N. Y. 593, 599), or an estate (Tobias v. Ketchum, 32 N. Y. 319, 330; Vernon v. Vernon, 53 N. Y. 351, 359, Robert v. Corning, supra), we need not now determine. Distribution in either view is subject to the same restrictions. Resort may be had to principal for the discharge of those expenses which are for the benefit of principal, as, e. g., permanent improvements and extraordinary assessments, but not for the payment of taxes or insurance or everyday repairs. Matter of Albertson, 113 N. Y. 434, 439, 21 N. E. 117; Stevens v. Melcher, 152 N. Y. 551, 565, 46 N. E. 965.

The order of the Appellate Division and the decree of the Surrogate's Court should be reversed, and a rehearing ordered, with costs to the appellants payable out of the estate.

HISCOCK, C. J., and HOGAN, POUND, McLAUGHLIN, CRANE, and ANDREWS, JJ., concur.

Order reversed, etc.

=====

(232 N. Y. 112)

**HEYMAN COHEN & SONS, Inc., v. M. LURIE WOOLEN CO., Inc.**

(Court of Appeals of New York. Nov. 22, 1921.)

**1. Contracts ⟺10(4)—Buyer's option to purchase more than amount covered by sales contract held based on a consideration.**

Provision of sales contract giving buyer option of purchasing as much more of the goods as seller could procure *held* based on a consideration; the privilege to order more being coupled with the obligation to accept a stated minimum.

**2. Contracts ⟺9(1)—Not to be ignored as meaningless unless so indefinite that construction becomes futile.**

An agreement is not to be ignored as meaningless unless so indefinite that construction becomes futile.

**3. Sales ⟺1(4)—Provision of sales contract giving buyer "privilege to confirm more" held not so vague as to be unenforceable.**

Provision of contract for sale of specified amount of cloth giving buyer the "privilege * * * to confirm more of the above if M. [seller] can get more," *held* not so meaning-

less as to be unenforceable, being sufficiently definite to entitle buyer to elect within a reasonable time to order any additional amount that could be supplied by seller at the price of the initial quantity.

**4. Judgment ⟺572(2)—On demurrer not conclusive in subsequent action where defects in pleading have been corrected.**

Judgment sustaining demurrer to complaint was not conclusive in subsequent action in which the complaint did not contain the defects for which it had been held demurrable in the previous action.

Crane, J., dissenting.

Appeal from Supreme Court, Appellate Division, First Department.

Action by Heyman Cohen & Sons, Incorporated, against the M. Lurie Woolen Company, Incorporated. From an order of the Appellate Division (197 App. Div. 797, 189 N. Y. Supp. 380), reversing an order of the Special Term, which denied defendant's motion for judgment on the pleadings, and granting such motion, the plaintiff appeals. Order of the Appellate Division reversed, and that of the Special Term affirmed.

Jacob R. Schiff and Samuel W. Dorfman, both of New York City, for appellant.

S. J. Rawak and A. S. Marcuson, both of New York City, for respondent.

CARDOZO, J. The pleadings show a written contract, dated April 10, 1919, by which the plaintiff agrees to buy and the defendant to sell 200 pieces of tricotine at $3.02½ per yard, delivery to be completed by June 1, 1919. The plaintiff is given the "privilege * * * to confirm more of the above if M. Lurie Woolen Company [the defendant] can get more." The 200 pieces were delivered and paid for. The plaintiff, exercising its option, demanded as much more of the cloth as defendant could procure. The defendant confirmed the exercise of the option, and delivered 16 additional pieces, with the statement that it could procure no more. In fact, it had procured 500 pieces, which it withheld. The plaintiff suffered damage for which judgment is demanded.

[1] We find no lack of consideration for the concession of an option. The privilege to order more is coupled with the promise and obligation to accept a stated minimum. 1 Williston on Contracts, §§ 44, 140. Schlegel Mfg. Co. v. Cooper's Glue Factory, 231 N. Y. 459, 132 N. E. 148, is not adverse to our conclusion. There the option stood alone; it was voluntary and revocable. Here the option is supported by the consideration of the sale.

[2, 3] The defendant, then, is bound, un-

less its promise is to be ignored as meaningless. Rejection on that ground is at best a last resort. Matter of Buechner, 226 N. Y. 440, 443, 123 N. E. 741; Ellis v. Miller, 164 N. Y. 434, 438, 58 N. E. 516; 1 Williston on Contracts, §§ 37, 137. Indefiniteness must reach the point where construction becomes futile. Uncertainties, thought to be impenetrable, are suggested in respect of subject-matter, time, and price. They will be found to be unreal. It is said that we cannot tell whether the buyer, in exercising the option, must make demand for all that the seller can supply, or is free to call for less. We think the implication plain that the buyer is to fix the quantity, subject only to the proviso that quantity shall be limited by ability to supply. It is said the option does not state the time within which election is to be announced. We think a reasonable time is a term implied by law. Pope v. Terre Haute Car & Mfg. Co., 107 N. Y. 61, 63, 13 N. E. 592. It is said the option does not embody a statement of the price. We think a "privilege to confirm more" imports a privilege to confirm at the price of the initial quantity. This option was drawn by merchants. We are persuaded that merchants reading it would not be doubtful of its meaning. It was meant to accomplish something. We find no such elements of vagueness as to justify the conclusion that in reality it accomplished nothing.

[4] A former judgment, stated in the answer and admitted in the reply, is pleaded as a bar. We think it fails of that effect. The former judgment was on demurrer. The defects in the first pleading have been corrected in the second. Gould v. Evansville, & C. R. R. Co., 91 U. S. 526, 534, 23 L. Ed. 416; Genet v. President, etc., of Delaware & H. Comde Co., 163 N. Y. 173, 178, 57 N. E. 297. The first pleading failed to state that election to avail of the option had been announced within a reasonable time. This was an omission that made it subject to demurrer. Pope v. Terre Haute Car & Mfg. Co., supra. The present pleading states that when the election was announced, the defendant "ratified and confirmed" it, and delivered 16 pieces in response to the demand. This was a waiver of the right of rescission for delay, if any there had been.

The order of the Appellate Division should be reversed, and that of the Special Term affirmed, with costs in the Appellate Division and in this court.

HISCOCK, C. J., and HOGAN, POUND, McLAUGHLIN, and ANDREWS, JJ., concur. CRANE, J., dissents.

Ordered accordingly.

(232 N. Y. 115)

**REINHARDT v. NEWPORT FLYING SERVICE CORPORATION et al.**

(Court of Appeals of New York. Nov. 22, 1921.)

Admiralty ⊜6—Hydroaeroplane while on water is a "vessel" within admiralty jurisdiction.

Employee struck by propeller of a hydroaeroplane while it was moving on the water was not entitled to compensation under the Workmen's Compensation Law, since a hydroaeroplane, while on the water, is a "vessel," and therefore the jurisdiction of the admiralty excluded that of the State Industrial Commission.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Vessel.]

Appeal from Supreme Court, Appellate Division, Third Department.

Proceedings under the Workmen's Compensation Law (Consol. Laws, c. 67) by Aksel Emil Reinhardt for compensation for injuries, opposed by the Newport Flying Service Corporation, employer, and Ætna Life Insurance Company, insurance carrier. Award of the State Industrial Commission for claimant affirmed by the Appellate Division of the Supreme Court (197 App. Div. 915, 188 N. Y. Supp. 947), and the employer and insurance carrier appeal. Order of the Appellate Division and award of the Industrial Commission reversed, and claim dismissed.

T. Carlyle Jones and James B. Henney, both of New York City, for appellants.

Charles D. Newton, Atty. Gen. (E. C. Aiken, of Albany, of counsel), for respondents.

CARDOZO, J. Claimant was employed in the care and management of a hydroaeroplane which was moored in navigable waters at Gravesend Bay, Brooklyn. The plane traveled between Brooklyn, N. Y., and Miami, Fla. While moored in these navigable waters, it began to drag anchor and drift toward the beach, where it was in danger of being wrecked. Claimant waded into the water to turn the plane about, and was struck by the propeller. The question to be determined is whether he was injured by a vessel. If he was, the jurisdiction of the admiralty excludes the jurisdiction of the commission. Knickerbocker Ice Co. v. Stewart, 253 U. S. 149, 40 Sup. Ct. 438, 64 L. Ed. 834, 11 A. L. R. 1145. If he was not, employment and injury suffice to justify an award. The latest of man's devices for locomotion has invaded the navigable waters, the most ancient of his highways. Riding at anchor is a new craft which would have mystified the Lord High

# INDEX FOR EXHIBIT "55"

## Supplemental Authorities Pursuant to Local Rule 7.05(A)(4)

I. Defendants' Opposition to Erwin-Penland Motion for Summary Judgment

|  | *Fn.* | *Authority* |
| --- | --- | --- |
| 1. | 26, 29, 31 | 17 C.J.S. Contracts § 6(b) (rev. ed. 1999) |
| 2. | 32. | Restatement (Second) of Contracts § 33(2) |
| 3. | 33, 36 | Busching v. Griffin, 542 So.2d 860, 863 (Miss. 1989) |
| 4. | 34. | Corbin on Contracts § 4.1 |
| 5. | 37, 38, 40 | Corbin on Contracts § 4.3 |
| 6. | 39. | Heyman Cohen & Sons, Inc. v. M. Lurie Woolen Co., 232 N.Y. 112, 133 N.E. 370, 371 (1921). |
| 7. | 72. | http://www.networksolutions.com/whois-search/howsweetthesoundmemphis.com |
| 8. | 73. | http://www.redorbit.com/news/business/1011670/verizon_wireless_names_three_premier_ad_agencies_for_nationwide_continuity/index.html |
| 9. | 76. | 11 Moore's Federal Practice §56App.200[34] |
| 10. | 77. | http://www.gospelpundit.com/on-tv-bet-documentary-on-how-sweet-the-sound-6077 |
| 11. | 80. | Hall's Reclamation, Inc. v. APAC Carolina, Inc., 1996 U.S. App. LEXIS 33040 (4th Cir. 1996) (unpublished). |
| 12. | 84. | McCarthy on Trademarks and Unfair Competition § 31:76 at 31-169 (Supp. 12/2009) |
| 13. | 86. | Intellimedia Sports Inc. v. Intellimedia Corp., 1997 WL 398344, at *4 (T.T.A.B. May 20, 1997). |

COPY

Network Solutions >> Whois >> Results
Log In



- Search
- Renew
- Transfer
- Features
- Private Registration
- Forward
- WHOIS

# WHOIS Results

**You Searched for: howsweetthesoundmemphis.com**

Get this domain with an alternate extension now!

.net.org.biz.bz.eu

Add Selected to Cart

WHOIS results for howsweetthesoundmemphis.com

Thumbnail of howsweetthesoundmemphis.com
BOOKMARK
Visit AboutUs.org for more information about HOWSWEETTHESOUNDMEMPHIS.COM
AboutUs: HOWSWEETTHESOUNDMEMPHIS.COM

**Registrant:**                                    Make this info private
Erwin-Penland Inc
125 East Broad Street
Greenville, SC 29601
US

**Domain Name:** HOWSWEETTHESOUNDMEMPHIS.COM

**Promote your business to millions of viewers for only $1 a month!**
Learn how you can get an Enhanced Business Listing here for your domain name. Learn
More

**Administrative Contact , Technical Contact :**
Erwin-Penland Inc
domains@epinteractiv.com
125 East Broad Street
Greenville, SC 29601
US
Phone: (864)271-0500

**Record expires on** 15-May-2010
**Record created on** 15-May-2007
**Database last updated on** 15-May-2007

**Domain servers in listed order:**                     Manage DNS

NS3.EPINTERACTIV2.COM                              66.223.50.124
NS4.EPINTERACTIV2.COM                              66.223.50.125

Show underlying registry data for this record

| | |
|---|---|
| **Current Registrar:** | NETWORK SOLUTIONS, LLC. |
| **IP Address:** | 66.223.50.124 (ARIN & RIPE IP search) |
| **IP Location:** | US(UNITED STATES)-WASHINGTON-KENMORE |
| **Record Type:** | Domain Name |
| **Server Type:** | Apache 2 |
| **Lock Status:** | clientTransferProhibited |
| **WebSite Status:** | Active |
| **DMOZ** | no listings |
| **Y! Directory:** | see listings |
| **WebSite Title:** | Verizon Wireless: How Sweet the Sound |
| **Meta Description:** | How Sweet The Sound Memphis is a musical competition sponsored by Verizon Wireless to find the best church choir in the Memphis, TN area. |
| **Meta Keywords:** | choir, church, choir contest, memphis, sweet sound, gospel, religious music, church music, congregation, music contest, memphis area church, choir competition, gospel music, tn, ar, ms, tennessee, mississippi, arkansas |
| **Secure:** | No |
| **Ecommerce:** | No |
| **Traffic Ranking:** | Not available |
| **Data as of:** | 08-Mar-2008 |

Make an instant, anonymous offer to the current domain registrant. Learn More





Search Again

Search again here...

Search by either

- <u>Domain Name</u> e.g. networksolutions.com
- <u>IP Address</u> e.g. 205.178.187.13



WHOIS Searches

- <u>Popular</u>
- <u>Recent</u>

**Domain Name**   Total Searches     RSS

sbcglobal.net - 27201

amazon.com - 7490

craigslist.com - 5435

kingsridge.com - 4699

cisco.com - 3787

mchsi.com - 3259

ibm.com - 3160

disney.com - 3159

tcs.com - 2896

cnn.com - 2558

« PrevNext »

# INDEX FOR EXHIBIT "55"

## Supplemental Authorities Pursuant to Local Rule 7.05(A)(4)

I.  Defendants' Opposition to Erwin-Penland Motion for Summary Judgment

|     | *Fn.*       | *Authority* |
|-----|-------------|-------------|
| 1.  | 26, 29, 31  | 17 C.J.S. Contracts § 6(b) (rev. ed. 1999) |
| 2.  | 32.         | Restatement (Second) of Contracts § 33(2) |
| 3.  | 33, 36      | Busching v. Griffin, 542 So.2d 860, 863 (Miss. 1989) |
| 4.  | 34.         | Corbin on Contracts § 4.1 |
| 5.  | 37, 38, 40  | Corbin on Contracts § 4.3 |
| 6.  | 39.         | Heyman Cohen & Sons, Inc. v. M. Lurie Woolen Co., 232 N.Y. 112, 133 N.E. 370, 371 (1921). |
| 7.  | 72.         | http://www.networksolutions.com/whois-search/howsweetthesoundmemphis.com |
| 8.  | 73.         | http://www.redorbit.com/news/business/1011670/verizon_wireless_names_three_premier_ad_agencies_for_nationwide_continuity/index.html |
| 9.  | 76.         | 11 Moore's Federal Practice §56App.200[34] |
| 10. | 77.         | http://www.gospelpundit.com/on-tv-bet-documentary-on-how-sweet-the-sound-6077 |
| 11. | 80.         | Hall's Reclamation, Inc. v. APAC Carolina, Inc., 1996 U.S. App. LEXIS 33040 (4th Cir. 1996) (unpublished). |
| 12. | 84.         | McCarthy on Trademarks and Unfair Competition § 31:76 at 31-169 (Supp. 12/2009) |
| 13. | 86.         | Intellimedia Sports Inc. v. Intellimedia Corp., 1997 WL 398344, at *4 (T.T.A.B. May 20, 1997). |

COPY



Like the BlackBerry® Curve™ 8530 the next generation of Smartphone
Buy One for $2999 and get one Free!

verizon

Free Activation,
Free Overnight Shipping
& Instant Discounts
with online orders

Learn More

HOME    COMMUNITY    NEWS    VIDEO    IMAGES    SPACE    SCIENCE    TECH    HEALTH    EDUCATION    FUN    SHOP    SITEMAP        SEARCH

Space    Science    Technology    Health    General    Sci-fi & Gaming    Oddities    International    Business    Politics    Education    Entertainment    Sports

E-mail    Print    Comment    Font Size    Digg    del.icio.us    Discuss article    Buzz up!    Stumble It!

## Verizon Wireless Names Three Premier Ad Agencies for Nationwide Continuity of Local Market Advertising

Posted on: Wednesday, 25 July 2007, 09:18 CDT

BASKING RIDGE, N.J., July 25 /PRNewswire/ -- Verizon Wireless today announced that three premier advertising and brand agencies -- Hill Holliday, Global Hue and Zenith -- have been selected to provide account service and creative support to advertising efforts in Verizon Wireless' local markets nationwide.

Beginning today: -- Hill Holliday will be responsible for the strategy and creative support for all local advertising. The account will be handled by Hill Holliday's Erwin-Penland unit in Greenville, S.C., which previously handled retail marketing duties for Verizon Wireless in the southern United States; and Hill Holliday -- New York, which had similar responsibilities for Verizon Wireless in the northeastern United States. -- Detroit-based Global Hue, in an extension of its role as multicultural agency for national advertising, will be the lead multicultural agency for the company's local markets. -- Zenith -- New York, currently responsible for national advertising media planning and buying, will add to its duties the coordination and support of local efforts in markets throughout the country.

The three agencies now exclusively supporting Verizon Wireless' regional efforts will be called upon to ensure the company's brand strategy and messaging is consistent in all local newspaper, radio, outdoor and business advertising. Previously, eight agencies managed Verizon Wireless' local advertising effort.

"In the eyes of the consumer, Verizon Wireless has always been known for its network reliability and its quality communications products and services," said Mike Lanman, vice president and chief marketing officer for Verizon Wireless. "With this line-up of agency talent, we will enhance our national branding and advertising efforts with an even stronger coordinated effort on the local level."

Verizon Wireless' new agency line-up builds upon parent company Verizon Communications' recent creation of a team of the nation's leading brand and advertising agencies to handle account services and creative support for Verizon Communications, Verizon Business and Verizon Wireless. Information on that announcement can be found at: http://news.vzw.com /news/2007/05/pr2007-05-18.html.



Sprint

Connect five Wi-Fi devices at once with speeds up to 10x faster than 3G.

Overdrive™ 3G/4G Mobile Hotspot

Learn more

For more information about Verizon Wireless products and services, visit a Verizon Wireless Communications Store, call 1-800-2 JOIN IN or go to http://www.verizonwireless.com/.

About Verizon Wireless

Verizon Wireless operates the nation's most reliable wireless voice and data network, serving 62.1 million customers. The largest U.S. wireless company and largest wireless data provider, based on revenues, Verizon Wireless is headquartered in Basking Ridge, N.J., with 67,000 employees nationwide. The company is a joint venture of Verizon Communications and Vodafone (NYSE and LSE: VOD). Find more information on the Web at http://www.verizonwireless.com/. To preview and request broadcast-quality video footage and high-resolution stills of Verizon Wireless operations, log on to the Verizon Wireless Multimedia Library at http://www.verizonwireless.com/multimedia.

Verizon Wireless

CONTACT: Brenda Boyd Raney of Verizon Wireless, +1-908-559-7518,Brenda.Raney@verizonwireless.com

Web site: http://www.verizonwireless.com/http://www.verizonwireless.com/multimediahttp://news.vzw.com/news/2007 /05/pr2007-05-18.html

Source: PRNewswire

More News in this Category

## Related Articles

Verizon Wireless Kicks Off 2010 Community Giving With $10,000 Donation To Walter Reed Society
Peace Over Violence Receives Grant From Verizon Wireless Communications Store
Verizon Wireless Expands Local Wireless Broadband Network
Verizon Wireless Expands Local Wireless Broadband Network In Southern Delaware
Verizon Wireless to Purchase SureWest Communications' Wireless Assets in Northern California
65 New England Domestic Violence Shelters Benefit From Verizon Wireless 'Kids In Need Holiday Drive'
Verizon Wireless Opens Communications Store in Biddeford, Maine
Verizon Wireless Opens Communications Store in Dedham, Massachusetts
Strategy Analytics: Verizon Wireless Rated Best Carrier for Cellphone Support
Verizon Wireless Is Taking Business Communication to a Whole New Level With the XV6600

# INDEX FOR EXHIBIT "55"

## Supplemental Authorities Pursuant to Local Rule 7.05(A)(4)

I.   Defendants' Opposition to Erwin-Penland Motion for Summary Judgment

|     | *Fn.* | *Authority* |
| --- | --- | --- |
| 1. | 26, 29, 31 | 17 C.J.S. Contracts § 6(b) (rev. ed. 1999) |
| 2. | 32. | Restatement (Second) of Contracts § 33(2) |
| 3. | 33, 36 | Busching v. Griffin, 542 So.2d 860, 863 (Miss. 1989) |
| 4. | 34. | Corbin on Contracts § 4.1 |
| 5. | 37, 38, 40 | Corbin on Contracts § 4.3 |
| 6. | 39. | Heyman Cohen & Sons, Inc. v. M. Lurie Woolen Co., 232 N.Y. 112, 133 N.E. 370, 371 (1921). |
| 7. | 72. | http://www.networksolutions.com/whois-search/howsweetthesoundmemphis.com |
| 8. | 73. | http://www.redorbit.com/news/business/1011670/verizon_wireless_names_three_premier_ad_agencies_for_nationwide_continuity/index.html |
| 9. | 76. | 11 Moore's Federal Practice §56App.200[34] |
| 10. | 77. | http://www.gospelpundit.com/on-tv-bet-documentary-on-how-sweet-the-sound-6077 |
| 11. | 80. | Hall's Reclamation, Inc. v. APAC Carolina, Inc., 1996 U.S. App. LEXIS 33040 (4th Cir. 1996) (unpublished). |
| 12. | 84. | McCarthy on Trademarks and Unfair Competition § 31:76 at 31-169 (Supp. 12/2009) |
| 13. | 86. | Intellimedia Sports Inc. v. Intellimedia Corp., 1997 WL 398344, at *4 (T.T.A.B. May 20, 1997). |

COPY

# MOORE'S FEDERAL PRACTICE THIRD EDITION

## VOLUME 11

*JAMES WM. MOORE*

**BOARD OF EDITORS**

**Daniel R. Coquillette**
J. Donald Monan
University Professor of Law
Boston College
and Lester Kissel
Visiting Professor of Law
Harvard Law School

**Gregory P. Joseph**
Gregory P. Joseph Law Offices LLC
New York

**Sol Schreiber**
Milberg Weiss LLP
New York

**Jerold S. Solovy**
Jenner & Block
Chicago

**Georgene M. Vairo**
Professor of Law
and William M. Rains Fellow
Loyola Law School
Los Angeles

2007

 **LexisNexis**

---

# Volume 11 *Table of Contents*

A COMPLETE SYNOPSIS FOR EACH CHAPTER APPEARS AT THE BEGINNING OF THE CHAPTER

## FEDERAL RULES OF CIVIL PROCEDURE *(continued)*

### CHAPTER 56.   SUMMARY JUDGMENT

**PART A.**       Purpose and Availability of Summary Judgment

56.01             Text of Civil Rule 56

56.02             Summary Judgment Motions Seek to Avoid Trial or Extensive Discovery If Facts Are Settled and Dispute Turns on Issue of Law

56.03             Supreme Court's 1986 "Trilogy" of Summary Judgment Decisions Increased Availability of Summary Judgment

56.04–56.09       Reserved

**PART B.**       Requirements for Obtaining Summary Judgment

56.10             Summary Judgment Motions Are Controlled by Several Important Technical Regulations Regarding Timing and Format

56.11             To Obtain Summary Judgment, Movant Must Demonstrate That, Under Undisputed Material Facts, Movant Is Entitled to Judgment as Matter of Law

56.12             Summary Judgment Properly Granted in Jury Trial Cases Does Not Violate Seventh Amendment

56.13             Burdens of Production and Persuasion on Summary Judgment Motion

56.14             Affidavits and Supporting Material May Be Used to Support Summary Judgment Motions

56.15             Hearing on Summary Judgment Motion

56.16–56.29       Reserved

**PART C.**       Strategic and Jurisprudential Considerations

56.30             Summary Judgment Differs Importantly From Other Potentially Dispositive Motions

56.31             Summary Judgment Is Not Restricted According to Subject Matter of Case, but Certain Cases Are More Susceptible to Summary Judgment

56.32             Considerations in Deciding Whether to Seek Summary Judgment

56.33             Sanctions and Summary Judgment: Motions Lacking Reasonable Basis Are Frivolous and Subject Movant to Possible Sanctions

56.34–56.39       Reserved

**PART D.**       Partial Summary Judgment, Appeals, and Claims Involving Government

56.40             Partial Summary Judgment May Be Granted

56.41             Appeals Relating to Summary Judgment

56App.-141                    HISTORICAL APPENDIX                    § 56App.200[34]

instrument was forged, summary judgment should be denied if genuine issues of fact exist.[249]

## [34]  Fraud

Relief from fraud is as varied as the cunning and artifice productive of the fraud. An affirmative claim may be predicated upon fraud, as a claim for damages, for an accounting and damages, for rescission, cancellation, the avoidance of a transfer, the impression of a trust, and other appropriate relief. Fraud may also be the basis for a defense, or the ground for the avoidance of a defense. But in whatever manner the issue of fraud may appear in an action, the general basic principles underlying summary judgment apply and, if these are met, the issue of fraud may be summarily adjudicated. Some general observations concerning the application of these principles to an issue of fraud are, however, appropriate.

Summary judgment is appropriate to be inappropriate in an action based on a complex scheme of fraud if the court is asked to decide the motion on lengthy affidavits and documents and voluminous depositions.[250] In ruling on the motion, the court should remember that the movant has the burden of demonstrating clearly the absence of any genuine issue of material fact,[251] that the court should

| | |
|---|---|
| 5th Circuit | City of Zephyrhills, Fla. v. R. E. Crummer & Co., 237 F.2d 338 (5th Cir. 1956). |
| 10th Circuit | See also Dempsey-Tegeler & Co. v. Otis Oil & Gas Corp., 293 F. Supp. 1383 (D. Colo. 1968). |

[249] Penn Finance Corp. v. Chelsea Title & Guar. Co., 371 F. Supp. 398 (E.D. Pa. 1974) (third-party action by drawer against collecting).

[250] **Summary judgment may be available in actions based on complex scheme of fraud.**

| | |
|---|---|
| 2d Circuit | Teledyne Industries, Inc. v. Eon Corp., 373 F. Supp. 191 (S.D.N.Y. 1974) (citing Moore's); Shultz v. Manufacturers & Traders Trust Co., 1 F.R.D. 451 (W.D.N.Y. 1940) (defendants' motion denied). |
| 3d Circuit | Kubic v. Goldfield, 479 F.2d 472 (3d Cir. 1973) (citing Moore's); John Blair & Co. v. Walton, 47 F.R.D. 196 (D Del 1969) (citing Moore's). |
| 5th Circuit | Keiser v. Coliseum Properties, Inc., 614 F.2d 406 (5th Cir. 1980) (summary judgment was improperly granted to a defendant in an action concerning a complex allegedly fraudulent sale of franchises when evidence indicated that there was a genuine question of material fact). |
| 10th Circuit | Exchange Commission v. Geyser Minerals Corp., 452 F.2d 876 (10th Cir. 1971) (citing Moore's). |

[251] **Movant has burden of demonstrating absence of triable issue of fact.**

| | |
|---|---|
| 2d Circuit | Friedman v. Meyers, 482 F.2d 435 (2d Cir. 1973), (action alleging fraudulent diversion and misappropriation of funds of real estate |

---

## Volume 11 Table of Contents

| | | |
|---|---|---|
| 56.42 | | Summary Judgment and Claims Involving Government |
| 56App.43–56App.49 | | Reserved |
| PART E. | | Relative Merits of Restrained and Aggressive Use of Summary Judgment |
| 56.50 | | Relative Merits of Restrained and Aggressive Use of Summary Judgment |

**Historical Appendix**

| | | |
|---|---|---|
| PART A. | | Legislative History of Rule 56 |
| 56App.01 | | Original Rule 56 |
| 56App.02 | | 1946 Amendment to Rule 56 |
| 56App.03 | | Proposed (but Unadopted) Amendments of 1955 to Rule 56 |
| 56App.04 | | 1963 Amendment to Rule 56 |
| 56App.05 | | 1987 Amendments to Rule 56 |
| 56App.06 | | 2007 Amendment to Rule 56 |
| 56App.07–56App.99 | | Reserved |
| PART B. | | Historical Analysis of Rule 56 |
| 56App.100 | | Historical Overview |
| 56App.101 | | Rationale of Revisions to Rule 56 |
| 56App.102 | | 1986 Supreme Court Trilogy and Attempted Amendments to Rule 56 |
| 56App.103–56App.199 | Reserved | |
| PART C. | | Compilation of Cases on Summary Judgment in Particular Types of Actions |
| 56App.200 | | Summary Judgment Available in All Types of Cases, Although Practically More Difficult to Obtain in Some Types of Cases |

not draw factual inferences in favor of the moving party,[252] and should not resolve a genuine issue of credibility.[253] If, however, the moving party's materials are

syndicate; summary judgment for defendants based on, *inter alia*, the statute of limitations reversed; defendants failed to meet burden; citing Moore's).

**3d Circuit**
Kubic v. Goldfield, 479 F.2d 472 (3d Cir. 1973) (citing Moore's); Associated Hardware Supply Co. v. Big Wheel Distributing Co., 355 F.2d 114 (3d Cir. 1966) (citing Moore's).

**5th Circuit**
XRT, Inc. v. Krellenstein, 448 F.2d 772 (5th Cir. 1971) (action alleging fraud in sale of a business; summary judgment for defendant reversed as premature).

**[252]** Court not permitted to draw factual inferences in favor of movant when rendering summary judgment.

**2d Circuit**
Weitzen v. Kearns, 271 F. Supp. 616 (S.D.N.Y. 1967).

**3d Circuit**
Kubic v. Goldfield, 479 F.2d 472 (3d Cir. 1973) (citing Moore's); Associated Hardware Supply Co. v. Big Wheel Distributing Co., 355 F.2d 114 (3d Cir. 1966) (citing Moore's); Levin v. Marder, 343 F. Supp. 1050 (W.D. Pa. 1972) (citing Moore's); Gould v. American Hawaiian Steamship Co., 319 F. Supp. 795, 803 (D. Del. 1970) ("if the facts are not in dispute, the question arises whether the inferences that can be drawn from those facts point to only one conclusion—in favor of the moving party; otherwise, the motion for summary judgment must be denied"; citing Moore's).

**D.C. Circuit**
Isen v. Calvert Corp., 379 F.2d 126, 129 (D.C. Cir. 1967) (action for damages involving a real estate transaction; summary judgment for defendants reversed; "The District Judge, in light of such references and orders of record, may have concluded that Isen should not prevail. But he was not free, short of trial, so to conclude on the record before him for he was bound to view the materials then available in the light most favorable to the party opposing the motion.").

**[253]** Summary judgment may not be used to resolve issues of credibility.

**2d Circuit**
See also Schmidt v. McKay, 555 F.2d 30 (2d Cir. 1977) (since fraud necessarily involves conflicting interpretations of events it is not ordinarily proper to resolve such issues by summary judgment).

**3d Circuit**
Kubic v. Goldfield, 479 F.2d 472 (3d Cir. 1973) (citing Moore's); Associated Hardware Supply Co. v. Big Wheel Distributing Co., 355 F.2d 114, 121 (3d Cir. 1966) (quoting Moore's as setting forth the accepted rule in this circuit).

**10th Circuit**
Commercial Iron & Metal Co. v. Bache & Co., 478 F.2d 39 (10th Cir. 1973).

**D.C. Circuit**
Gordon v. Miami National Bank, 406 F.2d 660, 661 (D.C. Cir. 1968) (bank's action to recover on purported loan guaranty agreement; in reversing summary judgment for bank because defendant had no notice that the hearing was to consider a motion for summary judgment, the court stated: "And of course, it is always a defense that

sufficient in themselves, the party opposing summary judgment cannot hold back his evidence until trial,[254] but must present counter-affidavits or other extraneous materials, pursuant to Rule 56(e),[255] that raise a triable issue of fact or, in accordance with Rule 56(f),[256] show that he is presently unable to do so. This general rule has been applied to the situation in which the critical facts are said to be in the possession of the moving party.[257]

In general, an issue of fraud, whether the basis of a claim or defense, may be summarily adjudicated if the issue of fraud is patently sham[258] or immaterial[259]

a promise has been obtained by fraud. Both of these claims [oral condition precedent and fraud] would raise factual issues, including issues of credibility, to be resolved at trial, rather than upon summary judgment"; citing Moore's].

**[254]** Party opposing summary judgment should not wait until trial to present evidence of material fact.

**5th Circuit**
See also Standard Dredging Corp. v. Inter-American Center Auth., 351 F.2d 470, 471 (5th Cir. 1965) (suit by dredging company against state agency; summary judgment for defendant affirmed as "the issue of fraud had not been presented to [the district court] by pleadings or proof. Therefore, we feel that no genuine issue as to any material fact existed.").

**9th Circuit**
Turner v. Lundquist, 377 F.2d 44 (9th Cir. 1967).

**[255]** Tilden Financial Corp. v. Palo Tire Service, Inc., 596 F.2d 604 (3d Cir. 1979), (summary judgment in favor of plaintiff in a breach of contract action affirmed when the plaintiff rebutted defendant's allegations of fraud in its affidavits and defendant filed no material in opposition to plaintiff's motion but merely relied on the allegations in its pleadings, thus failing to state specific facts showing that a question of material fact existed; citing Moore's).

**[256]** Opposing party must immediately present evidence raising triable issue of fact of show why he or she is presently unable to do so.

**3d Circuit**
Levin v. Marder, 343 F. Supp. 1050 (W.D. Pa. 1972) (citing Moore's).

**10th Circuit**
See Party Precision v. Brown & Sharpe Mfg. Co., 742 F.2d 1260 (10th Cir. 1984) (it was error for the district court to grant summary judgment to the defendant in a fraud action without ever ruling on plaintiff's Fed. R. Civ. P. 56(f) affidavit for additional discovery time; such affidavits should be treated liberally, especially in fraud actions, in which a party's access to witnesses or discovery material is essential; citing Moore's).

**[257]** Critical facts in possession of movant.

**5th Circuit**
XRT, Inc. v. Krellenstein, 448 F.2d 772 (5th Cir. 1971) (summary judgment for defendants reversed; facts necessary for plaintiff to create issue of material fact were in defendants' possession).

**6th Circuit**
See also Bufalino v. Michigan Bell Tel. Co., 494 F.2d 1023 (6th Cir. 1968).

**[258]** Perma Research and Development Co. v. Singer Co., 410 F.2d 572 (2d Cir. 1969), (breach

or, if substantial, the moving party clearly establishes that there is no genuine issue of material fact.[260] Otherwise, a motion for summary judgment should be

of contract action; summary judgment dismissing claim of fraud affirmed; fraud claim without any substance; citing Moore's); Donald Zucker Co. v. Prime Properties, Inc., 392 F. Supp. 933 (S.D.N.Y. 1975) (defendants' motion granted; plaintiff's claim of fraud without foundation in fact; action to recover on a brokerage contract).

[259] Issue of fraud as immaterial to motion for summary judgment.

3d Circuit    Clyde v. Hodge, 413 F.2d 48 (3d Cir. 1969) (action alleging that because of fraud, mistake, or undue influence plaintiff was excluded from an inter vivos created by his grandmother; summary judgment for all but one defendant on basis of res judicata affirmed; summary judgment for remaining defendant reversed).

7th Circuit    Schaeffer v. First National Bank of Lincolnwood, 500 F.2d 1287 (7th Cir. 1975); Green v. Valve Corp. of America, 428 F.2d 342 (7th Cir. 1970) (affirming summary judgment for defendants; release disposed of cause of action).

8th Circuit    United States v. Rolene, 345 F. Supp. 1260 (D. Neb. 1972) (action to recover payments made to defendant pursuant to Commodity Credit Corporation Charter Act; defendant's motion on basis of statutes of limitations).

9th Circuit    Turner v. Lundquist, 377 F.2d 44 (9th Cir. 1967) (action alleging violations of antifraud provisions of federal securities laws; affirming summary judgment for defendant on basis of statute of limitations).

[260] Issue of fraud is substantial, but no trialable issue of fact is present.

2d Circuit    Wood v. Wood, 312 F. Supp. 758 (S.D.N.Y. 1969) (granting defendants' motion); Klein v. Spear, Leeds & Kellogg, 309 F. Supp. 341 (S.D.N.Y. 1970) (action alleging fraudulent manipulation of price of stock purchases; defendants' motion granted for one claim, denied as to other); Weitzen v. Kearns, 271 F. Supp. 616 (S.D.N.Y. 1967)

4th Circuit    Paine-Henderson v. Eastern Greyhound Lines, Inc., 320 F. Supp. 1138 (D.S.C. 1970).

7th Circuit    FDIC v. Lauterbach, 626 F.2d 1327 (7th Cir. 1980) (summary judgment was properly granted to the plaintiff despite defendant's defense of fraud in the inducement when the defendant failed to demonstrate a genuine factual basis for this allegation; citing Moore's); O'Brien v. McDonald's Corp., 48 F.R.D. 370 (N.D. Ill. 1970) (defendants' motion; action alleging common-law fraud).

8th Circuit    City Arkansas Bank of Fort Smith, Arkansas v. Vanderboom, 422 F.2d 221 (8th Cir. 1970), cert. denied, 399 U.S. 905 (1970) (bank's action to collect on notes; summary judgment for bank affirmed).

9th Circuit    Caplan v. Roberts, 506 F.2d 1039 (9th Cir. 1974) (summary judgment for defendants affirmed); Fifty Associates v. Prudential Ins. Co. of America, 450 F.2d 1007, 1010 (9th Cir. 1971) (foreclosure action; summary judgment granting foreclosure affirmed as mortgagee's "denials have placed in dispute the legal consequences of its "repre-

denied.[261]

sentations' and not the factual matters. . . . Under these circumstances, we are satisfied that there is no merit to the contention that a motion for summary judgment was improper" (emphasis in original)); Unruh v. Udall, 269 F. Supp. 97, 98 (D. Nov. 1967) (granting defendants' motion in action seeking review of administrative order as "[a]ll parties allude solely to the administrative record in support of other contentions. Accordingly, the issues are those of law only, there are no disputed issues of material fact, and summary judgment is a proper procedure.").

10th Circuit    Securities and Exchange Commission v. Geyser Minerals Corp., 452 F.2d 876 (10th Cir. 1971) (summary judgment granting permanent injunction against defendants affirmed; citing Moore's).

[261] KangaROOS U.S.A., Inc. v. Caldor, Inc., 778 F.2d 1571 (Fed. Cir. 1985) (it was improper to grant summary judgment in favor of the defendant in a patent infringement action on the ground that the patent was void for fraud or inequitable conduct, when factual questions existed as to intent to deceive and the district court erroneously drew factual inferences in favor of the defendant).

2d Circuit    Friedman v. Meyers, 482 F.2d 435 (2d Cir. 1973) (citing Moore's); Russell v. Trigo, 424 F.Supp. 1125 (S.D.N.Y. 1976) (plaintiff's motion for summary judgment denied; Wood v. Rex-Noreco, Inc., 61 F.R.D. 669 (S.D.N.Y. 1973) (plaintiffs' motion denied); Xerox Corp. v. Dennison Mfg. Co., 322 F. Supp. 963 (S.D.N.Y. 1971) (patent infringement action; defendants' motion denied); Cohen v. Tenney Corp., 318 F. Supp. 280 (S.D.N.Y. 1970) (defendants' motion); In re Cohen's Will 51 F.R.D. 167 (S.D.N.Y. 1970) (action alleging violations of antifraud provisions of federal and state security laws; defendants' motion denied).

3d Circuit    TPO Inc. v. Federal Deposit Ins. Corp., 487 F.2d 131 (3d Cir. 1973) (suit to recover on cashier's checks; summary judgment against bank reversed); Kubic v. Goldfield, 479 F.2d 472 (3d Cir. 1973) (action by buyers of securities alleging violations of antifraud provisions of federal securities laws; summary judgment for defendant securities dealers vacated; issues in regard to plaintiffs' allegations of fraud not reached; citing Moore's); Clyde v. Hodge, 413 F.2d 48 (3d Cir. 1969); Associated Hardware Supply Co. v. Big Wheel Distributing Co., 355 F.2d 114 (3d Cir. 1966) (citing Moore's); Levin v. Marder, 343 F. Supp. 1050 (W.D. Pa. 1972) (denying defendants' motion; citing Moore's); Bird v. Penn Central Co., 334 F. Supp. 255 (E.D. Pa. 1971) (action for rescission of liability insurance policy on grounds of fraud; defendants' motion denied); Gould v. American Hawaiian Steamship Co., 319 F. Supp. 795 (D. Del. 1970) (action alleging fraud and breach of fiduciary duties; cross-motions for partial summary judgment as to liability denied; citing Moore's).

4th Circuit    Paine-Henderson v. Eastern Greyhound Lines, Inc., 320 F. Supp. 1138 (D.S.C. 1970) (passengers action against bus company and advertising agency for loss of baggage; bus company's motion denied; advertising agency's motion granted).

## Volume 11 Table of Contents

| | |
|---|---|
| 56.42 | Summary Judgment and Claims Involving Government |
| 56App.43–56App.49 | Reserved |
| **PART E.** | Relative Merits of Restrained and Aggressive Use of Summary Judgment |
| 56.50 | Relative Merits of Restrained and Aggressive Use of Summary Judgment |

**Historical Appendix**

| | |
|---|---|
| **PART A.** | Legislative History of Rule 56 |
| 56App.01 | Original Rule 56 |
| 56App.02 | 1946 Amendment to Rule 56 |
| 56App.03 | Proposed (but Unadopted) Amendments of 1955 to Rule 56 |
| 56App.04 | 1963 Amendment to Rule 56 |
| 56App.05 | 1987 Amendments to Rule 56 |
| 56App.06 | 2007 Amendment to Rule 56 |
| 56App.07–56App.99 | Reserved |
| **PART B.** | Historical Analysis of Rule 56 |
| 56App.100 | Historical Overview |
| 56App.101 | Rationale of Revisions to Rule 56 |
| 56App.102 | 1986 Supreme Court Trilogy and Attempted Amendments to Rule 56 |
| 56App.103–56App.199 | Reserved |
| **PART C.** | Compilation of Cases on Summary Judgment in Particular Types of Actions |
| 56App.200 | Summary Judgment Available in All Types of Cases, Although Practically More Difficult to Obtain in Some Types of Cases |

---

instrument was forged, summary judgment should be denied if genuine issues of fact exist.[249]

### [34] Fraud

Relief from fraud is as varied as the cunning and artifice productive of the fraud. An affirmative claim may be predicated upon fraud, as a claim for damages, for an accounting and damages, for rescission, cancellation, the avoidance of a transfer, the impression of a trust, and other appropriate relief. Fraud may also be the basis for a defense, or the ground for the avoidance of a defense. But in whatever manner the issue of fraud may appear in an action, the general basic principles underlying summary judgment apply and, if these are met, the issue of fraud may be summarily adjudicated. Some general observations concerning the application of these principles to an issue of fraud are, however, appropriate.

Summary judgment is appropriate to be inappropriate in an action based on a complex scheme of fraud if the court is asked to decide the motion on lengthy affidavits and documents and voluminous depositions.[250] In ruling on the motion, the court should remember that the movant has the burden of demonstrating the absence of any genuine issue of material fact,[251] that the court should clearly the absence of any genuine issue of material fact,...

**5th Circuit**   City of Zephyrhills, Fla. v. R. E. Crummer & Co., 237 F.2d 338 (5th Cir. 1956).

**10th Circuit**   See also Dempsey-Tegeler & Co. v. Otis Oil & Gas Corp., 293 F. Supp. 1383 (D. Colo. 1968).

249 Penn Finance Corp. v. Chelsea Title & Guar. Co., 371 F. Supp. 398 (E.D. Pa. 1974) (third-party action by drawer against collecting).

250 **Summary judgment may be available in actions based on complex scheme of fraud.**

**2d Circuit**   Teledyne Industries, Inc. v. Eon Corp., 373 F. Supp. 191 (S.D.N.Y. 1974) (citing Moore's); Shultz v. Manufacturers & Traders Trust Co., 1 F.R.D. 451 (W.D.N.Y. 1940) (defendants' motion denied).

**3d Circuit**   Kubic v. Goldfield, 479 F.2d 472 (3d Cir. 1973) (citing Moore's); John Blair & Co. v. Walton, 47 F.R.D. 196 (D Del 1969) (citing Moore's).

**5th Circuit**   Keiser v. Coliseum Properties, Inc., 614 F.2d 406 (5th Cir. 1980) (summary judgment was improperly granted to a defendant in an action concerning a complex allegedly fraudulent sale of franchises when evidence indicated that there was a genuine question of material fact).

**10th Circuit**   Exchange Commission v. Geyser Minerals Corp., 452 F.2d 876 (10th Cir. 1971) (citing Moore's).

251 **Movant has burden of demonstrating absence of triable issue of fact.**

**2d Circuit**   Friedman v. Meyers, 482 F.2d 435 (2d Cir. 1973) (action alleging fraudulent diversion and misappropriation of funds of real estate

# INDEX FOR EXHIBIT "55"

## Supplemental Authorities Pursuant to Local Rule 7.05(A)(4)

I.   Defendants' Opposition to Erwin-Penland Motion for Summary Judgment

|     | *Fn.* | *Authority* |
|-----|-------|-------------|
| 1.  | 26, 29, 31 | 17 C.J.S. Contracts § 6(b) (rev. ed. 1999) |
| 2.  | 32. | Restatement (Second) of Contracts § 33(2) |
| 3.  | 33, 36 | Busching v. Griffin, 542 So.2d 860, 863 (Miss. 1989) |
| 4.  | 34. | Corbin on Contracts § 4.1 |
| 5.  | 37, 38, 40 | Corbin on Contracts § 4.3 |
| 6.  | 39. | Heyman Cohen & Sons, Inc. v. M. Lurie Woolen Co., 232 N.Y. 112, 133 N.E. 370, 371 (1921). |
| 7.  | 72. | http://www.networksolutions.com/whois-search/howsweetthesoundmemphis.com |
| 8.  | 73. | http://www.redorbit.com/news/business/1011670/verizon_wireless_names_three_premier_ad_agencies_for_nationwide_continuity/index.html |
| 9.  | 76. | 11 Moore's Federal Practice §56App.200[34] |
|     |     | http://www.gospelpundit.com/on-tv-bet-documentary-on-how-sweet-the-sound-6077 |
| 11. | 80. | Hall's Reclamation, Inc. v. APAC Carolina, Inc., 1996 U.S. App. LEXIS 33040 (4th Cir. 1996) (unpublished). |
| 12. | 84. | McCarthy on Trademarks and Unfair Competition § 31:76 at 31-169 (Supp. 12/2009) |
| 13. | 86. | Intellimedia Sports Inc. v. Intellimedia Corp., 1997 WL 398344, at *4 (T.T.A.B. May 20, 1997). |

COPY

# GospelPundit.com // a new blog for gospel lovers



- what's a pundit?
- who is EJ?
- faq's
- house rules
- contact me

- Home
- Christian
- Events
- Industry
- Music
- twitterROLL



FEATURES THE NEW SONG "COME TOGETHER NOW" - MUSIC CITY UNITES FOR HAITI PLUS "THE POWER OF ONE" - ISRAEL HOUGHTON, "HEALER" & KARI JOBE "BREAK YOUR KNEES" - FLYLEAF & MORE



## On TV: BET Documentary On "How Sweet The Sound"

by EJ on May.29, 2009 at 3:00 pm, under Events

Tune in to **BET** this Sunday at 11am, folks.

They're airing a one-hour documentary recapping the **2008** *How Sweet The Sound* nationwide choir competition. It should be good– featuring stories of the choirs, choir members and, of course, some good sangin'! 😄

:BET, how sweet the sound, on tv
4 comments for this entry:

1. *Tyrone*
   May 29th, 2009 on 3:29 pm

   FINALLY! It's been a long wait…I hope it's good.

2. *chris*
   May 29th, 2009 on 5:11 pm

   BET is doing it again!!! We will all be at church.

   I will just tape it

3. *ebonisun*
   May 30th, 2009 on 10:20 am

   I hope they are airing it another time-people still go to church on Sunday morning. I want to see it.

4. *SHEILA*
   May 31st, 2009 on 6:43 pm

   Just let me know why its put on the air on a Sunday in May, thought it was suppose to be put on in Febuary 2008.

## WRITE ON THE WALL:

Name (required field)

Email Address (required field, but won't be visible online)

Check this box to be notified when someone else comments to this post!

Heads up: To block spammers, wall posts with links in 'em require my approval, so it may take a minute for those comments to appear here.

Click Here to Post

## • Welcome to GospelPundit.com!

It's the NEW blog for gospel music lovers. Get comfy and don't be shy-- whether you check daily or it's your first time here, you're NEVER too late for the discussions!

Read the posts, leave some comments and ENJOY!

### Subscribe:

You'll get an email about the day's posts!

Enter Email Address          Click Here!



•

## • Recent Comments:

○ GiveAway: 21:03 Giving Away "Favor" Ringtone On Twitter: roscoe says "@so! U obviously didn't...
  "
○ ChitChat: Who Cares About Gospel Music Videos These Days?: MrsRkb says "For an up and coming artist a video can be a...

# INDEX FOR EXHIBIT "55"

*Supplemental Authorities Pursuant to Local Rule 7.05(A)(4)*

I.  Defendants' Opposition to Erwin-Penland Motion for Summary Judgment

|     | *Fn.* | *Authority* |
| --- | --- | --- |
| 1. | 26, 29, 31 | 17 C.J.S. Contracts § 6(b) (rev. ed. 1999) |
| 2. | 32. | Restatement (Second) of Contracts § 33(2) |
| 3. | 33, 36 | Busching v. Griffin, 542 So.2d 860, 863 (Miss. 1989) |
| 4. | 34. | Corbin on Contracts § 4.1 |
| 5. | 37, 38, 40 | Corbin on Contracts § 4.3 |
| 6. | 39. | Heyman Cohen & Sons, Inc. v. M. Lurie Woolen Co., 232 N.Y. 112, 133 N.E. 370, 371 (1921). |
| 7. | 72. | http://www.networksolutions.com/whois-search/howsweetthesoundmemphis.com |
| 8. | 73. | http://www.redorbit.com/news/business/1011670/verizon_wireless_names_three_premier_ad_agencies_for_nationwide_continuity/index.html |
| 9. | 76. | 11 Moore's Federal Practice §56App.200[34] |
| 10. | 77. | http://www.gospelpundit.com/on-tv-bet-documentary-on-how-sweet-the-sound-6077 |
| 11. | 80. | Hall's Reclamation, Inc. v. APAC Carolina, Inc., 1996 U.S. App. LEXIS 33040 (4th Cir. 1996) (unpublished). |
| 12. | 84. | McCarthy on Trademarks and Unfair Competition § 31:76 at 31-169 (Supp. 12/2009) |
| 13. | 86. | Intellimedia Sports Inc. v. Intellimedia Corp., 1997 WL 398344, at *4 (T.T.A.B. May 20, 1997). |

COPY

Page 1



LEXSEE 1996 US APP LEXIS 33040

**HALL'S RECLAMATION, INCORPORATED, Plaintiff-Appellee, v. APAC CAROLINA, INC., Defendant-Appellant.**

No. 95-2870

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

*1996 U.S. App. LEXIS 33040*

October 31, 1996, Argued
December 18, 1996, Decided

**NOTICE:** [*1] RULES OF THE FOURTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** Reported in Table Case Format at: *103 F.3d 117, 1996 U.S. App. LEXIS 36353.*

**PRIOR HISTORY:** Appeal from the United States District Court for the District of South Carolina, at Florence. Cameron McGowan Currie, District Judge. (CA-94-87).

**DISPOSITION:** AFFIRMED

**COUNSEL:** ARGUED: Mark I. Levy, HOWREY & SIMON, Washington, D.C., for Appellant.

Nathan Maxwell Crystal, Columbia, South Carolina, for Appellee.

ON BRIEF: Patricia L. O'Beirne, Timothy K. Armstrong, HOWREY & SIMON, Washington, D.C., for Appellant.

James B. Van Osdell, Cynthia Graham Howe, VAN OSDELL, LESTER, HOWE & RICE, P.A., Myrtle Beach, South Carolina, for Appellee.

**JUDGES:** Before WILLIAMS, MICHAEL, and MOTZ, Circuit Judges.

**OPINION**

PER CURIAM:

In this diversity action, APAC-Carolina, Inc. (APAC) appeals a $ 3.2 million jury verdict in favor of Hall's Reclamation, Inc. (Hall's) for fraud, breach of contract, breach of contract accompanied by a fraudulent act, and violation of the South Carolina Unfair Trade Practices Act (SCUTPA), *see S.C. Code Ann. § 39-5-20* (Law. Co-op. 1985). We affirm.

I.

Hall's, a trucking company, began providing trucking [*2] and hauling services for APAC, an asphalt paving contractor, in 1989. At that time, APAC hauled asphalt to job sites either by hiring outside trucking firms or by using its own in-house fleet of trucks. In June of 1991, after terminating its primary outside trucker, APAC requested that Hall's increase the amount of work it did for APAC. One month later, in July of 1991, APAC vice-president Andy Jones met with Gerald Hall, the owner of Hall's, to discuss the future relationship of the two companies. At that meeting, Jones told Hall that APAC had decided to get out of the trucking business and asked if Hall's would like to buy APAC's truck fleet. Hall declined, noting the age and disrepair of APAC's fleet. Later that year, on December 13, 1991, Jones offered Hall the following deal: if Hall's would purchase APAC's fleet of used trucks and dedicate its entire trucking operation to serving APAC's needs, APAC would guarantee Hall's $ 4 million worth of business each year. This time, Hall accepted Jones' offer.

Although the agreement was never reduced to writing, Hall's notes from the December 13, 1991 meeting were introduced at trial as documentation of the agreement. In addition, the [*3] evidence revealed that Jones orally confirmed the contract to several individuals. On

April 21, 1992, Hall's agreement to purchase APAC's trucks was finalized. The parties agreed that Hall's would pay $ 215,000 for both the purchase of the trucks and APAC's guarantee of $ 4 million per year in business.

Hall then proceeded to obtain financing for the transaction from NationsBank. As part of the loan application process, a NationsBank loan officer spoke with Jones by telephone and confirmed that APAC had guaranteed Hall's at least $ 4 million per year in hauling work as Hall had stated in a letter requesting the loan. NationsBank subsequently approved the loan.

On June 20, 1992, Hall's took possession of the APAC trucks. In addition to purchasing and repairing the used trucks, Hall's made several financial and personnel commitments in anticipation of the expected increase in APAC business. Specifically, Hall's hired drivers, administrative personnel, and a comptroller in preparation for APAC's guaranteed work. Hall's also leased a shop in Florence, South Carolina, near APAC's Florence asphalt plant.

APAC never fulfilled its promise to provide Hall's with $ 4 million of work per year. [*4] During the second half of 1992, Hall's received just $ 520,000 of work from APAC, a quarter of that due under the agreement. In all of 1993, Hall's received only $ 1,759,000 worth of APAC work, less than half of the amount guaranteed by APAC. The lack of work placed a financial strain on Hall's. In March 1994, the company closed its business and sold its trucks at auction to pay its creditors.

In January 1994, Hall's filed a complaint in South Carolina state court, alleging that APAC had committed fraud, breached its agreement to provide Hall's with $ 4 million of work per year, and engaged in unfair trade practices. APAC removed the case to the United States District Court for the District of South Carolina where the case was tried before a jury on August 15-18, 1995. The case was submitted to the jury on four claims: fraud; breach of contract; breach of contract accompanied by a fraudulent act; and violation of SCUTPA. The jury returned a verdict for Hall's on all four claims.

The jury awarded Hall's $ 2.4 million in compensatory damages on each of the claims for fraud, breach of contract, and breach of contract accompanied by a fraudulent act (which were not to be aggregated under [*5] the court's instructions); on the unfair trade practices claim, the jury awarded damages of $ 167,000, which were trebled under SCUTPA, *see S.C. Code Ann. § 39-5-140(a)* (Law. Co-op. 1985). The jury then heard additional evidence and received further instructions regarding punitive damages on the claims for fraud and breach of contract accompanied by a fraudulent act, and awarded punitive damages of $ 800,000 on each of those two claims (which again were not to be aggregated).

On September 21, 1995, the district court denied APAC's motions for judgment as a matter of law and for a new trial. The court also ruled that the damages awarded on the SCUTPA claim duplicated the damages awarded on the other claims. Accordingly, the district court entered an amended final judgment for Hall's in the amount of $ 3.2 million ($ 2.4 million in compensatory damages on each of the claims for fraud, breach of contract, and breach of contract accompanied by a fraudulent act, and $ 800,000 in punitive damages on the fraud and fraudulent-breach claims). APAC now appeals the district court's denial of its motions for judgment as a matter of law and for a new trial.

II.

On the fraud claim, APAC [*6] argues that the district court erred in denying its motion for judgment as a matter of law because Hall's failed to prove anything more than breach of contract at trial. * According to APAC, "Hall's proof of the alleged fraud consisted of nothing more than APAC's failure to give Hall's $ 4-million worth of business . . . ." (Appellant's Br. at 26.) We review the district court's denial of APAC's motion for judgment as a matter of law de novo. *See In re Wildewood Litigation, 52 F.3d 499, 502 (4th Cir. 1995); White v. County of Newberry, 985 F.2d 168, 172 (4th Cir. 1993).* In doing so, we must determine whether the jury's verdict is supported by substantial evidence in the record. *See White, 985 F.2d at 172.* That is, we must determine whether "*a* jury, viewing the evidence in the light most favorable to [Hall's], could have properly reached the conclusion reached by *this* jury." *Wildewood, 52 F.3d at 502* (emphasis added); *see also Austin v. Torrington Co., 810 F.2d 416, 420* (4th Cir.), *cert. denied, 484 U.S. 977, 98 L. Ed. 2d 487, 108 S. Ct. 489 (1987).*

> * APAC also argues that any breach of contract claim is barred by the Statute of Frauds. For the reasons set forth in Part III of this opinion, we need not address this issue.

[*7] In South Carolina, fraud is proven when a party establishes by clear, cogent, and convincing evidence the following elements:

> (1) a representation; (2) its falsity; (3) its materiality; (4) either knowledge of its falsity or a reckless disregard of its truth or falsity; (5) intent that the representation be acted upon; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the hearer's right to rely thereon; [and] (9) the hearer's consequent and proximate injury.

1996 U.S. App. LEXIS 33040, *

*M.B. Kahn Constr. Co. v. South Carolina Nat'l Bank, 275 S.C. 381, 271 S.E.2d 414, 415 (S.C. 1980); see also First State Sav. & Loan v. Phelps, 299 S.C. 441, 385 S.E.2d 821, 824 (S.C. 1989).* While "a mere violation of a contract does not support a fraud claim," *Duc v. Orkin Exterminating Co., 729 F. Supp. 1533, 1536 (D.S.C. 1990),* entering into a contract without the present intention of rendering performance under the contract does, *see Thomas & Howard Co. v. Fowler, 225 S.C. 354, 82 S.E.2d 454, 456 (S.C. 1954); see also Buzhardt v. Cromer, 272 S.C. 159, 249 S.E.2d 898, 900 (S.C. 1978)* (promisor liable for fraud where he had no present intention of performing the promise); *Woods v. South Carolina Highway Dep't,* [*8] *314 S.C. 501, 431 S.E.2d 260, 263 (S.C. Ct. App. 1993)* (summarizing South Carolina law concerning when the failure to honor a promise amounts to fraud because the promisor lacked the intention to perform at the time the promise was made). Thus, the critical inquiry for the jury was whether APAC's agreement to provide Hall's with $ 4 million worth of business per year was fraudulent when made. Although breach of an oral agreement does not establish fraud, *see Winburn v. Ins. Co. of North America, 287 S.C. 435, 339 S.E.2d 142, 146 (S.C. Ct. App. 1985),* breach of an oral agreement *coupled with other evidence* is sufficient to establish fraudulent intent not to perform the agreement, *see id.* ("Nonobservance of a promise may support an inference of a lack of intent to perform only when it is coupled with other evidence."); *see also Dailey Co. v. American Inst. of Marketing Systems, Inc., 256 S.C. 550, 183 S.E.2d 444, 445-46 (S.C. 1971).*

At trial, Hall's presented evidence establishing that APAC breached the oral agreement to provide Hall's with $ 4 million of business per year by providing only $ 520,000 of work during the second half of 1992 and only $ 1,759,000 of work during all of 1993. Hall's also presented [*9] "other evidence," *see Winburn, 339 S.E.2d at 146,* establishing that APAC never intended to perform the contract. Specifically, Hall's presented evidence that APAC represented to Hall's, NationsBank, and several Hall's employees that APAC was getting out of the trucking business, that Hall's would be APAC's trucker, and that APAC would guarantee Hall's $ 4 million of business per year, while never intending to get out of the trucking business or provide Hall's with $ 4 million of business per year. Furthermore, Hall's presented evidence establishing that APAC acquired trucks from its sister company in Texas and through the acquisition of a competitor, Ocean Lakes Construction Company, for the purpose of expanding its in-house trucking operation, while falsely representing to Hall's that it neither asked for nor wanted the trucks. Hall's presented evidence showing that these false representations were material

because they induced Hall's to purchase the APAC fleet and persuaded NationsBank to provide financing for the acquisition. Hall's also presented evidence that its reliance on APAC's promise of $ 4 million per year in business was reasonable because APAC was a large company [*10] that had provided its outside truckers with over $ 4 million in business in previous years. In addition, Hall's presented evidence that it incurred expenses purchasing the APAC fleet and preparing for the increased business, and that it lost money and was forced to go out of business because of APAC's fraud. Finally, Hall's presented evidence establishing that APAC failed to perform the contract from the contract's inception.

Viewing the evidence in the light most favorable to Hall's, *see Wildewood, 52 F.3d at 502,* we hold that the jury's verdict on the fraud claim is supported by substantial evidence. A jury could properly reach the conclusion that Hall's had proven by clear, cogent, and convincing evidence each element of fraud. Thus, we affirm the district court's denial of APAC's motion for judgment as a matter of law on the fraud claim.

Alternatively, APAC argues that it is entitled to a new trial on the fraud claim because the district court's instructions to the jury were flawed. According to APAC, the district court did not properly instruct "the jury of the need and the standards for distinguishing the" fraud and contract claims. (Appellant's Br. at 29.) Instead, APAC [*11] argues, "the court's instructions tended to gloss over the[] distinctions [between fraud and contract] and further amalgamated rather than disentangled the claims." (Appellant's Br. at 30.) We review the district court's denial of APAC's motion for a new trial for abuse of discretion. *See Wildewood, 52 F.3d at 502; Bristol Steel & Iron Works, Inc. v. Bethlehem Steel Corp., 41 F.3d 182, 186 (4th Cir. 1994).*

Upon reviewing the court's instructions to the jury, we find nothing in the instructions that "rose to the level of error, let alone prejudicial error." *Hardin v. Ski Venture, Inc., 50 F.3d 1291, 1296 (4th Cir. 1995).* First, APAC did not argue, and we do not find, that the jury instructions were not accurate. *Cf. id. at 1294* ("A set of legally accurate instructions . . . is generally adequate."). Indeed, APAC acknowledges the accuracy of the jury charge, conceding that the trial court charged that mere breach of contract did not constitute fraud and that nonperformance may warrant an inference of fraud only when coupled with "other evidence," and that the trial judge gave instructions on the burdens of proof applicable to fraud and to breach of contract.

Second, [*12] despite APAC's protestations, our review of the record reveals that the district court specifically instructed the jury on the distinctions between fraud and breach of contract. As to the burden of proof

for fraud, the court clearly stated that "in order to prevail in an action based upon fraud, the plaintiff must show [by] clear, cogent[,] and convincing evidence the following nine elements . . . ." (J.A. at 523.) Furthermore, the record reveals that the trial court carefully instructed the jury on the different elements of each claim. Indeed, to avoid confusion among the four claims, the court submitted the case with separate verdict forms for each claim. Finally, we note that APAC has failed to bring to our attention any evidence that the jury was confused by the district court's charge. As a result, we hold that the district court did not abuse its discretion in denying APAC a new trial. *See Hardin, 50 F.3d at 1296.*

III.

Because we affirm the district court's denial of APAC's motions on the fraud claim for judgment as a matter of law and for a new trial, we affirm the jury's award of $ 2.4 million in compensatory damages and $ 800,000 in punitive damages. *See Elders* [*13]  *v. Parker, 286 S.C. 228, 332 S.E.2d 563 (S.C. Ct. App. 1985)* (holding that plaintiff was entitled to punitive damages where evidence supported a finding of fraud). Because we affirm the jury's award to Hall's of compensatory and punitive damages on the ground that APAC

committed fraud-- and because those awards mirror the damage awards under the breach of contract and breach of contract accompanied by a fraudulent act claims -- we need not consider whether the district court erred in denying APAC's motions for judgment as a matter of law and for a new trial on those claims. *Cf.  Winant v. Bostic, 5 F.3d 767, 775 (4th Cir. 1993)* ("Having found that there was sufficient evidence to allow the fraud claim to go to the jury, we need not consider appellants' challenges to the denial of their motion for judgment as a matter of law on the other counts."); *Polo Fashions, Inc. v. Craftex, Inc., 816 F.2d 145, 149 (4th Cir. 1987)* ("We need not consider whether, under these circumstances, the plaintiff was entitled to an award of damages under the Lanham Act, for it clearly was entitled to such an award upon its common law claim of unfair competition and its claim under North Carolina's Unfair Trade [*14] Practices Act."); *Anderson v. West, 270 S.C. 184, 241 S.E.2d 551, 553 (S.C. 1978)* ("We hold that where a jury returns a general verdict involving two or more issues and its verdict is supported as to at least one issue, the verdict will not be reversed."). Accordingly, the judgment below is affirmed.

*AFFIRMED*