IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| HILL HOLLIDAY CONNORS COSMOPULOS, INC. d/b/a ERWIN-PENLAND, )<br>)<br>)<br>)<br>    Plaintiff, )<br>)<br>vs. )<br>)<br>JEFFREY GREENFIELD and )<br>1st APPROACH, LLC, )<br>)<br>    Defendants, and )<br>    Third-Party Plaintiffs, )<br>)<br>vs. )<br>)<br>CELLCO PARTNERSHIP d/b/a )<br>VERIZON WIRELESS, and )<br>JOSEPH A. ERWIN, )<br>)<br>    Third-Party Defendants. ) | Case Number: 6:08-CV-3980-GRA |

**MEMORANDUM IN REPLY TO THIRD-PARTY PLAINTIFF'S OPPOSITION TO THIRD-PARTY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

In his response to Verizon Wireless' Motion for Summary Judgment, ("Greenfield's Verizon Wireless Response"), Greenfield only addresses the trade secret and constructive trust claims. Rather than address all four claims upon which Verizon Wireless moved for summary judgment, he opts to confuse the issues by incorporating his responses to Erwin ("Greenfield's Erwin Response") and Erwin-Penland ("Greenfield's EP Response") into Greenfield's Verizon Wireless Response. All three responses are filled with unsupported factual allegations and blatant mischaracterizations of the law, and the facts and arguments conveniently change depending on which party he is addressing.

1

In short, in a last-ditch effort to avoid summary judgment on his claims against Verizon Wireless, Greenfield attempts to distract the Court from the factual simplicity that is fatal to his case against Verizon Wireless. As set forth in Verizon Wireless' Motion, the simple and pertinent undisputed facts are that Erwin-Penland invited Greenfield to an April 26, 2006 unsolicited pitch of a televised gospel choir competition to Verizon Wireless without its knowledge; Greenfield spoke at the April pitch for less than five minutes about "how production of the competition for potential television could be used to exploit local marketing opportunities," (Greenfield's Summary Judgment Motion at 7, found at Docket No. 105); Verizon Wireless had no business relationship with Greenfield at any time; Greenfield never requested a contract, nondisclosure agreement, or any form of compensation (whether monetary payment or public recognition) from Verizon Wireless in relation to the gospel choir competition concept; Greenfield has never assisted in the execution of any version of "How Sweet the Sound" ("HSTS"); and Verizon Wireless had no knowledge of any alleged relationship between Greenfield and Erwin-Penland. Greenfield has not refuted any of these facts and Verizon Wireless is entitled to judgment as a matter of law.

In contrast, Greenfield spills considerable ink attempting to attribute various actions and knowledge to Verizon Wireless while citing e-mails, conference calls, and other communications to which Verizon Wireless was not a party, all in an attempt to muddy the factual landscape of his suit against Verizon Wireless. Greenfield's Verizon Wireless Response is also littered with immaterial "disputed" facts. For example, he lists the following "hotly disputed" facts: what "formula" should be attributed to Greenfield's contributions, what "formula" should be attributed to Erwin-Penland's contributions, and

2

what "formula" should be attributed to Verizon Wireless' contributions to HSTS. (Greenfield's Verizon Wireless Response at 3). What formula can be attributed to each party is immaterial to the ultimate legal conclusions of whether or not a trade secret exists and, if so, whether or not Greenfield took the requisite steps to protect any such trade secret. Greenfield also notes that whether a trade secret exists is a "hotly disputed" fact—again, this is not a disputed fact but an ultimate legal conclusion that the court may properly decide on a summary judgment motion.

Finally, Greenfield makes unsupported factual allegations, such as his broad assertion that Verizon Wireless has "profited mightily" from HSTS. (Id. at 1). For this proposition, he cites to a deck speculating on the maximum incremental revenue possible if Verizon Wireless captured over 1.5 million additional subscribers in various markets. (Id. at 1 n.3). Not only has Greenfield presented no evidence to support the figures contained therein, Verizon Wireless employees have testified that financial gains from this expensive program are speculative, at best. (Rossi Dep. at 71:15–72:6; Deering Dep. at 63:16–64:9; Duval Dep. at 31:4–15, all found at Docket No. 133).

## ARGUMENT

Where, as here, "there is no genuine issue of material fact . . . the movant is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). Greenfield has not presented any evidence demonstrating a genuine issue of material fact. Instead, Greenfield boldly contends that every element of trade secret law must be submitted to a jury.

It is well settled, however, that a trade secret claim involves mixed questions of law and fact. Where the facts are not in dispute, the question for the court is whether the

3

facts satisfy a particular legal standard, such as the standard for trade secret status. Corroon & Black-Rutters & Robert v. Hosch, 325 N.W.2d 883, 885 (Wisc. 1982); see also Ornelas v. United States, 517 U.S. 690, 696–97 (1996) (noting that when the facts and rule of law are undisputed in a mixed question of fact and law, the court must merely apply the law to the established facts).  Moreover, trade secret claims are often resolved by the Court on a motion for summary judgment.  See, e.g., IVS Hydro, Inc. v. Robinson, 93 Fed. App'x 521, 527 (4th Cir. 2004) (affirming grant of summary judgment where it was "readily apparent that no trade secret existed" because the information was widely known and inadequate steps were taken to protect the alleged trade secret); Telecom Am. v. Oncor Communs., 31 Fed. App'x 809, 814 (4th Cir. 2002) (affirming grant of summary judgment where the plaintiff did not make reasonable efforts to keep the information secret and did not prove that the defendant engaged in improper means).

**I.     Greenfield has not Established the Elements of a Trade Secret**

    **A.     Greenfield has not defined his alleged trade secrets**

Despite more than forty-five pages of briefing, Greenfield attempts, yet again, to define his trade secrets, without success.  Notably, Greenfield admits that one "must articulate protectable trade secrets with specificity or suffer dismissal of his claim." Nilssen v. Motorola, Inc., 963 F. Supp. 664, 672 (N.D. Ill. 1997).  Despite this admission, and after nine months of discovery, Greenfield has yet to produce any documents or testimony that defines his alleged trade secret with any specificity.

Greenfield apparently is not seeking protection for a branded entertainment concept, as he claimed in his Third-Party Complaint, (Compl. ¶¶ 7, 12), and he is not seeking protection for the concept of an "American Idol" style singing competition, as he

4

claimed in his deposition, (Greenfield Dep. at 82:24–83:5, found at Docket No. 100). Rather, now he claims that:

> it was Greenfield's genius in selecting and identifying this perfect branding opportunity for Verizon: the concept of a national gospel choir competition that *by its very nature* personally involved tens of thousands of the targeted AA consumers; and within that format, conceiving and developing a series of specific steps needed to build brand identification and loyalty.

(Greenfield's Verizon Wireless Response at 8). Such a general, undefined description of a gospel choir competition targeting the African American population does not meet the degree of specificity Greenfield acknowledges he must meet. Even assuming a marketing strategy could be considered trade secret material, Greenfield has utterly failed to carry his burden of presenting facts clearly specifying any actual trade secret, and Verizon Wireless is entitled to summary judgment for this reason alone.

### B.     Greenfield's alleged trade secret has no independent economic value

Greenfield correctly notes that where a trade secret is presented unsolicited, "some modest degree of true novelty is required, or it cannot be said that the submitted secret has potential *independent* economic vale." (Id. at 9). Greenfield does not attempt to argue that his alleged trade secret has "some modest degree of true novelty," and for good reason. It is undisputed that all of the elements of the alleged trade secret included in the April Deck had been well known in the industry for many years before the unsolicited pitches. Instead, Greenfield first presents the incredible notion that this case does not involve an unsolicited submission of ideas. It is undisputed, however, that Verizon Wireless never solicited Erwin-Penland or Greenfield to develop the gospel choir competition concept. The fact that Joe Erwin initially approached Greenfield does not change the fact that Verizon Wireless did not solicit the December and April pitches,

5

did not ask Greenfield to attend either pitch, and had no knowledge that he would be attending the April pitch. Because he cannot show that his alleged trade secret has any degree of true novelty or that Verizon Wireless solicited his trade secret submission, Greenfield cannot show his alleged trade secret has any specific independent value.

Greenfield next attempts to portray his alleged trade secret as having *potential economic value*. Even assuming that the alleged trade secrets were novel, Greenfield has presented no credible evidence to support the sweeping claim that the trade secrets confer an advantage to Verizon Wireless over competitors in the African American community. Rather, Greenfield baldly asserts that Verizon Wireless somehow obtained an increase in sales and market share from its competitors without pointing to a single document or example of those increases.[1] Indeed, the only evidence Greenfield presents in support of this claim is an e-mail from a Verizon Wireless executive that he liked the idea. From that e-mail, Greenfield takes the extraordinary and unsubstantiated leap that HSTS was perfect for Verizon Wireless and it wanted the program before competitors got it.[2] Of course, Greenfield overlooks the fact that the HSTS programs that Verizon Wireless ultimately ran were vastly different from the program that was pitched to that executive.

Finally, Greenfield's citation of numerous trade secret cases does nothing to prevent summary judgment. Greenfield cites an extremely similar case in which the plaintiff made an unsolicited pitch for a family situation comedy involving an African American family starring Bill Cosby and then sued NBC for trade secret

---

[1] Taking Greenfield's argument to its logical conclusion, any Verizon Wireless advertisement that "seeks to increase both sales and market share" could be considered a trade secret.

[2] Greenfield also attempts to bolster his claim of potential economic value by confining the relevant trade to the mobile phone industry. The attempt is specious considering that the alleged trade secrets were created in connection with the pitch of a television series gospel choir competition to Captain D's—a restaurant chain. (Greenfield's EP Response at 12).

6

misappropriation when it began airing "The Cosby Show." Murray v. NBC, Inc., 671 F.Supp. 236 (S.D.N.Y. 1987). The court granted summary judgment in favor of NBC, finding that the idea was not novel since the plaintiff merely combined ideas that had been circulating the industry for years and Bill Cosby had been associated with television programs in the past. Id. at 241. Murray directly refutes Greenfield's claims here.[3]

Greenfield insists that this case is more like All Pro Sports Camp, Inc. v. Walt Disney Co., 727 So. 2d 363 (Fla. Ct. App. 1999) than Murray. This is not the case. Disney involved a state court motion to dismiss state claims pursuant to *res judicata* after the federal court entered summary judgment on the federal claims and dismissed the state claims. Disney, 727 So. 2d at 365. The state appellate court reinstated the state claims dismissed by the state trial court after finding that the plaintiff submitted a business proposal that both parties understood contained trade secrets and the parties subsequently entered into a joint venture agreement. Id. at 366. Thus, Disney is easily distinguishable on the facts. Here, Verizon Wireless was given no notice that the December, April, and June decks contained alleged trade secrets and Verizon Wireless never entered into a joint venture agreement with Greenfield. This Court should consider Murray as the relevant case for determining novelty of unsolicited pitches and whether a party can effectively claim ownership over an idea to bolster a non-existent trade secret claim.[4]

---

[3] Far from attempting to distinguish Murray from the instant case, Greenfield argues only that this case "is far closer to Nadel [v. Play-by-Play Toys and Novelties, Inc., 208 F.3d 368 (2d Cir. 2000)], than it is to Murray. (Greenfield's Verizon Wireless Response at 9). Greenfield is wrong. In Nadel, the plaintiff sued the defendant for breach of contract, quasi contract, and unfair competition based on defendant's alleged use of plaintiff's toy idea without paying compensation. Nadel, 208 F.3d at 371. Notably, the case did not involve misappropriation of trade secrets. The court held that *contract-based claims* require only a showing that the disclosed idea was novel to the buyer alone. Id. at 380. In fact the court specifically noted that "[b]y contrast, misappropriation claims require that the ideas at issue be original and novel in absolute terms. This is so because unoriginal, known ideas have no value as property." Id.

[4] Greenfield asks this Court to consider his claim under other highly distinguishable cases as well, like Nadel, discussed *supra* note 3, and Apfel v. Prudential-Bache Sec., Inc., where the plaintiff disclosed his

7

### C.     Greenfield has not protected his alleged trade secret

Even if the Court were to deny summary judgment for the lack of a trade secret, it should grant summary judgment nonetheless in that the undisputed facts demonstrate that Greenfield failed to take reasonable steps to protect any such secret.  As discussed above, it is completely proper for the Court to decide this issue because the facts are not in dispute.  As a matter of law, the steps taken by Greenfield were inherently unreasonable.

As an initial matter, it is undisputed that Greenfield failed to request that Verizon Wireless or any of the various agencies present at the April 2006 pitch execute a nondisclosure agreement.  This fact alone is fatal to Greenfield's reasonableness claims.  It is well-settled under South Carolina law that the lack of a confidentiality agreement suggests the absence of the mandatory understanding of confidentiality required to protect a trade secret.  Lowndes Prods., Inc. v. Brower, 191 S.E.2d 761, 765–66 (S.C. 1972); see also Wilkes v. Pioneer Am. Ins. Co., 383 F. Supp. 1135, 1141 (D.S.C. 1974) (noting "that at no time did the plaintiffs make or allow the disclosure of the plan . . . without first obtaining nondisclosure agreements").

Greenfield's unconvincing distortion of case law from other federal districts is a blatant attempt to shift onto Verizon Wireless a confidentiality burden that clearly belongs to him.  Greenfield incorrectly contends that Verizon Wireless had the responsibility to take measures to protect his alleged trade secret by initiating and executing the nondisclosure agreement that Greenfield neglected to request.  (Greenfield's Verizon Wireless Response at 11 & n.52, 13–14).  For this proposition,

---

idea only after executing a confidentiality agreement with the defendant, and, then subsequently entered into another agreement wherein the defendant agreed to pay a stipulated price for the idea's use.  616 N.E.2d 1095, 1095–96 (N.Y. Ct. App. 1993).  Verizon Wireless has never entered into a confidentiality or any other agreement regarding rights or payment with Greenfield.

Greenfield relies on La Calhene, Inc. v. Spolyar, 938 F. Supp. 523 (W.D. Wis. 1996), a case that cannot even be compared to the instant facts in any credible manner.

In Spolyar, the plaintiff company developed technology used in the pharmaceutical industry, and sued defendant, the former COO of the company, for misappropriating company trade secrets and thus violating the non-competition clause of his employment contract after his resignation. Spolyar, 938 F. Supp. at 526. In that case, and not here, the company maintained a policy of restricting access to confidential company information, included a confidentiality provision in the employment contract of the defendant and other high ranking employees, and developed a confidentiality licensing policy. Id. at 530.

Based on this case, Greenfield incredibly concludes that "precautions to protect the secrecy [of HSTS] actually fall within [Verizon Wireless'] area of responsibility" and "it would be inequitable if Erwin-Penland or VZW could now escape liability to Greenfield for their misdeeds because of EP or VZW's own failings in preserving the secrecy of HSTS." (Greenfield's Verizon Wireless Response at 11, 14). Setting aside the glaring factual distinctions, Greenfield cannot support the theory that Verizon Wireless had an obligation to protect Greenfield's trade secrets. Unlike Spolyar, there was no employee-employer relationship and the case does not stand for the extremely broad proposition that a party with no relationship to another has an obligation to protect unknown trade secrets. In reality, Greenfield was the only person in a position to protect any alleged trade secrets as the party with knowledge that they existed. And Greenfield knows this well, since his company, Buzznation, has used nondisclosure agreements in other speculative pitches. (Hughes Dep. at 325:10–15, attached hereto as **Ex. 1**).

Realizing that clear precedent regarding confidentiality agreements precludes any claim of reasonableness, Greenfield instead desperately contends that he attempted to protect his trade secrets by: placing a copyright notice on the last page of the deck; identifying himself as a co-creator in the deck; including confidential legends on materials submitted to Erwin-Penland, and registering a televised gospel choir competition with the Writers Guild of America.[5]  (Greenfield's Verizon Wireless Response at 12–15); (Greenfield Aff. ¶ 8, found at Docket No. 105).  These contentions are unavailing.

First and foremost, Greenfield has no response to the black letter law cited by Verizon Wireless demonstrating that a copyright notice is insufficient to protect a trade secret.  Moreover, Greenfield's alleged use of confidentiality legends on documents submitted to Erwin-Penland is irrelevant to his claim against Verizon Wireless.  None of the documents presented to Verizon Wireless contained these legends or any reference to the term "trade secret."  Greenfield had clearly used such legends in the past and could have easily placed them in documents presented to Verizon Wireless, but elected not to do so.  Greenfield cannot now claim that he relied on Erwin-Penland or Verizon Wireless to protect his rights.

Specifically, Greenfield's claim that he relied on Erwin-Penland's Master Advertising Agreement with Verizon Wireless, which he alleges prohibited *all* Verizon

---

[5] The claim that Greenfield protected his trade secrets by registering "How Sweet the Sound" with the Writers Guild of America ("WGA") as an "'American-Idol' style competition" is similarly unpersuasive. Clearly such a registration, that protects only "written ideas specifically intended for radio, television and film, video cassettes/discs, or interactive media," WGAW Registry FAQ, http://www.wgawregistry.org (last visited Mar. 22, 2010), cannot protect Greenfield's trade secrets as he does not "claim trade secret status for the concept of an 'American Idol' style televised singing competition," (Greenfield's Verizon Wireless Response at 7).  In fact, the Writers Guild of America website makes clear that registration does not provide any legal protection, but merely "evidence for the material that establishes a date for the material's existence."  WGAW Registry FAQ, *supra*.

10

Wireless agencies from discussing Verizon Wireless marketing plans, is both particularly disingenuous and fatal to his claim. (Greenfield's Verizon Wireless Response at 12 & n.57). Even assuming that such reliance was reasonable based on Greenfield's lack of pre-discovery knowledge of such agreements, these agreements exclusively relate to vendor confidentiality duties and not Verizon Wireless' ability to disclose marketing plans it has been pitched. Furthermore, the agreement clearly states that all creative materials and intellectual property created for Verizon Wireless immediately become and remain the exclusive property of Verizon Wireless, which is fatal to his entire claim. (2004 Master Advertising Agreement § 13.2.1, found at Docket No. 120.)

> **D. Greenfield has failed to show that Verizon Wireless misappropriated his trade secret**

In the limited space that he devotes to actual misappropriation, Greenfield contends that "if VZW had *reason to know* that Greenfield held rights to HSTS trade secrets, it is liable for its failure to acquire those rights by 'proper' means, i.e., by making payment to the trade secret holder by paying to license or use those rights." (Greenfield's Verizon Wireless Response at 14). Greenfield then claims that Verizon Wireless "has predicated its entire defense on suppressing the single most damaging, undeniable, and uncontroverted fact," (id. at 2): mainly, Verizon Wireless' alleged knowledge from slide 8 of the April Deck that "'How Sweet the Sound' is a local marketing and television concept conceived by Erwin-Penland and 1st Approach as a reality program that taps into the soul of America with a celebration of music and spirituality."[6] Setting aside the fact

---

[6] Greenfield also points to a May 16, 2006 e-mail from Allen Bosworth to John Harrobin and Suzy Deering as evidence of Verizon Wireless' "conscious disregard" of his rights. (Greenfield's Verizon Wireless Response at 5 & n.22). Greenfield is listed as jeff@1stapproach.com and is buried along with 9 other people in the "cc:" line of the e-mail. Verizon Wireless employees did not respond to this e-mail, and, recognizing the e-mail as solely an Erwin-Penland e-mail, Suzy Deering forwarded the e-mail to other

11

that Verizon Wireless quoted this exact language in its summary judgment brief (Verizon Wireless Motion at 7, 20, found at Docket No. 100), the limited discussion of this slide reflects Verizon Wireless' proper analysis of a misappropriation claim. Greenfield's claim that Verizon Wireless' alleged actual knowledge is sufficient for misappropriation is an incredible mischaracterization of the law.

"A trade secret endures and is protectable and enforceable until it is disclosed or discovered by proper means." S.C. Code Ann. § 39-8-30(A). Without citation to any authority, Greenfield takes the liberty to define "proper means," a term not defined in the statute, solely as "making payment to the trade secret holder by paying to license or use those rights." (Greenfield's Verizon Wireless Response at 14). In contrast, the South Carolina statute limits "improper means" to "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, duties imposed by the common law, statute, contract, license, protective order, or other court or administrative order, or espionage through electronic or other means." S.C. Code Ann. § 39-8-20(1).

Greenfield has not pointed the Court to a single instance in which Verizon Wireless engaged in "improper means" in relation to Greenfield's alleged trade secret. In fact, the undisputed fact is that Greenfield and Erwin-Penland jointly presented and disclosed any alleged trade secrets to Verizon Wireless on their own accord, without a confidentiality agreement and without any notice that the April Deck contained any trade secrets. (Third-Party Compl. ¶ 29); (Greenfield Dep. at 183:17–21, found at Docket No.

---

Verizon Wireless employees saying: "Here's the run down that EP put together regarding How Sweet the Sound." See VZW000076154, Ex. 52 to Greenfield's Verizon Wireless Response. Thus Greenfield is asking this Court to transform a group e-mail sent from Erwin-Penland to Verizon Wireless to which Verizon Wireless did not respond into evidence of Verizon Wireless' apparent "conscious disregard of Greenfield's rights." (Greenfield's Verizon Wireless Response at 5 & n.22).

100); (April Deck, found at Docket No. 24). Verizon Wireless thus directly discovered any alleged trade secrets through proper means. (Verizon Wireless' Motion at 21–22).

In Greenfield's EP Response, he actually concedes that Verizon Wireless had no knowledge of Erwin-Penland's alleged improper means:

> Bosworth concealed from Greenfield the fact that he had modified Greenfield's original deck, *eliminating all references to 1st Approach*, and then presented the modified deck to VZW's Joe Saracino on December 29, 2005 as if it were EP's sole and exclusive work product, trade secret, and marketing plan. At various other times in 2006, 2007, and 2008, EP repeated the process, passing off Greenfield's work as exclusively their own.

(Greenfield's EP Response at 8 (footnotes omitted)); see also (id. at 12 ("EP's denials defy the reality that valuable trade secret rights were created in the first pitch deck that Greenfield sent to EP on November 4, 2005, and which EP re-purposed, without attribution to 1st Approach, into the December 29, 2005 pitch deck that made its way to John Stratton's desk at VZW. . . . EP began deceptively appropriating Greenfield's intellectual property and passing it off to VZW as its own creation on December 29, 2005.")); (id. ("To cash in on HSTS, EP has clearly deceived both VZW and the USPTO.")); (Greenfield's Erwin Response at 11 ("Erwin . . . fail[ed] to inform VZW and EP of Mr. Erwin's express and implied promises that Erwin made on behalf of EP to Greenfield—i.e., that Greenfield would be compensated for VZW and EP's commercial use and exploitation of Greenfield's Trade Secrets and for Greenfield's substantial work in creating and developing the How Sweet the Sound campaign.")). Thus, Greenfield himself has conceded that Verizon Wireless did not know and had no reason to know that any alleged trade secrets were misappropriated by Erwin-Penland.

Because Greenfield still fails to identify a protectable trade secret under the South Carolina law and has not shown that Verizon Wireless misappropriated these alleged trade secrets, as defined by statute, this Court should grant summary judgment in favor of Verizon Wireless on Greenfield's misappropriation of trade secrets claim.

## II.     Constructive Trust

Citing Wolfe v. Wolfe, 56 S.E.2d 343 (S.C. 1949), Greenfield asserts that this Court should establish a constructive trust for his benefit based on fraud or breach of fiduciary duty. Greenfield has not asserted a claim of fraud against Verizon Wireless and Greenfield has set forth no set of facts that suggests Verizon Wireless engaged in any conduct nearing fraud.[7]

In Greenfield's Erwin Response, he asserts that Verizon Wireless owed him a fiduciary duty that "arose from its actual knowledge acquired *at least* as early as April 26, 2006 that Greenfield was the co-creator of HSTS." (Greenfield's Erwin Response at 13). Unfortunately for Greenfield, actual knowledge of authorship is not an element of a breach of fiduciary claim. Rather, Greenfield must show that he imposed a special confidence in Verizon Wireless, which was acting not on its own behalf, but in his interests. See Pitts v. Jackson Nat'l Life Ins. Co., 574 S.E.2d 502, 507 (S.C. Ct. App. 2002); Island Car Wash, Inc. v. Norris, 358 S.E.2d 150, 152 (S.C. Ct. App. 1987).

There is absolutely no foundation for Greenfield's alleged belief that Verizon Wireless was not acting in its own interests, but rather in the interests of Greenfield.

---

[7] Even assuming the truth of Greenfield's assertion that "VZW had actual knowledge on April 26, 2006 that Greenfield was co-creator of the trade secrets contained in HSTS," (Greenfield's Verizon Wireless Response at 14), Greenfield completely ignores his burden to establish *in his pleadings* "(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of the falsity; (5) his intent that it should be acted upon by the person; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; and (9) his consequent and proximate injury" against Verizon Wireless. Mutual Sav. & Loan Ass'n v. McKenzie, 266 S.E.2d 423, 425 (S.C. 1980).

14

Erwin-Penland and, later, Greenfield approached Verizon Wireless with unsolicited pitches of a "perfect branding opportunity . . . to build brand identification and loyalty" in the African American demographic. (Greenfield's Verizon Response at 8). Greenfield's argument can thus be reduced to: 1) he developed a marketing strategy to specifically assist Verizon Wireless in gaining customers in a specific demographic, 2) the marketing strategy was presented to Verizon Wireless in an unsolicited pitch in which he participated for less than five minutes, and 3) during this presentation he believed that Verizon Wireless was acting on his behalf rather than in its own interests. Even if Greenfield truly believed this inconceivable argument, he can present no evidence that Verizon Wireless was aware of this misplaced expectation, as required under the law. See Burwell v. S.C. Nat'l Bank, 340 S.E.2d 786, 790 (S.C. 1986).

## CONCLUSION

Based on the foregoing, Verizon Wireless respectfully requests that the Court grant Verizon Wireless' motion for summary judgment on all claims against Verizon Wireless.

This the 24th day of March, 2010.

*[signature]*

_____
Robert A. Muckenfuss
McGuireWoods, LLP
100 North Tryon Street, Suite 2900
P. O. Box 31247
Charlotte, NC  28231-1247
T:  704.343.2000
F:  704.343.2300
Email: rmuckenfuss@mcguirewoods.com
Attorneys for Verizon Wireless

15

## CERTIFICATE OF SERVICE

      This is to certify that I have this day served a copy of the foregoing **MEMORANDUM IN REPLY TO THIRD-PARTY PLAINTIFF'S OPPOSITION TO THIRD-PARTY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** as indicated below, upon the below named persons:

      (**X**)    Served via CM/ECF e-mail Service only

      (  )    By delivering a copy personally

      (  )    By leaving a copy at the office of such person

      (  )    By telecopying said papers as indicated below

      (  )    By depositing a copy of same in the United States Mail, postage prepaid, addressed as shown below and by electronic mail

| | |
|---|---|
| Brenda R Sharton<br>Neil Thomas Smith<br>Goodwin Procter<br>Exchange Place<br>53 State Street<br>Boston, MA 02109<br>617-570-1214<br>Email: bsharton@goodwinprocter.com<br>       nsmith@goodwinprocter.com<br>*Attorneys for Plaintiff* | Bernie W. Ellis<br>Rita McKinney<br>McNair Law Firm<br>P.O. Box 447<br>Greenville, SC 29602<br>Email:<br>bellis@mcnair.net<br>rmckinney@mcnair.net<br>*Attorneys for Plaintiff* |
| Phillip Jeffrey North<br>P Jeffrey North Law Office<br>PO Box 7525<br>Hilton Head, SC 29938<br>843-341-5200<br>Email: attorney@pjnorth.com<br>*Attorney for Jeffrey Greenfield and 1st Approach LLC* | Frederick J. Jekel<br>Paul J. Doolittle<br>Jekel-Doolittle, LLC<br>P.O. Box 2579<br>Mt. Pleasant, SC 29465<br>Email: fritz@j-dlaw.com<br>       paul@j-dlaw.com<br>*Attorney for Jeffrey Greenfield and 1st Approach LLC* |

      This the 24th day of March, 2010.

*/s/ Robert A. Muckenfuss*

--------------------------------

                Robert A. Muckenfuss